UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| NEW YORK LEGAL ASSISTANCE GROUP,<br><br>                    Plaintiff,<br><br>         -against-<br><br>THE SOCIAL SECURITY ADMINISTRATION,<br><br>                  Defendant. | **Civil Action No. 23 Civ. 9363**<br><br>**Oral Argument Requested** |

## <u>MEMORANDUM OF LAW IN SUPPORT OF<br>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

NEW YORK LEGAL ASSISTANCE GROUP
100 Pearl Street, 19th Floor
New York, NY 10004
Telephone: (212) 613-5000

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ............................................................................................................2

    I.    NYLAG Uses FOIA to Help Individuals with Very Low Incomes Access Benefits Administered by SSA. ...............................................................................2

    II.    NYLAG Regularly Seeks, and Needs, Waivers of Fees under FOIA. ...................4

    III.    SSA's Regulations Require It to Grant Fee Waivers to Requesters like NYLAG When Waiver Is in the Public Interest. ...................................................5

    IV.    SSA Repeatedly Denied NYLAG's FOIA Fee Waiver Requests. .........................7

    V.    SSA Denies Virtually All Fee Waiver Requests....................................................12

    VI.    SSA's Fee Waiver Practices Reveal an Informal Policy of Blanket Fee Waiver Denials............................................................................................................14

PROCEDURAL HISTORY...............................................................................................18

ARGUMENT ..............................................................................................................20

I.    Summary Judgment Should be Granted Where, As Here, the Material Facts are Undisputed. ......................................................................................................20

II.    SSA is Liable to NYLAG Because It Unlawfully Denied NYLAG's Fee Waiver Requests. ......................................................................................................21

    A.    NYLAG Was Entitled to Fee Waivers Under SSA's Fee Waiver Regulation. ........................................................................................................22

        i.    Disclosure of NYLAG's Requested Information Was Likely to Contribute Significantly to Public Understanding of SSA's Operations and Activities. ...............................................22

        ii.    Disclosure of the information NYLAG requested is not primarily in NYLAG's commercial interest. .................................24

        iii.    SSA's conclusory, boilerplate denials contained insufficient reasoning. ...........................................................................................25

    B.    SSA's Unlawful Denials of NYLAG's Fee Waiver Requests Violated FOIA. ............................................................................................................27

    C.    In the Alternative, NYLAG Can Challenge SSA's Unlawful Denials of Its Fee Waiver Requests under the APA. ................................35

III.    NYLAG Is Entitled to Summary Judgment as to SSA's Unlawful Blanket Denials of Virtually All Fee Waiver Requests.................................................................38

    A.    SSA's Pattern or Practice of Denying Fee Waiver Requests Without Meaningful Review Violates FOIA............................................39

i

B.    SSA's Policy of Denying Fee Waiver Requests Should Be Set Aside Under the APA. ...............................................................................45

i.    SSA's Policy of Denying Fee Waivers, even if Informal, Is a Final Agency Action. .................................................................45

ii.    SSA's Policy of Fee Waiver Denials Is Arbitrary and Capricious and Contrary to Law. ....................................................47

CONCLUSION...........................................................................................................................49

# TABLE OF AUTHORITIES

## Cases

*Am. Soc'y for the Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*, 2021 WL 1163627 (S.D.N.Y. Mar. 25, 2021), *aff'd*, 60 F.4th 16 (2d Cir. 2023) .......... 40

*Am. Soc'y for the Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*, 60 F.4th 16 (2d Cir. 2023) ............................................................................... 39

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................................... 35

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ........................................... 21

*Carney v. U.S. Dep't of Just.*, 19 F.3d 807 (2d Cir. 1994) ...................................................... 20, 25

*Cedars Nursing & Convalescent Ctr., Inc. v. Aetna Life & Cas. Ins. Co.*, 472 F. Supp. 296 (E.D. Pa. 1979) ............................................................................................ 35

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................ 20

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235 (D.C. Cir. 2017 ................................................................................................................... 39

*Coleman v. Drug Enf't Admin.*, 714 F.3d 816 (4th Cir. 2013) ...................................................... 25

*De La Mota v. U.S. Dep't of Educ.*, No. 02-cv-4276, 2003 WL 21919774 (S.D.N.Y. Aug. 12, 2003) ............................................................................................... 46

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) .............................................................. 37

*Diapulse Corp. of Am. v. Food & Drug Admin. of Dep't of Health, Educ. & Welfare* F.2d 75 (2d Cir. 1974) ....................................................................................... 28, 41

*Doyle v. U.S. Dep't of Homeland Sec.*, 331 F. Supp. 3d 27 (S.D.N.Y. 2018), *aff'd*, 959 F.3d 72 (2d Cir. 2020) ...................................................................................... 40

*Eudey v. CIA*, 478 F. Supp. 1175 (D.D.C. 1979) ............................................................. 38

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118 (2d Cir. 2020) ..................... 36, 49

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ................................................... 21

*Forest Guardians v. U.S. Dep't of Interior*, 416 F.3d 1173 (10th Cir. 2005) ............................... 24

*Friends of the Coast Fork v. U.S. Dep't of the Interior*, 110 F.3d 53 (9th Cir. 1997) ............ 25, 34

*Garland v. Ming Dai*, 593 U.S. 357 (2021) ................................................................... 37

*Hajro v. U.S. Citizenship & Immigr. Servs.*, 811 F.3d 1086 (9th Cir. 2016) ............................... 39

*Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525 (D.C. Cir. 1990) ............... 46

*Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010) ................................................................ 20

*Int'l Refugee Assistance Project, Inc. v. U.S. Citizenship & Immigr. Servs.*, 551 F. Supp. 3d 136 (S.D.N.Y. 2021) ..................................................................................... 40

*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140 (2d Cir. 2008) ................................................ 20

*Jud. Watch, Inc. v. Gen. Servs. Admin.*, No. 98-cv-2223, 2000 WL 35538030 (D.D.C. Sept. 25, 2000) ........................................................................................................ 25, 36

*Jud. Watch, Inc. v. Rossotti* ("*Jud. Watch I*"), 326 F.3d 1309 (D.C. Cir. 2003) ............. 24, 28, 34

*Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.* ("*Jud. Watch II*"), 895 F.3d 770 (D.C. Cir. 2018) ........................................................................................................... 39, 42

*Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129 (2d Cir. 2022) ............................ 36, 37

*Larson v. CIA.*, 664 F. Supp. 15 (D.D.C. 1987), *aff'd*, 843 F.2d 1481 (D.C. Cir. 1988) ............. 38

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........................................................................................................ 47, 48

*N.Y. Times Co. v. F.B.I.*, 822 F. Supp. 2d 426 (S.D.N.Y. 2011) ................................................. 40

*Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 581 F. Supp. 2d 491 (S.D.N.Y. 2008) ...................... 24

*Nat'l Sec. Couns. v. C.I.A.*, 898 F. Supp. 2d 233 (D.D.C. 2012), *aff'd*, 969 F.3d 406 (D.C. Cir. 2020) ................................................................................................................... 42

*New York Legal Assistance Group v. Board of Immigration Appeals*, 987 F.3d 207 (2d Cir. 2021) ..................................................................................................................... 40

*New York v. Admin. for Child. & Fams.*, --- F. Supp. 3d ---, 2026 WL 673848 (S.D.N.Y. Mar. 10, 2026) .................................................................................................. 37

*New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019) .......... 21

*Nightingale v. U.S. Citizenship & Immigr. Servs.*, 507 F. Supp. 3d 1193 (N.D. Cal. 2020) .. 42, 44

*Panjiva, Inc. v. U.S. Customs & Border Prot.*, 342 F. Supp. 3d 481 (S.D.N.Y. 2018), *aff'd*, 975 F.3d 171 (2d Cir. 2020) ................................................................................ 40

*Paskar v. City of New York*, 3 F.Supp.3d 129 (S.D.N.Y. 2014) .................................................. 12

*Payne Enters., Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988) .......................................... 44

*Physician's Comm. for Responsible Med. v. Dep't of Health & Hum. Servs.*, 480 F. Supp. 2d 119 (D.D.C. 2007) .................................................................................... 35

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................ 46, 47

*Reclaim the Recs. v. U.S. Citizenship & Immigr. Servs.*, No. 23-cv-1997, 2025 WL 936924 (S.D.N.Y. Mar. 27, 2025) ................................................................................ 40, 42

*Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974) ........................................... 40

*Salazar v. King*, 822 F.3d 61 (2d Cir. 2016) ........................................................................... 35, 45

*Shapiro v. U.S. Soc. Sec. Admin.*, 160 F.4th 347 (2d Cir. 2025) ................................................. 33

*Sierra Club v. Salazar*, 177 F. Supp. 3d 512 (D.D.C. 2016) ...................................................... 37

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ........................................... 36

*Velesaca v. Decker,* 458 F. Supp. 3d 224 (S.D.N.Y. 2020) ......................................................... 46

*Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008) .................................. 46

*Webster v. Doe*, 486 U.S. 592 (1988) ........................................................................ 36

## Statutes

5 U.S.C. § 502................................................................................................................ 39

5 U.S.C. § 552....................................................................................................... passim

5 U.S.C. § 704........................................................................................................ 35, 45

5 U.S.C. § 706....................................................................................................... passim

42 U.S.C. § 1306................................................................................................... passim

## Rules

Fed. R. Civ. P. 15(a)(2)................................................................................................. 49

Fed. R. Civ. P. 23(a) .................................................................................................... 49

Fed. R. Civ. P. 23(b)(2).................................................................................................. 49

Fed. R. Civ. P. 30(b)(6)............................................................................................ 16, 19

Fed. R. Civ. P. 56(a) .................................................................................................... 20

## Regulations

20 C.F.R § 402.10................................................................................................... 28, 30

20 C.F.R. § 402.05........................................................................................................ 28

20 C.F.R. § 402.105 ......................................................................................... 1, 7, 30, 31

20 C.F.R. § 402.15........................................................................................................ 30

20 C.F.R. § 402.185 ................................................................................................. passim

20 C.F.R. § 402.20........................................................................................................ 28

20 C.F.R. § 402.30........................................................................................................ 29

20 C.F.R. § 402.35........................................................................................................ 29

20 C.F.R. § 402.50..................................................................................................... 6, 30

20 C.F.R. § 402.75..................................................................................................... 7, 31

20 C.F.R. § 402.80.................................................................................................... passim

20 C.F.R. § 402.85.................................................................................................... passim

20 C.F.R.§ 402.100.................................................................................................. 30, 32

89 Fed. Reg. 102,704, 102,711 (Dec. 18, 2024) ........................................................ 29

**PRELIMINARY STATEMENT**

Plaintiff the New York Legal Assistance Group ("NYLAG") is a civil legal services organization dedicated to serving individuals in poverty, including many who receive benefits administered by Defendant the Social Security Administration ("SSA") and are fighting to protect their eligibility. To understand SSA's (often labyrinthine) practices affecting these clients, NYLAG regularly files information requests with the agency under the Freedom of Information Act ("FOIA"). And, since NYLAG is a nonprofit with limited funds that acts in the public interest, NYLAG asks SSA to waive the fees associated with those requests under FOIA and SSA's implementing regulation at 20 C.F.R. § 402.85 ("Fee Waiver Regulation"), which mandates waiver of fees when disclosure of the records would be in the public interest. NYLAG regularly seeks, and is granted, this type of waiver from numerous other federal agencies from which it obtains information it needs to represent its clients.

But SSA has denied NYLAG's fee waiver requests, over and over, without any legal basis and without providing any reasoned justification. And NYLAG is not alone. In the past six years, SSA has denied *2,569 out of the 2,600 fee waiver requests it has adjudicated*—a denial rate of 98.8%. NYLAG brought this lawsuit to challenge these unlawful blanket denials of fee waiver requests.

SSA's denials of NYLAG's fee waiver requests plainly violated the Fee Waiver Regulation. The records NYLAG sought were "likely to contribute significantly to public understanding of the operations or activities of the government," and disclosure of those records was not "primarily in [NYLAG's] commercial interest." And, as other SSA regulations (as well as additional authority) make clear, the appropriate method by which NYLAG may challenge those illegal denials is by bringing an action in this Court under the FOIA statute's provision for judicial review, codified at 5 U.S.C. § 552(a)(4)(B). *See* 20 C.F.R. § 402.105 (SSA regulation on

1

judicial review of fee waiver, and other, decisions via § 552). But even if FOIA did not supply a cause of action here (as SSA asserted earlier in this litigation), the result would be the same, since NYLAG brought—and has adduced sufficient evidence to prove —an identical challenge through the Administrative Procedure Act ("APA").

The record before the Court on this motion, moreover, shows that NYLAG should prevail not just in challenging SSA's wrongful denials of its own fee waiver requests, but also in challenging SSA's pattern and practice of unlawfully denying fee waiver requests generally. SSA's 99% denial rate alone supports a finding of liability on these claims. And information NYLAG obtained in discovery shows how SSA's blanket-denial policy is operationalized: by the informal transmission of entrenched institutional norms that result in nearly identical denials devoid of explanation for virtually every single FOIA requester. Whether considered under FOIA or the APA, NYLAG is thus also entitled to summary judgment on its claims against SSA for systemic unlawful conduct.

## BACKGROUND

I.  **NYLAG Uses FOIA to Help Individuals with Very Low Incomes Access Benefits Administered by SSA.**

NYLAG is a leading civil services organization that provides free legal assistance to New Yorkers experiencing poverty, last year serving over 125,000 individuals at over 200 community sites. (Plaintiff's Local Civil Rule 56.1 Statement of Material Facts ("56.1") ¶ 1.) Many of the individuals NYLAG serves receive benefits through the Supplemental Security Income ("SSI") or Social Security Disability Insurance ("SSDI") programs administered by Defendant SSA. (*Id.*) In particular, NYLAG's Disability Advocacy Project provides free legal advice and representation to eligible disabled individuals whose SSD or SSI benefits have been wrongfully denied or terminated. (56.1 ¶ 2.) In the past three years alone, NYLAG has assisted over 4,500

clients with such issues. (56.1 ¶ 5.) Of those individuals, over half identified as Black, African, Latinx, or Hispanic; over one-quarter had a primary language other than English; and the vast majority identified as having a disability. (56.1 ¶ 6.) And, even counting income received from public benefits, approximately 80% of social security benefit recipients served by NYLAG have income below the federal poverty line. (56.1 ¶ 7.)

These programs are crucial for the many Americans who rely on them for necessary expenses. SSI provides subsistence benefits for individuals with very low incomes and who are also elderly or have significant disabilities. (56.1 ¶ 18.) SSI beneficiaries depend on their benefits to cover their most basic needs for shelter, food, clothing, and medical care. (56.1 ¶ 18.) As of December 2024, 7.4 million people across the country received payments from SSI. (56.1 ¶ 19.) The SSDI program provides benefits to disabled individuals who have paid into the Social Security system and their dependent family members. (56.1 ¶ 20.) Although financial hardship is not required for eligibility, many recipients rely on these benefits to cover their basic needs. (56.1 ¶ 20.) As of December 2024, about 8.6 million people across the country received SSDI benefits. (56.1 ¶ 21.) SSI and SSDI overwhelmingly serve individuals who belong to groups that have faced systemic discrimination: for example, all SSDI recipients and the majority of SSI recipients (6.4 million) are eligible on the basis of disability or blindness; and child recipients of SSI are disproportionately Black compared to the general population. (56.1 ¶ 23.)

SSA also operates the Social Security Retirement and Survivors' Benefits Program, which provides benefits to nearly 55 million people across the country ages 62 and older. (56.1 ¶ 24.) Approximately half of the American population aged 65 or older lives in households that receive at least half of their family income from these benefits and about one-quarter of these households receive at least 90% of their family income from these benefits. (56.1 ¶ 25.)

3

For many of these beneficiaries, legal assistance is essential to help them access the full benefits to which they are entitled. (56.1 ¶ 26.) For example, SSA may find an individual to be initially ineligible for benefits, or may reduce or terminate an individual's benefits because of findings about ongoing ineligibility and, without legal representation, these issues can be difficult to resolve. (56.1 ¶ 27.) It is challenging for unrepresented individuals who believe SSA has made errors in their cases to understand SSA's labyrinthine rules and regulations, to marshal the necessary law, argument, and documentation to submit to SSA, and to navigate the lengthy and confusing appeal process without legal assistance. (56.1 ¶ 28.) Deprived of benefits, recipients may face a host of devastating harms, including homelessness, hunger, and the loss of critical Medicaid coverage linked to SSI. (56.1 ¶ 29.)

To effectively counsel these clients on accessing the benefits they need to afford food, healthcare, and housing, NYLAG requires transparency into SSA's policies and practices. (56.1 ¶ 9.) When, as is often the case, publicly-available information about SSA's operations does not adequately explain those policies and practices, NYLAG regularly seeks their disclosure through requests filed with SSA under FOIA. (56.1 ¶ 10.) Indeed, like many other nonprofit organizations serving individuals experiencing poverty, NYLAG seeks records through FOIA from a variety of federal agencies that serve its client communities. (56.1 ¶ 8.) NYLAG uses the records responsive to its FOIA requests, received from both SSA and other agencies, to better inform and counsel thousands of New Yorkers, as well as to educate other advocates and the general public. (56.1 ¶¶ 11-12.)

## II.    NYLAG Regularly Seeks, and Needs, Waivers of Fees under FOIA.

In seeking disclosure of information from SSA, as well as from other federal agencies, NYLAG relies heavily on FOIA fee waivers, which are guaranteed by statute. (56.1 ¶ 4, 8.) Under FOIA, agencies "shall" produce documents at no charge to the requester, or at a reduced

charge, if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

NYLAG is a nonprofit organization with constrained funds to support its work, so without fee waivers, it cannot obtain meaningful access to records it needs to assist SSA beneficiaries and other clients. (56.1 ¶ 13.) If NYLAG is denied a fee waiver, it faces the choice to either forgo records that are critical to fulfilling its core mission of serving New Yorkers with low incomes, or pay the requested fee and then incur the financial and resource costs of litigating its entitlement to the waiver. (56.1 ¶ 14.)

NYLAG is regularly granted fee waivers in connection with its FOIA requests to federal agencies. In recent years, for example, NYLAG was granted FOIA fee waivers by the United States Department of Education, the United States Department of Veteran Affairs, the Executive Office for Immigration Review within the United States Department of Justice, and the Department of Homeland Security. (56.1 ¶ 15.)

## III.   SSA's Regulations Require It to Grant Fee Waivers to Requesters like NYLAG When Waiver Is in the Public Interest.

FOIA requires each agency to promulgate regulations that establish procedures and guidelines for the waiver or reduction of fees. 5 U.S.C. § 552(a)(4)(A)(i). Consistent with FOIA's requirements, SSA's Fee Waiver Regulation, 20 C.F.R. § 402.85,[1] mandates that SSA

---

[1] At the time this lawsuit was filed, SSA's fee waiver regulation was at 20 C.F.R. § 402.185. In 2025, SSA replaced that regulation, along with a number of others related to FOIA, with a revised version. *Compare id. with* 20 C.F.R. § 402.185 (2000). The new rule was intended to reorganize and streamline the agency's FOIA regulations, as well as make some additional updates, but the changes did not substantively impact SSA's processes and standards for FOIA requests and FOIA fee waiver requests. 88 Fed. Reg. 36980, https://www.federalregister.gov/documents/2023/06/06/2023-09824/availability-of-information-and-records-to-the-public ("NPRM"); (56.1 ¶ 240.) Throughout this Memorandum, unless noted, reference is to the current regulation.

"will waive or reduce" fees if the request is "in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government" and "[i]s not primarily in the commercial interest of the requester." *Id.* §§ 402.85(a)-(b); *see also* 5 U.S.C. § 552(a)(4)(a)(iii) (similar).

In analyzing the public interest requirement, SSA considers four factors:

(i)     How the records pertain to the Federal Government's operations or activities;

(ii)    Whether disclosure would reveal any meaningful information about Government operations or activities not already known to the public; and

(iii)   Whether the contribution to public understanding of those operations or activities would be significant.

(iv)    Regarding the above criteria, you must be reasonably specific in your waiver request as to the specific Government operation or activity and provide direct, clear (not remote or attenuated) connections to the meaningful information you seek. Generalized interest in government programs is not reasonably specific to grant waiver.

20 C.F.R. § 402.85(b)(2).[2] The Fee Waiver Regulation also specifies how SSA should decide whether a disclosure is "primarily in the requester's commercial interest"—by asking if the records would advance a commercial interest at all and, if so, further asking, "would that effect outweigh the advancement of the public interest"; that is, "[w]hich effect is primary?" *Id.* § 402.85(b)(3); *see also* Program Operations Manual System ("POMS") GN 03311.005 (implementing § 402.85(b)(3)).

SSA's regulations also provide that the person empowered to decide whether to grant fee waiver requests is the Agency's FOIA Officer. *Id.* § 402.50(a)(3). The requester may

---

[2] The preceding regulation, at 20 C.F.R. § 402.185(b), contained a slightly different list of factors: "(1) How, if at all, do the records to be disclosed pertain to the operations or activities of the Federal Government? (2) Would disclosure of the records reveal any meaningful information about government operations or activities? Can one learn from these records anything about such operations that is not already public knowledge? (3) Will the disclosure advance the understanding of the general public as distinguished from a narrow segment of interested persons? … (4) Will the contribution to public understanding be a significant one? Will the public's understanding of the government's operations be substantially greater as a result of the disclosure?"

6

administratively appeal a denial, and may seek judicial review of a final fee waiver decision in District Court under the FOIA statute. *Id.* § 402.105 ("Requesters may … ask a U.S. District Court to review our final decision" (citing 5 U.S.C. 552(a)(4)(B))); *id.* § 402.85(b)(1) ("[T]he process prescribed in § 402.105 will also apply to" fee waiver decisions).

Section 1106(c) of the Social Security Act, codified at 42 U.S.C. § 1306 ("§ 1306"), also addresses fees SSA may assess in response to requests for information. That statute provides that SSA "may require the requester to pay the full cost" if SSA determines that the request's purpose relates "to the administration of an employee benefit plan" or "is made for any other purpose not directly related to the administration of the program or programs under this chapter to which such information relates." 42 U.S.C. § 1306(c). Under SSA's implementing regulation, 20 C.F.R. § 402.80, if SSA determines the FOIA request is not for a "program purpose," it may assess fees for a range of processing tasks undertaken by SSA staff. *Id.*

Notably, the Fee Waiver Regulation provides that SSA "*will* waive or reduce fees we would otherwise charge" when waiver is in the public interest, regardless of whether any fees would be assessed under FOIA or under § 1306. 20 C.F.R. § 402.85 ("A requester may request waiver or reduction of fees, whether charged under § 402.75 [FOIA fee schedule] or § 402.80 [charging under § 1306], if the release of the requested records is in the public interest."). In other words, SSA applies the same fee waiver standards to FOIA fee waiver requests regardless of whether SSA determines that it would assess fees for the underlying request under § 1306.[3]

## IV.    SSA Repeatedly Denied NYLAG's FOIA Fee Waiver Requests.

In March 2023, NYLAG had been assisting low-income clients whose challenges with

---

[3] *See also* NPRM, 88 Fed. Reg. 36980, 36986 (new regulation will make explicit that SSA "will consider waiver under this regulation whether the agency charges under the FOIA's fee schedule or [§ 1306]").

debit cards issued by Direct Express, on which their Social Security benefits had been deposited, affected their access to benefits and thus to food, health care, and housing. (56.1 ¶ 30.) NYLAG therefore submitted a FOIA request to SSA seeking release of a section of SSA's POMS relating to SSA's use of Direct Express cards—which SSA had kept secret from the public. (56.1 ¶ 31.) NYLAG included a detailed request for a fee waiver, on the ground that disclosure would be in the public interest.[4] (56.1 ¶¶ 31, 32.) SSA denied NYLAG's fee waiver request. (56.1 ¶ 32.) NYLAG administratively appealed, but the matter eventually resolved without adjudication of the appeal. (56.1 ¶¶ 33-34.)

Thereafter, between April and December 2023, NYLAG submitted six FOIA requests to SSA, five of which are the subject of this motion (collectively, "NYLAG's FOIA Requests"). (56.1 ¶¶ 36-67.) In each of the relevant five, NYLAG sought needed records and asked for a waiver of fees. (56.1 ¶¶ 36, 41, 47, 54, 62.) SSA denied each of these fee waiver requests (in full or in part). (56.1 ¶¶ 37, 42, 48, 55, 63.) These requests were:

FOIA Request 1 (SSA-2023-006957): On April 4, 2023, NYLAG, concerned about the denial of its earlier fee waiver request, submitted a request seeking SSA's policies for adjudicating FOIA fee waivers. (56.1 ¶ 36.) That Request also sought a waiver of fees, supported by a three-page explanation of how the Request would contribute to public understanding of the operations of the government, and in particular, SSA's procedures regarding adjudication of FOIA fee waivers. (56.1 ¶ 36.) On May 1, 2023, NYLAG received a letter from SSA's Freedom of Information Act Officer regarding NYLAG's "Freedom of Information Act (FOIA) request."

---

[4] NYLAG's complaint, as described *infra*, included, in addition to claims challenging SSA's fee waiver practices, claims that SSA failed to make certain policies available to the public, in violation of FOIA's provisions mandating affirmative disclosure of certain materials. Sec. Am. Compl. ¶¶ 177-84. Those claims have since settled. *See* Procedural History.

In that letter, SSA denied NYLAG's request for a fee waiver, citing 20 C.F.R. § 402.185(b) (the predecessor to the current fee waiver regulation). (56.1 ¶ 37.) The denial also stated that NYLAG's "fee waiver request fails to explain with reasonable specificity how the disclosure of the information you requested will meet the above factors, and I have not otherwise found that release of the records requested would meet the abovementioned factors" (the "Reasonable Specificity Language"). (56.1 ¶¶ 37, 163.) NYLAG appealed this fee waiver denial; the deadline for SSA to adjudicate that appeal passed before the Complaint in this action was filed. (56.1 ¶¶ 38-39.) After NYLAG brought this case, SSA produced responsive records without adjudicating the appeal. (56.1 ¶ 40.)

FOIA Request 2 (Request No. SSA-2023-006956): On April 4, 2023, NYLAG submitted a request to SSA seeking six types of records in connection with SSA's proposed implementation of automated payroll information exchange with Equifax, an external payroll data provider, that would directly affect SSA's determination of SSI and SSDI benefits for NYLAG's clients. (56.1 ¶ 41.) That request also sought a waiver of fees, again including a three-page explanation of how the Request would contribute to public understanding of SSA's operations as to this impending information exchange. (56.1 ¶ 41.) SSA sent a letter on July 26, 2023, regarding NYLAG's "Freedom of Information Act (FOIA) request," denying NYLAG's request for a fee waiver using language from the FOIA statute, 5 U.S.C. § 552(a)(4)(A)(iii), and referencing the criteria in 20 C.F.R. § 402.185(b). (56.1 ¶ 42.) SSA denied NYLAG's waiver request as to five of the six categories of records, using Reasonable Specificity Language identical to what it used in its denial as to Request 1. (56.1 ¶¶ 42, 164.) SSA granted a limited fee waiver for one of the six types of records requested (documents "relating to the assessment of Equifax's data" and information "regarding Equifax's use of 'reasonable procedures to ensure maximum accuracy,

relevance, and timeliness of its wage and employment information"), but did not explain why it granted a waiver as to that section while denying the rest. (56.1 ¶ 42.) On July 28, 2023, NYLAG appealed the fee waiver denial, but, after NYLAG filed this litigation, SSA produced responsive records without adjudicating the appeal. (56.1 ¶¶ 43-45.)

FOIA Request 3 (Request No. 2023-FOIA-79687) (not at issue in this motion): NYLAG requested that SSA make publicly available its entire POMS. See Dkt. No. 22 ("Sec. Am. Compl.") ¶¶ 177-84. (56.1 ¶ 46.) Because this was not a request for records to be released directly to NYLAG, the fee requirements did not apply. (This Request was related to the affirmative disclosure claims that were originally part of this action but have been settled.) See Procedural History.

FOIA Request 4 (Request No. SSA-2024-00387): On December 5, 2023, NYLAG submitted a FOIA request seeking a POMS section about how the Agency works with individuals of limited English proficiency, a procedure manual instructing staff in SSA's hearing office about how to conduct those hearings, and all SSA field office phone numbers. (56.1 ¶ 47.) That request also sought a waiver of fees, again accompanied by a three-page explanation, highlighting the importance to the public of SSA's language accommodation and hearing procedures, and contact information for offices the public critically needed to access. (56.1 ¶ 47.) Again, SSA denied the fee waiver request using identical Reasonable Specificity Language for all records except the POMS section. (56.1 ¶¶ 48, 164.) SSA's explanation for this partial grant stated, in full, "you sufficiently addressed how the information requested under item #1 meets our regulatory criteria; therefore, I will grant a fee waiver for item #1." (56.1 ¶¶ 48, 164.) On February 7, 2024, NYLAG appealed the fee waiver denial, but SSA did not adjudicate that appeal. (56.1 ¶ 49.) On May 31, 2024, SSA sent a letter to NYLAG assessing $771 in fees to

10

process this request. (56.1 ¶ 50.) On June 18, 2024, NYLAG submitted payment of $771 to SSA, and SSA subsequently produced documents. (56.1 ¶¶ 51-53.)

FOIA Request 5 (Request No. SSA-2024-00391): On December 6, 2023, NYLAG submitted a FOIA Request seeking certain SSA policy documents concerning SSA's use of vocational experts to determine entitlement to disability benefits. (56.1 ¶ 54.) That request also sought a waiver of fees, including a four-page explanation of how the materials would contribute to public understanding of, in particular, SSA's handling of certain poorly understood medical conditions. (56.1 ¶ 54.) Once again, NYLAG received a letter from SSA's Freedom of Information Officer describing its request as one under FOIA and denying NYLAG's fee waiver request using identical Reasonable Specificity Language without further explanation. (56.1 ¶¶ 55, 164.) On February 7, 2024, NYLAG appealed the fee waiver denial, but SSA did not adjudicate that appeal. (56.1 ¶¶ 56, 58.) On May 31, 2024, SSA assessed NYLAG $1,067 in fees to process the request. (56.1 ¶ 57.) On June 27, 2024, NYLAG submitted a check for $1,067 to SSA. (56.1 ¶ 60.) SSA produced responsive documents during the pendency of this litigation. (56.1 ¶¶ 60-61.)

FOIA Request 6 (FOIA Request No. SSA-2024-00397): On December 7, 2023, NYLAG submitted a FOIA Request seeking certain data regarding "redeterminations," which are SSA's periodic reassessments of benefits eligibility to which NYLAG clients are regularly subject. (56.1 ¶ 62.) That request also sought a waiver of fees supported by a lengthy explanation of how the requested materials would contribute to public understanding of SSA's operations as to its evaluations of child recipients of SSI benefits as they approach age eighteen. (56.1 ¶ 62.) SSA again denied NYLAG's fee waiver using identical Reasonable Specificity Language. (56.1 ¶¶ 63, 164.) On February 7, 2024, NYLAG appealed the fee waiver denial, but SSA did not adjudicate

11

that appeal. After NYLAG brought this case, SSA responded to this Request. (56.1 ¶¶ 64-66.)[5]

## V.    SSA Denies Virtually All Fee Waiver Requests.

The denials of NYLAG's fee waiver requests were in no way outliers. On the contrary,

SSA's publicly reported data confirms that SSA denies *virtually all* of the hundreds of fee waiver

requests it receives every year. According to SSA's Annual FOIA Reports:

- In fiscal year 2020, SSA adjudicated 194 FOIA fee waiver requests. Of these, SSA granted zero requests (0.0%) and denied all 194 requests (100%).

- In fiscal year 2021, SSA adjudicated 265 FOIA fee waiver requests. Of these, SSA granted one request (0.4%) and denied 264 requests (99.6%).

- In fiscal year 2022, SSA adjudicated 332 FOIA fee waiver requests. Of these, SSA only granted one request (0.3%) and denied 331 requests (99.7%).

- In fiscal year 2023, SSA adjudicated 374 FOIA fee waiver requests. Of these, SSA granted none (0%) and denied 374 fee waivers (100%).

- In fiscal year 2024, SSA adjudicated 633 FOIA fee waiver requests. Of these, SSA granted 8 (1%) and denied 625 fee waivers (99%).

- In fiscal year 2025, SSA adjudicated 802 FOIA fee waiver requests. Of these, SSA granted 21 (3%) and denied 781 fee waivers (97%).

(56.1 ¶¶ 170-77, 181.)[6] In total, over the six-year period from fiscal years 2020 to 2025, **SSA**

**denied 2,569 out of 2,600 adjudicated fee waiver requests—a denial rate of 98.8%**. (56.1

---

[5] NYLAG has continued after this litigation was filed to submit FOIA requests in the regular course of its business, filing eight from approximately mid-2023 to the present. (56.1 ¶ 67.) In some, NYLAG did not even seek a fee waiver, since its waiver requests had been uniformly denied. (56.1 ¶ 70.) SSA did not grant any of the waiver requests that NYLAG filed. (56.1 ¶¶ 68-69.)

[6] Courts may take judicial notice of "[o]fficial government reports and other types of government records," *Paskar v. City of New York*, 3 F.Supp.3d 129, 134 (S.D.N.Y. 2014), including "statistics and data that federal agencies made publicly available," *United States v. Gonzalez*, 442 F.2d 698, 709 (2d Cir. 1970); *accord Placide-Eugene v. Visiting Nurse Serv. of New York*, 12 Civ. 2785, 2013 WL 2383310, at *12 (E.D.N.Y. May 30, 2013).

¶ 182.) In reality, SSA's denial rates are almost certainly *higher*.[7]

These figures are even more extreme when compared to other federal agencies, which grant fee waivers at overwhelmingly higher rates. For example, in Fiscal Year 2025:

- The Equal Employment Opportunity Commission granted 359 of 359 FOIA fee waiver requests (100%).

- The Department of Agriculture granted 1,084 of 1,225 FOIA fee waiver requests (88%).

- The Department of the Interior granted 1,336 of 1,632 FOIA fee waiver requests (82%).

- The Department of Education granted 998 of 1,385 FOIA fee waiver requests (72%).

- The Department of Commerce granted 684 of 1,113 FOIA fee waiver requests (61%).

- The Department of Energy granted 161 of 274 FOIA fee waiver requests (59%).

(56.1 ¶ 185). The rates are similarly high in prior fiscal years. (56.1 ¶ 184.)

Among the many requesters whose fee waiver requests SSA has denied are ones that, like NYLAG, operate in the public interest, have little to no commercial interest in the materials, and otherwise satisfy the regulatory criteria. For example, the record on this motion shows that SSA denied fee waiver requests submitted by the Urban Justice Center, Community Legal Services, Southern Louisiana Legal Services, Justice in Aging, Legal Health Council of Justice, FedScoop News, independent journalist Mark Betancourt, National Organization of Social Security Claimants' Representatives, MuckRock News, the University of Oregon, Democracy Forward, the American Civil Liberties Union, National Student Legal Defense, Manhattan Legal Services,

---

[7] SSA's publicly available "raw" data suggests that, at least for the years in which such data is available, some of the fee waiver "grants" included in the Annual FOIA Reports are in connection with requests that were not made under FOIA, but rather other types of requests, such as for "Decedent Numident" information used to verify information for deceased beneficiaries. (56.1 ¶ 173.) However, such requests are "handle[d] … separately" from FOIA requests. (56.1 ¶ 173.) In addition, if a fee waiver request is denied, and the denial is later reversed on appeal, SSA's data systems record the waiver as "granted." (56.1 ¶ 167.) As a result, the Annual FOIA Reports overstate grant rates for initial determinations.

Stanford Law School Professor Anne Joseph O'Connell, Atlanta Legal Aid, Gulfcoast Legal Services, the newsroom SF Standard, Southern Minnesota Regional Legal Services, the Wall Street Journal, and the University of Rochester. (56.1 ¶¶ 74-163.) And the denial letters sent to each of these requesters, as well as the other denial letters attached to this motion—forty-seven in all—contained Reasonable Specificity Language that is identical to the language in the denials received by NYLAG. (56.1 ¶ 164.)

## VI. SSA's Fee Waiver Practices Reveal an Informal Policy of Blanket Fee Waiver Denials.

SSA's publicly reported statistics about its near-universal fee waiver denials speak for themselves. But information NYLAG obtained in discovery demonstrates how SSA's informal policy of blanket fee waiver denials operates in practice.

FOIA requests received by SSA are processed by the FOIA and Transparency Division of the Office of Privacy and Disclosure ("OPD"), which is situated within SSA's Office of General Counsel. (56.1 ¶ 186.) That Division is run by the Deputy Executive Director of OPD, who is, by regulation, the Agency's FOIA Officer. (56.1 ¶ 187.) The large majority of the FOIA requests that OPD receives are submitted through SSA's "FOIAXpress" data system, which SSA also uses internally to track the status of requests.[8] (56.1 ¶ 188.) SSA receives between 10,000 and 15,000 FOIA requests per year. (56.1 ¶ 190.)

Each request received by SSA is assigned to an analyst called a government information specialist. (56.1 ¶¶ 191, 201.) That individual does the first review of each records request, as well as the associated fee waiver request, if one has been lodged. (56.1 ¶ 201.) For each fee waiver application, the same staff person creates a first draft of the fee determination letter. (56.1

---

[8] Before using FOIAXpress, SSA used a similar system called FOIA Online. (56.1 ¶ 189.) While the transition from FOIA Online to FOIAXpress in 2023 changed SSA's data collection practices in some ways, it did not affect the Agency's substantive practices. (56.1 ¶ 189.)

¶¶ 201, 207.) These letters set forth the regulatory criteria for fee waivers, inform the requester about SSA's decision on the fee waiver request, and, if the determination is a denial—as it virtually always is—purports to explain the basis of the denial. (56.1 ¶ 164.)

In reviewing the fee waiver request, analysts are instructed to consider only the content of the request, the requester's description of the requested records (but not the responsive records themselves), and the "plain language" of the regulations memorialized in the Federal Register. (56.1 ¶¶ 202-04.) Notably, the government information specialists are directed to consult the Fee Waiver Regulation, 20 C.F.R. § 402.85, regardless of whether the Agency is taking the position that fees assessed in connection with the request would be determined under FOIA or under § 1306. (56.1 ¶¶ 203, 223, 228.)

SSA does not provide any formal training to its government information specialists—on fee waivers or anything else. (56.1 ¶ 192.) It provides no written guidance to these staff: no desk guides, no FAQs, no flow charts, no directions from SSA's Office of General Counsel. (56.1 ¶¶ 195-197, 223.) Instead, analysts are informally educated by "senior" government information specialists about the agency's informal fee waiver determination policies and practices. (56.1 ¶ 193.) In addition, government information specialists reach out to the Office of General Counsel for consultations about individual fee waiver requests "in most cases." (56.1 ¶ 206.)

The analyst creates the fee determination letter using "sample" language that senior reviewers hand down to less senior analysts. (56.1 ¶ 211.) While SSA denies that it uses "template" denial letters, in practice, virtually all of SSA's fee waiver denial letters are substantively identical to each other. (56.1 ¶¶ 164, 210.) Each of NYLAG's FOIA Request fee waiver denials, as well as the dozens of others attached to this motion, contain the exact same Reasonable Specificity Language set forth above. (56.1 ¶ 164.) And not one of the forty-seven

15

fee waiver denials sent to NYLAG and other requesters articulated any reasoning or support for SSA's denial, no matter the fee waiver request's length, level of detail, or contents. (56.1 ¶ 164.)

The analyst's first draft of a fee waiver response is reviewed by one of the senior government information specialists, then reviewed by the Division Director, and then reviewed by the Deputy Executive Director of OPD. (56.1 ¶ 212.)[9] Each of these reviewers could, in theory, make changes to the determination or the text of the letter. (56.1 ¶ 214.) Any of these individuals could also consult with the Office of General Counsel, colleagues in OPD, or, staff in a relevant SSA component office. (56.1 ¶¶ 205-206.) However, the outcome of almost every one of these consultations, as the statistics show, is for SSA to deny the waiver using a virtually identical denial letter. (56.1 ¶ 164.) *See* Background Section V.

In the ordinary course, every finalized fee waiver determination letter is approved and signed (personally or through a designee) by the Deputy Executive Director of OPD—the Agency's FOIA Officer. (56.1 ¶ 230.) Then the letter is sent to the requester to notify it of the SSA's decision. (56.1 ¶ 231.) SSA's determination on a fee waiver request is also recorded in FOIAXpress as either granted or denied (or, in special situations, assigned a different status). (56.1 ¶¶ 167, 232.)[10]

---

[9] During the period NYLAG's FOIA requests were processed, this position was filled by SSA's Fed. R. Civ. P. 30(b)(6) deponent, Michelle Christ. After Ms. Christ's deposition, the position was filled by Jennifer Karangelen. SSA Contact Us, available at https://www.ssa.gov/foia/contact.html. During the period relevant to this litigation, SSA's FOIA-related practices did not change meaningfully, except for the transition from FOIA Online to FOIAXpress. *See supra* n.8.

[10] "Granted" means that the fee waiver request is granted. "Denied" means that the fee waiver request is denied in full, or that part of a fee waiver request is granted and part is denied. (SSA does not maintain any exportable data identifying the number of fee waiver requests that are granted in part and denied in part.) If a request is denied but the denial is later reversed on appeal, the status is changed to "granted." The other possible statuses that may be reflected in FOIAXpress are: "TBD" ("to be determined," selected by SSA staff when the agency's review

SSA admits it has engaged in no systemic reviews of its fee waiver practices. (56.1 ¶ 218.) Nor has any external entity ever audited these decisions. (56.1 ¶ 218.) Instead, "quality control" consists of its "intense" review process—that is, the process by which, supposedly, four reviewers, plus often the Office of General Counsel, review each "unique" waiver request on a "case-by-case basis" and nonetheless determine to deny 99% of them using substantively identical letters. (56.1 ¶ 219.)

At some point in the process, SSA decides whether the request is for a "program purpose," such that the Agency would charge under FOIA, or "not for a program purpose," such that the Agency would charge under § 1306. (56.1 ¶ 221.) SSA has no specific process for when an analyst should make that decision: it might be made at intake, or in conjunction with a fee waiver request, or later. (56.1 ¶ 222.) As is true for fee waiver determinations, analysts are given no guidance, written materials, or instructions on how to assess whether a request is for a program or non-program purpose, save a copy of "the regulation itself." (56.1 ¶ 223.) Unlike fee waiver determinations, however, SSA does not track the outcome of this determination in FOIAXpress. (56.1 ¶ 224.) SSA considers virtually every request to be not for a program purpose—over 95% or more. (56.1 ¶¶ 225-26.)

Once SSA determines not to grant a requester's fee waiver request—as it does for virtually all of them—or if the requester did not seek a fee waiver, the government information specialist prepares a "fee notice," which sets forth SSA's anticipated charges for processing the request. (56.1 ¶¶ 50, 57, 233-34.) SSA determines the amount of fees either under FOIA or

---

of the request is ongoing); "withdrawn" (the requester withdrew the fee waiver request and/or the underlying FOIA request); "not billable" (SSA decided not the bill the requester, for example because the document is already publicly available or is being made publicly available by SSA, or SSA decided not to charge a fee because the fee would be *de minimis*, among other reasons); and "N/A" (infrequently used). (56.1 ¶ 167.)

§ 1306, based on what SSA concludes about whether it is for a "program purpose." (56.1 ¶ 227.) The fee notice informs the requester that SSA will not process the request until the requester provides payment information (such as credit card information, or a check or money order), and includes a form the requester can use to provide the information. (56.1 ¶¶ 50, 234.) If the requester provides payment information, SSA processes the request and charges the requester for the final amount based on actual work performed. (56.1 ¶ 236.) If the requester does *not* provide payment information up front, however, the agency considers the request "withdrawn," and does not search for or produce records. (56.1 ¶ 235.) Because of the way SSA's data is maintained, it cannot determine how often that situation occurs.[11]

On occasion, SSA may deny a fee waiver request and solicit payment information, but ultimately produce records without collecting fees. (56.1 ¶ 239.) However, SSA does not maintain any data identifying the number of FOIA requests for which that happens. (56.1 ¶ 239.) Accordingly, there is no way for SSA to measure how many cost-sensitive requesters have withdrawn requests that SSA tells them will result in charges, and so never reached the point at which SSA might later have decided to produce without charge. (56.1 ¶ 239.) And of course, it is impossible for SSA to know how many requesters cut back on filing records requests, or stopped submitting them altogether, after being repeatedly denied fee waivers.

### PROCEDURAL HISTORY

After SSA denied NYLAG's six fee waiver requests in a row, NYLAG filed this case on October 24, 2023. Dkt. No. 1. NYLAG amended the Complaint on March 19, 2024, to add additional claims. Sec. Am. Compl.; *see also* Dkt. No. 21 (granting leave to amend complaint).

---

[11] If a requester whose fee waiver is denied refrains from providing payment information, SSA marks the request as "withdrawn" in FOIAXpress, so it is impossible to distinguish such requests in FOIAXpress from other requests that are withdrawn for other reasons or under other circumstances. (56.1 ¶ 235.)

NYLAG's complaint brought claims challenging two types of misconduct by SSA: SSA's failure to meet its affirmative disclosure obligations and its practice of denying virtually all fee waiver requests. The affirmative disclosure claim, Claim Five, asserted that SSA was in violation of its obligations under FOIA to proactively publish the agency's policies governing the administration of benefits. Sec. Am. Compl. ¶¶ 69-158; 228-32. The fee waiver claims, Claims One, Two, and Three, asserted that SSA violated its fee waiver obligations under FOIA and/or the APA by denying NYLAG's fee waiver requests and by systemically denying virtually all fee waiver requests. *Id.* ¶¶ 18-68, 159-223. SSA filed a pre-motion letter regarding an "anticipated motion to dismiss," Dkt. No. 31, but did not ultimately file such a motion.

NYLAG sought the Court's leave, over SSA's objection, to take targeted discovery in light of the crucial facts in dispute at that time. Dkt. No. 30. The Court granted NYLAG's request and allowed NYLAG to take discovery. Dkt. No. 32. NYLAG served written discovery requests and took two depositions, including, as relevant to SSA's fee waiver practices, the Fed. R. Civ. P. 30(b)(6) deposition of Michelle Christ, the then-Deputy Executive Director of SSA's Office of Privacy and Disclosure, on February 7, 2025. *See* Dkt. Nos. 49-1; 55-1.

Following discovery, the Parties entered into a Stipulation of Settlement as to NYLAG's affirmative disclosure claim on June 27, 2025, Dkt. No. 65, which the Court subsequently so ordered, Dkt. No. 72. Under this settlement, SSA agreed to, going forward, publish its POMS and other policy documents on SSA's public website, and to publish 200 currently unpublished POMS. *Id*. SSA is currently implementing that Stipulation.

Despite months of negotiations, however, the Parties were unable to settle Plaintiffs' fee waiver claims, and requested a summary judgment briefing schedule. Dkt. No. 85; *see also* Dkt. No. 90. NYLAG now moves for summary judgment as its Claims One, Two, and Three. *See* Sec.

19

Am. Compl. ¶¶ 210-23.[12]

## ARGUMENT

**I.    Summary Judgment Should be Granted Where, As Here, the Material Facts are Undisputed.**

Summary judgment is appropriate where, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). NYLAG, as the moving party on this motion, bears the initial burden of demonstrating the absence of any genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After that, SSA, as the non-moving party, must "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). In opposing NYLAG's motion, SSA may not "rely on mere speculation or conjecture." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation omitted).

The FOIA statute is explicit that, when an agency is alleged to have violated the Act, "the burden is on the *agency* to sustain its action." 5 U.S.C. § 552(a)(4)(B) (emphasis added); *see also Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994) ("In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden showing that its [actions were] adequate."). In FOIA cases generally, and in fee waiver challenges specifically, the Court "shall determine the matter de novo." 5 U.S.C. § 552(a)(4)(A)(vii) (fee waivers); *id.* § 552(a)(4)(B) (FOIA matters generally). The statute is explicit that in requesters' judicial challenges to fee waiver decisions, the court's review "shall be limited to the record before the agency." *Id.* § 552(a)(4)(A)(vii). In other words, the agency may not supplement or rehabilitate

---

[12] Because SSA produced records in response to NYLAG's FOIA requests during the pendency of this litigation (56.1 ¶¶ 35, 40, 45, 53, 61), NYLAG does not move for summary judgment as to NYLAG's Claim Four, challenging SSA's withholding of records, Sec. Am. Compl. ¶¶ 224-227.

those denials through post hoc litigation arguments. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962).

When "a party seeks review of agency action under the [Administrative Procedure Act] . . . the entire case on review is a question of law . . . [that is] amenable to summary disposition." *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019) (citation modified). The court must ask whether, as a matter of law, the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). Review is confined to the administrative record compiled by the agency at the time of its decision; the agency may not supplement or augment that record in subsequent proceedings. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).

## II. SSA is Liable to NYLAG Because It Unlawfully Denied NYLAG's Fee Waiver Requests.

NYLAG's fee waiver requests easily satisfied the Fee Waiver Regulation, which mandates that SSA grant fee waiver requests that are in the public interest and not in the commercial interest of the requester, and SSA's explanations for those denials were facially deficient. SSA's denials were thus plainly unlawful.

The only remaining question is what statute provides NYLAG a remedy. The most straightforward answer is also the correct one: FOIA. SSA asserted earlier in this litigation that it is not subject to the FOIA statute governing fee waivers, 5 U.S.C. § 552(a)(4)(A), because § 1306(c) supposedly "govern[s]" SSA's assessment of costs for certain information requests to the exclusion of FOIA. *See* Dkt. 31 at 1-2. But this argument is both wrong and irrelevant to liability. As explained below, SSA's regulations and own practices make clear that SSA's denials of fee waiver requests are subject to challenge under the provision of FOIA authorizing judicial review. *See* 20 C.F.R. § 402.105(e) (directing judicial review of agency decisions,

21

including regarding fee waivers, under 5 U.S.C. § 552(a)). But even if FOIA did not supply NYLAG a cause of action here, the APA would, and SSA's unlawful denials of NYLAG's fee waiver requests would equally give rise to liability under 5 U.S.C. § 706. NYLAG is thus entitled to summary judgment as to SSA's denials of fee waivers for NYLAG's requests.

### A.  NYLAG Was Entitled to Fee Waivers Under SSA's Fee Waiver Regulation.

Since NYLAG's detailed FOIA requests demonstrated that the materials sought were "likely to contribute significantly to public understanding of the operations or activities of the government" and disclosure of those records was not "primarily in [NYLAG's] commercial interest," and SSA's denials were conclusory and boilerplate, SSA's denials violated its own binding regulation. SSA's denials also violated the FOIA statute, from which the regulation is derived, and which contains essentially the same standard. 5 U.S.C. § 552(a)(4)(A)(iii) (requiring fee waiver where "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester").

### i.  Disclosure of NYLAG's Requested Information Was Likely to Contribute Significantly to Public Understanding of SSA's Operations and Activities.

NYLAG's waiver requests straightforwardly satisfied the first prong of the Fee Waiver Regulation for being in the public interest, considering the three factors set out in 20 C.F.R. §§ 402.85(b)(2)(i)-(iii). The regulation itself makes clear that this is not a high bar: requests must only be "reasonably specific"; that is, they need only articulate something more than a "[g]eneralized interest in government programs." *Id.* § 402.85(b)(2)(iv).

First, it cannot reasonably be disputed that the records NYLAG requested "pertain[ed] to the Federal Government's operations or activities" (factor one). *See* Background VI.

Second and third, the requested records sought "meaningful information" that was "not

22

already known to the public" (factor two) and "that contribution to public understanding . . . would be significant" (factor three). 20 C.F.R. § 402.85(b)(2)(i)-(ii). NYLAG's detailed, specific explanations, which span three to four pages each, amply satisfy the requirements of "reasonable specificity" established by courts in evaluating denials of fee waivers. (56.1 ¶¶ 36, 41, 47, 54, 62.) These describe far more than a "generalized interest" in government programs, instead identifying specific impacts that the information would have on the public and, in particular, NYLAG's low-income clients who need legal assistance accessing benefits to which they are entitled. 20 C.F.R. § 402.85(b)(2)(iv); *see also* POMS GN 003311.005(G) (factors relevant to fee waiver requests include "[w]hether the records being requested could actually be used to benefit the general public").

Specifically, NYLAG's fee waiver requests described in detail how the records sought would contribute meaningfully to the public's understanding of SSA's programming:

1. How SSA evaluates fee waiver requests: As NYLAG's fee waiver request explained, "there has been limited public information from SSA on how FOIA requestors can submit a viable fee waiver request; instead, the fee waivers are summarily denied." The public has a clear interest in understanding whether SSA has policies and procedures in place to adjudicate fee waiver requests—particularly since the Agency has been denying virtually all fee waivers for years, leading to the meaningful deprivation of access to records by thousands of members of the public. (56.1 ¶ 36.)

2. SSA's policies related to information exchange with a payroll data provider: Although SSA had promulgated a Notice of Proposed Rulemaking regarding selection of a new data payroll provider, it had not published information on how that information exchange would work. The public has a strong interest in understanding the guardrails on sharing of their payroll data, since SSA intended to use that data to determine benefits eligibility and thus affect beneficiaries' access to food, healthcare, and housing. (56.1 ¶ 41.)

4. SSA's policies for providing language assistance to SSA beneficiaries with limited English proficiency and for conducting hearings, and field office phone numbers: This information is meaningful to members of the public who need to interface with SSA in a language other than English; need the hearing office to resolve benefits disputes; or need to contact field offices—all information that SSA was keeping secret at the time of the request. (56.1 ¶ 47.)

5.  SSA's policies and instructions to staff on how to make crucial determinations turning on medical evaluations of claimants and disability determinations, when a consultive examination is required, and best practices for oversight meetings with state agencies: Taken together, these internal and previously undisclosed policies have a profound effect on whether members of the public are eligible for benefits and what requirements they must meet to receive benefits. (56.1 ¶ 54.)

6.  Data on when youth receiving SSI benefits who are transitioning to adulthood are able to maintain their benefits: This data is of vital interest to the public, especially young people reliant on SSI benefits who need to determine their ongoing eligibility as they turn 18. (56.1 ¶ 62.)

NYLAG also, for each request, explained how it would disseminate the information to its clients, advocates, and the public. *See* Background IV. (56.1 ¶¶ 36, 41, 47, 54, 62.)

Courts have repeatedly confirmed that even substantially less meaty requests satisfy FOIA's statutory waiver criteria on which SSA's regulation is based. So long as a request is supported by more than "conclusory allegations," the reasonable specificity requirement is met. *Jud. Watch, Inc. v. Rossotti* ("*Jud. Watch I*"), 326 F.3d 1309, 1312 (D.C. Cir. 2003) (citation modified). And for example, as a court in this District recognized, an organization seeking to provide "independent analysis of currently undisclosed agency records" that "shed light" on the agency's actions, and share that analysis with the public," satisfies this requirement. *Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 581 F. Supp. 2d 491, 495, 499 (S.D.N.Y. 2008) (EPA's denial violated FOIA's fee waiver provision); *see also Forest Guardians v. U.S. Dep't of Interior*, 416 F.3d 1173, 1180 (10th Cir. 2005) (requester's plans to "disseminat[e] the requested records" would contribute to the public's understanding of the agency).

### ii. Disclosure of the information NYLAG requested is not primarily in NYLAG's commercial interest.

SSA cannot reasonably dispute that it was not "primarily" in NYLAG's "commercial interest" to obtain the material NYLAG sought. *See* 20 C.F.R. § 402.85(b). SSA has never alleged that NYLAG had *any* commercial interest in those records, nor could it: As NYLAG

explained in its fee waiver requests, it is a 501(c)(3) nonprofit organization that provides free legal services to New Yorkers who cannot afford attorneys. NYLAG advocates on behalf of clients who are receiving or applying for public benefits administered by SSA, and does not charge these clients any fees. NYLAG sought the requested information to aid in its free representation of low-income clients, and, specifically, to ensure that clients eligible to receive benefits from SSA in fact receive those benefits. And, NYLAG explained that it intended to distribute, for free, the information and documents it received in response to its FOIA requests to other advocates and to the public. *See* Background IV. (56.1 ¶¶ 36, 41, 47, 54, 62.)

### iii.   SSA's conclusory, boilerplate denials contained insufficient reasoning.

Even setting aside that SSA's denials of NYLAG's fee waivers were substantively wrong, they were also unlawful because they were functionally identical and conclusory, containing no reasoning. They thus did not sufficiently support SSA's determinations.

In seeking a fee waiver, the requester need make only "a prima facie showing before the agency is obligated to consider the request." *Coleman v. Drug Enf't Admin.*, 714 F.3d 816, 826 (4th Cir. 2013); *accord Carney*, 19 F.3d at 814 (fee requester waiver bears the initial burden to "establish that the disclosure of information was in the public interest and was not primarily in his commercial interest"). Once the requester has "passed the test," the agency's denial "must be reasonably calculated to put the requester on notice as to the deficiencies in the requester's case." *Friends of the Coast Fork v. U.S. Dep't of the Interior*, 110 F.3d 53, 55 (9th Cir. 1997). A conclusory denial is not enough: "An agency is obliged to *explain* its refusal to waive fees." *Jud. Watch, Inc. v. Gen. Servs. Admin.*, No. 98-cv-2223, 2000 WL 35538030, at *4 (D.D.C. Sept. 25, 2000) (emphasis added) (citation modified). Critically, "mere recitation" of regulatory language "does not suffice as a reasoned explanation for [the] denial" of a request. *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 436 F. Supp. 3d 354, 359 (D.D.C. 2020).

Even if SSA could come up with better reasons now—which it cannot, since no good reasons for these denials exist—the Court would be prohibited from considering them. "On judicial review, [courts] cannot consider new reasons offered by the agency not raised in the denial letter." *Friends of the Coast Fork*, 110 F.3d at 55. "[T]he agency must stand on whatever reasons for denial it gave in the administrative proceeding. If those reasons are inadequate, and if the requesters meet their burden, then a full fee waiver is in order." *Id.*; *see also Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 432 F.3d 945, 947 (9th Cir. 2005) (reviewing court "cannot consider new reasons offered by the agency not raised in the denial letter").

SSA's denials of NYLAG's fee waivers unquestionably fail this test. As discussed above, in contrast to NYLAG's detailed FOIA requests, SSA's denials relied on identical language that, literally, recapitulated the § 402.85 language, then stated: "Your fee waiver request fails to explain with reasonable specificity how the disclosure of the information you requested will meet the above factors, and I have not otherwise found that release of the records requested would meet the abovementioned factors." (56.1 ¶¶ 37, 42, 48, 55, 63.) These bare recitations of the Fee Waiver Regulation standard do not meet SSA's obligation to put NYLAG "on notice" as to any deficiencies in its request. *See Friends of the Coast Fork*, 110 F.3d at 55; *see also Citizens for Resp. & Ethics in Wash.*, 436 F. Supp. at 361 (agency's single-sentence denial of request for expedited consideration "[did] not stand up to judicial review"). SSA's denials of NYLAG's fee waivers were thus erroneous as a matter of law for this additional reason.

The narrow slivers of NYLAG's requests for which SSA did grant partial fee waivers— one limited sub-request each in Requests 2 and 4—simply underscore the arbitrariness and insufficiency of the remainder of SSA's denials. For example, SSA granted NYLAG's fee waiver request for records related to Equifax's "quality assurance assessments to ensure

accuracy" of data from employers, but denied it as to SSA's policies for "independent verification of" that same data, as well as "assessments, studies, and/or cost-benefit analyses" regarding SSA's use of that same data. (56.1 ¶ 41.) There is no conceivable basis—nor did SSA even attempt to identify one—on which SSA could have determined that the first category would make a "significant" contribution to the "public's understanding" of SSA's operations vis-à-vis Equifax by "reveal[ing] . . . meaningful information . . . not already known to the public," while the latter categories did not. (56.1 ¶¶ 41-42.) All of the requested information equally concerned previously-unavailable information about how SSA intended to use Equifax payroll data to impact eligibility and thus beneficiaries' access to food, health care and housing. *See also* (56.1 ¶¶ 42, 48.) (denying fee waiver for Request 4 as to limited English proficiency policies, but granting as to hearing office staff's procedure manual, despite both meaningfully informing the public about policies affecting access to benefits).

### B.  SSA's Unlawful Denials of NYLAG's Fee Waiver Requests Violated FOIA.

The FOIA statute mandates that agencies provide fee waiver requests in the public interest; SSA regulatorily implemented that requirement in its Fee Waiver Regulation; and SSA's regulations plainly prescribe judicial review of fee waiver decisions through actions brought under FOIA. There should be no reasonable dispute that FOIA is the appropriate way for NYLAG to seek redress for SSA's unlawful denials of its waiver requests. Yet SSA has previously taken the position that these denials are not reviewable under FOIA because SSA's authority to assess fees is supposedly governed by § 1306 and not FOIA. Dkt. 31 at 1-2. This argument is wrong: regardless of whether SSA purports to charge fees for a FOIA request's processing under § 1306, all fee waiver requests are connected to FOIA requests and are thus subject to challenge in federal court under FOIA's grant of judicial review authority.

FOIA allows requesters to bring suit in federal court where some aspect of their FOIA

27

request has been denied, including that requesters may "seek judicial review of denials of fee waivers[.]" *Jud. Watch I*, 326 F.3d at 1310; 5 U.S.C. § 552(a)(4)(B) (general judicial review provision); 5 U.S.C. § 552(a)(4)(A)(vii) ("In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo[.]"); *see also Diapulse Corp. of Am. v. Food & Drug Admin. of Dep't of Health, Educ. & Welfare*, 500 F.2d 75, 78 (2d Cir. 1974) (for agency to condition its response to FOIA request "upon payment of unlawful fees would be the sort of improper withholding of material that 5 U.S.C. § [552(a)(4)] gives the district courts jurisdiction to enjoin").

FOIA also mandates that "each agency shall promulgate regulations . . . specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced." 5 U.S.C. § 552(a)(4)(A)(i). SSA has done just that, promulgating such regulations to implement the FOIA statute's command. *See* 20 C.F.R. §§ 402.05-165; *see also id.* § 402.05(a) ("The purpose of this part is to describe [SSA's] policies and procedures for implementing the requirements of the Freedom of Information Act."); *id.* § 402.10 (defining FOIA as the law "that provides the public with the right to request agency records from the Federal executive branch agencies."). Under these regulations, "FOIA and the rules in this part apply to all SSA records." 20 C.F.R. § 402.20(a). One of these regulations is SSA's Fee Waiver Regulation, § 402.85. Indeed, SSA's Fee Waiver Regulation repeats the "public interest" and "not primarily in the commercial interest" language of the FOIA statute itself. *Compare* 20 C.F.R. § 402.85 *with* 5 U.S.C. § 552(a)(4)(A)(iii). SSA's regulations regarding the "[a]vailability of [i]nformation and [r]ecords to the [p]ublic" also implement 42 U.S.C § 1306 as to the charging of fees for certain requests, 20 C.F.R. § 402.80—but not to the exclusion of FOIA. *See* 20 C.F.R. pt. 402;

28

Availability of Information and Records to the Public, 89 Fed. Reg. 102,704, 102,711 (Dec. 18, 2024) (listing 5 U.S.C. § 552, as well as 42 U.S.C. § 1306, as authority for 20 C.F.R. pt. 402).

As relevant here, SSA's regulations are unambiguous about three things: (1) all requests for information subject to 20 C.F.R. Part 402 are FOIA requests; (2) all fee waivers associated with FOIA requests are subject to the public interest analysis in 20 C.F.R. § 402.85; and (3) denials of fee waiver requests are properly the subject of FOIA lawsuits under 5 U.S.C. § 552.

First, SSA's regulations explain that all requests subject to Part 402, including those with associated fee waiver requests, are FOIA requests.[13] In describing the "[r]equirements of a FOIA Request," the regulations require that "[t]o be considered a FOIA request," the request must only be "written"; submitted via SSA's FOIA portal, to FOIA.Public.Liaison@ssa.gov, or by mail; include the requester's contact information; and "clearly state and reasonably describe what SSA records are being requested in sufficient detail to enable OPD to locate them with a reasonable amount of effort." 20 C.F.R. §§ 402.30(a), 402.35(a). All such requests are FOIA requests; there is no alternative category of § 1306 requests. SSA's practices and its staff's understanding confirm this legal characterization. *See* Background III.

The regulatory section titled "[c]harging under section [1306] of the Social Security Act" makes this even more explicit. It clearly refers to all requests charged under § 1306 as "FOIA requests," even while clarifying that, consistent with § 1306, SSA is "permit[ted] … to charge the full cost to process requests for information for purposes not directly related to the administration of program(s) under the Social Security Act," notwithstanding the specific fee mandates within FOIA (or other laws). 20 C.F.R. § 402.80. Once a FOIA request has been

---

[13] SSA does receive other types of records requests, for instance requests for "Decedent Numident" information, *see infra* n.7, or requests under the Privacy Act, but those are "handle[d] … separately" and are not at issue here. (56.1 ¶ 173.)

29

received, it is sent to the "FOIA Officer," who is the "only" person who makes determinations about, *inter alia*, "[c]harging or waiver of fees." *Id.* § 402.50(a). If a "requester disagrees with the FOIA Officer's determination," about a fee waiver or anything else, they may administratively appeal that decision pursuant to § 402.105, which in turn instructs that such appeals are "FOIA appeal[s]." *Id.* §§ 402.50(b), 402.105(a) (3), (b)-(c). So, under SSA's regulations, all requests for information submitted to SSA are FOIA requests—regardless of whether SSA invokes § 1306 as the basis for the specific amount charged.[14]

Second, SSA's regulations provide that all FOIA fee waiver requests—whether SSA would otherwise charge fees for the request under FOIA or § 1306—are subject to the Fee Waiver Regulation at 20 C.F.R. § 402.85. Whether to grant a fee waiver is determined separately from the *amount* of fees that SSA charges. When it comes to calculating the amount, there are two categories of FOIA requests—those for which § 1306 supplies the charging parameters, 20 C.F.R. § 402.80, and those for which the FOIA statute supplies the charging parameters, *id.* § 402.70(a). Those categories matter because they control the substantive fee amount SSA assesses. For example, SSA "may charge full costs" for FOIA requests subject to § 1306, including costs for search, review, production and duplication, certification, employee's time, forwarding/delivering materials, and "performing special services." *Id.* § 402.80(a). By contrast,

---

[14] In total, "FOIA" or "Freedom of Information Act" appears in Part 402 more than two hundred times. *See, e.g.*, 20 C.F.R. § 402.15(a) ("SSA will withhold information only if we reasonably foresee that disclosure would harm an interest protected by a FOIA exemption or if disclosure is prohibited by law"); *id.* § 402.100 (directing requesters to the "FOIA public liason" via the email address FOIA.Public.Liason@ssa.gov); *id.* § 402.10 (defining "Chief FOIA Officer" as "senior official of SSA who has an agency-wide responsibility for ensuring efficient and appropriate compliance with the FOIA, monitoring implementation of the FOIA throughout the agency, and making recommendations to the head of the agency to improve the agency's implementation of the FOIA"); *id.* § 402.10 (defining components as "each separate office, division, commission, service, center, or administration within SSA that may maintain agency records subject to a request under the FOIA").

SSA may charge standard FOIA fees only for some of these costs, depending on the type of requester. *Id.* § 402.75(a) (distinguishing between costs for "[c]ommercial use requesters" and for "non-commercial educational or scientific institutions and representative of the news media"). And, of course, if the FOIA request is for a "program purpose," SSA may not charge any fees—regardless of any other inquiry, including a fee waiver inquiry. *Id.* § 402.80(a).

The Fee Waiver Regulation, § 402.85, is explicit that "[a] requester may request waiver or reduction of fees, whether charged under § 402.75 [fees under FOIA] or § 402.80 [fees under § 1306] if the release of the requested records is in the public interest," and that, regardless of the charging authority, "[w]e *will* waive or reduce the fees we would otherwise charge" if the request is "in the public interest" and "not primarily in the commercial interest of the requester." *Id.* § 402.85(a)-(b) (emphasis added).

Third, SSA's regulations clearly provide that parties seeking judicial review of fee waiver decisions must do so under the FOIA statute's jurisdictional grant. Once the FOIA Officer has made a decision on a FOIA request, including as to a fee waiver, § 402.105 instructs that "requesters may . . . ask a U.S. District Court to review our final decision." That judicial review provision cites FOIA and only FOIA— not any other provision, such as § 1306 or the APA. *Id.* (citing 5 U.S.C. § 552(a)(4)(B)). Lest any doubt remained, the regulatory provision on "[c]harging under section [1306] of the Social Security Act," states that "[t]he process described in § 402.105"—that is, the provision that provides exclusively for judicial review via an action pursued in District Court under the FOIA statute—"will . . . apply to . . . appeals" of the FOIA Officer's decision about whether to charge fees under § 1306 for a purportedly non-program-purpose request. 20 C.F.R. § 402.80(e). So, the regulations are explicit that, for fee waiver requests where fees would be assessed under § 1306, the appropriate avenue for judicial review

31

is *still* a FOIA challenge under § 552.

SSA's treatment of all the FOIA requests it receives, including NYLAG's, is consistent with the regulations' unambiguous commands to treat all requests as FOIA requests subject to the Fee Waiver Regulation. *See* Background III (confirming SSA's practices and staff's understanding that SSA treats all requests subject to Part 402 as FOIA requests). Each fee waiver denial letter SSA sent to NYLAG says that SSA is responding to "your fee waiver request regarding your … *Freedom of Information Act (FOIA) request for records*." (56.1 ¶¶ 37, 42, 48, 55, 63, 164.) (emphasis added). Each denial specifically provided that: "*Our regulation (20 C.F.R. § 402.[]85(b)) lists factors we consider in analyzing whether disclosure is in the public interest*." (56.1 ¶¶ 37, 42, 48, 55, 63, 164.) (emphasis added). Each denial instructed NYLAG to direct questions and requests for assistance to the "FOIA Public Liaison" at the email address listed in 20 CFR § 402.100, FOIA.Public.Liaison@ssa.gov, and to send an appeal of the denial to that same email, identified as a "*Freedom of Information Appeal*." *Id*. (emphasis added). Each denial directed NYLAG to consider "mediation services to resolve disputes *between FOIA requesters* and federal agencies." *Id*. (emphasis added). When SSA sent NYLAG a fee notice for Request 4, SSA explained that the communication was "associated with your Freedom of Information Act (FOIA) request." (56.1 ¶ 50.) That letter explained it was withholding certain information under FOIA exemptions—again confirming that SSA understood that the requests, including fee waiver requests, were under FOIA. (56.1 ¶ 50.) As these denials make clear, SSA understands that § 1306 does not alter that these requests are FOIA requests, and SSA must assess fee waivers associated with them using the criteria that SSA itself implemented in § 402.85.

The Second Circuit recently weighed in on a related matter and recognized that even if

the charging basis for a FOIA request is supplied by § 1306, challenges to determinations associated with that request should be litigated under FOIA. *Shapiro v. U.S. Soc. Sec. Admin.*, 160 F.4th 347, 349-50 (2d Cir. 2025). In *Shapiro*, the plaintiff brought a FOIA claim arguing, principally, that the FOIA statute prohibited SSA from charging him fees when the agency failed to provide records within the timelines set forth in the statute. *Id.* at 352 (describing plaintiff's challenges under 5 U.S.C. § 552(a)). SSA contended that § 1306 "displace[d]" that statutory provision, which, notably, SSA had not implemented by regulation. Br. for Appellant, *Shapiro v. U.S. Soc. Sec. Admin.*, No. 22-1191, Dkt. 36 at 2 ("*Shapiro* SSA Brief"). SSA did not dispute that the court had jurisdiction to consider the FOIA appeal under § 552, *id.* at 1, and the Second Circuit did not question its jurisdiction, instead reaching the merits. *Shapiro*, 160 F.4th at 355.

The *Shapiro* court held that, as to FOIA's ban on fees for late-produced records specifically, notwithstanding FOIA, § 1306 permits SSA "the authority to charge Shapiro the full cost of FOIA processing fees despite the agency's failure to respond to his request within the twenty-day statutory deadline." *Id.* at 355 (citation modified); *see also id.* at 357-58 (concluding that under § 1306, Shapiro's request was not "program-related"). But *Shapiro* had no cause to address public interest fee waivers, *see* 20 C.F.R. § 402.85, because they were not at issue in the case. Nor did *Shapiro* suggest, as SSA has asserted earlier in this litigation, that fee waiver requests, including where fees would be assessed under § 1306, are not litigable under FOIA, or that § 1306 "governs" all aspects of SSA's fee-charging decisions to the exclusion of FOIA. *Compare* Dkt. No. 31 at 2, *with Shapiro*, 160 F.4th at 354-57. And *Shapiro* certainly did not hold that § 1306 abrogated or otherwise disturbed judicial review of FOIA fee waiver denials under FOIA—indeed, it (implicitly) recognized the opposite by reaching the merits of Shapiro's FOIA challenge. *See Shapiro*, 160 F.4th at 355.

33

Finally, to the extent that SSA may assert that by labeling a request as for a non-program purpose under § 1306, SSA could deprive a requester of FOIA's protections and avenue for judicial review, that would be both legally meritless and deeply problematic. First, it would violate SSA's existing regulations on both public interest fee waivers and judicial review. *See* Argument II.A (explaining how SSA's denials violate 20 C.F.R. § 402.85 and those denials are subject to judicial challenge under FOIA). Second, it would be inconsistent with SSA's actual practices, as to NYLAG and all other requesters, of treating all requests as FOIA requests. *See* Background VI. And third, it would condition requesters' access to rights guaranteed by FOIA on SSA's own determinations about whether a request is for a "program" or "non-program" purpose—determinations which are systematically arbitrary, lopsided, and unsupported.[15]

In short: SSA's regulations, its practices, and case law all confirm that challenges to SSA's unlawful denial of fee waiver requests may be challenged in federal court via FOIA, and, since SSA's denials of NYLAG's fee waiver requests plainly violated § 402.85, NYLAG is entitled to relief under FOIA. This relief should include, at a minimum, a declaration that SSA's denials were unlawful, and a judicial order that SSA grant NYLAG's fee waivers. *See* 5 U.S.C. § 552(a)(4)(A)(iii) ("[d]ocuments *shall be furnished*" at no or reduced charge where disclosure is in the public interest (emphasis added)); *Jud. Watch I*, 326 F.3d at 1312, 1315 (ordering agency to grant waiver where requester had no commercial interest in disclosure, consistent with Congress's intent to prevent fees from deterring public interest requesters); *Friends of the Coast Fork*, 110 F.3d at 56 (remanding to district court with instructions to grant full fee waiver).

---

[15] *See infra* nn. 18, 19 (SSA has deficient processes for program/non-program determinations and virtually never finds a request to be for a program purpose).

34

### C. In the Alternative, NYLAG Can Challenge SSA's Unlawful Denials of Its Fee Waiver Requests under the APA.

Even if this lawsuit could not be litigated under FOIA—which, as the foregoing explains, it plainly can and must—NYLAG is still entitled to summary judgment. SSA has argued that its Fee Waiver Regulation was issued exclusively under § 1306, not FOIA, and has suggested that judicial review under FOIA is thus foreclosed. Dkt. 31 at 1. These arguments are meritless, but, at most, they would merely redirect NYLAG's challenge through the APA, not eliminate it. Such a challenge would likewise result in a grant of summary judgment to NYLAG, because the denials were reviewable final agency action and, since they violated SSA's own regulations, were arbitrary and capricious and contrary to law. *See* 5 U.S.C. § 706(2)(a).[16]

SSA's denials of NYLAG's fee waiver requests represented "final agency action[s]." 5 U.S.C. § 704. An agency's action is "final" for APA purposes when it (1) "mark[s] the consummation of the agency's decisionmaking process . . . [and is] not of a merely tentative or interlocutory nature," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). SSA's denials of NYLAG's fee waiver requests meet both of these criteria: (1) SSA's denials were the agency's final decision on whether to grant those requests; and (2) the denials "determined" NYLAG's right to the waiver—in the negative—and had the "legal consequence" that NYLAG would be obligated to

---

[16] The Court may only consider the APA if it concludes, contrary to the straightforward law described above, that NYLAG's claim cannot proceed under FOIA. 5 U.S.C. § 704 (providing for review of agency action "for which there is no other adequate remedy in a court"); *see also Physician's Comm. for Responsible Med. v. Dep't of Health & Hum. Servs.*, 480 F. Supp. 2d 119, 121 n.2 (D.D.C. 2007) (declining to reach APA claim because "[t]here is, of course, an adequate remedy in court under FOIA for denial of a fee waiver request"); *Cedars Nursing & Convalescent Ctr., Inc. v. Aetna Life & Cas. Ins. Co.*, 472 F. Supp. 296, 297 (E.D. Pa. 1979) (where FOIA review was not available, "review of an agency decision to disclose information may be had under the [APA]").

pay whatever fees SSA chose to assess (or else withdraw its requests altogether). *See id.* (agency determination that caused plaintiffs to owe money was a final agency action).

SSA's denials of NYLAG's fee waiver requests violated the APA in at least two ways. First, the denials violated the APA's requirement that agency action comply with its own regulations—here, 20 C.F.R. § 402.85. "Under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations." *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)); *see also Webster v. Doe*, 486 U.S. 592, 602 n.7 (1988) (an "[a]gency's failure to follow its *own regulations* can be challenged under the APA" (emphasis in original)). "When agencies fail to do so, the APA (as developed by case law) gives aggrieved parties a cause of action to enforce compliance." *Fed. Defs. of N.Y., Inc.*, 954 F.3d at 130; *see also id.* at 122 (plaintiffs' cause of action was 5 U.S.C. § 706(2)). That is what happened here: SSA violated § 402.85 by denying NYLAG's fee waiver requests, and thus ran afoul of § 706 of the APA.

Second, and independently, SSA's denials violated the APA's prohibition on agency action that is arbitrary and capricious, or not in accordance with law. 5 U.S.C. § 706(2)(A). "An agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022) (citation modified). As with FOIA, under the APA, a "court may not consider new reasons by the agency that were not advanced in its denial letter." *Jud. Watch,*, 2000 WL 35538030, at *4; *see also*

36

*Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."). Courts "must assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any *ex post* rationales a court can devise." *Kakar*, 29 F.4th at 132 (quoting *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021)). Where an agency has not "articulated a satisfactory explanation for its action," that action is arbitrary and capricious. *Id.* at 135 (citation modified).

As described in detail above, SSA's denial letters do not engage with the § 402.85 factors in any meaningful way: They do not assess whether the specific records requested would contribute to public understanding of government operations; they do not analyze NYLAG's commercial interest, or lack thereof; and they are supported only by boilerplate text devoid of detail or reasoning. *See* Argument II.B. Under APA case law, this makes them arbitrary and capricious. *See Kakar*, 29 F.4th at 133, 135 (setting aside agency action where agency did not "articulate[] a satisfactory explanation" and its *post hoc* justifications were "insufficient to permit [the Court] to discern [the agency's] reasoning or to conclude that the agency has considered all relevant factors"); *New York v. Admin. for Child. & Fams.*, --- F. Supp. 3d ---, 2026 WL 673848, at *18 (S.D.N.Y. Mar. 10, 2026) (plaintiffs were likely to succeed on their claim that agency action was arbitrary and capricious where the agency "provide[d] no reasoned explanation" for its decision); *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 532 (D.D.C. 2016) (an agency "must, of course, reveal the reasoning that underlies its conclusion" (citation modified)). An "agency's decision not to waive fees [under FOIA] is arbitrary and capricious when there is nothing in the agency's refusal of a fee waiver which indicates that furnishing the information requested cannot be considered as primarily benefiting the general public." *Eudey v. CIA*, 478 F. Supp. 1175, 1177

37

(D.D.C. 1979) (quotation omitted); *see also Larson v. CIA.*, 664 F. Supp. 15, 19 (D.D.C. 1987), *aff'd*, 843 F.2d 1481 (D.C. Cir. 1988) (granting summary judgment under APA, in FOIA fee waiver challenge that preceded FOIA's private cause of action (quotation omitted)).[17]

If this Court grants summary judgment in NYLAG's favor under the APA, the Court should issue a declaration in NYLAG's favor, set aside the denials, and remand to the agency with instructions to grant NYLAG's fee waiver requests. *See* 5 U.S.C. § 706(2)(A), (C).

## III. NYLAG Is Entitled to Summary Judgment as to SSA's Unlawful Blanket Denials of Virtually All Fee Waiver Requests.

SSA's wrongful denials of NYLAG's fee waiver requests were not isolated events. Rather, the evidence shows that SSA denies virtually all fee waiver requests using categorically insufficient, nearly identical denials. As with NYLAG's individual claims, SSA is liable for this unlawful practice under either FOIA or the APA. FOIA provides a cause of action to challenge precisely this kind of noncompliance where, as here, the agency has a policy or practice of flouting its statutory obligations in ways that will continue to harm plaintiffs. And in the event FOIA did not supply an adequate systemic remedy, the APA would, since it directs courts to set aside informal policies that are arbitrary and capricious or contrary to law—as SSA's blanket denial practice plainly is. NYLAG is therefore entitled to summary judgment on its systemic FOIA claim (Count One), or in the alternative, its systemic APA claim (Count Two).

---

[17] The APA's prohibition on arbitrary and capricious agency action would also apply if, as SSA has previously asserted, § 1306, not FOIA, exclusively "governs" SSA's ability to charge fees for FOIA requests. *See* Dkt. No. 31 at 2. SSA's purported determinations that NYLAG's FOIA requests were not for a program purpose under § 1306 were unsupported by any explanation or reasoning—indeed, in four of NYLAG's five requests, the denial letters did not mention § 1306 at all, (56.1 ¶¶ 37, 42, 48, 55, 63)—and thus did not meet the APA's requirement that agencies articulate an explanation for their decisions. *See also infra* n.20 (describing the deeply deficient practices by which SSA claims that virtually all requests are not for a program purpose).

38

### A.  SSA's Pattern or Practice of Denying Fee Waiver Requests Without Meaningful Review Violates FOIA.

The evidence here shows that SSA has a pattern or practice of routinely denying fee waiver requests without meaningful review, and without regard for merit—including NYLAG's, as well as 99% of other requesters'—in violation of SSA's own regulation. NYLAG's challenge to that practice is cognizable under FOIA, and the Court should grant NYLAG summary judgment on Claim One, Sec. Am. Compl. ¶¶ 210-14.

As discussed above, a plaintiff may challenge the wrongful denial of its own fee waiver request through litigation filed under FOIA, 5 U.S.C. § 502. *See* Argument II.B. That is equally true, contrary to SSA's assertion earlier in this case, *see* Dkt. 31 at 3, when an agency has developed a pattern and practice of such wrongful denials. "[A] plaintiff may challenge an agency's policy or practice [of violating FOIA] where it will impair the party's lawful access to information in the future." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1242 (D.C. Cir. 2017) (citation modified). Other courts, including the Ninth and D.C. Circuits, have held that pattern or practice claims constitute independent causes of action under FOIA. *See, e.g.*, *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.* ("*Jud. Watch II*"), 895 F.3d 770, 779-80 (D.C. Cir. 2018); *Hajro v. U.S. Citizenship & Immigr. Servs.*, 811 F.3d 1086, 1102-03 (9th Cir. 2016).

Although the Second Circuit has declined to rule on this issue, it assumed without deciding that pattern or practice claims can be brought under FOIA. *Am. Soc'y for the Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*, 60 F.4th 16, 21 (2d Cir. 2023) (per curiam). And district courts within this Circuit—consistent with the views of the Ninth and D.C. Circuits—have reached a consensus that FOIA pattern or practice claims are indeed available. *See, e.g.*, *Reclaim the Recs. v. U.S. Citizenship & Immigr. Servs.*, No. 23-cv-1997,

39

2025 WL 936924, at *12 (S.D.N.Y. Mar. 27, 2025) (Engelmayer, J.); *Int'l Refugee Assistance Project, Inc. v. U.S. Citizenship & Immigr. Servs.*, 551 F. Supp. 3d 136, 166 (S.D.N.Y. 2021) (Lehrburger, J.); *Am. Soc'y for the Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*, 2021 WL 1163627, at *14 (S.D.N.Y. Mar. 25, 2021) (Buchwald, J.), *aff'd*, 60 F.4th 16 (2d Cir. 2023); *Doyle v. U.S. Dep't of Homeland Sec.*, 331 F. Supp. 3d 27, 66-67 (S.D.N.Y. 2018) (Failla, J.), *aff'd*, 959 F.3d 72 (2d Cir. 2020); *Panjiva, Inc. v. U.S. Customs & Border Prot.*, 342 F. Supp. 3d 481, 496 (S.D.N.Y. 2018) (Oetken, J.), *aff'd*, 975 F.3d 171 (2d Cir. 2020); *N.Y. Times Co. v. F.B.I.*, 822 F. Supp. 2d 426, 431 (S.D.N.Y. 2011) (Patterson, J.).

These cases correctly recognized FOIA pattern or practice claims for three reasons. First, FOIA grants courts broad remedial powers to enforce the terms of the statute. *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 19 (1974) ("Congress knows how to deprive a court of broad equitable power when it chooses so to do. . . . With the express vesting of equitable jurisdiction in the district court by [§] 552(a), there is little to suggest . . . that Congress sought to limit the inherent powers of an equity court."). These expansive powers reflect Congress's intention that courts act as the principal enforcers of FOIA. *Id*. Moreover, as the Second Circuit has held, FOIA's text, read in light of its history and purpose, empowers courts to enforce the full range of FOIA's mandates. In *New York Legal Assistance Group v. Board of Immigration Appeals*, the Second Circuit held that courts may enforce FOIA by requiring an agency to proactively make certain documents publicly available, rejecting the government's position that courts merely serve as adjudicators for individual document requests. 987 F.3d 207, 224 (2d Cir. 2021). In doing so, the Court recognized that "[a] broad reading of FOIA's remedial provision is . . . consistent with the statute's purpose," which is "to facilitate public access to Government documents." *Id*. at 223. This reasoning applies with equal force in this case. If District Courts

40

may order agencies to comply with their affirmative disclosure obligations, they may certainly order compliance with the mandatory fee waiver provision, which imposes an equally non-discretionary obligation on agencies when the waiver criteria are met. *See id.* (authorizing courts to issue remedies that "in fact require the agency to do what Congress wanted"); *cf. Carney*, 19 F.3d at 814 (confirming broad judicial authority to remedy improper fee waiver denials by independently reviewing agency determination).

Second, FOIA's statutory text and structure confirm the breadth of courts' powers to grant the relief necessary to enforce the statute's terms. Its fee waiver provision, 5 U.S.C. § 552(a)(4)(A)(iii), is mandatory: documents "shall be furnished without any charge" or at a reduced charge when the criteria are met. *See Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("It is undisputed that the word 'shall' imposes a mandatory command."). And, as discussed above, under 5 U.S.C. § 552(a)(4)(B), courts have jurisdiction to direct agencies to provide materials without charging fees that are "not authorized." *See Diapulse Corp. of Am*, 500 F.2d at 76, 79.

Moreover, FOIA's enforcement scheme is deliberately structured to give courts independent authority over fee waiver decisions. The statute specifically provides that fee waiver denials are subject to de novo review. 5 U.S.C. § 552(a)(4)(A)(vii). In other words, not only are courts empowered to review fee waiver denials, they are prohibited from deferring to an agency's fee waiver determination. Instead, they are directed to independently assess whether a requester was entitled to a waiver—and if so, a waiver must be provided.

Third, FOIA pattern or practice claims function as a necessary statutory enforcement tool that prevents the government from avoiding accountability altogether. Courts have recognized that agencies have "exploited the Article III case-or-controversy requirement that prevents federal courts from issuing advisory opinions" by complying with the statute's terms only after a

41

requester files suit. *Reclaim the Recs.*, 2025 WL 936924, at *9. In *Judicial Watch Inc. v. Department of Homeland Security*, for example, a requester was forced to file five separate lawsuits challenging the same type of unlawful withholding, because each time—only after litigation commenced—the agency belatedly produced the records. *Jud. Watch II*, 895 F.3d at 773. The D.C. Circuit recognized that, absent a pattern and practice claim, an agency's last-minute compliance, conveniently timed to moot pending litigation, would allow agencies to evade judicial review for systemic FOIA violations. *Id.* at 780. This is why courts—including the D.C. Circuit, which is "the most frequent appellate forum in FOIA cases"—have recognized pattern or practice FOIA claims to ensure agencies do not circumvent their statutory obligations. *See Reclaim the Recs.* 2025 WL 936924, at *10; *see also Jud. Watch II*, 895 F.3d at 773.

The evidence presented here successfully proves a pattern or practice claim under FOIA. To prevail on a FOIA policy or practice claim, a plaintiff must show that: "(1) the agency in question has adopted, endorsed, or implemented a policy or practice that constitutes an ongoing failure to abide by the terms of the FOIA; and (2) the plaintiff will suffer continuing injury due to this practice." *Nat'l Sec. Couns. v. C.I.A.*, 898 F. Supp. 2d 233, 253 (D.D.C. 2012), *aff'd*, 969 F.3d 406 (D.C. Cir. 2020) (citation modified). A formal written policy is not required; "informal agency conduct . . . may serve as the basis for a policy or practice claim." *Nightingale v. U.S. Citizenship & Immigr. Servs.*, 507 F. Supp. 3d 1193, 1207 (N.D. Cal. 2020) (citation modified).

First, SSA has adopted and implemented an informal policy of denying virtually all fee waiver requests regardless of their individual merits. Indeed, SSA's own statistics establish that over six fiscal years, it denied 98.8% of fee applications. SSA's predictable claim that each determination is made on a case-by-case basis via a four-reviewer process, yet produces a 98.8% denial rate, defies credulity: No genuine review of individual requests, each with their own

42

subject matter, requester, and level of specificity, could plausibly yield a uniform outcome across hundreds of varied applications year after year. Indeed, it is precisely this review process, among other practices, that institutionalizes SSA's informal policy. SSA gives no formal training to its staff—instead, new staff learn from the same supervisors who have long been denying every request; new staff have their determinations approved by the same managers who have long been denying every request; and new staff consult with the same counsel's office that has long been approving the denial of every request. *See* Background VI. In this manner, SSA's practices ensure that the same results are reproduced year after year, regardless of the nominal decisionmaker's supposed "case-by-case review."

This same culture of replication, by which fee denial letters are drafted using sample language passed from senior to junior staff, also resulted in the nearly fifty fee waiver denial letters in the record containing uniform conclusory language, regardless of the underlying request's individual characteristics. *See* Background VI. (56.1 ¶¶ 201-11.) This repetition proves that no individualized review is occurring; an agency genuinely weighing the merits of each distinct application does not produce letters that are, word for word, identical. And those boilerplate denials independently violate FOIA. *See* Argument II.B.

Second, NYLAG has suffered, and will continue to suffer, concrete injury from SSA's policy. As a nonprofit legal services organization, NYLAG faces real resource constraints if forced to pay fees associated with requesting the records it needs to provide legal assistance to low-income Social Security beneficiaries. NYLAG regularly submits FOIA requests to SSA in furtherance of its mission to serve this community—not just the six requests at issue in this lawsuit, but eight more since the lawsuit was filed—and intends to continue doing so in the future. (56.1 ¶¶ 16, 67.) Given SSA's historical denials of NYLAG's waiver requests and those

43

of 98.8% of other requesters', there is no reasonable basis to expect that any future meritorious fee waiver request NYLAG submits to SSA will be granted following genuine, individualized consideration. If NYLAG is not granted relief through this lawsuit, SSA's blanket denial policy may eventually cause NYLAG—as it has surely already caused other resource-constrained requesters—to give up entirely, chilling its access to records it legally has the right to receive without cost. The ongoing nature of the injury is the predictable, documented consequence of a pattern or practice that has operated without interruption for years.

The evidentiary record here mirrors the record that compelled summary judgment in *Nightingale v. United States Citizenship & Immigration Services*. 507 F. Supp. 3d 1193 (N.D. Cal. 2020). In *Nightingale*, the court granted summary judgment on a FOIA pattern or practice claim based on statistical and documentary evidence of systemic agency noncompliance. *Id.* at 1202-04, 1213. While the agencies had not adopted an official policy, the court found no genuine issue of material fact that informal agency conduct resulted in a growing backlog of unprocessed FOIA requests for eight consecutive years, and concluded that that conduct was a sufficient basis to support a finding that the agencies had a policy or practice of violating FOIA. *Id.* at 1196, 1207. The same logic compels an identical result here.

Summary judgment in NYLAG's favor is warranted. Upon a finding of liability, the Court should grant declaratory relief, holding that SSA has engaged in a longstanding pattern or practice of violating the statutory and regulatory standards governing fee waiver requests. *See id.* at 1207 (issuing similar declaration). The Court should also enjoin SSA to conduct genuine, individualized review, of fee waiver requests going forward. *See Payne Enters., Inc. v. United States*, 837 F.2d 486, 495 (D.C. Cir. 1988) (remanding with instructions to grant declaratory relief and consider injunctive relief); *Nightingale*, 507 F. Supp. 3d at 1208 (explaining that

44

likelihood of recurrence of violation weighed in favor of injunctive relief).[18]

### B. SSA's Policy of Denying Fee Waiver Requests Should Be Set Aside Under the APA.

If, in the alternative, the Court determines that SSA's pattern or practice of fee waiver denials may not be challenged under FOIA, or that FOIA does not authorize adequate relief to remedy systemic statutory violations, NYLAG is still entitled to summary judgment on its systemic challenge to SSA's fee waiver policy under the APA.

### i. SSA's Policy of Denying Fee Waivers, even if Informal, Is a Final Agency Action.

The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(D); *see* Argument II.C. Not only are SSA's denials of NYLAG's fee waivers individually arbitrary, capricious, and contrary to law, SSA's overall policy of systematically denying fee waivers to virtually all requesters is also arbitrary and capricious and contrary to law. That policy therefore violates the APA and must be set aside.

As a threshold matter, SSA's policy of summarily denying fee waivers is reviewable as a final agency action, *see* 5 U.S.C. § 704, because SSA's denials consummate the agency's decision-making process and have a direct and immediate legal effect on fee waiver requesters. *See Salazar*, 822 F.3d at 82; *see also* Argument II.C. First, SSA's informal policy of blanket denying fee waiver requests has operated in practice to undermine the rights of requesters on a nearly uniform basis. And second, the policy has the effect of extinguishing, for virtually every requester, the requester's statutory right to individualized fee waiver consideration.

---

[18] Should the Court find liability on this pattern and practice claim under FOIA, and/or on NYLAG's systemic claim under the APA, *see* Argument III.B.ii, NYLAG respectfully requests the opportunity to submit supplemental briefing on the particulars of injunctive relief.

The fact that SSA's blanket-denial policy has not been formalized is irrelevant. Courts regularly hold that agency action "need not be in writing to be final and judicially reviewable." *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015); *see also, Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (finding that "the absence of a formal statement of the agency's position . . . is not dispositive"); *De La Mota v. U.S. Dep't of Educ.*, No. 02-cv-4276, 2003 WL 21919774, at *8 (S.D.N.Y. Aug. 12, 2003) (same); *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008) (same).

Courts confronting agency policies similar to SSA's—policies that were unwritten, denied by the agency, and implemented through consistent conduct—have found final agency action subject to APA review. *Velesaca v. Decker*, for example, involved a challenge to ICE's New York Field Office's secret practice of denying release to virtually all immigration detainees regardless of individual circumstances. 458 F. Supp. 3d 224, 227 (S.D.N.Y. 2020). ICE had never announced or codified the policy, and affirmatively denied its existence during the litigation. *Id.* at 232. Nonetheless, the court held that the statistical record alone established a reviewable final agency action: data from ICE released noncitizens on bond or recognizance approximately 2% of the time. *Id.* at 241. Here, as in *Velesaca*, "the numbers speak for themselves"—a 99% fee waiver denial rate. *Id.*

Similarly, in *R.I.L-R v. Johnson*, the plaintiffs challenged ICE's ongoing practice of considering improper factors when making individualized custody determinations. 80 F. Supp. 3d. 164. The government asserted that such a policy did not exist and plaintiffs had "merely described a generalized agency decision-making process that is not subject to review." *Id.* at 184 (citation modified). The court rejected the government's position, inferring the existence of a reviewable final policy not from any written directive but from the consistent, uniform pattern of

46

agency conduct across multiple individual cases. *Id.* Just as DHS replaced individualized custody determinations with a blanket no-release policy while denying its existence in court, the evidence here shows that SSA has replaced individualized fee waiver adjudication with a blanket denial policy while spuriously defending each denial as the product of independent individualized review. Accordingly, SSA's systematic fee waiver denial policy constitutes a final agency action subject to review under the APA.

### ii. SSA's Policy of Fee Waiver Denials Is Arbitrary and Capricious and Contrary to Law.

When an agency "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it [cannot] be ascribed to a difference in view or the product of agency expertise," its action must be set aside as arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Just as SSA's denials of NYLAG's individual fee waiver requests were arbitrary, capricious, and contrary to law, so too is SSA's unwritten policy of near-universal denials. That policy ignores the criteria required for assessing fee waiver requests, substitutes SSA's own policy preferences for Congress's determination as to when FOIA requesters are entitled to fee waivers, and violates SSA's own regulations.

First, just as with NYLAG's fee waiver requests, SSA's blanket denials systematically fail to consider the specific criteria governing fee waivers set forth in FOIA, as well as its own regulation. *See* Argument II.C. Each of the nearly fifty denial letters included with this motion— just like the denials issued to NYLAG—contain only bare and conclusory language that regurgitates the regulatory criteria unmoored from the specific facts of each request. (56.1 ¶ 164.) None of these denials explain which aspect of the requester's stated purpose fails the

public interest test, why the records sought would not contribute to public understanding, or what commercial interest allegedly predominates. (56.1 ¶ 164.) Indeed, in many cases, SSA's rote denials contain explanations "that run[] counter to the evidence before the agency"—namely, requesters' *prima facie* showings of their eligibility for waivers. *See State Farm*, 463 U.S. at 43; *see* Background V-VI; Argument II.C. Denying nearly all fee waiver requests using virtually identical, cursory denial language is arbitrary and capricious. *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1346 (D.C. Cir. 2014) (holding series of TSA denials arbitrary and capricious where the agency "failed to adequately explain most of its denials").[19]

Second, SSA's blanket denial policy is arbitrary and capricious because it substitutes the agency's own policy preferences for the congressional judgment reflected in FOIA's fee waiver provision—namely, that requesters who seek records to serve the public interest should not be priced out of access to government records. *See* 132 Cong. Rec. S16496 (daily ed. Oct. 15, 1986) (statement of Sen. Leahy) ("[W]e have sought to remove the roadblocks and technicalities which have been used by various Federal agencies to deny waivers or reductions of fees under the FOIA to . . . public interest users of the FOIA."). By denying 98.8% of fee waiver applications, SSA has effectively shut down all public access to fee waivers and substituted its own policy preference—requesters do not get waivers even when waiver is in the public interest—for the

---

[19] For the same reason, even if the court reviewed SSA's action under § 1306 alone, and not FOIA (as SSA has suggested), SSA's policy of systemically categorizing all requests as not for a program purpose and thus "governed" by § 1306 would also violate the APA, because these alleged determinations are not supported by any explanation at all. Indeed, often fee waiver denials do not even mention § 1306. And SSA does not maintain any system to ensure that "program purpose" decisions are made considering the relevant criteria, or even made at all. SSA admitted it has no specific process or timeline for making the "program" versus "non-program" distinction, provides no training to its staff about it, and keeps no record of it in its system. And the results of the agency's supposed decision-making process are all the same: SSA finds virtually every request to be not for a program purpose. (56.1 ¶¶ 225-26.)

standard Congress enacted. That is the paradigmatic case of an agency "rely[ing] on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

Finally, in addition to being arbitrary and capricious, SSA's policy is contrary to law. As explained above, an agency must follow its own regulations. *Accardi*, 347 U.S. at 268. SSA's near-uniform denial policy violates 20 C.F.R. § 402.85, giving rise to APA liability. *See* Argument II.C; *Fed. Defs. of N.Y., Inc.*, 954 F.3d at 130.

In light of the overwhelming evidence of an unlawful (if informal) policy that violates regulation and statute, this Court should order both declaratory and systemic injunctive relief. If the Court concludes, for any reason, that such relief is not available under FOIA, it should enter that relief as an exercise of its power under the APA to set aside arbitrary and capricious, or unlawful, agency action. Specifically, the Court should declare that the informal policy by which SSA effectively denies all fee waivers as a categorical matter violates the law. And the Court should set aside SSA's blanket-denial policy, instead enjoining SSA to do what FOIA and SSA's regulations already mandate: consider each fee waiver request on its merits, grant waivers when the statutory and regulatory criteria are met, provide reasoned explanations for its decisions, and end its practice of denying meaningful access to government records. *See* 5 U.S.C. § 706(2)(A).[20]

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to NYLAG.

---

[20] If the Court finds that neither FOIA nor the APA provides a vehicle for systemic relief on the current record, NYLAG respectfully requests leave to amend its complaint to add class allegations pursuant to Federal Rule of Civil Procedure 23. Leave to amend should be freely granted "when justice so requires," Fed. R. Civ. P. 15(a)(2), and any such amendment would not be futile given the substantial evidence already in the record that SSA's across-the-board fee waiver denials practice is affecting similarly situated requesters in a manner that meets the certification requirements set forth in Rule 23(a) and (b)(2).

49

Dated: June 15, 2026
       New York, New York

/s/ Danielle Tarantolo
Danielle Tarantolo
Kate Fetrow
Shannon Lee (admission pending)
NEW YORK LEGAL ASSISTANCE GROUP
100 Pearl Street, 19th Floor
New York, NY 10004
(212) 613-7578
dtarantolo@nylag.org
kfetrow@nylag.org
slee@nylag.org
Counsel for Plaintiff