# Exhibit A

Michelle Christ
February 07, 2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.: NO. 23 CIV. 9363 (ALC)

NEW YORK LEGAL ASSISTANCE GROUP,

     Plaintiffs,

-against-

THE SOCIAL SECURITY ADMINISTRATION,

     Defendants.

DEPOSITION OF MICHELLE CHRIST

DATE TAKEN: FEBRUARY 7, 2025

TIME:        9:09 a.m. - 4:55 p.m.

             (Based on Time Zone from Notice)

LOCATION:    NEW YORK LEGAL ASSISTANCE GROUP
             100 PEARL STREET, 19TH FLOOR
             NEW YORK, NEW YORK 10004

Reported By:
QUINN O'CONNOR, AAERT No. 3613
Notary Public for the State of New York

Michelle Christ
February 07, 2025

APPEARANCES


  On behalf of NEW YORK LEGAL ASSISTANCE GROUP:
     NEW YORK LEGAL ASSISTANCE GROUP
     BY: DANIELLE TARANTOLO, ESQUIRE
     100 Pearl Street, 19th Floor
     New York, New York 10004
     dtarantolo@nylag.org
     APPEARED In Person

 On behalf of NEW YORK LEGAL ASSISTANCE GROUP:
      NEW YORK LEGAL ASSISTANCE GROUP
      BY: JESSICA RANUCCI, ESQUIRE
      100 Pearl Street, 19th Floor
      New York, New York 10004
      jranucci@nylag.org
      APPEARED In Person

On behalf of THE SOCIAL SECURITY ADMINISTRATION:
     U.S. DEPARTMENT OF JUSTICE UNITED STATES ATTORNEY'S OFFICE
     SOUTHERN DISTRICT OF NEW YORK
     BY: TARA SCHWARTZ, ESQUIRE
     86 Chambers Street
     New York, New York 10007
     tara.schwartz@usdoj.gov
     APPEARED In Person


 ALSO PRESENT:
          Benji Toruno, Paralegal
          Michelle Spadafore, esquire
          Michael Corona, esquire
          Rachel Kroll, esquire

Michelle Christ
February 07, 2025

INDEX

EXAMINATION OF MICHELLE CHRIST                                    PAGE

  By Ms. Tarantolo                                              6

  By Ms. Ranucci                                                175

  By Ms. Schwartz                                               239

  By Ms. Tarantolo                                              243

Witness Signature Page                                          245

Certificate of Reporter                                         246

Certificate of Transcriptionist                                 247

Errata Sheet                                                    248

Michelle Christ
February 07, 2025

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 15 |
| Exhibit 2 | Screenshot | 53 |
| Exhibit 3 | Letter Dated December 19, 2023 | 89 |
| Exhibit 4 | Federal Register | 102 |
| Exhibit 5 | Program Operational Manual Systems | 102 |
| Exhibit 6 | Letter Dated May 31, 2024 | 132 |
| Exhibit 7 | Application Request Detail Page | 158 |
| Exhibit 8 | Annual Report | 161 |
| Exhibit 9 | Sensitive Instructions | 187 |
| Exhibit 10 | Sign Off Sheet | 189 |
| Exhibit 11 | Medicare Program Integrity | 224 |
| Exhibit 12 | Second Program Operational Manual Systems | 236 |

Michelle Christ
February 07, 2025

P R O C E E D I N G S

Deposition taken before QUINN O'CONNOR, AAERT No. 3613, Digital Reporter, State of New York pursuant to Notice.

THE REPORTER:  I'm a notary public licensed by the State of New York.  The parties agree that I will administer the oath to the witness and that a certified transcript will be created from the audio record of this proceeding.  In accordance with applicable law, the transfer will be provided to the witness for review, correction and signature.  Would the parties please state your appearances for the record.

MS. TARANTOLO:  Danielle Tarantolo, New York Legal Assistance Group, on behalf of plaintiff.

MS. RANUCCI:  Jessica Ranucci, New York Legal Assistance Group, on behalf of plaintiff.

MS. SCHWARTZ:  Tara Schwartz from the U.S. Attorney's Office for the Southern District of New York, on behalf of the defendant, Social Security Administration.

THE REPORTER:  Okay.  Will the witness please say and spell your first and last name for the record?

THE WITNESS:  Sure.  It's Michelle Crist. M-I-C-H-E-L-L-E, Christ, C-H-R-I-S-T.

THE REPORTER:  Perfect.  Let the record show, that the witness did present to me valid government issued ID.  Please raise your right hand.

Do you solemnly swear or affirm, that the testimony

Michelle Christ
February 07, 2025

you give in this matter will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

MICHELLE CHRIST

was called as a witness and, after having been first duly sworn, testified as follows:

THE REPORTER:  Thank you.  Did the parties have any stipulations they would like to put on the record?

MS. SCHWARTZ:  Yes.  So the parties stipulate and agree that the witness will receive a read and sign version of the transcript and have 30 days to review it and submit an errata.  And also that if the witness is shown or if there are discussions about documents that are marked protected information pursuant to the protective order in this case, that those portions of the transcript will be protected pursuant to the protective order.

THE REPORTER:  Okay.  Thank you.  Please proceed.

EXAMINATION

BY MS. TARANTOLO:

Q.   Thank you.  Hello again, Ms. Christ.  I'm Danielle Tarantolo.  This is my colleague, Jessica Ranucci.  We are attorneys at the New York Legal Assistance Group, NYLAG, which, as you know, in this case, is both the plaintiff and the lawyers.  I'm going to go through a few basic housekeeping things, and then we're talking about two major topics today.

Michelle Christ
February 07, 2025

Fee waivers under FOIA and affirmative disclosures under FOIA. I will speak to you about the first topic. At a certain point, I will turn it over to my colleague. Ms. Ranucci will speak to you about the second topic. Thank you again for being here today, especially given the inclement weather. Everyone was shockingly prompt and on time. Thank all -- thank you all.

Have you ever given a deposition before?

A.   No, I have not testified in a deposition before.

Q.   Have you testified at trial?

A.   No.

Q.   But you are an attorney, right?

A.   Yes.

Q.   So you perhaps have more context for this proceeding than other people would. In your career as an attorney, have you taken a deposition?

A.   I have.

Q.   Okay. I will go through these rules. They will be not unfamiliar to you, but to have them on the record. As you know, this is recorded by a court reporter sitting here. You are under oath. You have to tell the truth. You have to give full and complete answers. You have to give your answers out loud. You can't make them with a shrug. You can't make them with a gesture, et cetera.

Please wait for me to finish asking my question before you answer. I will wait for you to finish answering before I

Michelle Christ
February 07, 2025

ask my next question.  That will make the transcript easier for everyone to follow.  If I ask you a question, you need to answer it to the best of your ability, unless your lawyer tells you not to.  If I ask you a question and you don't know the answer, just tell me that you don't know.  I might ask you to guess or speculate about the answer, in which case I'll make that clear.  If there's any question you don't understand, please ask me to clarify it.

We can take breaks as you wish during the course of the day.  I just ask that you not ask for a break and we not take one while I've asked a question and you haven't answered it yet.  If I ask you a question and you answer, later on today you remember something else or you think you might have misspoken, just say so.  We can clarify whatever you said earlier.

What steps did you take to prepare for the deposition today?

A.   I, you know, prepared -- port.

Q.   Could you elaborate?

A.   I relooked over the New York LAG FOIA, as mentioned in the deposition notice, as well as the topics.

Q.   Did you meet with your attorney?

A.   Yes.

Q.   And without telling me what you talked about, how many times did you meet with her?

A.   I can't recall, several.

Michelle Christ
February 07, 2025

Q.   How much time for each meeting?

A.   I don't recall.

Q.   Did you meet with anyone else besides Ms. Schwartz in prep -- to prepare for the deposition?

A.   Yes.

Q.   Who else?

A.   The agency attorneys.

Q.   The attorneys who -- to be clear, the attorneys who are in house at the Social Security Administration?

A.   Sorry, yes.  The attorneys who are in house at Social Security.

Q.   Were those the same meetings or different meetings than the meetings with Ms. Schwartz?

A.   Some were the same, and some were different.

Q.   Approximately, how many times?

A.   Again, I can't recall.  It was several, less than five.

Q.   Did you meet with anyone else at the Social Security Administration, besides the agency attorneys?

A.   No.

Q.   Were you given any written instructions from anyone about the deposition?

A.   I'm sorry, may I clarify?

Q.   Yes.

A.   My deputy -- my division director, who's in charge of

Michelle Christ
February 07, 2025

FOIA division was also in those meetings.

Q.   Thank you.  With -- the meetings with the agency attorneys?

A.   With the agency attorneys and Ms. Schwartz.

Q.   Understood.  The division -- would you say that person's title again?

A.   She's Division Director of the FOIA and Transparency Division.

Q.   What is her name?

A.   Sarah Reagan.

Q.   Thank you.  Is there anything that might affect your ability to understand questions today or testify truthfully, for example, medication?

A.   No.

Q.   You understand that you're here today on behalf of the agency and not in your personal capacity?  This is what we call 30(b)(6) deposition, deposition under the federal rule of civil procedure, 30(b)(6).  So you're here to testify as a corporate representative, quote unquote, of the Social Security Administration.  Do you understand that?

A.   Yes.

Q.   If that ever -- it becomes confusing at any point with my questions, please just ask me to clarify.  All right.  I'd like to move on to your background.  How -- what is your current position at SSA?

Michelle Christ
February 07, 2025

A.    Deputy executive director.

Q.    Deputy executive director of what?

A.    Office of privacy and disclosure.

Q.    And how long have you had that position?

A.    I became acting unit in July 2022 and became permanent in April 2023.

Q.    Before you held the position of Acting Deputy Executive Director of OPD, or for the court reporter, the Office of Privacy and Disclosure, OPD, is that -- is that the acronym you all used within the agency?

A.    Yes.

Q.    Okay.  Before you became the Acting Deputy Executive Director of OPD in July of 2022, what was your position?

A.    I was a supervisory regional counsel.

Q.    Supervisory regional counsel?

A.    Yes.

Q.    Also at OPD or in a different --

A.    No, I was -- no, I was in the New York Regional Chief Counsel's office.

Q.    And how long did you -- when did you begin that position?

A.    I began that position back in, I believe, 2018.

Q.    So approximately 2018 through -- middle of 2022?

A.    Correct.

Q.    Does that office have anything to do with office of --

Michelle Christ
February 07, 2025

with OPD, or is it different?

A.    Yes.

Q.    What does it have to do with -- what's its relationship with OPD?

A.    So we're both part of the Office of General Counsel. And the -- the New York Regional Office, you know, works with OPD when we have privacy issues, FOIA issues, litigation in those areas, requests in those areas.  And I supervised the privacy and disclosure area for the New York office.

Q.    Before 2018, did you have a different position at SSA?

A.    Yes.

Q.    What was that position?

A.    Assistant regional counsel.

Q.    And how was that position different from being a supervisory regional counsel?

A.    Well, in the assistant regional counsel role, I was a line attorney, and I performed work on behalf of the agency from an agents perspective.  I did federal litigation, defending Social Security cases, as well as, you know, contracts, personnel work, employment litigation, and law, physical matters.  And I -- you know, I handled a -- well, I was the subject matter expert lead for the privacy and disclosure area. So I handled law enforcement requests, health and safety requests.

        I helped coordinate data exchanges with New York City,

Michelle Christ
February 07, 2025

New York state, and other entities within the region, Puerto Rico, New Jersey, Virgin Islands.  I also, you know, advised on different privacy areas that might have occurred within the agency, as well as worked with OPD on some national projects.  So, you know, such as tax return information requests under 6103, I orders, as well as other matters of -- additional.

Q.   Thank you.  I'm going to ask you to slow down a little bit just for the -- for the benefit of the court reporter.  I followed what you were saying and that was helpful.  So approximately what year did you start that position?

A.   So just to finish with that --

Q.   Oh, excuse me.

A.   No, no.  So differed from that position from a supervisory one is that then when I became a supervisor, I supervised attorneys who were performing that work.  So while I was still very much involved in the substantive review and, you know, guidance and mentoring of it, I was also, you know, supervising employees in the New York regional office as they worked in those -- in different areas.

Q.   Understood?  So let me reask my question.  Approximately when did you start that position?

A.   So -- August 2007.

Q.   Before 2007, did you have a different position at SSA?

A.   Yes, I was a law clerk.

Q.   A law clerk in what office?

Michelle Christ
February 07, 2025

A.    In the New York Regional Chief Counsel's Office.

Q.    Approximately what year did you start that position?

A.    August 2006.  I'm sorry, June 2006.

Q.    Okay.  And before that, did you have any other positions at SSA?

A.    No.

Q.    Before that, did you have any other positions as a lawyer?

A.    No.

Q.    So you -- that was your first position after you finished law school?

A.    Correct.

Q.    You finished law school in 2006?

A.    2007.

Q.    2007.  Where did you go to law school?

A.    Fordham Law School.

Q.    Are you barred in New York as an attorney?

A.    Yes.

Q.    Any other jurisdictions?

A.    Connecticut.

Q.    In your current role as the deputy executive director of OPD, is it -- is that position required to be held by a lawyer?

A.    No.

MS. TARANTOLO:  I'm handing you a document -- or the court reporter is handing you a document that's been marked as Exhibit 1.

(Exhibit No. 1 marked for identification.)

BY MS. TARANTOLO:

Q.    Do you recognize this document?  There are two sections to it, a front page and then a attachment.

A.    Yes.

Q.    What is it?

A.    It was the notice of deposition.

Q.    And have you seen -- you've seen this document before?

A.    Yes.

Q.    Could you turn to Attachment A, titled Deposition Topics.  Could you take a look, please, at Topic 1a.  Is this a topic that you are prepared to give a deposition about today?

A.    Yes.

Q.    Could you please turn to Topic 5, and take a moment to read it.  Is this a topic that you're prepared to testify about today?

A.    Yes.

Q.    Could you look at Topic 6.  Is this a topic you're prepared to testify about today?

A.    Yes.

Q.    Please look at Topic 7.  Now, we've had further correspondence with your attorney about this topic since the

Michelle Christ
February 07, 2025

deposition notice was served.  So I'll ask you, instead of, are you prepared to talk about this as written, are you prepared to talk about the process by which the type of numbers that are mentioned in Topic 7 are generated?

A.   I'm sorry, could you please clarify?

Q.   Sure.  Topic 7, asks -- describes actual numbers. We're not asking -- I'm not asking whether you're prepared to give actual numbers today.  I'm only asking whether you're prepared to talk about the processes by which fee -- the number of fee waiver requests granted or denied by SSA are calculated?

A.   Yes.

Q.   Thank you.  Could you look at Topic 8.  Are you prepared to testify about that topic today?

MS. SCHWARTZ:  I just want to object on the record. The agency is objecting to providing testimony on Topic 8.

MS. TARANTOLO:  Noted.

BY MS. TARANTOLO:

Q.   Ms. Christ, are you prepared to test -- to testify about Topic 8 today?

A.   To the extent that the agency is objecting and it's outside the scope, I will not be testifying.

Q.   Okay.  Noted.  Please look at Topic 9.  Specifically 9a.  Are you prepared to talk about Topic 9a?

A.   Yes.

Q.   As to Topics 9b and c, I -- we have also had further

Michelle Christ
February 07, 2025

correspondence with your lawyer, but to get all of the

information on the record, are you prepared to talk about Topics

9b, and C today?

MS. SCHWARTZ:  I just want to note on the record that

the agency has objected to proffering 30(b)(6) testimony on

topics 9b and 9c.

MS. TARANTOLO:  Noted.

BY MS. TARANTOLO:

Q.    Ms. Chris, could you please answer anyway?

A.    To the extent that the agency objected, I would not be

testifying about it.

Q.    Are you prepared to testify?  I understand if I ask

you a question, your attorney might object at that point, but

are you prepared to testify about them, those topics?

A.    Yes, I'm prepared, but I would not testify to the

extent that the objection they are outside the scope.

Q.    Understood.  And please, look at Topic 10.  Are you

prepared to talk about Topic 10?

A.    Excuse me.  Yes, I am.

Q.    Okay.  Thank you very much.  Now, I'd like to talk to

you about OPD.  What is OPD?

A.    The Office of Privacy and Disclosure is an office

within the Office of General Counsel for the Social Security

Administration.  We're about 50 members, and we have -- consist

of five divisions.  We're charged with advising on privacy and

Michelle Christ
February 07, 2025

Freedom of Information Act policy for the agency.  Topics include breach, disclosure, and data exchanges, as well as electronic exchanges and liaisons.  And additionally, privacy implementation for the agency, including enterprise wide systems, and, of course, FOIA and -- Freedom of Information Act, FOIA, I'm going to refer to that colloquially, if that's okay --

Q.   Please.

A.   -- with everyone.  FOIA and Transparency Division, which adjudicates centrally all of the agency's FOIA requests.

Q.   You mentioned that there are five divisions.  Is -- the FOIA and Transparency Division is one of the five?

A.   Correct.

Q.   Is that the only division that deals with FOIA?

A.   For the most part, yes.  Sometimes other divisions will work on it if we require it for workload purposes.

Q.   Understood.  So you might ask a different division to pitch in sometimes if --

A.   Less than I would ask a different decision -- I should probably distinguish that.  But more that we might ask employees from that division to work within the constraints of the Division 3.

Q.   Okay.  When we're -- as you know, we're interested today in FOIA.  So when I talk about OPD today, I mean the FOIA and Transparency Division, whether I say it or not.  And if at any point I ask you a question and the answer would involve a

division other than the FOIA and Transparency Division, could you please specify that?

A.   Yes.

Q.   Do all FOIA requests made to SSA go through the FOIA and Transparency Division?

A.   Yes, for the most part, except for a small number of simple requests that are handled by another component.

Q.   Understood.  Is that -- are those the decedent annuitant records?

A.   Yes.

Q.   Thank you.  Again, we're not interested in those particular requests for today's deposition.  So if I ask you about FOIA requests, I'm talking about requests other than those, that category of requests.  Is the FOIA and Transparency Division, the only division that deals with affirmative disclosure under FOIA?  The only division within OPD?

A.   Generally.

Q.   What do you mean generally?

A.   I mean, I -- you know, occasionally other divisions may, you know, have matters that might involve it, but generally at that point in time, they would loop in the Division 3.

Q.   Division 3, is that --

A.   I'm sorry, yes.  Division 3 is the FOIA and Transparency Division.

Q.   Understood.  And in the -- in its capacity dealing

Michelle Christ
February 07, 2025

with affirmative disclosures, does the FOIA and Transparency Division work with ODEPPIN, O-D-E-P-P-I-N?

    A.    I'm sorry, could you repeat the question?

    Q.    Yes.  In its capacity dealing with affirmative disclosures under FOIA, does the FOIA and Transparency Division ever work with ODEPPIN, the -- The Office Of Data Exchange and Policy Publication -- and International Negotiations, this is otherwise more -- maybe more colloquially known as the publications office.

    A.    So OPD is solely charged with executing FOIA, you know, and, you know, and reviewing FOIA requests.  We do work with ODEPPIN in various contexts.  They may seek our advice or to review something under the FOIA principals.

    Q.    I understand.  Okay.  Thank you.  The FOIA and Transparency Division, Division 3.  Apart from FOIA, what else does it do?

    A.    It really just does FOIA.  It will occasionally respond to congressional requests or inquiries.

    Q.    You said earlier that your role is the Deputy Executive Director of OPD.  What is the responsibility of that role?

    A.    So that role is, you know, the alter ego of the executive director.  I oversee the five, you know, divisions. I'm a first line supervisor to our division directors and second line -- supervisor to our government information specialists.

Michelle Christ
February 07, 2025

You know, I obviously provide oversight and review of the work that our, you know, our office handles, as well as, you know, manages workloads and oversees things.  We provide substantive input.  We also -- I will advise senior agency officials on different privacy and FOIA matters in response to requests.  And also as the executive director, I am the agency's FOIA officer by regulation.

Q.   To make sure I've understood, so do you report directly to the executive director of OPD?

A.   Yes.

Q.   Who is that?  What is that person's name?

A.   Matthew Ramsey.

Q.   And both you and Mr. Ramsey have responsibility for overseeing all five divisions of OPD?

A.   Yes.

Q.   What portion of your job approximately involves overseeing Division 3, the FOIA and Transparency Division, as opposed to the other work that you described?

A.   Well, I'm very involved in all of the others, but I might be slightly more involved as my role as FOIA officer with Division 3.

Q.   If you had to approximate in a percentage, what would that be?  25, 50, somewhere between there?

A.   Probably about 30 percent.

Q.   Okay.  You said before that you also function as the

Michelle Christ
February 07, 2025

FOIA officer by regulation.  Am I right that that's a regulatory category, it's not a specific job title for you within the organizational chart at SSA?  Or maybe you could -- what does that mean, to be a FOIA officer?

A.   That is correct.  It is a specific role and by regulation is not a job title that I encumber.

Q.   Who does Mr. Ramsey report to?

A.   Our acting general counsel.

Q.   Who is that?

A.   Grace Kim.

Q.   Could you spell that?

A.   Grace, G-R-A-C-E.  Kim, K-I-M.

Q.   Okay.  Thank you.  And does -- who does Ms. Kim report to?

A.   I honestly don't know.

Q.   Up the chain from -- within -- still within the general counsel's office?

A.   No, I would assume she reports outside of the general counsel's office.

Q.   Understood.  You said earlier that the -- that OPD has about 15 members, but five divisions.  How many of those members --

A.   It has about 50 members.

Q.   50, excuse me.

A.   5-0.

Michelle Christ
February 07, 2025

Q.   5-0.  Okay.  Thank you.  That's an important clarification, my mistake.  Of the 50 members of OPD, how many of them work in the FOIA and Transparency Division?

A.   10, approximately.

Q.   And who is the -- who is in charge of the FOIA and Transparency Division.

A.   Well, you know, I -- as the FOIA officer, I am, you know, the second line supervisor to the -- to the government information specialist in it, and then the first line supervisor in charge of -- our division director for it is Sarah Reagan.

Q.   Okay.  And she's the division director?

A.   Correct.

Q.   Does Ms. Reagan report to you?

A.   Yes.

Q.   And of the -- what are the -- so that's -- is she one of the 10 people that you've described?  Of the 10 members of the FOIA and Transparency Division, Ms. Reagan is one of the 10?

A.   Yeah.

Q.   Could you give me the titles of the other nine?

A.   Sure.  All other nine are government information specialists.  I should clarify that Ms. Regan's actual civil service job title is supervisory government information specialist.  We colloquially refer to her as the division director.

Q.   Understood.  Would you say that formal title again,

Michelle Christ
February 07, 2025

and thank you.

A.   Sure, supervisory government information specialist.

Q.   So then there are nine government information specialists within the FOIA and Transparency Division.  Those people all report directly to Ms. Reagan?

A.   Yes.

Q.   I have seen in various sources other types of titles, I'm going to tell you what they are.  Could you tell me if they're in the -- I'm going to call it Division 3 just for simplicity, or elsewhere in OPD?  A FOIA privacy act coordinator, is that a job that exists?

A.   Not to my knowledge.

Q.   And a FOIA public liaison?

A.   No.

Q.   Is that a -- is that a specific person, or is that a role?

A.   There's no specific person who's a FOIA public liaison.  We in OPD manage a FOIA public liaison email box.

Q.   I see.

A.   Where the public can provide -- you know, can email us with questions about FOIA.

Q.   Understood.  Okay.  Thank you.  The government information specialists, do they have -- all have roughly the same responsibilities, or are they specialized?

A.   So they all handle all aspects of FOIA requests.

However, within the division, we have two senior -- there are different grade levels, GS grade levels, and they have different levels of responsibility dependent upon their grade level.  So we have two senior GS 14s who are reviewers.  So their workload is a little bit different than the rest of the staff.  And we will often take into account grade level when we're assigning complexity.

Q.   Understood.  But all nine of them handle FOIA requests?

A.   Yes.

Q.   And specifically, do all nine -- would all nine of them handle fee waiver requests under FOIA?

A.   Yes.

Q.   Approximately, what is a government information specialists workload in terms of numbers of FOIA requests handled per some time period?  Whatever makes sense.

A.   So in a general year we have between 10,000 and 15,000 FOIA requests.  Divided by nine, that is probably about 1000 a year.

Q.   Okay.

A.   And that's in addition to responding to FOIA public liaison requests, congressional inquiries, and other miscellaneous matters that may arise.

Q.   For the government information specialists, approximately what portion of their job is FOIA requests versus

the other responsibilities that you just described?

A.    For most of them, I think 90 percent.

Q.    Okay.  You mentioned that there were two senior government information specialists who have some more -- roles as reviewers.  Am I -- did I understand you correctly that they're not -- they don't formally supervise the other specialists, but they have -- informally they have certain heightened responsibilities?

A.    Well, I would say that they are more subject matter experts.  They don't supervise anybody from, say, like a managerial perspective, but they review requests and mentor.

Q.    Do either of those reviewers have subject matter expertise in fee waiver requests specifically?

A.    I mean, they have -- you know, they're both experienced government information specialists who've been with the office for many years.  So, you know, they have experience in fee waiver requests, along with all other aspects of FOIA, probably about the same.

Q.    Understood.  I'd like to ask you a few questions about how the staff of Division 3 are trained.  How are new staff members trained within Division 3?

A.    Sure.  So we don't have, you know, a ton of turnover. Most of our -- so most of our subs have been there for many years.  But when a new staff member comes on, they will be assigned one of our more senior reviewers generally, sometimes

Michelle Christ
February 07, 2025

one of our GS 13s, depending on workloads and availability.  And that person will mentor them, and they will go through cases on a case by case basis, you know, showing them as they go along and learn.

Q.   I'll come back to the informal -- that more informal mentorship in a minute.  Are there any written -- what written materials do you give to new staff to train them?

A.   We really -- we refer them to the federal regulations on FOIA under SSA.  Those are in 20 CFR part 402.

Q.   Anything else written?

A.   No.

Q.   How about the POMS?

A.   Yes, we may refer them to the POMS as well, but we really adhere closely to the regulations.

Q.   Do the -- do new staff do any formal training sessions?

A.   Not to my knowledge.

Q.   And with respect to informal training and guidance, could you say more about the assigned mentor experience?

A.   Sure.  We would assign a mentor to the new staffer. They would -- the new staffer would be assigned FOIA requests. They would begin working them, and as they work them, they would send any work product to their reviewer to look at.  The reviewer and the new employee would meet frequently, maybe daily, maybe weekly, depending on their, you know, their

Michelle Christ
February 07, 2025

aptitude and how far along they are in experience, or prior experience.  And they would, you know, discuss those cases as the -- you know, and the analysis that the new employee is performing.

Q.   And would that mentorship cover fee waivers as well as the other aspects of processing FOIA requests?

A.   Yes, it covers all aspects of FOIA, including fee waivers.

Q.   And similarly, when you mentioned that you -- your office -- that Division 3 shows regulations to new staff, that would also include regulations that pertain to fee waivers?

A.   Yes.

Q.   We were provided a copy of a training material from a Freedom of Information and Privacy Act training conducted by Graduate School USA.  Do you know -- when I say that, does that mean anything to you?

A.   Yes.

Q.   What is that?

A.   So, you know, from time to time as an office, we provide, you know, external training.  This was provided to all members of OPD, not just Division 3, because we expect, again, for all of our employees to be versed and fluent, to be able to handle workload requirements, you know, mandate such.  So we've got an outside entity to provide -- you know, I actually contracted it myself, you know, to provide our employees with

Michelle Christ
February 07, 2025

some in person training, very high level generalized FOIA.

Q. And when did that happen?

A. September 2024.

Q. September 2024. And you said that was every member of OPD, not just Division 3?

A. Yes.

Q. Anyone outside of OPD?

A. I believe we may have invited some of the other components. I'm not sure that any of them attended, though.

Q. Understood. The participant guide that we were shown, is that a reference material that the staff of Division 3 have access to?

A. Everybody in OPD received a copy.

Q. And where is that kept? Where's it maintained?

A. Every employee would maintain it on their own. They save it to their computer or print out.

Q. And are staff instructed to consult -- specifically instructed to consult that manual?

A. No. That was very high level and just for general awareness of FOIA parameters.

Q. Understood. Do you know what a monthly FOIA staff meeting refers to?

A. I'm not sure.

Q. This was a term that we saw in the Chief FOIA Officer Report, to describe monthly staff meetings among FOIA staff?

Michelle Christ
February 07, 2025

A.    Oh, yes.  Thank you for clarifying.

Q.    Yes, I didn't know if that was a term that you all would use internally or just for your external publications. What is that event?

A.    So that's a term that we use for, you know, purposes of our annual report, you know, to be consistent with what DOJ is requesting in terms of the annual report.  Our division actually holds weekly meetings.  So we go, you know, above just monthly.  And during that meeting, you know, our division director will provide any updates, and staff can also bring up anything, you know, of concern, either in FOIA or, you know, as a personnel perspective or something like that.

Q.    And do those -- have those meetings ever covered fee waivers specifically?

A.    Never as a general topic.

Q.    As in -- what do you mean by that?

A.    I mean, someone may have brought up a case that involved a fee waiver to discuss it, but nothing generally.

Q.    As in, not as part of a formal agenda?

A.    No.

Q.    And if fee waivers were discussed at a meeting like that, would there be a record of it having been discussed?

A.    These are informal staff meetings for collaboration.

Q.    Similarly, do you know what a quarterly FOIA privacy act coordinator meeting is?

Michelle Christ
February 07, 2025

A.    Could you clarify.

Q.    Yeah.  This is another term that we saw mentioned in that report described as a discussion including the interface between -- discussions including the interface between FOIA and the Privacy Act, FOIA fees, and fee waivers.  It is -- do you know what a FOIA or Privacy Act coordinator is?  Is that a term that's used internally?

A.    Yes.

Q.    What is that?

A.    So, yes, I'm familiar with the term in terms of our reporting.  It is -- our FOIA privacy coordinators are individuals in components, who we reach out to you when we are seeking responsive records.

Q.    And are there -- with that clarification, are there, if you know, quarterly meetings convened of those people?

A.    Yes.

Q.    And have those meetings ever covered fee waivers?

A.    I don't believe so, but obviously I have not sat in on every meeting.  I don't think they generally would.  Usually we are discussing things such as, you know, responsive records, or how to calculate fees time and grade.  We generally -- fee waiver determinations are made within OPD, so I don't believe we would discuss them with outside entities.

Q.    Are there written agendas for those meetings?

A.    I do not believe so.  Again, we want people to feel

Michelle Christ
February 07, 2025

comfortable bringing up their concerns and collaborating.

Q.   So if you wanted to find out whether fee waivers had been discussed at any of these past meetings, how would you do that?

A.   I mean, I don't believe that they would have been because, again, fee waiver determinations are made within OPD. The FOIA privacy coordinators, it's not -- it wouldn't be their role to advise on the fee waiver process.

Q.   Understood.  Apart from the things that we've already talked about, is there any other written material or reference guides that staff within Division 3 can consult about FOIA?

A.   No, I do not believe so.

Q.   For example, a desk guide, or a decision tree, or an FAQ, something of that nature?

A.   No, we do not have those.

Q.   If a staff within Division 3 has a question about FOIA, what are they directed to do?

A.   So generally they would start with our senior reviewers.  If they were not available or unable to assist, they would speak to our division director, or their supervisor, or myself.

Q.   Ms. Reagan, is the -- would be the director?

A.   Yes, Ms. Reagan.  R-E-A-G-A-N.

Q.   Thank you.  I was going to go look it up later, but that's helpful.  Now, I'm going to ask you at a very high level

Michelle Christ
February 07, 2025

about the process within Division 3 for responding to FOIA requests.  As you know, we're primarily interested right now in fee waivers, but in order to understand the full process and appreciate where that decision happens, I wanted you to give me an overview.  And for right now, what I'd like you to describe is the current process.  If as you're describing it, you know that there was some different process during -- since the time you've been within OPD, which I think is since 2022?

A.    Correct.

Q.    If there was a change in practice that relates to the particular thing that you're describing since you got there, could you just note that and we can circle back to it.  But unless I otherwise discuss, this is your current process.  Can you give me at a very high level, the stages of responding to a FOIA request within Division 3?

A.    Yes.  Generally we will receive the request.  It will either be inputted or the requests are put into a FOIA electronic case processing system, known as FOIAXpress.  It will then be usually assigned within a day or two to a FOIA analyst within Division 3.  We will send out an acknowledgment in receipt of the request.  At that point, the analyst will begin processing it.  It's then, you know, reviewed by a senior reviewer.  Then it will go to the division director, and finally to myself.  If it is an appeal --

Q.    Could you slow down?  Sorry to interrupt you.  Could

Michelle Christ
February 07, 2025

you slow down just a little bit?  You said it would -- it would be processed by the analyst -- before we go on, when you say analyst, is that the same as a government information specialist, or is that different?

A.  Yes, so it would be -- it would be entered into our system, FOIAXpress, and assigned to a government information specialist, or I was using the term analyst.

Q.  But those are the same?  Okay.  You said assigned to staff, then an acknowledgment would go out, then the staff person would process the request, and then after that, could you -- could you pick up there?

A.  So then the staff, the government information specialist, would review the request for a -- a fee waiver we're speaking about?  I'm sorry.

Q.  Sorry --

A.  For clarification, we're speaking about the --

Q.  Yeah, for clarification, right now we're speaking about the entire process front to back of responding to a FOIA request.  Then we're going to circle back to talk more about fee waivers.

A.  So then, if there's a fee waiver, they would look at that part of the request as well.

Q.  And that would be part of the stage that you described as processing, is that where --

A.  Yes.  They would begin reviewing the FOIA -- you know,

Michelle Christ
February 07, 2025

the request that came in, determine if it's a valid FOIA,

looking at -- the analysts will cover records being requested.

Q.   And at that stage, would also consider a fee waiver

request if one were made?

A.   Yes.

Q.   You said after that it goes to -- for review?

A.   Correct.

Q.   And to whom does it go for review?

A.   One of our two senior reviewers would be assigned to

it.

Q.   Then -- excuse me?

A.   Generally.  Occasionally if they are on leave or

otherwise, we may skip a step in the process or ask another

reviewer or another government information specialist to cover.

Q.   And after that?

A.   After that, it would go -- again, assuming that

there's nothing special to it, such as leave or workload

reasons, it would go to our division director or supervisory

government information about specialist Ms. Reagan.

Q.   After that?

A.   Then it would go to myself.

Q.   All requests would eventually go to you?

A.   Yes.

Q.   After that?

A.   In most cases, we would issue our response at that

Michelle Christ
February 07, 2025

point in time.

Q.    Within the step that you described as processing, I appreciate that a fee waiver determination would be part of that processing phase.  What about a fee notice?  Would that also be part of a -- the processing phase?

A.    Yes.

Q.    And how about the collection of fees?

A.    We usually do that after, at the very end.  We will provide a fee notice and ask for credit card information when we provide the fee notice, so that we can proceed with it.  But we don't actually charge a credit card until we determine what records are responsive, if any, and provide them.

Q.    So that would be after the issue of response step, the final step would be?

A.    Yes, it would be around the time of the final step.  Yes.  Because we wouldn't want to charge anybody if it turned out we didn't have records, or we had only a minimal amount of records and we're not charging a fee.

Q.    At what point in that process -- would it also be -- sorry, strike that.  Let me start again.

Also during the processing phase, would that be when a determination is made about whether the request is -- falls under 1106 or falls under FOIA?

A.    So as part of the fee waiver process, we look to see whether or not the person -- you know, is asking for a program

Michelle Christ
February 07, 2025

or non-program purpose under 1106, if it's for a program purpose, which is rare because most of those are handled at the field office level, we would not charge a fee at all.  However, assuming that's a non-program purpose, we would be able to charge under 1106.  We would then, though, look at the FOIA standard to see whether or not it fell in the public interest.

Q.   Okay.  There's a lot there, and I definitely want to return to that in a little bit.  But I think what I understand you saying, is that that decision, the program versus non-program decision, would also take place as part of the fee waiver process at that point in the life cycle that we've discussed?

A.   Generally, although sometimes if we note that something's for a program purpose, such as someone, you know, pursuing their own, you know, disability claim, we may refer them to the field office for quicker response.

Q.   Okay.  So there might be situations where that doesn't happen, but generally that would be part of the processing -- that determination would be part of the processing phase, and specifically in connection with the consideration of the fee waiver?

A.   Yes.

Q.   Could -- I'm sorry.

A.   No, I was just going to say, I mean, it's very rare for us to actually get a program purpose one submitted through

Michelle Christ
February 07, 2025

FOIAXpress.  Most people go to the field office.

Q.    Could we pause there, because I'd like to -- what requests go to field offices versus go to OPD?

A.    I mean, it's usually based on the individual, but some, you know, things that May fall under that program purpose, people would go to their local field office or their hearing office because they may be, say, pursuing a Social Security Disability claim and they need information for it.  It may be their own records or, you know, records that they're using for that purpose.

Q.    And are those characterized by the requestor as FOIA requests specifically?

A.    I mean, they may not -- they may or may not characterize it.  They may not realize it.  And, again, we're just trying to get folks their, you know, information as soon as possible, so they can pursue their, you know, whatever benefit they might be pursuing.

For instance, I'll give you an example of one that might come in through us that's a program purpose is, for instance, someone may be asking us how we look at sickle cell testing because it's their own case and they're trying to pursue it, or they're, you know, a representative of them.  In that instance, we may give it for no fee and it may go through us because it's more of a, you know, a question of, you know, how SSA is looking at sickle cell testing.

Michelle Christ
February 07, 2025

Q.   And for a request like that, are you -- the request would come directly to you, or a field office would refer it to you?

A.   I mean, it would depend on the requestor.

Q.   So it is possible for a FOIA request, or a request that would be considered a FOIA request by the agency, to be lodged in the field office and then come to your office?

A.   I mean, most of -- I wouldn't say that.  I would say most of the requests go through FOIAXpress.  It's more likely that we would refer somebody to the field office if we thought they could better help them.

Q.   Approximately, what portion of the 10,000 to 15,000 that you receive get referred to the field office?

A.   Oh, that's not included in that number.

Q.   I see.  So those might come to you through FOIAXpress in the first instance, but then be referred, then your office would not be tracking them anymore?

A.   Correct.  We might get something in and we might determine that it's more of a program matter, and we through FOIAXpress or more likely through our FOIA public liaison email box is the most common way that comes through, and we would refer them to the field office.

Q.   And are the requests that you described for an -- an individual's request for his or her own records, do you consider those to be Privacy Act requests?

Michelle Christ
February 07, 2025

A.    I'm sorry, could you repeat that?

Q.    Yes.  Privacy Act separate statutory -- let me -- sorry.  Let me actually repeat the question.  Apologies.

When you -- the request of the type that you described, where an individual is seeking records about his or her own Social Security account, does your office consider those to be made under the Privacy Act as distinct from FOIA?

A.    I think that it would be on a case by case basis.  I really couldn't, you know, speculate.  We do have Privacy Act requests, we handle those separately outside the FOIAXpress.  You know, outside the FOIA system.

Q.    And what kinds of requests are those, that are handled out separately?

A.    I mean, again, I think those would be sort of, you know, outside the scope of what we're talking about now.

Q.    Yeah, I'm just trying to understand what we're not talking about, so that I can understand what we are talking about.

A.    Well, as you mentioned, Privacy Act requests are a separate statute, a separate different type.  There are access requests, as well as consent based disclosures.  And those, OPD does -- you know, is involved in, but those are outside the FOIA division, and outside the FOIA matter.

Q.    I see.  So those are handled not by Division 3?

A.    Correct.

Michelle Christ
February 07, 2025

Q.    We didn't -- during our -- that overview of the whole process, we didn't talk about appeals.  At what point could an appeal be lodged by a requestor?

A.    So it depends on what they're appealing.

Q.    What's the range of times that -- the range of times that an appeal might be -- let's say, range of stages at which an appeal might be taken?

A.    So generally, it's after you receive response.  So if you receive a fee waiver denial, you can appeal that.  You know, if you receive -- you know, if you're unhappy with the response that you've gotten in response to the FOIA, you can appeal that separately.

Q.    Okay.  We may come back to that later, so that I can understand the interaction there between the regular track and the appeal track.  Just to make sure that I've understood, I'm going to say back the steps in the order that I think you said them, but please tell me if I get it wrong.

The request is received, the request is input into FOIAXpress.  Although, if I understand you, if a person has made the request electronically, it is already in FOIAXpress; is that right?

A.    Yes.

Q.    Then, it is assigned to staff, to a information specialist or analyst.  Then an acknowledgment email is sent to the requestor, or an -- some -- an acknowledgement is sent to

Michelle Christ
February 07, 2025

the requestor.  The analyst then processes the request, or begins processing the request.  That would include consideration of a fee waiver request, if one is made, preparation of a fee notice, and a process for obtaining the responsive -- researching for and obtaining the responsive records.  It would then go -- the whole package would go to a senior reviewer for review.

A.    Just to clarify, it may not be the whole package at once.

Q.    I see.  Okay.  So the independent pieces might go separately to the senior reviewer for review -- at an intermediate point while the processing is still going on?

A.    Correct.

Q.    For example, of interest to us here, a fee waiver determination might go to a senior reviewer for review before processing of the responsive records has been completed?

A.    Yes.

Q.    Then once whatever the piece is that has been reviewed by the senior reviewer has in fact been reviewed by the senior reviewer, it goes to the division director for review, then to you for review.  Then a response is issued, and then costs are collected around that time.

A.    Costs may or may not be collected.

Q.    Okay.  If collected, they would be collected then?

A.    Yes.

Michelle Christ
February 07, 2025

Q.   Okay.  Thank you.  You didn't -- while we were talking, you didn't mention that anything material had changed during since 2022 when you got there.  Did any -- has any of those steps changed in a meaningful way since 2022 when you started at PD?

A.   I don't believe so, and I don't believe they changed much from prior to that either.

Q.   And is that -- what's that -- about prior to 2022, what is that impression based on?

A.   Based on my discussions with staff, and my review, as well as my own interactions with OPD when I was in the regional office.  I didn't process FOIA requests at that time, but, you know, we did sometimes have FOIA litigation or matters that, you know, involved FOIA.

Q.   So as far as you know -- approximately how far back would you say that impression goes?  You can give it with whatever caveats, but how far back do you feel fairly comfortable saying that the process was more or less what you just described?

A.   I mean, I think -- it's hard for me to actually say a specific time frame, having not been in the Office of Privacy Disclosure, but I think that, you know, it goes back at least, you know, several years, if not longer.

Q.   Okay.

A.   I will say the only change has been that we were using

Michelle Christ
February 07, 2025

FOIA Online as our case processing system, and then I was there for their transition to FOIAXpress after FOIA Online no longer became available.

Q.    Understood.  When did that happen?

A.    That happened in July 2023.

Q.    And appreciating that the system has changed, did any -- did the change of the system from FOIA online to FOIAXpress change the order or the nature of any of the steps that you described earlier?

A.    No, there really were no substantive changes.

Q.    And we can -- we'll return to this later.  But did it -- in a meaningful way, did it change the type of data that was maintained by the agency about each request, or just the format in which the data was maintained?

A.    Could you repeat that question, please?

Q.    Yeah.  Let me try it a different way, and if it's too abstract, we'll circle back to it later.  When the agency switched from FOIA Online to FOIAXpress, did it start tracking different information about each request than it used to, or did it just track roughly the same information in the new system?

A.    I think there has been -- you know, we've always, you know, maintained the requirements that we provide for DOJ for quarterly reports as well as yearly, and sometimes there were tweaks about what they're requesting.  Certain data searches may be easier in FOIAXpress, but for the most part, they are the

Michelle Christ
February 07, 2025

same.

Q.   Thank you.  That's a helpful answer.  And we can come back to that later.  I'll just note that as I'm sure you know, there was a new FOIA regulation that went into effect very recently.  We may talk about that more later.  But with respect to the process that we just described, was there anything about that regulation that changed the nature of the process?

A.   Nothing that changed the process.

Q.   That's all I'm asking about for now.  And similarly, we've seen that the POMS about FOIA and Privacy Act requests was updated in October 24 -- excuse me, October of 2024.  Was there anything about that update that changed the nature of the process that you described?

A.   No.

Q.   Okay.  Thank you.  Would you like to take a break?

A.   Sure.

MS. TARANTOLO:  Okay.  Let's take a few minutes.  It's a good stopping point.

(Off the record at 10:06 a.m.)

(On the record at 10:20 a.m.)

THE REPORTER:  All right.  We're back on.

MS. TARANTOLO:  Great.  Thanks.

BY MS. TARANTOLO:

Q.   Thank you for the overview you just gave before the break.  I want to go back and clarify one thing to make sure

Michelle Christ
February 07, 2025

I've understood.  I think that we talked about at least four categories of FOIA requests.  I'm going to say what they are.

So there's the requests that come into OPD and then stay with OPD.  Requests that come to OPD and are sent to field offices.  Requests that come to field offices and go to OPD, and then requests that go to field offices and stay in field offices.  I'm not -- this is the whole universe of all FOIA requests that go to the agency, and I -- you look -- okay.  So I'll stop.

A.   So thank you for that.  Let me clarify.  That is not what I meant.

Q.   Okay.

A.   If that was how it was understood.  The -- OPD processes all FOIA, true FOIA requests.  We sometimes receive inquiries that could be better handled by our field office.  We don't count those towards our annual FOIA requests, and they may be an individual kind of looking for information that is related to, like, a program purpose, or their benefit application, or their own records, or something like that, and they're -- could get better handled there.  Sometimes field offices do receive FOIA requests, that's pretty rare, in which case they do indeed send them to us, so we can process them.

Q.   Okay.

A.   As well as other offices in SSA.

Q.   Okay.  So let me clarify a little bit.  Of all the

Michelle Christ
February 07, 2025

inquiries that come to OPD, some -- I think a large -- by far the largest number that we're going to talk about today, but I'll come back to the numbers in a second.  First, I want to make sure I understand the categories.  Inquiries come to OPD, and remain with OPD, and are tracked as FOIA requests for purposes of the reports?

A.    Yes.

Q.    And they are true for requests.  And can -- those are either for a program purpose, or not for a program purpose, or are they all not for a program purpose?

A.    The majority are for -- not for program purpose, we do occasionally get some that are program purpose.

Q.    Those two together comprise the approximately 10,000 per year?

A.    Yes, approximately.

Q.    And of the 10,000, roughly how many are program purpose versus not program purpose?

A.    It is rare for us to have a program purpose.  I think I would be comfortable saying about, you know, like 95 percent are not program purpose.  And it could potentially be higher, it depends on the year.

Q.    Okay.  So of all -- to restate, of all of the inquiries that come to OPD, the large majority of them, approximately 10,000 to 15,000 per year, are considered true FOIA requests.  Of those, approximately 95 percent or more are

Michelle Christ
February 07, 2025

considered by the office to be not for a program purpose.  And approximately 5 percent or less are considered to be for a program purpose?

A.    Correct.

Q.    And then to round out my categories -- but that was -- that is very helpful.  Thank you.  There are some inquiries that come to OPD that OPD sends out to the field offices for a response.  Those are not considered true FOIA requests and they're not tracked?

A.    Correct.  You know, our information, so that we are transparent and allow people to easily make a FOIA request is put on a lot of government websites, our own, as well as others.  So we are often the public contact that an individual can find when they want to reach out to the agency.  But it doesn't necessarily mean that they have a true -- an actual FOIA request.

Q.    Understood.  Understood.  Okay.  And those would be -- and then -- those would all -- the ones that -- the inquiries that you received that you send to the field office, you would not consider them to be -- do you -- do you classify -- would those -- sorry.  Let me start that question again.

Of the inquiries that come to OPD that get sent out to a field office, are those all for a program purpose or potentially is that a question you don't ask and answer because -- you don't ask and answer?

Michelle Christ
February 07, 2025

A.   We're not looking at them necessarily further.  You know, they'll work with the field office.  We don't ask the field office to report back, but it wouldn't necessarily be something they would be -- in all cases would be applicable.  You know, sometimes they may contact us and say, you know, I want my record, I want my -- I want my hearing decision.  Let's say, for example, they've had an ALJ hearing, administrative law judge hearing of their denial, I want it because I want to appeal it.  You know, in that case, we might refer them back to the hearing officer the -- you know, the others because they're really not making a FOIA request, they want to pursue their administrative appeal rights, you know, in a totally different context.  They just happen to have our number.

Q.   Okay.

A.   So the -- we wouldn't then ask, like, is that -- I mean, I -- they would not be charged usually for a copy of their own records.  And they're really doing a bigger -- you know, it's part -- they're not really asking for information, so much as they're trying to pursue their claim.

Q.   Understood.  And then, that goes to the field office.  It's not in FOIAXpress anymore, it's not tracked, it's not reporting?

A.   Yes, and probably never goes into FOIAXpress.

Q.   Got it.

A.   We try to move those along as quickly as possible,

since we understand people probably have deadlines and things.

Q.   Understood.  Understood.  There are some inquiries that go out to field offices and are handled in field offices.  And is it fair to say that your office is not involved in those?

A.   Yes.

Q.   And then, there are a few -- I think you testified this is rare, but there are -- might be some inquiries that are received in the first instance by a field office, that the field office forwards to OPD for processing?

A.   Yes.  And, I mean, it's not extremely rare, but sometimes someone may walk in and say, I have a FOIA request, I'd like to hand this to you in the field office personally.  In which case, the field office would then send it to us.

Q.   And then, would that -- roughly -- how many per year?  How many times per year?

A.   I mean, I don't know because I'm not -- I don't always get -- you know, it would depend.  I mean, I'll have someone probably once a month reach out to me from field office, say, hey, somebody walked in with a FOIA request.  This is area --

Q.   I --

A.   And the same thing with our folks.  We don't always know how it actually, you know, came to us, you know.

Q.   So maybe no more than a few dozen per year?

A.   Probably.  That would be -- would be about right, I would think.

Michelle Christ
February 07, 2025

Q.   And then, once it comes to you, does it go into FOIAXpress?

A.   Yes.

Q.   And at that point, you would consider it a true FOIA request, and you would further decide if it is for a program or a non-program purpose?

A.   We would follow our normal protocols and procedures that I described to you earlier.

Q.   Okay.

A.   We wouldn't treat it any differently than the one that came in through FOIAXpress.

Q.   Understood.  Thank you.  Very clarifying.  I'm glad we've circled back on that.

A.   Thank you.

Q.   All right.  Now, I want to speak -- talk a little bit in more detail about fee waiver requests.  To orient us, you described earlier, three different -- slightly different stages that I think are generally relevant to fee waiver requests and fees.  A fee waiver request, an actual request for a fee waiver, the fee notice, which interacts with fees also, and then the, let's say, assessment of costs, or collection of costs.  I'm going to come back to the other two later.  For right now, I just want to talk about fee waiver requests that are classified as fee waiver requests and treated as fee waiver requests. Again, just saying this for clarity, I'm asking you about the

Michelle Christ
February 07, 2025

current process.  If anything relevant was different since you got to OPD, please let me know.  We'll come back and dig into that later if we need to.  What you explained before is that a request will come in often through FOIAXpress, though if it comes in through a different way, it's been input into FOIAXpress, it's then assigned to a staff person.  As the staff person begins processing the request or reviewing the request, does the staff person enter information about it into FOIAXpress?  Like, is that part of the review?  Let me phrase it a different way.  Some information comes in, let's just say it's filed through FOIAXpress.  Some information is automatically important, I assume, from the interface that the requester interacts with, you know, at their computer.  Maybe I should check if that assumption is right.  When we -- let me -- when we file a FOIA request here, we -- through FOIAXpress, we type in some information.  There's some information in the field that we see here at NYLAG.  Does that information go automatically into FOIAXpress on your end?

     A.   Yes, we can see the FOIA request.

          MS. TARANTOLO:  Okay.  I think this will be more concrete.  Let me -- I'm going to hand you a document that's marked as Exhibit 2, Plaintiff Exhibit 2, and it has the Bates stamp of SSA 000377.  This was a document produced to us in this litigation.

          (Exhibit No. 2 marked for identification.)

Michelle Christ
February 07, 2025

MS. SCHWARTZ:  I just want to note for the record, that this exhibit is marked protected information.

BY MS. TARANTOLO:

Q.   What is this document?  What does this document show?

A.   It seems to show a screen grab.

Q.   And do you know what it's a screen grab -- screen grab of?

A.   Of FOIAXpress.

Q.   Who would see this screen?

A.   Whoever is assigned to the matter, as well as anybody reviewing it.

Q.   When a request is first referred to an analyst, what would that person see in the fields that are here?

A.   I mean, it would depend on the nature of the request and what information was given.

Q.   Okay.  If NYLAG, for example, had filed a request and we had clicked the box selecting that we were seeking a fee waiver, would this fee waiver requested box that you see on the top be preselected as yes when the analyst sees the record?

A.   I believe so.

Q.   And then, if you look down, it says start -- there's a field called start date.  Do you see that?

A.   Yes.

Q.   What would be in there?

A.   Generally, the date that we received the request, I

Michelle Christ
February 07, 2025

suppose, if it, you know, came in on a holiday or a different day or something, it might be a day or two later.

Q.   And where it says end date, that field is currently blank.  What would be there -- at the beginning when the analyst first receives the request, what would be in that box?

A.   I believe it would be blank.

Q.   And later on, what would be populated there?

A.   When we reply to the fee waivers.

Q.   So that's the reply to the fee waiver specifically?

A.   Yes.

Q.   And to be clear, it's not -- as opposed to the final resolution of the request through the provision of records or a no fee -- no record finding, et cetera?

A.   Correct.

Q.   The fee -- the box that says fee waiver description, which is blacked out, what would be there?

A.   Sometimes if a person put information about why they're requesting a fee waiver or, you know, relevant information that -- it would really vary case by case.

Q.   So am I right that -- am I right that that would be filled with text that had been put there by the requester?

A.   Yes.

Q.   It's not something that the analyst would separately type in?

A.   No, not generally.

Michelle Christ
February 07, 2025

Q.   Determination.  There's a field called determination. Do you see that?

A.   Yes.

Q.   And then, there appear to be several dropdown options, TBD, granted, denied, withdrawn, not billable, and N/A.  Do you see that part?

A.   Yes.

Q.   What does -- what does TBD mean?

A.   To be determined.

Q.   And when would that option be selected?

A.   While we were reviewing the fee waiver request.

Q.   If you know, is that a default option that would be there at the beginning or the analyst would select it?

A.   I honestly do not know.  I think it's default, but I don't want to say that definitively.

Q.   Understood.  How about granted, when would that be selected?

A.   If we were to grant the fee waiver request.

Q.   So that would be -- that dropdown option would be selected later on in the process after the fee waiver request has been determined?

A.   Yes, I think typically the analyst would put it in after we released the response to the request.

Q.   So if, for example, the fee waiver is granted on January 1, but the request is not satisfied, the records are not

Michelle Christ
February 07, 2025

produced until February 1, when would the granted indicator be selected, on January 1, or February 1, or some other time?

A.    Probably on January 1.

Q.    Similarly for -- would the same be true for denied, if the fee waiver -- after the fee waiver is determined -- fee waiver request is determined and denied?

A.    It might be, but if there's an appeal, we might hold off.

Q.    Let's come back to an appeal in a second, let's just say in a straightforward case where it's just denied and not appealed, this would be selected as denied after the determination is made, and the determination is a denial?

A.    We might wait a little while to see if the person's going to file an appeal.

Q.    I see.  So it might remain as TBD, for example?

A.    Yes.

Q.    How about withdrawn?  When would that be put in?

A.    Probably whenever the requests are indicated they were withdrawing their fee waiver request.

Q.    And withdrawn, does that refer specifically to the request for a fee waiver, as opposed to the underlying request itself, the underlying FOIA request?

A.    Yes, I think so.  But usually they are one and the same.

Q.    Not billable.  What does that mean?

Michelle Christ
February 07, 2025

A.    That would be if we determine that it would, you know, produce only a minimal effort for us to provide the record. Somebody only wants, you know, a copy of something that's short, then we're not going to bill them because it'd be more costly to the administrative billing them as well as, you know, de minimus.  Or if, for instance, we decide to put it in our FOIA library or reading room, then we would not bill them.  We -- because we're making it publicly available now, we just refer them to that.

Q.    When would that option be selected?  When in the process?

A.    Usually when we're, you know, looking at the matter. It might be when we have the fee waiver.  Sometimes though, it may be later on when we actually are gathering the records.  We may, you know, for an example, we may either grant or deny the fee waiver.  The -- but the requester, in case they still want to go forward with their records, we will then go through the collection.  We may determine as we actually collect all the responsive records and finalize them, that either it's not to be billable because it's a small amount, it didn't take us that long, or we didn't have responsive records.  Or we may decide, hey, we're putting it -- we're making it publicly available somewhere on the agency website, we're going to refer them there.  Or we may determine that it's on another government website already, like the congressional record or something, and

Michelle Christ
February 07, 2025

refer the person there.

Q.   Okay.  I want to come back to that decision in more detail later.  But just so I understand, it's -- one situation that might arise, is a party would file a fee waiver request.  At that time, the indicator says TBD.  Then the fee request is determined and it's denied.  The indicator is changed to denied, maybe after a little bit that they're not -- and they won't -- don't appeal, so it goes to denied.  But at some time later, OPD makes a determination not to bill, and then the indicator would again be changed from denied to not billable?

A.   Yes.

Q.   Every time the agency decides not to bill, would it move this to not billable?

A.   It should, but I don't know that it always does.

Q.   I understand.  And what if the -- but that would only come into play if a fee waiver request had been lodged in the first instance?

A.   Yes.

Q.   So, for example, a requester might file a request, not to seek a fee waiver.  Ultimately, the agency decides not to charge, but this would remain blank because this whole section would not be in play?

A.   Yes, the fee waiver would not be in play.

Q.   Okay.  The last option is N/A.  When would that be selected?

Michelle Christ
February 07, 2025

A.    I don't believe that we select that very often.  I do not know that we generally do.

Q.    Okay.  So nothing comes to mind at the time that that would be?  It's a -- it is an option that exists, but you can't think of a --

A.    It's an option that we have in the system, but I don't believe that we select it.  If we do, it's very infrequently.

Q.    Got it.  Could you look to the right at the drag and drop zone?  What is the drag and drop zone?

A.    That is where if someone wants to attach a file.

Q.    And what kind of file might be attached there?

A.    I mean, sometimes we might get a request in -- you know, the FOIA request is see my Word document, we would add the Word document there.

Q.    And later on, once a fee waiver determination letter is generated, would that also be in the drag and drop -- in this zone over here, or it's just the information that comes in from the requester?

A.    I think generally it would just be the information that's on the request or we put that in a different place.

Q.    Understood.  Okay.  We can put this document aside. Now, I want to ask you about the process for determining fee waiver requests.  I'm not asking you about the standards for now, we're going to come back to that and talk about it later. I'm just talking about the process.  When would -- who does a

Michelle Christ
February 07, 2025

first pass at the determination of a fee waiver request?

A.   The assigned government information specialist.

Q.   And what is the full universe of materials that that person might consult while they're making a determination?  What are the things they might look at?

A.   They regulate the federal regulations in 20 CFR Part 402.

Q.   Anything else?

A.   No, just we -- we adhere closely to regulatory standards.

Q.   And they would also presumably look at the waiver request itself?

A.   Yes, of course.

Q.   Just to be --

A.   Yeah.

Q.   -- you know, comprehensive here.

A.   I appreciate that.  Yes, they would look at the fee waiver request itself.

Q.   Would they look at any responsive records?

A.   Not generally, no.

Q.   When you say not generally, why is that?  Or what do you mean by not generally?

A.   Well, I mean, I don't think they normally would as a matter of, you know, the regular process.  I'm just more, you know, out of abundance of caution because I obviously don't sit

Michelle Christ
February 07, 2025

with everyone analyst while they do it, that I don't think that usually responsive records themselves do not play a role in the fee waiver.  It's the nature of the request and the reasons justified by the requestor.

Q.   And based on what you described before, would it be sometimes or often true that the responsive records have not yet been identified at the stage that the determination is made on the fee waiver request?

A.   Yes, I think so in most cases.

Q.   Most cases.  What if the -- what is the analyst -- GIS analyst -- what is the staff person directed to do if they're not familiar with the subject matter area of the request?

A.   I mean, generally they're looking at what the requester put as their justification provides in the public interest.  You usually do not need a deep subject matter expertise in the actual request itself.  So usually I think that OPD looks at it itself.

However, if they had a question about the nature of it, maybe it's highly technical or something like that that would be useful to them in determining whether the appropriate fee waiver standards were applicable, they would reach out to the component that authored it or maintained a copy of those potentially responsive records, and see if they could provide, you know, any general analyst -- analysis, excuse me, or information.

Michelle Christ
February 07, 2025

Q.    So I think I understand.  Most of the time that would not happen, but sometimes it might happen?

A.    Yes.  And they would be clearly just asking them about the subject matter at issue, they would not be asking them for their opinion on the fee waiver.

Q.    Approximately, how often do you think that happens?

A.    I don't think it happens very often.

Q.    Maybe less than 5 percent of the time?

A.    I mean, I really would be, you know, loathe to say I don't think it happens very often at all, but, you know, it could potentially.

Q.    Okay.  I understand.  At that stage where the analyst is making the first pass at the decision, let's say, are there any other people that the analyst might consult with apart from the scenario that you just described with a highly technical area where they would reach out to the component?

A.    I mean, they may speak to their colleagues or, you know, their mentor, or the senior reviewers if they want to get their take on it.  Usually, they'll hold off for the senior review, because that person would be reviewing it anyway.  But maybe if they had a question as they were going through.

Q.    And if they were to reach out to their colleagues to discuss, or to the mentor, in what format would that outreach happen?

A.    I mean, probably -- and, again, I think it would be

Michelle Christ
February 07, 2025

informal and would likely just be a work conversation, if they're seated next to one another, or on the phone or, you know, Teams.

Q.   Got it.  So maybe by phone, maybe face to face, maybe by Teams.  And are those conversations logged in FOIAXpress or logged anywhere else if a informal conversation like what you described were to happen?

A.   I think in most instances, yes.

Q.   Could you describe how they would be logged?

A.   I mean, without getting too much into our published area, I would just say that we would annotate it.

Q.   Okay.  And to be very clear, I'm not asking you anything about what's in those communications for now, just the method.  What does a -- what does an annotation mean?  What do you mean by an annotation?

A.   I mean, they would -- literally, there's fields to annotate, you know, what steps you are taking.  So if they talked to a colleague, or they talked to counsel, they would annotate that they had such a conversation and this was so and so's thoughts or opinions.

Q.   I see.  Are those free text fields, so to speak, are there -- or could you describe the field where they would enter those notes?

A.   Yes.  May I refer back to this exhibit?

Q.   Absolutely, please.  We're looking again, sorry, at

Michelle Christ
February 07, 2025

the exhibit marked 2, I believe.

A.   So this is not where they would put it.

Q.   Right.

A.   There is a separate thing, but it would be similar to, like, a fee waiver description, which would come from the requester.  But they would just -- it's a box.  It's a text box.  And they would enter their -- you know, they would put the date, and who they spoke to, and, you know, what was discussed.

Q.   And, for example, if they had two conversations, one on January 1 and one on January 2, am I correct that that would just be the same text box, first it would say January 1, I spoke to so and so.  And then, it would say January 2, I spoke to so and so, or it will be two different boxes?

A.   It'd be two different boxes, so as not to cause confusion, to make sure that we're accurately documenting our thoughts.

Q.   And there are unlimited boxes, or as many boxes as an analyst needs to record their notes?

A.   As many boxes as they need.

Q.   You said that those -- the purpose of those boxes is to describe the steps the analyst is taking.  One of the steps might be consultation with a colleague, or a consultation with a component, consultation with counsel.  What other kinds of steps might get annotated in those boxes?

A.   Well, just to clarify, they're not necessarily doing

Michelle Christ
February 07, 2025

it to do the steps.  They're just -- they're indicating that they were discussing with somebody on such and such date, and what the discussion might have entailed.  We actually in the system have a dropdown -- thing for recording the steps that it's at, and the stages, and the actions.

Q.   I see.  So I'm not quite sure I understand this.  The dropdown menu of different actions, is that separate from the boxes that you just described?

A.   Yes.  So the -- as they move to different stages generally, like it's with the analyst, now it's with the reviewer, now it's with the division director, now it's with me. They will note it in the -- it's with the office of -- you know, it's with counsel, it will be noted, you know, in the dropdown box, and it will be recorded, and it can be there and you can see the history.  The other portion of it would be the notations for what different conversations entailed.

Q.   I see.  So there are two types of -- two types of information being tracked in FOIAXpress that we're currently talking about.  There might be others, these two are -- one is a free text -- set of free text boxes that can be annotated with text by the analyst to describe things such as conversations. Separately, there's a different part of the FOIAXpress interface where you can select what -- what stage the request is at?

A.   Yes.

Q.   Do those other stages also have free text box for

Michelle Christ
February 07, 2025

notes?

A.    I believe so.  Yes.  Yes, they do.

Q.    Okay.  As we carry on with the process, I may pause because we don't have screenshots of those, so it's hard to ask specific questions.  I may pause and ask you to explain if there would be a place where that thing is entered -- being entered into FOIAXpress.  You mentioned that another person that the analyst might consult with is counsel.  Without describing the content of those communications, can you explain to me what the process for that consultation would be?

A.    We would ask counsel to take a look at whatever issue we had concern about or more generally.

Q.    When you say counsel, which office within SSA?

A.    The Office of General Law.

Q.    And who reaches out to OGL, I'll call it, is that the analyst or somebody else?

A.    It could be the analyst.  It could be one of the reviewers.  Could be me.

Q.    And if the analyst, or the reviewer, or you were to make an outreach like that, what format would it be?

A.    Be through FOIAXpress.

Q.    I see.  So there's a way to actually use FOIAXpress to send a message to OGL to seek guidance?

A.    Yes.

Q.    And then, the response would also come through

Michelle Christ
February 07, 2025

FOIAXpress?

A.    Most cases.

Q.    You said most cases.  Sometimes would you -- you could get a response through other means?

A.    Sometimes we could verbally discuss, it might be easier.

Q.    Right, through a phone call, or a video conference, or a face to face meeting?

A.    Yes.

Q.    Those communications, if they happen by phone, for example, or video conference, or face to face, would they then be annotated back into FOIAXpress?

A.    Yes, they'd be documented.

Q.    On approximately what portion of fee waiver requests specifically is there outreach to OGL?

A.    I couldn't really speculate, but we do frequently contact them.

Q.    Like 50 percent or 25 percent?  I understand -- I won't hold you to this, but just to give an idea of how often it happens?

A.    I mean, I think we do it in most cases.

Q.    In most cases.  So maybe 75 percent?

MS. SCHWARTZ:  Objection.

BY MS. TARANTOLO:

Q.    If -- more or less than 75 percent?

Michelle Christ
February 07, 2025

A.   I mean, I -- without getting into the scope of our privilege, I really can't answer.

Q.   Okay.  I'm still not -- I'm not asking about the content at all.  Just the -- the type of -- getting information about the communication.  And in a situation where OPD reaches out to OGL for advice on a fee waiver request, who is the final decision maker on the fee waiver request?

A.   I'm the FOIA officer by statute.

Q.   So just to make that concrete, OGL might say a thing, you may disagree with the advice of OGL, as people often disagree with their own lawyers.  It's -- ultimately, it's your decision, it's not OGL's decision whether to grant or deny a fee waiver request?

A.   Well, obviously, I strongly consider what OGL's -- especially because I'm not making the decision on behalf of myself, but on the agency.  And I do not have the authority to assume litigation risk on behalf of the agency.  But the ultimate decision is mine as the FOIA officer.

Q.   I understand.  And I can't say how often do you follow -- I would -- I can't ask you how -- if I were to ask you how often do you follow your lawyer's recommendation, your lawyer would object.  So I'm not asking it, but I think you have given me the understanding that I need, so thank you.  And if you know what training -- oh, sorry.  Strike that, please.

Are there specific individual people within OGL who

Michelle Christ
February 07, 2025

are responsible for fielding questions about fee waivers?

A.   I'm not responsible for managing OGL's workload.  I mean, obviously, we deal with similar attorneys on a regular basis, and it's a small office.

Q.   Understood.  And do -- if you know, do you know what training those individuals receive about fee waivers?

MS. SCHWARTZ:  Objection.

BY MS. TARANTOLO:

Q.   I'm just asking if you know, you can answer it yes or no.

A.   No.

Q.   All right.  Returning back to the analyst who is formulating -- is reviewing the fee waiver request, how is the analysts recommendation about the determination of the fee waiver request memorialized, in what format?

A.   Typically, they submit a draft response for review.

Q.   So the analyst drafts a response?

A.   Yes.

Q.   And then, you say -- I'll come back to that in one second, that you say they submit it.  How does the submission happen?

A.   They submit it to their reviewers through FOIAXpress.

Q.   And when the reviewer receives the draft determination letter -- is that a good thing to call it?  Is that what you would -- what would you call that document, a draft

Michelle Christ
February 07, 2025

determination letter or something else?

A.  I think that's -- I mean, I don't generally call it that, but I think that's a fair description.

Q.  Okay.  You can call it a different thing and I'll adapt?  In addition to seeing the draft determination letter, does the reviewer -- what else does the reviewer have available to them to review in connection with the request?

A.  I mean, they have the file in FOIAXpress.  So they have the initial request, they can look at any correspondence or advice that's been previously given.  And, of course, they have the regulations which we follow.  And it's, you know, done on a case by case basis.

Q.  Roughly, how long is an analyst expected to spend reviewing a fee waiver request and drafting a determination letter?

A.  We don't have any quotas.  I mean, it would depend on the nature of the request.  Some are straightforward, some are very complex.

Q.  The amount of time that the analyst spends, is that something that is tracked in FOIAXpress?

A.  No.

Q.  And approximately, what is an analyst's workload as to fee waiver requests?  For example, on average, how many fee waiver requests are they deciding per week, month, year?  Whatever makes sense to you.

A.    Well, almost everybody requests a fee waiver, and they handle between a thousand and 1,500 a year, so I would put it in that range.

Q.    And from what I understood of the nine analysts, are they all receiving roughly the same level of assignments, in the sense of one could divide that number by nine and get an approximate sense of the workload per analyst?

A.    Yes, I mean unless someone was on extended leave for some period of time, they all perform similar workloads.  And our reviewers handle slightly fewer of their own cases because they were reviewing others.  So actually -- if I may clarify, I think our analyst actually do more like close to 2000.

Q.    Okay.  Thinking specifically about -- or turning specifically to the drafting of the determination letter, how is that letter generated by the analyst?

A.    The analyst use Microsoft Word.

Q.    Are there template letters that the analyst starts from?

A.    No, not templates.  But usually we -- you know, people do have, like, drafts that contain, you know, like address and other formatting things to save time and be efficient, and language.  But there's no, like, template where they're, you know, checking boxes or that, you know, does any analysis or anything like that.

Q.    When you say there might be something to save time, is

Michelle Christ
February 07, 2025

that some kind of interaction between FOIAXpress and Word, so that the info -- like an address info, for example, gets populated?

A.    No, but that would be nice.

Q.    Okay.  So you're just saying they might have a --

A.    I mean, if you're doing 2000, you know, fee waiver responses a year, you're going to have, you know, language, you know, like, address, like, you know, you're going to have, like, a draft document that, you know, contains your address to put in and the, you know, name, your, like, that kind of thing.  Your sign off, that sort of --

Q.    Yes, it would shock me if a person whose job that was, started with a blank page every time and wrote it from scratch. So I'm trying to -- because clearly I've already not guessed correctly about what that might look like.  Would an analyst pre -- generally work from a previous draft that the analyst had created in the past?

A.    Yeah.  I mean, I think that we usually give, you know, like, a sort of, like, draft document that would have, like, you know, some of the -- you know, the address, for example, of how you might do appeal to OGIS, like that sort of thing.  You know, like some regular draft language.  But it doesn't contain any analysis in it, is what I'm trying to say.  It just contains the form and the bones of the structure, if that makes sense.  I'm trying to clarify things.

Michelle Christ
February 07, 2025

Q.    Yes, that is helpful.  And those -- when you say we would give a document like that, are those maintained in a central place, or how would the analyst access such a document?

A.    You know, in most cases, they all have their own by this point in time because they've been doing it for a long period of time.  But if there's, say, like, an update, we have to make, like, let's say the Office of Government Information Specialist update their address.  Our division director, Sarah Reagan, would send around an email to everybody, hey, OGIS updated their address, please update your -- you know, the format that you're using, letters that you're using.

Q.    We're going to look at one of these in a minute, so some of these questions might make more sense at that point.  But there is certain language, substantive language, that we see repeated in the determination letters that have come to us.  Where does that language come from, generally speaking?

A.    I mean, that would be in the sample letters that they're working off of.

Q.    So I think -- to check my understanding, each analyst would work from their own documents, but at some point in the past, they would have been provided documents by the office that contains sample language and the bones of the response?

A.    Yeah, so let's say when we get a new analyst, they're assigned a mentor.  And their, you know, mentor assigns them their first case.  And they say, oh, look it's a fee waiver

Michelle Christ
February 07, 2025

request.  Here's a sample fee waiver, you know, draft that is cleaned out of any personal information for anybody else, but, you know, contains, you know, standard language that we use in replying to these that lay out the legal standards as well as, you know, the logistics for how you might take whatever next steps the person is entitled to take.

Q.   I understand.  That's very helpful.  So generally speaking, a new staff person might receive such a document from their mentor at the beginning?

A.   Yes.

Q.   And the sample letters -- maybe that's a better term, they would be provided a sample letter or sample letters that contain certain standard language?

A.   Yes.

Q.   I see.

A.   We try to be consistent and efficient where we can. So, you know, not to confuse requesters for that.  I mean, obviously, we may doctor certain ones if we need to, based on the circumstances of the request.

Q.   Understood.  And so am I correct that it's up to the -- when the analyst is making the determination, drafting the determination letter, it's up to the analyst to select from that standard language and to add their own -- any of their own language to create the draft?

A.   Yes.

Michelle Christ
February 07, 2025

Q.   And again, just to check my understanding, there's not a formal set of instructions to an analyst about how to do that?

A.   No.

Q.   They would generally have learned from their mentor?

A.   Yeah -- they would learn it from their mentor, and then, their own experience and expertise as they go along.

Q.   And I think you address this, but, again, for -- just for clarity, the standard -- how is the standard language revised over time?

A.   I mean, most of the time it would be -- you know, it may be -- you know, oh, we -- this would be a more clean sentence that might be easier for someone to -- we're always trying to improve our plain language, so that our requesters can understand, you know, many of them don't have any experience with FOIA, our federal government.  We don't know their level of, you know, education or English aptitude.  So we always try to make sure that it's in clearest space.  We maybe updated a law, we may change something there.  There may be updated addresses.  So usually we do it kind of as these changes occur.

Q.   Yeah.  Sorry.  So, for example, I know when the new regulation went into affect, some of the numbers of the sections shifted.  Presumably that was an example of a time you had to update the standard language?

A.   Yeah.  So, you know, obviously our office had, you know, been leading that change, so we were all very involved.

Michelle Christ
February 07, 2025

But nonetheless, we sent out an email to the staff to, like, remember, today, January 17, the regulation has been updated. Please make sure that you change, you know, the following regulations in your standard letters.

Q.   I see.  So the revisions would generally be -- staff would be advised to do those revisions via email?

A.   Yes.

Q.   Okay.  Shifting now to the review of the draft determination letter.  I believe what you explained before is that generally the first level of review would be from one of the two senior reviewers in the office?

A.   In most cases, yes.

Q.   If not that person, the alternative is that it would go straight to you, or is there some other alternative?

A.   So there's a few alternatives.  It depends on the nature of the request, and that most -- sometimes we would ask a GS 13 to review it, if the GS 14s were busy or on leave.  So in many cases we do that.  If not, they would go to Sarah Reagan, and then to me.

Q.   I see.  Okay.  So the -- in all instances, the analyst would draft the recommendation -- the recommendation first, it would go to either one of the two senior GS 14 reviewers, a different relatively senior GS 13 reviewer, or Ms. Reagan?

A.   Yes.

Q.   And after that, it would go to you?

A.    Yes.

Q.    Okay.  I'm going to ask about that intermediate layer of review first.  If you think the answers would differ materially based on which of those types of people is doing the review, you can say that, but maybe it won't.  So what does -- what does the review consist of?

A.    So I think basically -- and I will say, yes, I would -- I think all of our review should be mostly consistent. You know, it's -- we have multiple layers for a check, and because it goes out under my name, but, you know, we're all applying the same standards.  But the reviewer will look at it. I mean, first of all, they'll look at it to make sure, you know, that it's well crafted and, you know, we don't really have an issue with this, but those -- typos, things like that.

But they also look at the analysis, and the outcome, and the request.  And then, they may, you know, reply to -- they may approve it.  They may suggest changes.  They may make edits. It would depend.  They may decide to, you know, that we need to seek counsel or something at certain stages, if it happened already.

Q.    And I'm going to -- based on -- summarize what I think -- where I think we left things before in terms of the materials that would be available to the reviewer if they wanted.  They would have the draft recommendation letter itself, the original request, any notes from communications that the

Michelle Christ
February 07, 2025

analyst had had with other people about -- on the subject of the request, possibly, but in rare circumstances, information from a subject matter expert in the component, and possibly the outcome of a consultation with counsel, either that the analysts had made or that the reviewer makes themselves, and the regulations themselves?

A.   Yes.

Q.   Anything else that they would -- that they might look at?

A.   Not that I can think of.

Q.   And would the -- you mentioned that they could approve, they could suggest changes, they could actually edit the document themselves, or they could sort of seek further information in some way; is that right?

A.   Yes.

Q.   Would they ever have a back and forth, like a conversation with the analyst about the letter?

A.   You may.

Q.   In what format would that happen?

A.   I mean, it would depend.  If they're both physically in the office, it would be in person, calls, Teams.  You know, that would be up to them.

Q.   And those might also -- those would also be recorded in FOIAXpress if they happened?  Or should be recorded in FOIA express if they happened?

Michelle Christ
February 07, 2025

A.    Yes, they would be.

Q.    And after the letter has gotten to the point where the reviewer approves it, it is submitted to you?

A.    It would then usually go to Ms. Reagan, unless she is on leave or unavailable with a different work load, and then it would go straight to me.  But most of the time it goes through Sarah.

Q.    I see.  So generally, in most cases, it would go analyst, senior reviewer, Ms. Reagan, you?

A.    Yes.

Q.    Sometimes it might go, analyst, different reviewer, Ms. Reagan, you?

A.    Yes.

Q.    Sometimes it might go analyst, Ms. Reagan, you?

A.    Yes.

Q.    Sometimes it might go analyst, senior reviewer of some type, and then you?

A.    Yes.

Q.    Okay.  Thank you.  When -- so Ms. Regan's review, in what ways would her review be different, if any, than the review that you just described by the intermediate level reviewer?

A.    Well, there really shouldn't be.  You know, items submitted to Ms. Reagan should be ready to go out and be in that shape.  It's really just more of a control to, you know, ensure.

Q.    As to the intermediate level review, how often does

Michelle Christ
February 07, 2025

the intermediate level reviewer make edits or suggest edits to the letter?

A.    I think that would get sort of into our deliberations. And, you know, I can't, you know, comment directly.  I mean, I also don't always check to see what the changes were in between, unless I have a concern as the manager about performance.

Q.    Is it -- but it's fair to say sometimes the first reviewer would make changes, sometimes not?

A.    Yes, absolutely.

Q.    And when the letter then goes to Ms. Regan's review, is that also fair to say, sometimes she makes revisions, sometimes not?

A.    Yes.

Q.    And roughly -- approximately how often does she make revisions, if you know?

A.    I mean, I don't really know, you know.  And I don't -- some of the nature may be different than others.  You know, she may approve it, but ask them to change a word, you know, for clarity, or something like that.  Or she may have, you know, a concern about the outcome.  So, you know, not all revisions are equal.

Q.    And then, when the decision comes to you, what is your review process like?

A.    So I look at everything that is in FOIAXpress carefully.  The request, any prior information, any advice that

Michelle Christ
February 07, 2025

we may have been given.  And, you know, I look at the -- I look at the reg -- I always take a quick look at the regulations just to make sure, refresh my recollection, and then I, you know, will review the letter itself.

Q.  And do you ever revise the letter or suggest changes?

A.  Sometimes, yes.

Q.  Approximately, how often?

A.  I really couldn't say.  I mean, again, not all revisions are equal.  I may approve it, but say, hey, could you change this sentence because I think it would be concise or clearer.  Or I may say, hey, I have some questions about the outcome, let's discuss it.

Q.  You said you might have questions about the outcome. How often does a letter come to you with one outcome, and it -- after you've reviewed, the outcome has been changed to a different outcome?

A.  I mean, that goes into some of our privileged areas, so, you know.  But I don't know -- you know, I haven't actually tracked it.  I don't, you know, track that.  And sometimes, I may have questions and we don't -- the analyst is able to answer my questions, and I agree.

Q.  You said just now, you haven't tracked it.  In theory -- well, not in theory.  There is actually a record of each draft.  So for a particular request, could you go and see every draft that existed, the first analyst draft, the draft

Michelle Christ
February 07, 2025

that got approved by the reviewer, the draft that got approved

by Ms. Reagan, and then the final draft?

A.    Oh, yeah, I absolutely could, but I haven't tracked

the numbers of how often that occurs?

Q.    I understand.  And then, approximately how long would

you spend typically on a review of a fee waiver determination

letter that comes to you?

A.    Entirely depends on the nature of the request.  It's

very much a case by case basis.

Q.    Okay.  Could you give a range, then, of how much time?

A.    I mean, you know, if it's a -- you know, if the

individual hasn't put even a reason for the fee waiver request,

it might be a pretty simple denial because the individual hasn't

put a justification for why they believe they're eligible for a

fee waiver.  Or if it's a topic where we have, you know,

repeatedly noted that this, you know, kind of request isn't the

one that would be eligible, I may -- you know, I will still look

through everything, just to make sure we didn't miss something,

or that we didn't miss that they did actually make a request,

you know, or something like that.  But that doesn't usually

happen.  But then, it may be a more complicated one, and I may

need to think about it.  I may need to review it.  I may need to

seek counsel.  I may want to talk to the analyst, or to one of

the reviewers, or all, you know, about it.

Q.    And, like, roughly how many fee waiver determination

letters specifically come across your desk in a week?

A.   I mean, you could take our -- like I said, most people apply for them and, you know, most of them.  So, I mean, I think I see almost all of them, so.

Q.   So you said that's around maybe up to 1000 to 2000 per year that would come --

A.   That's for each analyst.  I see them all.

Q.   Oh, I see.  So you're saying really the majority of all 10,000 to 15,000 have requested a fee waiver?

A.   Yes.

Q.   And roughly, what portion of your workload in a typical day or week is spent looking at fee waiver determination letters versus all the rest of your responsibilities?

A.   I have never tracked it, and it really varies by week. Sometimes we have a lot of fee waiver requests and I'm focused on FOIA.  Sometimes we have other work that, you know, has to take precedence or I'm looking at.

Q.   Could you give a range -- I won't hold you to it, but just to get a sense of -- you know, I understand from your testimony earlier, you have a lot of other responsibilities. Like, roughly what piece of your job is this particular responsibility?

A.   I mean, I would say -- you know, I'm really speculating here, because I have not tracked it.  I don't track my hours, I'm not an attorney role, so I'm not tracking my hours

Michelle Christ
February 07, 2025

that I'm working or that I'm spending on this. And I often do it in between other things.

So I can't, you know, really -- it's not like I block off my day and say, from like, 10:00 to 12:00 I look at fee waiver requests. I -- you know, I don't have any meetings at 8:00, well, then I might be looking at them that day. I mean, it's a regular occurrence and a regular workload that I handle.

Q. Okay. So, but less than 10 percent; is that safe?

MS. SCHWARTZ: Objection.

BY MS. TARANTOLO:

Q. You can answer.

A. I mean, I really can't say without getting into, you know, my work and, you know, other areas that are confidential.

Q. And I think you testified earlier, I can't find my note on this, so you'll correct me if I'm wrong, that about 30 percent of your workload is specifically about FOIA requests?

A. That's very much an estimate, but yes.

Q. Okay. And so just to be clear, this is a subsection of the 30 percent, would be the fee waivers determinations?

A. Yes.

Q. Okay. And would you say it's less than half of all the work that you do specifically about FOIA requests?

MS. SCHWARTZ: Objection.

THE WITNESS: I really can't get into it without like going into things, you know. And, again, I don't track it.

Michelle Christ
February 07, 2025

BY MS. TARANTOLO:

Q. How is your -- once you've approved, what's the -- what does the approval process entail? Like, literally, what do you do to approve a letter?

A. In FOIAXpress, I write approved, and then, I email separately as well, to indicate that I've approved, in most instances, just so the analyst sees it right away.

Q. So you -- there's not like an approval button, you're writing approved in? Or there is an approval button?

A. There is an approval button. I have approved and -- so there are different, you know, things. I do approved and ready for release. And then, most of the time I write approved in the text box, too, with my initials to give it, you know, additional, to make sure that they're aware that I didn't just accidentally hit a button, since we take these things seriously.

Q. So you would click a button, enter a text field, and often send an email?

A. Yes.

Q. And then, how is your signature actually affixed to the letter? Is that an automatic -- how does it happen?

A. I physically sign a -- you know, a sample, and then I have given it to the analysts, and with my permission, once I've done that, they apply it.

Q. I see. And where is the final letter saved once it is approved by you and has your signature?

Michelle Christ
February 07, 2025

A.    In FOIAXpress.

Q.    Anywhere else or just FOIAXpress?

A.    Probably on the analyst computer as well.  And they have a shared drive that, you know, is also Cloud.

Q.    Returning to the screenshot, the FOIAXpress screenshot before.  Once you've approved the letter, I think -- you can correct me if I'm wrong, but my understanding previously is that at that point, the analyst might check -- if it's granted, they would probably check granted; is that right?

A.    Probably, yes.

Q.    If it's denied, they might check denied right then, or they might wait to see if there's an appeal?

A.    Yes.

Q.    And either of those could happen?

A.    I mean, in theory either of those can happen.  I think most analysts wait.

Q.    Are they specifically directed to wait, or that's just their practice?

A.    I would have to actually check what they're reviewing, the reviewers.  But I think in most instances, the practice is just to wait because, again, if there's an appeal, we don't want to make this -- you know, we don't want to, you know, put in an incorrect statistic or something.

Q.    And we didn't talk about this specifically, but I know, including from NYLAG's own experience, that it is possible

to have a request partially granted and partially denied.  For a situation where a waiver request is partially granted and partially denied, is the overall process similar to what you've described in terms of the sequencing of steps?

A.    The overall process of review is similar.

Q.    Correct.  Okay.  And what is different then?

A.    So we actually put denied in the fee waiver description in FOIAXpress because as you can see from the exhibit, Exhibit 2, there is not an option for partially granted.  So if it's not a 100 percent granted everything, we press denied.

Q.    And why is that?

A.    We just think it's more fair to the requester.  You know, if we can't distinguish it in the system, we don't have that capability, we feel it would be inappropriate to say granted, since they were indeed charged for at least part of their records.

Q.    And once the letter has been finalized, how is the requester notified of the determination?

A.    They receive a letter.

Q.    Generally by email?

A.    It depends on what contact information they have given us.  Usually through FOIAXpress.

Q.    I see.  So if the request was made originally through FOIAXpress, the response would come back through FOIAXpress?

Michelle Christ
February 07, 2025

A.    Yes.  I mean, it depends if the person has an account. You know, if there are some people who prefer email, then we might email it, then.

Q.    And does FOIAXpress send the email automatically, or does someone at OPD have to do actions in order to make the email go out?

A.    The analyst has to trigger that.

Q.    And they trigger it in FOIAXpress?

A.    Yes, in most instances.

Q.    Approximately, how long does it take between a request being received with a fee waiver request and a fee waiver request being determined?

A.    I mean, in most instances, we try to move as quickly as possible.  We track that -- you know, we have certain number of calendar days to respond, and we always try to meet that deadline.  But I can't say, you know, as an average because I haven't looked, and there are certainly different requests that are more complex, that may take longer, unfortunately, and then there are some that may be shorter.

Q.    We're going to look at this report later, but I believe that in the most recent FOIA report it said about -- it said 11 days as an average and 22 as a median.  Does that seem roughly right?

A.    That does seem right.

MS. TARANTOLO:  Okay.  All right.  Okay.  Could I have

Michelle Christ
February 07, 2025

Exhibit L.  Could you mark that one as -- what are we up to, 3?

THE REPORTER:  3.

(Exhibit No. 3 marked for identification.)

BY MS. TARANTOLO:

Q.   All right.  The court reporter has handed you a document marked as Exhibit 3.  It is a letter dated December 19, 2023.  So this is a letter dated December 19, 2023, addressed to Jessica Ranucci at NYLAG.  Ms. Christ, do you recognize this document?

A.   Yes, I do.

Q.   And what is it?

A.   It is a fee waiver response.

Q.   And is that -- if you flip -- if you look at the second page, is that your signature at the end?

A.   Yes, it is.

Q.   And is this what we have been calling a fee waiver determination letter?

A.   Yes.  And we call them fee waiver responses.

Q.   Fee waiver responses.  That also works.  Did you review this document in advance of the deposition?

A.   I reviewed it when I approved it.

Q.   Yes, also that.  So you -- you did review it when you approved it, so that would have been on or around December 19, 2023?

A.   Yes.  And then I did review the request itself in

Michelle Christ
February 07, 2025

advance of the deposition.

Q.   I see.  But you didn't look again specifically at this letter?

A.   No, I did.

Q.   You did?  Okay.  So you saw it in December of 2023. You saw it at some point recently before this deposition.  If you've seen it other times, that's okay.  We don't need to nail it down, but just to make sure.

A.   I think those are the only times, but you know.

Q.   Now, do you know which analyst worked on this?  I'm not asking you to say their name, but do you know?

A.   Yes.

Q.   So I just want to ask you some questions about the process of generating the letter.  The process that we described that we just went through in some detail, was that process followed for this letter?

A.   Yes.

Q.   Do you specifically remember reviewing this letter in December of 2023?

A.   I mean, I remember generally, but not with specificity other than we, you know, handled it normally.

Q.   If you remember, what did you review in the process of approving this letter, apart from the letter draft itself?

A.   I mean, I don't remember, you know, exactly from December of 2023.  I mean, I just know that I did it, you know,

Michelle Christ
February 07, 2025

normally, which means I would have looked at the underlying request, any correspondence, guidance, or anything like that.

Q.    And was there correspondence -- were there records of correspondence between either the analyst, or the reviewer, or Ms. Reagan, and anyone else at the time you reviewed the letter?

MS. SCHWARTZ:  Objection.

Q.    You can answer.

A.    I think that would hold in privileged areas, but I followed the normal accordance.

Q.    Well, I -- I'm just asking you if you did look at records of correspondence.  I don't -- if you know the answer to that question, could you please answer unless you're directed not to answer?

MS. SCHWARTZ:  Yeah.  If the question is just, was there correspondence, you can -- give me -- if you know whether there was correspondence, you can answer that.

THE WITNESS:  Yes.

BY MS. TARANTOLO:

Q.    Sorry, so just to be clear, because -- the question took a round trip there.  There was -- you know that -- you do recall that there had -- there was correspondence about this request that you did review when you approved the letter?

A.    Yes, there was correspondence about this request that I did review when I reviewed the letter.

Q.    Correspondence with whom?  I'm not asking about what,

Michelle Christ
February 07, 2025

but just with whom.  You don't have to give their names, but the role.  With people in what roles?

    A.    I believe that that might be privileged.

        MS. SCHWARTZ:  You can answer.  If -- you don't have to say anything about the substance of the communications, but just -- if there -- if you know with whom there was correspondence between, you can state the roles of those people or the offices that they worked in.

        THE WITNESS:  Okay.  Thank you.  So there was correspondence.  There was correspondence internally within OPD at our, you know, review levels, and then there was also correspondence with our office of general law.

BY MS. TARANTOLO:

    Q.    When you say internally within OPD at the review level, could you just clarify what -- like between individuals with what roles?

    A.    Sure.  As is common, you know, our analyst had some questions for the reviewer, you know, that they sent along with it, and then the reviewer had some dialogue, and then our division director.

    Q.    I see.  So correspondence among the analyst, the reviewer, and the division director?

    A.    Yes.  You know, normal work conversation type things.

    Q.    That correspondence is recorded in FOIA request -- excuse me, FOIAXpress?

Michelle Christ
February 07, 2025

A.    Yes.

Q.    And you reviewed it when you approved the letter?

A.    Yes.

Q.    And did you have further correspondence or conversations with anyone else in your review process separate from reviewing notes of the correspondence that had already happened?

A.    Not that I can recall, albeit it was a year ago.

Q.    I understand.  This is all to the best of your recollection.  And you -- there had been correspondence with OGL?  I'm not asking you to tell me what it was about.

A.    Yes.

Q.    Okay.

MS. SCHWARTZ:  I just want to note for the record, too, that this was issued after this lawsuit was filed.  So we were already in active litigation.

MS. TARANTOLO:  Yes.  Understood.

BY MS. TARANTOLO:

Q.    And I will just ask you this question.  You may wait for a moment to allow your attorney to interject if she wants. What was your -- what were the contents of the discussions among the individuals at OPD that we described?

MS. SCHWARTZ:  Objection.  I'm going to instruct the witness not to reveal any -- the substance of any communications that were deliberations about how to adjudicate the fee waiver

Michelle Christ
February 07, 2025

requests, and that were made predecisional and that they were -- occurred prior to the agency making a final decision about how to adjudicate the fee waver request.  So to the extent that there's anything else you know of that would be responsive to the question, you can answer.  But to the extent that it was all deliberative discussions about how to adjudicate this fee waiver request prior to this letter being issued on December 19, 2023, then I'll instruct you not to answer.

THE WITNESS:  I don't believe there's anything outside the scope.

BY MS. TARANTOLO:

Q.   Understood.  And similarly, to have this on the record, what were the contents of your -- of the discussions with OGL that you reviewed in approving the letter?

MS. SCHWARTZ:  Objection.  I'm going to instruct the witness not to answer a question about the substance of communications that she or anyone from OPD had with OGL on the basis that those communications are attorney client privileged and potentially also delivered across as privileged.  And there may have been work product privilege, too, given that we were already in litigation.

MS. TARANTOLO:  Understood.  Just having all this on the record, thank you for your patience.

BY MS. TARANTOLO:

Q.   If you look at the request for a moment, the first

Michelle Christ
February 07, 2025

bullet is the -- there's three bullets that list the information being requested.  One of them is a portion of the section of the POMS.  Did you look at the section of the POMS when you reviewed the letter?

A.    I do not recall.

Q.    Do you typically, if the requests for a POMS, do you typically look at the POMS?

A.    It depends on the request.

Q.    And could you look down to the paragraph that starts, upon review of your fee waiver?  You can take a second to read the paragraph, and then the paragraph is followed by four bullets.  Do you see that portion?

A.    Yes.

Q.    Is that standard language or -- is that standard language of the type we discussed earlier, that would be provided to analysts in the form of sample letters?

A.    Well, the beginning part of the thing would be based on the analysis, you know, of the particular request, whether or not they felt it was applicable to any portion of it.  The second part the listing of the regulation criteria, the regulation at the time would be included.

Q.    Okay.  So let me actually break that down.  There's the first sentence that says, upon review of your fee waiver, I have decided not to waive or reduce the fee for a portion of this request, i.e. requested Item 2.  That's -- when you when

you were describing the beginning part, is that what you were talking about?

A.    Yes.

Q.    And then there's a couple of the -- few sentences that starts, we may waive or reduce fees, goes through the four bullets.  That's the description of the regulation that you were describing?

A.    Yes.

Q.    I think you said the description of the regulation is part of the standard language that an analyst might have available through a sample letter?

A.    Yes.

Q.    And this regulation, what is the subject of that regulation?

A.    The public -- whether or not the fee should be made because the request is the public interest.

Q.    Do all fee determination letters issued by your office cite that regulation?

A.    Yes, I believe so.

Q.    Are the analysts specifically directed to cite the regulation in every letter?

A.    Well, they're considering the regulation.  That's the main guidance by which we go on, so I think it would be -- we haven't explicitly instructed them to do so, but I think that you would have to in order to explain your position, since

Michelle Christ
February 07, 2025

that's the only thing -- the criteria you're really considering when you're issuing a response.

Q.    Could you -- if you flip to the second page, there are -- there's a sentence that starts, concerning Item 2, your fee waiver request fails to explain with reasonable specificity how the disclosure of the information you requested will meet the above factors, and I have not otherwise found that release of the records requested would meet the above mentioned factors. Do you see that part?

A.    Yes.

Q.    Is that also standard language that would be provided to the analyst in the form of sample letters?

A.    I mean, assuming that -- you know, we look at each case on a case by case basis.  So assuming that, you know, a request that met that, this might be standard language that they would use.

Q.    I see.  So assuming that the analyst makes a decision consistent with the language, the standard language would be the language that the analyst would use to put into the letter?

A.    Yes.

Q.    And does information -- sorry.  With the language that follows after 2, so concerning Item 2, take that out for -- strike that from the rest of the language.  Does language similar to that appear in every letter issued by your office that denies a fee waiver request in part or in full?

Michelle Christ
February 07, 2025

A.    Again, we look at each one on a case by case basis and determine if that language would be applicable.  I mean, it may be applicable in quite a few, but it would depend on why it didn't meet the public interest factor.  I mean, here it says with reasonable -- sorry, excuse me, reasonable specificity, but, you know, we may have another reason that it doesn't meet the factor or something like that.

Q.    Would a letter -- could a letter say that the fee waiver request does explain the request with reasonable specificity, but doesn't meet the factors?

A.    Yes.

Q.    And that is -- that's language that is sometimes used in some letters?

A.    I mean, I think it depends.  You know, I'm not sure we use language exactly like that.  I don't know if we say we met the -- you know, the specificity requirements, but it doesn't mean the above factors.  We just look at the factors that are in the current regulation and, you know, we determine whether or not it meets them, the criteria, and then we would tailor our response, you know, depending on that.  As I said, each one is done on, like, a case by case basis.

Q.    When an analyst denies -- or when an analyst is drafting a letter like this and they're denying a request in full or in part, is there one place that they can look for all of the possible standard language that might be available to

Michelle Christ
February 07, 2025

them to explain the rationale for the decision?

A.   Well, they would have multiple samples that they might choose from to, you know, use to express their thoughts and analysis efficiently.  We don't have, like, a single repository, though.

Q.   I see.  So there -- multiple samples exist, but there's not a single repository.  If you wanted to identify and collect all of that sample language, could you do that?  What would you do?

A.   I mean, I would have to go to each analyst and ask them for their sample, you know, language.  And, again, this is samples.  It's meant to -- so that they can efficiently and clearly explain things to people the ways that we've tested and reviewed past -- you know, it saves the reviewers time, so they're not constantly doing it.  But it has to meet the case by case basis.  You know, they have to do the analysis of front end work on each one and determine whether or not the sample language is appropriate, it needs to be tweaked, different samples need to be combined, or if they need to draft new language.

Q.   Okay.  So if you wanted to do that, you would have to ask the individual analysts?

A.   Yes.

Q.   And each analyst would have their own set of language that they might use?

Michelle Christ
February 07, 2025

A.   Well, many of their languages might overlap, since they all have similar mentors and they've been working together and reviewers have, you know, honed the language over time.

Q.   Could you look at the sentence that starts accordingly?  Accordingly, applying the standards listed above, I cannot waive the fee.  Similarly, is that standard language?

A.   I mean, it's very general language.  It's not, you know, anything -- probably it is -- I can't say for certain if it's standard.  I think we use something similar, though, you know, cut and paste in a lot of ours, since it's just a general thought.

Q.   And the next sentence, we will send further correspondence when we determine what fees apply to your request.  Similarly, is that standard language?

A.   I mean, again, I think if they determine that it's appropriate that we're going to send further correspondence, we're going to determine a fee, we might include that.

MS. TARANTOLO:  Okay.  Can we just pause one second?

(Off the record at 11:35 a.m.)

(On the record at 11:35 a.m.)

BY MS. TARANTOLO:

Q.   That Exhibit 3 is the fee waiver determination -- free fee waiver response letter for the request that we have called in this litigation, NYLAG Request 4.  I have and could put in front of you the fee response -- waiver response letters for

Michelle Christ
February 07, 2025

NYLAG requests 1, 2, 5, and 6.  We can do that, but generally what I'd like to know, if you know, did those fee waiver response letters also go through a similar process to the one that we just discussed?

A.   I mean, we all have -- we have the same, you know, process for how we, you know, do all of our cases and we do general protocols.  We did not deviate on any of them from our regular processes, and, you know.  And we are a small office to, so there were -- there could have been, you know, without getting into it for privilege, there could be overlapping analysts as well.

Q.   Did you look at those -- the response letters for the other NYLAG requests that are the subject of the litigation in advance of the deposition?

A.   Yes.

Q.   And they were all -- were they all originally signed by you?

A.   Yes, I believe so.

Q.   So you also reviewed them at the time you approved them?

A.   Yes, of course.

Q.   We've just spent a while describing the process for fee waivers.  Just for cleanup purposes, is there anything about that process that differed materially from the -- between the present and times in the past, going back to 2022?

Michelle Christ
February 07, 2025

A.   No.

Q.   Okay.  And previous to 2022, to the extent that you know from your other experiences, from discussions and your experience in the New York Regional Counsel Office, were there materially different practices prior to 2022?

A.   Not to my knowledge.

Q.   Okay.

MS. TARANTOLO:  Okay.  Could you mark that as Exhibit 4.

(Exhibit No. 4 marked for identification.)

(Exhibit No. 5 marked for identification.)

BY MS. TARANTOLO:

Q.   The court reporter has handed you two exhibits, Exhibit 4, which is a printout from the federal register. Exhibit 5, which is a printout from the program operations manual system POMS section -- I'll wait for the court reporter to right down.  Section GN 03311.005.

THE REPORTER:  Sorry, what was the --

MS. TARANTOLO:  4 is a section of the federal register.  Yep.  Yes.

BY MS. TARANTOLO:

Q.   Okay.  Ms. Christ, let's look at Exhibit 4.  The portion of the federal register.  Do you know what this is?

A.   Yes.

Q.   What is it?

Michelle Christ
February 07, 2025

A.    It is the federal register publishing the updated version of the social security administrations regulations at 20 CFR Part 0402.

Q.    So is this the currently operative regulation?

A.    Yes, it is.

Q.    And I believe you testified earlier that your office was involved in the drafting of this revised regulation; is that right?

A.    Yes.

Q.    And were you personally involved?

A.    Yes.

Q.    Okay.  We're going to come back to that later.  We've had a number of discussions about these regulations.  And specifically, could you look at the regulation, which is numbered Section 402.85, waiver of fees in the public interest?  It is -- the top page is 102717.

A.    I'm sorry, can you repeat that?

Q.    Yeah, 102717.  It might be under the staple, unfortunately.

A.    I'm used to blowing this up on my computer screen.

Q.    I know, I know.  It is -- we should have brought a magnifying glass.  Do you see where it says 402.85?

A.    Yes, thank you.

Q.    Now, when we were looking at the fee waiver response letter earlier, a regulation was cited.  Is that this

Michelle Christ
February 07, 2025

regulation, albeit in an earlier form before the -- is it the same section of the Code of Federal Regulations?

A. It is based on the same part of the federal statute. It is just moved to a different part and slightly amended. It was 402.185, now it is 402.85.

Q. Thank you. That's what I was trying to elicit. So just to have it be clear, we're looking at 402.85?

A. Yes.

Q. That is an amended version of the regulation that was previously at 402.185?

A. Yes. It doesn't change things substantively, but it did change the language and the regulation number to further clarify how we're acting at a sub regulatory level.

Q. Understood. And so a fee waiver response letter issued today, would it cite Section 402.85?

A. Yes, it would.

Q. Are these the -- sorry. Are the criteria set out in this regulation and in the predecessor regulation, the ones that govern your office's fee waiver determinations?

A. Yes.

Q. And do those factors -- I'm sorry. Do those criteria govern all fee waiver requests?

A. Yes.

Q. And is that true for both fee waiver requests that are considered to be for -- related to requests that are for a

Michelle Christ
February 07, 2025

program purpose and also requests that are related to a non-program purpose?

A.    So -- oh.

MS. SCHWARTZ:  No, go ahead.  Sorry, I was just going to cough.

THE WITNESS:  No, so a little bit of clarification there.  So in terms of program purposes, those don't necessarily always have to be FOIA requests.  You know, people can request their own record under the Privacy Act and get a copy and, you know, it may be for a program purpose and we don't charge them. They may want, like an earnings record or something like that. However, when we're considering all of these fee waiver requests in the FOIA context, we always do look at Section 1106 for program and non-program purposes as well.

Q.    Okay.  I'm a little confused there, so let me try to process and see if I understand what you're saying.  There are some requests that your office might get that would -- we would consider Privacy Act requests, an individual's requests for their own records.  Let's put those aside.  I'm not asking about those.  Of the remainder of the requests that come in, this is the 10,000 that we were talking about before.  A fee waiver request made in connection with any of the 10,000 we were discussing before, would your office assess that fee waiver request under this regulation?

A.    Yes.  For the 10,000 to 15,000, we would consider --

Michelle Christ
February 07, 2025

you know, FOIA request that we received, we would definitely consider it under 402.85.

Q.   Okay.  And of the -- so you testified earlier that those -- of that universe, approximately 95 percent were considered to be not for a program purpose, and approximately 5 percent were considered to be for a program purpose.  But have I understood you correctly that all 100 percent -- for all 100 percent, the fee waiver requests would be assessed under this regulation?

A.   Yes.

Q.   Okay.  Thank you.  Sorry, that was a little tedious, but we got there.  I'm going to direct your attention to a few of the factors.  If you can look down to the bottom of the first column, there's a Subsection 2 called Public Interest.  Do you see that?

A.   Yes.

Q.   And then there's a Romanette i, Romanette ii, Romanette iii and Romanette iiii?

A.   Correct.

Q.   Okay.  You see where I'm pointing.  Turning to the first one, how the records pertain to the federal government's operations and activities, how do you instruct your staff to interpret the meaning of that factor?

A.   Well, I think some of that may be privileged because we consult with the Office of general law.  I don't instruct my

Michelle Christ
February 07, 2025

staff how to perform necessarily.  I want them to perform the
analysis themselves on a case by case basis, and to look at the
plain language of the regulation and the statute.

Q.    Okay.  So to check my understanding, you would direct
staff to look at the plain language of the regulation, and under
some circumstances, to direct with -- to consult with OGL?

A.    Yes.

Q.    And there are no other instructions that you would
give to staff about how to interpret that factor?

A.    Well, I don't generally provide -- you know, I try to
stay -- and to leave them to perform their own analysis, you
know, at the onset they may -- you know, they -- of course, when
they begin, they are mentored and the reviewer may give them
examples of how they have applied it in the past.  But, you
know, I wouldn't be part of that conversation.

Q.    Okay.  So to be clear, if I were to change the
question and say, what would -- what instructions could
reviewers -- do reviewers give to staff about how to interpret
that factor of the regulation, how would your answer be
different?

A.    I mean, I would -- again, I would say, they may, you
know, walk -- in the beginning, they may, you know, discuss
different ways it could be applied.  But for the most part, we
really would just direct the person to read the waiver within
the regulation and apply their own analysis, and, if needed, you

Michelle Christ
February 07, 2025

know, consult with counsel.

Q.   Okay.  Could you look at this factor, little Roman ii, whether disclosure would reveal any meaningful information about government operations or activities not already known to the public.  How would analysts be directed to determine if a request seeks information about activities that are not already known to the public?

A.   Again, the analyst would look at the regulation on its face and, you know, apply it on a case by case basis to the particular request, and, if needed, consult with counsel.

Q.   And similarly, how would an analyst be directed to assess whether the information to be disclosed is meaningful?

A.   Again, whether the -- whether the disclosure would reveal meaningful information, Romanette ii?

Q.   Yes.

A.   Again, they would do it very similarly.  They would look at the plain language of the thing.  They would look also at the -- I should have put both in all the Romanettes.  They would also consider the request for justification closely if one was provided.  Some requesters do, some don't.  They would look at the regulation, and they would consult with counsel if needed.

Q.   When you say if needed, is that the instruction that would be given to the analyst as an -- or a more specific instruction about when to consult with counsel?

Michelle Christ
February 07, 2025

A.   I mean, we -- without getting into -- the privilege, we frequently -- we work closely with the office generally, these are regulations.  So often it would be appropriate for us to take counsel's opinion on them.

Q.   If you look at Romanette iii, whether the contribution to public understanding of those operations or activities would be significant.  Similar question, how do you -- how does -- how are analysts instructed to assess whether a contribution would be significant?

A.   Sure, I mean, it would be very similar -- or if exact, actually to the two areas above.  They would be instructed to look at the regulation itself, to look at what the request for justification was, if they put any, to look at the underlying request, and to consult with counsel as needed.

Q.   If you look at Romanette iiii, this is -- is this section new in this version of the regulation as compared to the prior version of the regulation?

A.   It's not new per se, but we need it more express in my opinion.

Q.   I see.  Okay.  Well, we may return to the sort of crafting of the regulation later.  For now, how do you -- how would an analyst be instructed to determine if a request has been reasonably specific as to the -- reasonably specific?

A.   Again, they would look at the plain language of the regulation themselves, draw on their own expertise in analysis,

Michelle Christ
February 07, 2025

they would look to the requesters justification, if any, and consult with counsel.

Q.   And in that same subsection where it says direct clear (not remote or attenuated), connections to the meaningful information.  How is an analyst instructed to determine if the request is direct and clear?

A.   Again, they would look at the regulation, and then they would look to the request itself to see if it was clear and direct.  And they -- again, they may, you know, discuss with counsel if needed.

Q.   You've mentioned now that they might consult with counsel.  I assume that would be in the -- procedurally in the context that we've described, where an analyst or first or second level reviewer, or yourself might reach out to OGL about a specific request; is that right?

A.   Yes, because everything is always done on a case by case basis.

Q.   And without asking about the contents of any such document, but just whether such a document or documents exist, is there any kind of -- is there any written document memorializing OGL's advice about the interpretation of any of the factors that we've just discussed?

MS. SCHWARTZ:  Objection.  Just to clarify, you mean general like a general document, or a specific response to an inquiry about --

Michelle Christ
February 07, 2025

MS. TARANTOLO:  Correct.  I mean a general document. So just to back up and be clear, I understand from what you've testified already, where an individual request is made by an analyst or reviewer as to a particular specific FOIA request, OGL's response would be recorded in FOIA -- in theory, in FOIAXpress about that particular request.  So I'm not asking about those right now.

BY MS. TARANTOLO:

Q.    Is there -- are there -- do there exist any generalized documents applicable in general that memorialized OGL's advice about the interpretation of these factors?

A.    No, there is not.  They provide us advice on case by case basis specific to the particular request.

Q.    Okay.  Thank you.  Could you look quickly at Exhibit 5, which is the POMS, and flip to Subsection G.  Which is called waiver or reduction fees.  You didn't previously mention that staff would be specifically instructed to consult the POMS as to the interpretation of the regulation.  When are staff directed to consult the POMS?  I'm sorry, let me be more specific.  When are staff directed to consult this Section G of the POMS in the process -- in determining a fee waiver request?

A.    Well, these POMS, you know, I'd never direct them to consider anything in particular other than to make sure we're adhering to the regulations and the requirements under FOIA.

Michelle Christ
February 07, 2025

These POMS are -- bound all SSA employees.  They are policy, and these POMS are actually authored by our office.  So staff are very familiar with these POMS.  I would defer to them on when and where they would need to consult them if they felt that it would provide further clarification that wasn't in the regulation.

Q.   Could you look specifically at Subsection G6?  There's a sentence that says, for example, a waiver or reduction of fees would generally not be granted if the requested record were part of the program operations manual system, POMS.  What does that mean?

A.   So if you see in the larger part of this, it talks about a waiver or reduction of fees, and six is one area where it says we wouldn't necessarily waive fees if it's available publicly already.  So since all of our POMS that are not sensitive are automatically published and in most of them would be available publicly, and we would just refer the requester there.  We would not need to, you know.  We would not -- if they want, you know, we would not provide them with a record and we would not have to waive a fee, since we're not providing them with a record.

Q.   So you would -- the OPD would check to see -- if a request is for a POMS, it might be for a POMS that's currently publicly available, or it might be for a POMS that was deemed sensitive and is not currently publicly available.  Would your

Michelle Christ
February 07, 2025

office check to see which kind of POMS it was?

A.    Oh, yes.    I mean, as you can see from the whole of the paragraph, that example is given in the context of whether information's already available for inspection for the public. So they're talking about the majority of the POMS, which are publicly available.    And it says, you know, in those cases, we would inform the requester where the information is available. So we'd obviously have to know that it was publicly available to inform the requestor as such.

Q.    Okay.    Understood.    You can put these aside for now. We've been talking about the determination of individual fee waiver requests.    I want to ask you a few questions about the systemic review of fee waiver determinations by your office. We've touched on the preparation of the annual FOIA report.    I understand that there is some statistical metrics that are tracked.    We'll talk about that a little bit more later.    For now, I'm not talking about that.    Does your office ever do any kind of systematic oversight of fee waiver requests determinations?

A.    So we do them all on a case by case basis because they're so unique.    And obviously, as I, you know, detailed, there are multiple steps of review, so that we can provide the sort of systematic quality controls to ensure consistency and an appropriate application of the federal regulations.

Q.    So let me break that down, because I think your answer

may be, no, there's no separate -- is there any oversight of -- sorry, let just strike that question.  Let me try again.

I understand, and we've discussed the individual layers of review of an individual request that is happening in real time leading up to the issuance of the determination. Putting that aside also, is there ever a time that the office does a systematic review of determinations that have already been made?

A.    I'm sorry, could you clarify that?

Q.    Let's -- maybe we can work back to the more general question.  I can give some examples.  For example, does the office ever go back and look at a later date at some number of decisions that were previously made to have a second look retrospectively about the decisions?

A.    In the fee waiver context?

Q.    In the fee waiver context specifically, yes.

A.    Not that I'm aware of.  Again, we're looking at them all in real time on multiple layers, so -- and if they're appealed, even our executive director reviews them.  So we're pretty, you know, careful in the original case.

Q.    Okay.  So I think what you're saying is there's review of the individual case, but there is not a later time after a decision has been made where a different kind of review happens?

A.    No, not generally.

Q.    And you mentioned the term quality control, which I

Michelle Christ
February 07, 2025

know is a thing that the agency cares about.  Is that your quality control process?  Or if not, what is the quality control process specifically as to fee waiver determinations?

A.  Yeah, I mean, I think we have a very intense review process, given that it goes through multiple layers in most instances, so.  And the individual can appeal, so, you know, that is our -- you know, that is generally our quality control.

Q.  You say generally.  Is there anything else that you -- specific that you can think of?

A.  You know, again, it is possible that in a managerial perspective, if I'm being told that, you know, a certain individual, which I haven't necessarily, was struggling with something, I might go back in and look and see their -- you know, there was a workload, you know, seemed to be piling up or something, I might go back and look at them to see how things were going.  But that is very rare.

Q.  So there might be a performance review, for example, of a particular staff person?

A.  Yes.  Or, you know, more positively, we may note that certain staff person is clearing a lot of them, and I may go back and look for the specific number so I may congratulate them.

Q.  Understood.

A.  I have done that actually quite frequently, so.

Q.  Understood.  Okay.  So you might review a specific

Michelle Christ
February 07, 2025

person's work as to fee waivers in order to learn information about that specific employee's performance?

A.   Yes.

Q.   Does your -- has your office been audited, either internally or externally?

A.   No.  We do provide, though, in a quarterly report, information to DOJ on our statistics as well as yearly.  And sometimes they will have questions or clarifications be sought and we will reply.  In most cases, the -- they've been very satisfied with our responses.

Q.   That process is -- there's both the annual FOIA reports and also a quarterly process, is that what you just explained?

A.   Yes.  And then there's also the chief FOIA officer's report.

Q.   Understood.  So the annual report and the chief FOIA officer's report are publicly available on SSA's website, right?

A.   Yes.

Q.   Yes, I've looked at them.  I know what they are.  The quarterly reporting, is that also available on the website?

A.   I don't believe so, because it's still a work in process.  You know, we haven't closed the cases, so, you know, statistics will change.  But it mirrors the annual report statistics each -- you know.

Q.   I see.  So it's also statistical information.  It's

Michelle Christ
February 07, 2025

not substantive information or qualitative information?

A.   Could you clarify that?

Q.   Sure.  Is it -- does it include interim statistics?

A.   Yes.

Q.   In addition to that, does it provide, for example, a sample of fee waiver requests where the substantive outcome is being provided to DOJ?

A.   I'm sorry.  Could you please clarify that?

Q.   What, apart from statistics, if anything, do you give to DOJ as part of the quarterly reporting?

A.   It's mostly statistics.

Q.   We talked before about the trainings, is that a piece of it?  The reporting about the trainings?

A.   Yeah, we -- I mean, we report about whatever DOJ is asking.  It can vary, you know, depending on what they're asking, of all agencies.  I mean, it's not to SSA varied, I should clarify that as to whatever they determine they're asking agencies.

Q.   And as far as you know, has DOJ ever conducted a review specifically of the outcomes of fee waiver requests?  Not the statistics, not the numbers, or the time, but the outcomes?

A.   I'm sorry.  Can you clarify that?

Q.   Yes.  I understand you provide the interim statistics to DOJ and then the final statistics.  Those statistics include statistics about fee waiver determinations, specifically how

Michelle Christ
February 07, 2025

many there are, and what their determination is, what the timeline is for deciding that.  I'm not talking about that.  Is there any other review of fee waiver request determinations that DOJ has done?

A.    I mean, not to my knowledge.  They do ask after the reports, you know, they may ask a question or something, or for us to clarify a statistic, and we may provide, you know, additional -- we have a good relationship with the office, and we may provide, you know, short verbal answer or something like that to clarify why, you know, something like that.  I don't know of anything in particular with fee waivers that I can recall.

Q.    Okay.  That makes sense.  Thank you.

MS. TARANTOLO:  How are you all doing?  Do you want a break?  It's noon.  We can --

MS. SCHWARTZ:  I'm okay --

MS. TARANTOLO:  Do you want to go a little longer?

THE WITNESS:  We can go a little longer if you want.

MS. TARANTOLO:  Okay.  Let's keep going.

MS. SCHWARTZ:  Daniel, do you have any estimate as to how long we'll go?

MS. TARANTOLO:  Like -- let's just go off the record.

(Off the record at 12:04 p.m.)

(On the record at 12:05 p.m.)

THE REPORTER:  All right.  Back on.

Michelle Christ
February 07, 2025

MS. TARANTOLO:  Thank you.

BY MS. TARANTOLO:

Q.    Earlier this morning, you kindly explained the full life cycle of your offices processing of a FOIA request.  We've been talking specifically about the process for determining a fee waiver request.  I want to move to a different but related process that you also described, which is the generation of the fee notice.  When I say fee notice, is that a document that -- is that a term that your office use -- actually uses internally?

A.    Yes.

Q.    And what is a fee notice?

A.    So a fee notice is when we let the requester know, you know, approximately how much we believe at this point in time the request would cost.

Q.    And at a very high -- at a high level first, what are the steps for calculating that estimate?

A.    So we would go out to any components that may have potentially responsive records.  So obviously we do a wider draw to make sure that we get all of them.  We ask them to please look for and locate those records, and to let us know how long it would take for them -- that if they have those records or are able to search for them, how long would it take them to produce those records.  And we ask for the time, as well as the grade of the person who is doing that collating, so that we can, then, you know, calculate the estimated fee amount.

Michelle Christ
February 07, 2025

Q.   Okay.  And then, once you know that information, what next?

A.   Once we do that, our analyst would put together -- our government information specialists would put together, any fee notice letter, you know, what the estimate would be, and ask for a credit card information.  But we would not charge the person until we actually determined what records we had and how much it actually would take us time.

Q.   Okay.  So the middle step there, it's the same analyst that we were talking about before?

A.   Yes.

Q.   So the person who was assigned at the beginning who has done the draft recommendation on the fee waiver, if there was one, is the same person who would then be preparing the fee estimate and drafting the fee notice?

A.   In most cases, unless there was a workload or, you know, extended leave situation.

Q.   And speaking specifically about the step where the analyst prepares the estimate.  Could we go a little -- get a little bit more granular?  What are the steps of that process?

A.   They would send the request out to the FOIA privacy coordinators in each component and ask them to please either themselves or ask staff, who might have access to the specific record records, give them a copy of the request, tell them the type of records they're looking for, and ask them to please get

Michelle Christ
February 07, 2025

it, while also calculating how long it would take them and, you know, the -- would take an individual to do it and what grade that individual would be at, and they'd ask them to respond within a certain time frame.

Q.    Okay.  So they would -- the information that the analyst would learn from the component is how long the search process would take and the grade of the -- the GS grade of the person who would be doing the searching within the component?

A.    Yes, in the fee waiver context.

Q.    In the fee waiver context or the fee calculation --

A.    I mean, fee calculation.  Excuse me.

Q.    Okay.  Just want to make sure I'm following.

A.    No, thank you for that.

Q.    And then, the hours and the grade are an input, as I understand it, into the calculation.  What are the other -- and the hours to be spent in the component, and the grade of the person in the component.  What are the other inputs into the calculation of a fee, a total fee?

A.    I mean, I think those are the primary ones that, you know, we would look at.  If there's a chance it's a particularly -- this is rare, but it's a particularly burdensome, like somebody wants microfiche from, like, 1942, you know, and we have it in the -- you know, the geographical location, for instance, SSA does store a lot of documents in the government archives and the caves, the limestone caves in

Michelle Christ
February 07, 2025

Missouri.  So something like that, we may charge an additional fee.  But most of the time, it's just that.

Q.    And are there -- does the estimate build in additional time by folks in your office, or is it based only on the time spent by the individuals in the component?

A.    Only on the individuals in component.

Q.    And am I -- well, once you have the hours and the grade, just close the loop for me.  How do we get to the estimate that's provided to the individual requester?

A.    So the analysts follow a formula and we have them, you know, published in our columns, I believe, you know, how we calculate that.  And they would do that, and then they might send it to a reviewer to look at.  That one does not come to me.

Q.    What do you mean that one does not come to you?

A.    I do not review fee notices.

Q.    You do not review fee notices.  I will get back to that in a minute, but to make sure I understand the formula.  So there's a schedule that's available to the analysts?

A.    Yes, there's a schedule.  It's in POMS, and it's also in our federal register, I believe, or -- that's the wrong word.  It's published, you know, online, the formula that we use, and, you know, in government documents to show what -- you know, what calculation it is.  And, you know, it's the one that is used by -- you know, by all agencies to calculate fees.

Q.    And when you say formula, are you speaking

Michelle Christ
February 07, 2025

specifically about the hourly figure per -- the hourly amount to be assigned for each grade level, each GS grade level?  Or are you talking about something else?

A.    I'm talking about that.  I mean, there would be -- the person would only have one GS grade level.

Q.    Right.

A.    But, you know.

Q.    So my understanding, and now, you can correct me if I'm wrong, is that there are two potential fee schedules for two potential methods of calculating fees.  One that's under FOIA, and one that's under 1106 -- Section 1106; is that right?

A.    Not exactly.  You know, we determine charging under Section 1106.  And for some items we have like a flat rate that we charge.  For instance, if people who are requesting new images, which I know is not part of our scope of our conversation here, but then we would apply those schedules as applicable to records in the FOIA context.

Q.    So are -- all fee notices that go out from your office would use the 1106 charging formula, charging schedule?  I'm not sure what the right word is there for these.

A.    Again, I don't review them.  So I really -- I don't want to say because I honestly don't recall exactly.  I would think so, but I'm not, you know, certain on that.

Q.    Okay.  Let me ask in a different way also, just to see what I understand.  Again, earlier we were talking about how

Michelle Christ
February 07, 2025

approximately 95 percent of the FOIA requests process in your office are determined to be not for a program purpose and 5 percent approximately are determined to be for a program purpose.  Did those have -- are those -- are fees assessed in the same way, whether it's -- a request is in the 95 percent or the 5 percent or they requested it -- calculated in different ways?

A.   No, that's not, you know, applicable here.  If we found that someone was asked for a program purpose, there's no charge at all.  So there would never be a calculation of fees.

Q.   I see.  For the approximately five percent that are found to be for a program purpose, no charge.  Is that indicated in FOIAXpress?

A.   Yes.

Q.   In what way is it recorded in FOIAXpress?

A.   I mean, I think in most of those cases, we would have had a few waiver requests and granted.  Honestly, they're so rare, you know, and 5 percent is the estimate as we sort of established.  I honestly can't say -- most of those were -- I think maybe actually we would have said not billable -- excuse me, wouldn't have put granted, we put not billable.

Q.   I see.

A.   Because in those instances, they are just not billable.

Q.   Okay.  So if a -- in the small number of cases that

Michelle Christ
February 07, 2025

are determined to be for a program purpose, there is no charge that would be indicated in FOIAXpress by selecting not billable from the dropdown menu?

A.   Yes.

Q.   Am I right that there might be other situations, though, where not billable would also be selected?

A.   Yes.

Q.   For example, something that is for a non-program purpose, but for other reasons that you mentioned earlier that we're going to talk about in a few minutes, the agency has decided not to charge?

A.   Yes.

Q.   So as far as you know, there's no way in FOIAXpress to definitively identify the 5 percent versus the 95 percent, or 3 percent, or whatever it is.  But yes, the program purpose versus non-program purpose?

A.   I mean, I think you would have to do it manually, you'd have to go through all the non billable ones, which, you know, would depend what they are.

Q.   I see.  And at what point would a requester be informed if their request is being considered to be for a program purpose versus a non-program purpose?

A.   It is -- or not, you know, often.  I think it -- you know, it would depend on what point in time we determined that it met that criteria.  But most of the time, I think when we

looked at the request initially, we're going to be able to determine that, oh, you know, this person is asking for something from program -- that would be a program purpose.

Q.   Okay.  For the ones -- again, I agree they're -- I understand they're a small number.  We're going to talk about the one that's the big number in a second.  But just to make sure I understand, apart for the ones that -- for the requests that are deemed to be for a program purpose and there's no charge, are those treated differently than the remainder in any other respect besides that they would be not billable?

A.   I'm sorry, could you repeat that?

Q.   Yes, I understand that -- let me try again.

I understand that the small number of cases that are determined to be for a program purpose, the agency doesn't assess a charge, they would be marked as not billable.  Is there any other way that those are treated differently than the rest of the requests in terms of how they're processed or the communications or anything else that we've discussed?

A.   I mean, I don't think so.  I mean, every case is looked at on a case by case basis.  So they all might be handled, you know, slightly different, but we follow our, you know, review process and protocols for all the cases consistently.

Q.   I see.  So there's a natural variation in the way all of the requests are treated?

Michelle Christ
February 07, 2025

A.    Yes, I mean, obviously from an -- a literal point of view, but not from a procedural point of view.

Q.    Okay.  Thank you.  Procedurally, they would be treated the same, except that there would definitely be no charge.  And in the other cases, there might or might not be a charge based on other factors?

A.    Yes, unless we felt that it was clear fee waiver --

Q.    And sorry, just to make sure that that question -- and I think in context, we understood each other, but to restate it to make sure it's very clear.  For requests that are deemed to be for a program purpose, there would always be no charge.  For the remainder of requests that are deemed to be for a non-program purpose, sometimes there would be a charge ultimately, sometimes there would not based on other criteria that we can talk about in a minute?

A.    Yes, for the most part.  I mean, there is a few instances where a program purpose might be charged, but those are even rarer.

Q.    Like a -- would that be a special circumstances situation?

A.    Yes, it'd be special circumstances if we requested something that is for program purpose, but it would be extremely hard for us to get or require extensive administrative --

Q.    Understood.  So for some -- a particularly burdensome -- an unusually burdensome request?

Michelle Christ
February 07, 2025

A.   Yes.

Q.   Okay.  One last cleanup on that.  My understanding of general FOIA fee charging procedures is that there are certain differences in the way fees are assessed based on who the requester is.  For example, commercial requesters are charged differently than noncommercial and other requesters.  Does that sound right to you?  Do you know whether that's right?

A.   So I would like to clarify that.

Q.   Yeah.

A.   And I thank you for the opportunity.  We don't look at the requester.  We look at the request.  So you could be a commercial requester, but your request may not be for commercial purposes.  What we do is we look at the request itself, not the requester.  So you could be someone who's not commercial, but your request could still have commercial elements to it.  What we look at is the criteria that are in, you know, 402.85, and we look at, you know, the three things and how they apply to the request.  We don't look at who the actual requestor is.

Q.   I see.  I think -- let me say that back to you, and you can see if I have it right.  What I was talking about is a formalistic approach in FOIA requests where, for example, commercial requesters are charged for search time and other requesters aren't, a formulaic thing that is based on the identity of the requestor.  You were telling me that's not practice that the agency follows.  To the extent that the agency

Michelle Christ
February 07, 2025

considers the commercial or noncommercial aspect of a request,
it's looking at the nature of the request, and then it's
applying the fee waiver factors that are set forth in the
regulation we talked about earlier?

A.   Yes, we're applying the fee waiver factors to each
request to see if they are applicable.  And one of them is the
commercial piece of it, but we don't look at the requestor
themselves.

Q.   I see.  Thank you.  I understand.  Okay.  I believe
you said a moment ago you were not involved in the fee notice
letters; is that right?

A.   Yeah.  I mean, generally, unless someone has a
question or wants to, but most of the time, they aren't.

Q.   Are you nonetheless familiar with -- generally with
the process for how those get generated?

A.   From a very high level, yes.

Q.   Could you explain that to me?  And if it's overlapping
with what we've already discussed, you can indicate where it's
overlapping.

MS. SCHWARTZ:  Objection.  I just -- what part of the
30(b)(6) notice does this fall within?

MS. TARANTOLO:  This has to do with the -- hold on.
Give me a second.  I would say multiple topics, but most
obviously Topic 8, SSA's collection ... of fees assessed in
connection with FOIA requests.

Michelle Christ
February 07, 2025

MS. SCHWARTZ:  Okay.  I'm going to object if we get to the use of fees, but I'll let her answer to the extent she has information about how fee notices are generated, I'll let her answer.

MS. TARANTOLO:  Sure.  For now, I just want to talk about how the fee notices are generated.

MS. SCHWARTZ:  Fine.  Okay.

BY MS. TARANTOLO:

Q.   Okay.  So turning back to that process, can you just take me quickly through the process for generating that notice?

A.   Well, I think we already basically discussed it.  You know, the analyst will reach out to the notice, to get the particular criteria that we use to calculate the fee.

Q.   And then, with respect to -- so those are -- that's how the analyst, as I understand it, gets the inputs necessary for the calculation.  And then when it comes time to prepare the notice with the cost estimate to send to the requester, who prepares the notice?

A.   I believe generally the analyst.

Q.   And then, the process for drafting that notice.  Is it similar, if you know, to the process for drafting a fee waiver determination letter?

A.   Could you clarify that?

Q.   Yes.  I'm talking literally about the process for preparing the written notice that goes to the requester.

Michelle Christ
February 07, 2025

A.   I understand that, but could you clarify what you mean by similar?

Q.   Is there also -- does the -- maybe it'll be easier if I just -- I'll ask you some questions based on what I understand the other process was and you can give me a yes or no.

The analyst drafts the fee notice letter in the first instance, right?

A.   Yes.

Q.   And does the analyst have sample letters with standard language available to the analyst in drafting that fee notice?

A.   I don't know.

Q.   Might the analyst have a back and forth with his or her colleagues or a reviewer -- start there.

A.   I think that would be sort of outside the scope of what, you know, we would want to say here.

Q.   Okay.  I'm --

MS. SCHWARTZ:  I'm putting an objection on the record that we didn't prep her on this.  She doesn't have personal knowledge of it.  And so I don't want her to speculate as to things that may or may not go on between analysts that she doesn't know about.

MS. TARANTOLO:  I understand.  We don't need to go to detailed here, I'm just trying to understand the general practice so that I can situate it in the timeline of processing the request.

Michelle Christ
February 07, 2025

BY MS. TARANTOLO:

Q. The draft that's prepared by the analyst, does it go to a reviewer, as far as you know?

A. Again, it's kind of outside the scope of what I would need to be involved in.

Q. For now, you can just -- do you know or not know if it goes to a reviewer?

A. No.

Q. You --

A. I don't know.

Q. Understood.

MS. TARANTOLO: Okay. This will be six.

(Exhibit No. 6 was marked for identification.)

BY MS. TARANTOLO:

Q. So the court reporter has handed you a document marked as Exhibit 6. This is a May 31, 2024 letter to Jessica Ranucci here at NYLAG. I will just represent to you that the tracking number on the top left is the same also for requests what we have called in this litigation NYLAG request 4. Now, this letter does have your signature on it?

A. Yes.

Q. So is this a letter that you reviewed and approved in May of 2024?

A. I don't think so.

Q. Then how did your signature come to be on it? Did you

Michelle Christ
February 07, 2025

authorize --

A.   I mean, this is out of -- this is outside the scope of my personal knowledge, but my staff is authorized to use my signature to issue notices.

Q.   I see.  So do you know one way or another if you looked at this on May 31st of 2024?

A.   I don't recall it.  It wouldn't have been normal routine for myself.

Q.   I see.  Okay.  I'm on -- since I've -- why don't you just take a minute to read it.  I have just a couple of basic questions about it.  You can look through the attachment, if you want, but I'm not going to ask you any questions about it.

MS. SCHWARTZ:  I just want to put an objection on the record that I understand this document and the questions about this document to pertain only to deposition topic.  Deposition notice Topic 8, which we indicated we were objecting to providing testimony on.  And the witness hasn't been prepped to respond to this line of questioning and just testified that she doesn't -- didn't personally sign this document or review this document.

MS. TARANTOLO:  This is also covered by 9a, Topic 9a.

MS. SCHWARTZ:  But this is really the fee notice.  This isn't the fee waiver request or response to the fee waiver request.

MS. TARANTOLO:  I would suggest -- if you let me ask

Michelle Christ
February 07, 2025

my questions, if there's --

MS. SCHWARTZ:  We'll let you ask the questions, but --

MS. TARANTOLO:  I don't -- well, I'll -- make your own decision, but let me ask the questions.  We may not have any issues.

MS. SCHWARTZ:  Okay.  That's fine.

BY MS. TARANTOLO:

Q.  Could you -- so just high level here, my understanding just for efficiency here, I'm going to tell you what my understanding is, and you can tell me if you know that it's right or wrong.  In a typical FOIA -- more typical FOIA request, there would be a determination about a fee waiver request if one was made first.  And then subsequently, a fee notice letter would be sent describing the fees.  And then, subsequently a production letter would be sent attaching the records?

MS. SCHWARTZ:  Objection.

BY MS. TARANTOLO:

Q.  Is that generally -- would that generally be the order in which those events would happen?

MS. SCHWARTZ:  Objection.  Only answer if you -- if you definitively know the answer to that question.

THE WITNESS:  I would say that it varies.

BY MS. TARANTOLO:

Q.  I appreciate, you know, but because of the -- because of what you're prepared -- have been prepared by your attorney

Michelle Christ
February 07, 2025

to testify and not, we only have the universe of NYLAG request documents to look at, and a lot of these documents were prepared, for example, after this litigation commenced.  I think it's -- just to be transparent here with what the problem is. We're trying to get at a generalized process, but we can only look at documents that are from a unique situation.  So we're trying our best to get an understanding of what the general process is based only on documents that were issued in connection with the NYLAG request.

I think that may -- that may explain what some of the frustration is here, because we're trying to get some information about how these are generated, but we don't have -- we have a unusual sort of series of events that happened with respect to the NYLAG request.

MS. SCHWARTZ:  I understand that with respect to the request that you're having her -- the letter you're having her look at, but she just testified that she doesn't review these fee notices generally and doesn't really know -- doesn't really know the process for generating them at anything more than a high level.  And she hasn't been prepped as a 30(b)(6) witness to answer these questions, so I don't know that it's anything specific to this document.

MS. TARANTOLO:  Let me keep asking my questions. You -- if you know the answer, you can tell it to me.  If you don't know the answer, just say you don't know.

Michelle Christ
February 07, 2025

BY MS. TARANTOLO:

Q.   Could you look at the paragraph on Page 2 that starts, because.  If you look at the second part of the first sentence, it says, we are charging you fees for your request for Item No. 2 under Section 1106(c) of the Social Security Act, et cetera. Do you see that?

A.   Yes.

Q.   Do you recognize that language?

MS. SCHWARTZ:  Objection.  She just said she doesn't review these and she hasn't seen this document and hasn't been prepped on it.

BY MS. TARANTOLO:

Q.   Have you seen that language in other letters?

MS. SCHWARTZ:  I mean, she just testified that she doesn't review these.  So what other letters are you talking about?

MS. TARANTOLO:  Well, she can answer.  I've asked her to tell me, if she --

BY MS. TARANTOLO:

Q.   If you know, just answer the -- you can just answer the question.

A.   You know, I don't usually review these.

Q.   So you don't know if you've seen the language in other letters?

A.   I mean, I haven't looked to see whether or not, you

Michelle Christ
February 07, 2025

know, I haven't compared other letters to see if I've looked at -- this is common language.

Q.   Is this standard language that is provided -- made available to analysts to use in fee notice letters?  Again, if you know.

MS. SCHWARTZ:  Objection.

BY MS. TARANTOLO:

Q.   You can answer.

MS. SCHWARTZ:  If -- I don't want you to speculate. If you don't know the answer.

THE WITNESS:  I don't review the fee notices, so I -- you know, couldn't say.

BY MS. TARANTOLO:

Q.   Okay.  Look at the next sentence, we have invoked. Are your answers the same, if I were to ask you the same questions about that sentence?

A.   Again, this sort of language may be in some fee waiver request or something similar to that, which I do review, but I can't tell you what's in the fee notices.

Q.   Okay.  Let's -- before we move on from this letter, the if you look down two paragraphs below, we estimate the cost to provide this information is $771, which includes 18 hours of search and review time at $33 per hour and three hours of search and review time at $59 per hour.  Do you see that?

A.   Yes.

Michelle Christ
February 07, 2025

Q.    Based on what you explained earlier, where did the analysts get those numbers?  The -- the numbers of hours?

MS. SCHWARTZ:  Objection.

BY MS. TARANTOLO:

Q.    But you -- you can answer.

A.    I mean, it's outside the scope.  I haven't reviewed this.  I have not discussed with the analyst, so I couldn't tell you how this analyst got it.  A plain reading of the language in the letter, though, indicates that they did it based off the GS, you know, grade of the person searching and the number of hours that they would be searching.

Q.    You testified a few minutes ago that the general practice is for the analyst to reach out to the component, learn the number of hours that the component expects will be spent in search -- for the search and review process.  Do you have any reason to believe that that is not the process that led to this calculation here?

MS. SCHWARTZ:  Objection.  She just said she has no personal knowledge of how this was calculated.

MS. TARANTOLO:  I'm asking her if she has any reason to think that it didn't happen.

BY MS. TARANTOLO:

Q.    Do you -- you can answer the question.

A.    I mean, I have no reason to think anything about this particular search.  I have no reason to know why anyone would

Michelle Christ
February 07, 2025

doubt -- would deviate, but there could be a substantive or other reason that may -- yeah, I can't speculate.  I mean, I think in general, we follow all of our procedures in all of our cases.

MS. TARANTOLO:  Can we go off the record?

(Off the record at 12:35 p.m.)

(On the record at 1:32 p.m.)

THE REPORTER:  We're back on the record.

MS. TARANTOLO:  Great.  Thank you.

BY MS. TARANTOLO:

Q.  Ms. Christ, I understand that there is an answer you gave earlier that you'd like to clarify or add to.  Why don't you go ahead?

A.  Yes, thank you.  I mean, we're just switching back and forth quickly between overall FOIA request and fee waiver requests.  And I just wanted to clarify that we receive at the agency about 10,000 to 15,000 FOIA requests each year.  We actually receive about 600 to 650 fee waiver requests each year.

Q.  Understood.  Thank you.  That is one issue that we did want to make sure we understood, how those numbers related to each other.  So that's helpful.  Okay.  After conferring with my colleagues over the lunch break, I think that we won't have to go back and look at the document that we were looking at before.  So I'm going to -- if our understanding of what you've said thus far is correct, I don't think we'll have to go back and look.

Michelle Christ
February 07, 2025

I'm going to try to restate what my understanding is, and you can tell me if I have it right.

I'm thinking -- I'm turning specifically to the distinction between program and non-program purpose requests. First, when I say describe the distinction between a program request and a non-program request, do you understand that to be similar to making a distinction between FOIA, which covers program requests, and Section 1106(c) of the Social Security Act, which covers non-program requests or are those different types of distinctions?

A.   Yes, those are different types of distinctions.

Q.   Okay.  Can you explain the difference?

A.   Sure.  So Section 1106 of the Social Security Act applies in a lot of different situations.  It is not exclusive to FOIA.  And there it makes a distinction between an individual asking for program requests or non-program requests.  If you're asking for a program request to pursue, you know, benefit under a program that we administer under the Social Security Act, there is no charge for at least the first copy, unless there's something extremely administratively burdensome.  When we receive FOIA requests, it is a subsection that we look at Section 1106, which allows us to charge regardless of the FOIA. And we check to see whether or not something is a program request because we would not charge under for something that is a program request if a FOIA request should actually also be a

Michelle Christ
February 07, 2025

program request in those odd instances.

Q.   Okay.  So let me try again to see if I understand the clarification.  Looking only at requests that are received under FOIA, the agency would determine if a FOIA request is for a program purpose or not for a program purpose, as the term is used in 1106, in order to decide whether it could charge or not?

A.   That would be part of the analysis, yes.

Q.   Okay.  What other part of the -- part of what analysis?

A.   The analysis on whether or not to charge a fee.

Q.   I see.  So there might be other things that the agency considers when deciding whether or not to charge a fee, but that is one of the things?

A.   That is one of the things we would consider, whether it was a program request or a non-program request.  We'd also consider, you know, the factors of public interest, for example, that are in the regulations and the FOIA the statute.  We also might consider whether or not it is a minimal burden.

Q.   Understood.  Okay.  I do want to come back to those, actually shortly and learn a little bit more about them.  But to stick with the big picture for a moment.  So of the approximately 10,000 requests that the agency receives per year, you testified earlier that more than 95 percent of them are considered by the agency to be for a non-program purpose, and less than 5 percent are considered to be for a program purpose;

Michelle Christ
February 07, 2025

is that right?

A.   Yes.  And it probably might even be less than that.

Q.   Okay.  We can maybe -- I can keep saying 95 and five, or do you want me to switch to 97 and 3, or 98 and 2?  Whatever you -- you tell me?

A.   I mean, we don't track it, so I really can't say.  You know, I'd be speculating, but it's a very small percentage.

Q.   Okay.  That's noted.  I'm going to keep using the 95 and the five because I think it's helpful to keep track of the categories, but it's -- I have noted the clarification.

As between the 95 percent and the 5 percent, is there a point in time that the analyst is directed to make that decision about whether the request is for a program purpose or a non-program purpose?

A.   I mean, no.  I mean, the analyst would do it as part of their regular intake.  They would take a look at what the request is seeking and why, which the person indicates as much or justification.

Q.   So the analyst is directed to consider that question at intake, at the initial review of the request.

A.   We would direct them, but that's part of their analysis.

Q.   And so for the 5 percent, I understand that you can't go identify them right now, but for that 5 percent, which notionally exists, at what point was the decision made that that

Michelle Christ
February 07, 2025

particular request was for a program purpose?

A.    I think that would go into some of, like, privileged areas.  It would depend on where -- I mean, some of it's pretty obvious from the get go.  So the analyst might decide -- might, you know, make that recommendation early on.  Other things may be as we develop it.  Sometimes we go back to requesters to ask further clarification about what they're seeking.  So we could -- or could happen during the review process if somebody, you know, determines that it looks that way.

Q.    When you say looks that way, you mean looks like a program request --

A.    Yeah.

Q.    -- instead of a non-program request?  So is it fair to say that -- maybe the numbers suggest this anyway, but just to clarify.  Is it fair to say that the default would be that a request would be treated as a non-program request, unless the analyst flags it at the initial review or -- either the analyst or a reviewer flags it at a later point as being for a program purpose?

A.    I don't --

MS. SCHWARTZ:  Objection.  Go ahead.  Objection.

BY MS. TARANTOLO:

Q.    But you can answer.  Please answer.

A.    I mean, I don't think you can answer that because we don't -- it's not -- there's no default.  An analyst is looking

Michelle Christ
February 07, 2025

at the request and making, you know, the decision, you know, looking at it at that point. You're not going in assuming it is not for a program purpose.

Q. Okay. Let me phrase it a different way, because I'm -- what I'm trying to get at really are the moments in the decision process. That's what I'm trying to get at. So -- go ahead.

A. No, I mean, if you're looking for the moment the analyst looks at it and they determine what kind of request it is based on its face. If they need more information, they seek more information. Or if they need to think about it more because it's more complex, they might seek counsel or speak to other people at that point in time, so.

Q. Okay. So let me try again. The analyst does an initial review. At that point, the analyst might decide that the request should be treated as a program purpose request and not a non-program purpose request. Or the analyst might decide the analyst needs more information and seek it in order to make that decision. Or the analyst may decide that there's not enough information there to deem it to be for a program purpose, but later on in the processing of the request, the analyst or a reviewer might make that determination?

A. I suppose it's all on a case by case basis. I don't want to speculate.

Q. I understand. I'm just again, it's -- do you agree

Michelle Christ
February 07, 2025

that those are the ways in which -- or the points in which that decision might be made?  The points in the processing of the request?

MS. SCHWARTZ:  Objection.

THE WITNESS:  I mean, again, I don't want to get into it because I think it would go into privilege and things like that.  So I'll respectfully decline to answer further.

BY MS. TARANTOLO:

Q.  I'm going to ask you -- if we need to read back the question, we can read it back.  I'm going to ask you to try to answer if you can, unless your lawyer directs you not to answer.

MS. TARANTOLO:  Could we read back the question?

THE REPORTER:  Of course.

MS. TARANTOLO:  Thanks.

(Last question was read back by the Court Reporter.)

THE WITNESS:  Could you clarify that, please?

MS. TARANTOLO:  Could you read the question before?

THE REPORTER:  Yes.

MS. TARANTOLO:  Thanks.

(Last question was read back by the Court Reporter.)

THE REPORTER:  Would you like the answer?

MS. TARANTOLO:  That's okay.

BY MS. TARANTOLO:

Q.  So having read that back, let me start.  Are all of those points at which that decision could be made, and I'm not

Michelle Christ
February 07, 2025

saying are they the only points, but are they some of the points that it could be made?

A.   I mean, again, these rarely happened, so it would be very speculative.  Also, the analyst doesn't ever decide it. They make recommendations and perform analysis, just to clarify that point.

Q.   Okay.  Thank you.  Let's substitute for recommend for decide, and are there -- are those all points that that recommendation could be made?

A.   I mean, again, you know, as I, you know, said, I think it would become speculative.  It doesn't happen that often. Conceivably, yes, but, you know, there may be others.

Q.   Okay.  Can you think of any specific other times that that decision has been made, the decision to treat a request as a program purpose?

A.   Again, I think that will go into areas of privilege, a deliberative, you know, processes internal to us and when we may have seeked counsel and different things.

Q.   Okay.  I think that's generally up to your lawyer to assert, but that's okay.  We can move on for now.  I know we have discussed NYLAG made a series of FOIA requests.  They're described that they're the subject of the litigation.  I could show you the fee determination letters in all of those requests. I don't think we need to, though.  Can you say one way or the other were all of NYLAG's requests treated as being for a

Michelle Christ
February 07, 2025

non-program purpose?

A.   I believe so, but I don't know which one -- are you referring to the ones listed in the deposition or -- could you please clarify?

Q.   Yes, I'm referring to the ones that are listed in Topic 9a, those are the requests that are the subject of the litigation.

A.   Could you indicate which NYLAG requests you're looking at?  You're looking at the ones in 9a?

Q.   Correct, and only in 9a for right now.

A.   I believe for the most part, they were not considered for program purposes.  That's correct.

Q.   Okay.  All right.  And can I also confirm -- so as you know, for some portions of some of those requests, a fee waiver was granted.  For other portions of the request, the fee waiver was not granted.  In all of the -- for all the request portions for which a waiver was not granted and costs were assessed, were the costs assessed under 1106 as the charging authority?

A.   I'm sorry, can you clarify that question.

Q.   Some of the -- there were some request -- some portions of NYLAG's request for which costs were assessed.  Were those costs assessed under 1106 as the charging authority?

A.   Yes.

Q.   Okay.  Thank you.  Okay.  If you look back at G and -- Exhibits G and E, these are the regulation and the POMS.

Michelle Christ
February 07, 2025

MS. SCHWARTZ:  We have them as numbers.

MS. TARANTOLO:  Exhibits 4 and 5, thank you.

BY MS. TARANTOLO:

Q.  Okay.  All right.  Let's look at Exhibit 4, which is the regulation.  Previously we were looking at regulation 402.85.  I'd like you to look instead, this time at 402.80.  It's on the page ending in 716 at the top.  What is this regulation about?

A.  It's about the agency's authority to charge under Section 1106 of the Social Security Act.

Q.  Okay.  I'm going to point to a few provisions of the regulation and ask you similar questions to the ones that I asked you about for the previous regulation.  The answers may or may not be the same.  If they're the same, it's not that I'm not paying attention, I just need to cover all the bases.  Could you look at the Subsection (d)(1), it says non-program purpose.  And then Subsection 1 is, we consider a request to be program related if.  Do you see that part?  It's on the right hand column --

A.  Yes.

Q.  -- about two thirds down.  If you go down a little further, it says, in deciding whether this Paragraph (d)(1), Romanette ii applies, the major criteria SSA considers is whether the information is:; do you see that part?

A.  I'm sorry, where are you?

Michelle Christ
February 07, 2025

Q.   Oh.

A.   You're on -- you're on 402.280?

Q.   Yes, it's on the bottom -- right --

MS. SCHWARTZ:  Do you want to start at the beginning of Romanette ii?  That might help.

MS. TARANTOLO:  Sure.  So -- yeah.

BY MS. TARANTOLO:

Q.   I'll just read it out loud from there, Romanette ii. The information will be used for a purpose which is directly related to the administration of a program under the act for which SSA has responsibility.  In deciding whether this paragraph, (d)(1), Romanette ii applies, the major criteria SSA considers is whether the information is:; do you see where I am?

A.   Yes.

Q.   Okay.

A.   Thank you.

Q.   Looking to Subsection A, needed to pursue a benefit under a program that SSA administers under the act, what do you -- what are staff in OPD directed to consult in interpreting that regulatory factor?

A.   Our staff, similar to the other regulations, look at the regulation itself.  They by their own expertise in analysis, and then if need be, they can consult with reviewers or the Office of General Law.

Q.   And similar to previously, there are -- are there any

Michelle Christ
February 07, 2025

additional written materials that staff are directed to instruct -- to consult, excuse me?

A.    No.  Thank you.

Q.    And similar to previously, any consultations with, for example, OGL, would be on a request by request basis; is that right?

A.    Yes.

Q.    And there would not be generalized written instructions from OGL regarding the interpretation of this factor?

A.    No, there would not be generalized instructions.

Q.    Okay.  Thank you.  I'm not going to read all of them out loud.  Could you read to yourself, B, C, and D.  Are your answers the same for the other regulatory factors there?

A.    Yes, they are.

Q.    Okay.  Thank you.  Okay.  Could you please look back at Exhibit 5, the POMS.

A.    Could I just get a clarification, though, I mean --

Q.    Sure.

A.    -- many of these would definitely not be applicable in most instances to FOIA.  Like, for instance, he is talking about FICA contributions by employers.  They would not normally go through the FOIAXpress, you know, route.  They would -- you know, they have systems set up to obtain that information and share it.

Michelle Christ
February 07, 2025

Q.   I understand.  So you're -- it's still true that they're not --

A.   Still absolutely true -- but yes, it wouldn't normally --

Q.   I understand.

A.   -- be a situation.

Q.   That particular factor would not be one that your staff would generally have reason to think about?

A.   Correct.

Q.   Understood.  Okay.  Looking at Exhibit 5, could you flip to section -- Subsection B(d).  It is on Page 4 of this 13 page document.  It's called -- the section is called Development.  Could you just read that to yourself when you find it.  Do you see Section D on Development?

A.   I do, yes.  Thank you.

Q.   What is this section about?

A.   So they're talking about in the context of when individuals are looking for their program purpose records.  You know, the subparagraph before C gives some examples of it. People who are looking to, you know, verify the have received a earnings record, or determine eligibility under Social Security prog -- programs.  It's talking about what they need to do in order to indicate and document that it's for a program purpose.

Q.   And this says that if the request does not contain sufficient information to determine whether it is for a program

Michelle Christ
February 07, 2025

purpose, obtain a signed statement from the individual including

a description of the purpose for which the information is

desired.  How often does OPD invoke that provision, or seek a

signed statement like?

     A.   Well, that's not applicable to OPD's work under FOIA,

this is referring to when individuals are looking for their

records, you know, as part of program purposes.  So, you know,

they're usually in the field office or something like that,

looking to get their earnings record or their credits for Social

Security eligibility, that kind of thing.

     Q.   I see.  So this is not a paragraph that your staff

ever acts on -- that OPD staff acts on?

     A.   Not generally because we don't usually deal with these

types of requests.

     Q.   Okay.  Thank you.

          MS. SCHWARTZ:  For -- in the records, Subsection B,

which this falls under, is request for information for program

purposes privacy act.

          MS. TARANTOLO:  I see.

          THE WITNESS:  These would not be FOIA records.

BY MS. TARANTOLO:

     Q.   Okay.  All right.  Changing topics.  You can put that

aside.  You've mentioned a few times that sometimes even when

the agency believes it is authorized to collect costs, it

chooses not to collect costs.  And you have mentioned a few

Michelle Christ
February 07, 2025

reasons that that might be the case.  Could you tell me the reasons that the agency might make that decision?

A.    So I mean, just to sort of clarify, you know, I think it's not necessarily in those cases that the agency is authorized.  You know, if we're authorized to collect costs, we usually do.  The, you know, exception to that might be if it is a minimal amount of records that we're producing or we're already going to disclose it publicly.

Q.    Okay.  So the circumstances in which the agency would take the position that it's authorized to collect costs, but is choosing not to, might be if it's a minimal amount of effort to respond, or if the information is already publicly available?

A.    Yes, correct.

Q.    Under what other circumstances would the agency decide not to collect costs?

A.    Well, I cannot think of them all exhaustively.  Most commonly, I would say it would be if we, you know, found that it meant one of the criteria, like a program purpose or, you know, met the public interest standard under FOIA.  Those are examples where we may not, you know, choose not to collect costs.

Q.    So program purpose, which you just mentioned, we've just talked about that, I understand what criteria govern that.  For the public interest factors, are you talking about a decision that's different than the decision to grant or deny a fee waiver?

Michelle Christ
February 07, 2025

A.   No, I'm not.

Q.   It's the same decision to grant or deny a fee waiver?

A.   Correct.

Q.   And is there ever a situation where the agency denies a fee waiver, having considered the regulatory factors we talked about, but then nonetheless decides not to collect fees because of a public interest related factor?

A.   Not generally.  We would have granted the fee waiver then.

Q.   But occasionally?

A.   I mean, not to my knowledge.

Q.   So to summarize, the times that the agency would not collect costs include chiefly, responding to the request is a minimal amount of effort, the materials are publicly available, the materials are for program purpose, or the materials meet the public interest factors stated in the regulation about fee waivers?

A.   Yes.  And would be eligible for a fee waiver.  Those are the factors that are generally included.

Q.   Are there any others that I didn't mention that come to mind?

A.   Not that I can recall at this time.

Q.   Sure.  We talked earlier about the preparation of the notice that informs a requester about the fees that are estimated to be charged in the request.  Is there ever a time

Michelle Christ
February 07, 2025

where that estimate is provided to the requestor and then the requester does not provide payment information and the agency nonetheless produces the record?

MS. SCHWARTZ:  I'm objecting to that on the grounds that I think it's not covered by the -- any of the 30(b)(6) deposition topics.  But if you know the answer, you can go ahead.

THE WITNESS:  Could you repeat the question?

MS. TARANTOLO:  Could you just read it back?  I think that will be easier.

(Last question was read back by the Court Reporter.)

THE WITNESS:  I cannot recall any instances at this time.  Usually if someone chooses not to, you know, provide payment and, you know, does -- they're not -- we consider them not wanting us to proceed with their request, could there be certain circumstances where that might have occurred?  I can't recall any at this moment.

BY MS. TARANTOLO:

Q.   And if the -- you said just now that if the person declines to provide the payment information, you consider them to be no longer pursuing the request.  How is that outcome reflected in FOIAXpress?

A.   I think generally you'd be requested as withdrawn.

Q.   So if -- that would be coded as a withdrawal and not a denial, I'm just trying to --

Michelle Christ
February 07, 2025

A.    I think we would have the fee waiver recorded as a denial, and then we would have the employer request listed as a withdrawn.

Q.    I see.  In the circumstances that we listed earlier where the agency would decide not to collect costs, how would those circumstances be recorded in FOIAXpress?  It might be different for the different circumstances.  We may have to go through them one by one.

A.    Yeah, I'm sorry.  Could you just clarify that?

Q.    Yeah.  So, again, so before you listed four possible situations in which the agency would decline to collect costs.  Minimal effort, publicly available, program purpose, public interest.  How would each of those be reflected in FOIAXpress if that was the basis for the agencies -- for an agency decision not to collect costs?

A.    So for the first one, with respect to if we decided that it was de minimis, we'd probably label it as not billable.  If we granted the fee waiver because we thought it was in the public interest, we would list it as granted.  And that's assuming that we granted all of the FOIA request as such.  If we granted it only in part, we would list it as denial.  And then to the extent that you were also seeing a program purpose, we would also indicate usually not billable if we were handling that.  And then the -- because, you know, we wouldn't have been authorized to charge for those in the first place.  And then the

Michelle Christ
February 07, 2025

fourth scenario -- I apologize, can you --

Q.   That's okay.  Already publicly available.

A.   Already publicly -- again, we'd put not billable because we would just be showing the person where it is available in the public.

Q.   Okay.  And we looked at a screenshot earlier that was marked as Exhibit 2.  When you say you referred to not billable, and granted, and denied, are those those dropdown options that you're talking about?

A.   Yes, I am.

Q.   Separately, if you look at the -- look back at Exhibit 2, there's a field underneath fee waiver requested called fee details, but the substance of that box is not on the screenshot.  Do you see that?

A.   Yes.

Q.   Do you know if there are any fields in that section that would -- what would be in that section?  What kind of data is in that section?

A.   It would depend on the nature of the request.

Q.   So is it, for example, like the dollar amount of the fees, or could you give me some examples?

A.   I don't know if it would be in there at that point because they may not know the dollar amount yet.  I honestly can't because it's so much on a case by case basis, and it would be fairly speculative if there's -- you know, there.

Michelle Christ
February 07, 2025

Q.   Are there similar fields like what we see in fee waiver requested boxes with dropdowns and -- do you know?

A.   I cannot recall at this time.

Q.   I can show it to you if you want, but maybe we -- I won't need to show it to you.  On the requester facing part of FOIAXpress.  There are some fields that relate to fees.  One of them is called payment status.  Do you know if that's -- do you know --

A.   If you have it available to see, that would be helpful, because obviously, I'm usually on the other side of the interface.

Q.   Understood.  Okay.  Let me --

A.   I have seen it when we tested it, but it's been -- yeah, I didn't prepare that.

Q.   Yeah, that's fine.

MS. TARANTOLO:  So this will be Exhibit 7.

(Exhibit No. 7 was marked for identification.)

BY MS. TARANTOLO:

Q.   So the document that the court reporter has just handed you marked as Exhibit 7 is a printout from the requester facing FOIAXpress Portal that relates to the same NYLAG Request form that we've looked at the other documents about.  If you could flip to the bottom of the second page of that document, do you see a section at the very bottom called cost details?

A.   Yes.  Thank you.

Michelle Christ
February 07, 2025

Q.   And it's continued, sort of unfortunately, on the very top of the next page where it says payment status, no charges, do you see that?

A.   Yes.

Q.   Do you know if these fields are similar to fields that exist in the SSA facing part of FOIAXpress?

A.   I can't answer that definitively.

Q.   So they may be, they may not be, you don't know?

A.   Yeah.

Q.   Ultimately, if costs are collected from a requester, is the amount of the cost that is collected reflected in FOIAXpress?

A.   Yes.

Q.   Now, specifically, if you look back at Exhibit 6, which was the May 31, 2024, letter relating to NYLAG Request 4. If you look -- we looked at the sentence earlier that said, we estimate the cost to provide this information is $771.

A.   Is this, just to clarify, on Page 2 that you're referring to?

Q.   Correct, Page 2.  In the middle.

A.   Yes, thank you.

Q.   Do you know if that 700 -- if NYLAG paid that $771?

MS. SCHWARTZ:  Objection.

BY MS. TARANTOLO:

Q.   Do you know -- I'm sorry.  The question is, do you

Michelle Christ
February 07, 2025

know -- yes or no, do you know if NYLAG did pay the $771?

A.   I do not know for this particular request.  I mean, I know that NYLAG submitted 10 requests and requested fee waived for nine of them, and I believe paid in one of them.

So I don't know if this was this particular request or not that paid, you know, or we gave a partial waiver and charged for the -- Request No. 2 of it, but I do not know.

Q.   Understood.  If you wanted to find out whether the $771 was collected from NYLAG or not, how could you do that?

A.   I could look up in FOIAXpress.

Q.   And if it was ultimately collected from NYLAG, the figure $771 would appear somewhere in FOIAXpress?

A.   Yes.

Q.   So if I understand it, at the stage after a notification like this is received by a requester that says, we estimate the cost is a particular amount, the agency requests payment information from the requester; is that right?

A.   Yes.

Q.   And that can be either a credit card information, or a check, or a money order; is that right, or -- is that right?  What form can that payment be?

A.   Again, I'm not heavily involved in the collection portion of it.  I know that we do accept credit cards, and I would imagine that we also, you know, allow other things.  The letter itself, you know, indicates that you can submit payment

Michelle Christ
February 07, 2025

by check or mail.  So I would need to see that that's allowed.

Q.   What --

A.   Or money order.

Q.   What office is in charge of processing the payments?  Is it the Division 3, but not you specifically?  Or is it some other part of SSA?

A.   We do not process the payments themselves.  We request the notice, and, you know, it is mailed to our office, and we take the checks in to make sure that they get to the appropriate office for processing, but it is not us.

Q.   What is the appropriate office, if you know?

A.   I do not know.

Q.   Okay.  That's something -- is that something that the analyst on the case would handle?

A.   Yes.

Q.   Understood.  Okay.

MS. TARANTOLO:  This will be Exhibit 8.

(Exhibit No. 8 was marked for identification.)

BY MS. TARANTOLO:

Q.   Actually, I'm going to ask about one other thing before we look at this.  You have it now, but let me ask what I think will be just a little bit more efficient.  We haven't talked specifically about appeals, and I just want to ask a few questions about those, so that we have context for understanding what's in the report.  So I understood you said very early on a

Michelle Christ
February 07, 2025

requester can appeal a determination, denying fully or partially a fee waiver as soon as that decision is made; is that right?

A.   Yes.

Q.   And how -- approximately what portion of fee waiver denials, if you have a sense, are appealed?

A.   I do not have a sense.

Q.   Okay.  We can look in a minute at the data, but I wanted to get the context.  If a fee waiver request is denied in the first instance and then that decision is affirmed on appeal, does FOIA request just reflect denied?  The -- sorry, the dropdown menu on Exhibit 2?

A.   Yes, for the initial request.

Q.   Okay.  And if the fee -- if the waiver request is denied in the first instance and then reversed on appeal, what would that dropdown menu say?

A.   I think -- well, it wouldn't be reversed, per se, but if we decided to grant it on appeal, it would change to grant.

Q.   I see.  Okay.  So if the initial determination is a denial, but on appeal, the determination is to grant, then this dropdown menu would be changed to say grant?

A.   Yes, in theory.

Q.   In theory, that's what would be the -- that would be the instruction about what -- an analyst would go make that change?

A.   I believe so.

Michelle Christ
February 07, 2025

Q.   And similarly, if a request -- you testified before that if a initial request is granted in part and denied in part, it's noted as denied in FOIAXpress?

A.   Yes, it's noted as denied.

Q.   And on appeal, if that is -- if the decision on appeal is the same as below, it stays as denied, the indicator?

A.   Yes.  Any decisions that are granted in part, or non billed in part, or denied, are just listed as denied at all stages.

Q.   Okay.  So if the appeal decision was to grant in full, then the indicator would be changed from denied to grant?

A.   I believe so.

Q.   Okay.  And just quickly to understand the process for an appeal of a fee waiver decision specifically, who does the appeal -- what is the initial process for initially reviewing an appeal?  Let me just strike that and try again.

Who does the first review of an appeal request of a fee waiver denial?

A.   So when we receive an appeal request of a fee waiver denial, it goes to a different analyst than handled the first appeal -- I mean the first request.

Q.   Understood.  And then, what happens next?

A.   A similar process.  The analyst reviews it, but then usually it goes to a different reviewer.  Then it will go to myself and -- will go to Sara, our division director, and then

Michelle Christ
February 07, 2025

it will go to myself usually, and but, then, it will ultimately -- I will not make the final determination in that instance.  Again, instead, it will go to our executive director, Matthew Ramsey.

Q.   And the review at the -- you just described five stages of review, four of which are ones we've talked about before, people we've talked about before, though, in a different context.  An analyst, a reviewer, Ms. Reagan, and you, and then the fifth layer of review for the appeal is the executive director, Mr. Ramsey?

A.   Yes.

Q.   As to reviews one, two, three, and four, is the process for those reviews similar to the process that we described already for the initial determination on the fee waiver, or is it different?

A.   No, it's similar unless additional information -- excuse me, unless additional information is provided.

Q.   And what kind of additional information might have been provided?  In what format?

A.   I mean, sometimes a requester will just give us more information about why they're requesting it.  You know, they now have the denial letter where we indicated what we -- why we didn't think it met our criteria, and then sometimes they will come back and provide us with more specific information, or additional information, or, you know, more context.

Michelle Christ
February 07, 2025

Q. Okay. I understand. While a fee waiver decision is on appeal, does the analyst continue working on processing the underlying request?

A. Yes, assuming that the person indicated they wanted to go ahead.

Q. I see.

A. Requester indicated they wanted to go -- the requester generally has 10 days to indicate to us if they want to go ahead, sometimes we will extend it, but they have 10 days to indicate if they want to go ahead, even though we have denied their fee waiver request.

Q. I see. And so what if the -- so if the requester receives a denial of the original fee waiver request and indicates that they will like to proceed, the analyst will proceed even if the fee waiver denial is also on appeal?

A. Yes.

Q. What if the requester says that they do not want an appeal -- do not want to proceed, excuse me, unless the fee -- because of the fee waiver denial? Does that make sense?

A. Yes. So you're asking what happens to the underlying request if it's appealed, but the requestor has not indicated they want to proceed. We do not proceed at that point in time. We -- you know, unless they provide us with a credit card information, we hold off while the matter is being appealed.

Q. Understood. So in that instance, the analyst would

Michelle Christ
February 07, 2025

not be working on the underlying request.  The request would go on hold in some way until the appeal has been finally decided by Mr. Ramsey?

A.    Yes, assuming the requester had indicated as much.

Q.    Understood.  Okay.  Now, let's take a look at Exhibit 8.

A.    Can I just clarify something.

Q.    Sure.

A.    Sometimes the requester will tell us they're good with up to a certain amount.  So they were appealing it, but they want us to proceed as long as we do not go over a certain amount, which is very common, actually.  And so we will then proceed with that request still, and if we come up with an amount that's higher than that or something like that, we will you know, again, dialogue with the requestor to find out what they're interested in.

Q.    I see.  So you might start doing work in that instance, and once you've done an amount of work that's approximately the amount the limit that the requestor is given, you would then --

A.    No, what we would do is the analysts would find out -- you know, they'd continue to work the case in terms of asking for fee estimates from the various components, you know, hours and timing grade.

And then they would come back to the requestor and

Michelle Christ
February 07, 2025

say, look, you know, if we do your request, it's going to -- you said you were good up to $3,000.  Well, it's actually going to be $4,000, do you still want us to proceed?

Q.   Okay.  I understand.  Thank you for that clarification.  Okay.  Take a look, please, at Exhibit 8.  What is Exhibit 8?

A.   It is our Freedom of Information Act annual fiscal 2024 report.

Q.   Okay.  Could you -- and what is this generally?  Who prepares this?

A.   OPD staff and myself.

Q.   And what kind of information is contained in this report?

A.   Information that is requested by DOJ, OGIS, about you know, the agencies procedures.

Q.   The statistics that appear in this report, where do they come from?

A.   They come from our electronic case processing system, as well as the analyst -- our senior reviewers own, you know, notes and double checking.

Q.   When you say the case management system, you're talking about FOIAXpress?

A.   I am, yes.  Well, for 2024.  In years past, before 2023, it was FOIA Online.

Q.   I understand.  Could you flip to -- there's no page

Michelle Christ
February 07, 2025

numbers, but Chart VIII(b), Roman VIII(b), requests for fee
waiver.  Do you see that?

    A.    Yes.

    Q.    Having confirmed that these numbers come from
FOIAXpress, I'm going to double check what I think they mean.
First of all, as to this particular statistic, the one that --
or the numbers that appear in Chart VIII(b) is the source for
those that specific dropdown menu in FOIAXpress that we looked
at as part of Exhibit 2?

    A.    Yes.

    Q.    Okay.  So when it says number denied 625, does that
mean -- excuse me, go ahead.

    A.    No, I'm sorry.  Just to clarify, the first two columns
come from that number.

    Q.    Yes.  Understood.  Okay.  Correct.  Thank you for
that.  Looking at number -- the first column, number granted.
Second column, number denied.  Those come from the dropdown menu
on Exhibit 2?

    A.    Yes.

    Q.    So where it says 625 in the column titled number
denied, that means there were 625 requests within that fiscal
year where that denied option was selected on the dropdown menu?

    A.    Yes.

    Q.    And likewise, eight requests for which the granted
dropdown --

Michelle Christ
February 07, 2025

A.    Yes.

Q.    -- was selected.  If the non billable option was selected on the dropdown menu, would that request appear anywhere in this chart?

A.    I do not believe so.

Q.    And similarly, if withdrawn was selected on the dropdown menu, would that appear anywhere in this chart?

A.    No.

Q.    I'm going to just cover the bases.  Same for NA?  I know you testified earlier that NA is not --

A.    No.

Q.    -- regularly used, but -- okay.  Understood.  The figures that are in the third and fourth columns, median number of days to adjudicate, average number of days to adjudicate. Where do those numbers come from?

A.    FOIAXpress.

Q.    And is that from the -- where did the -- how are those days calculated based on what's in FOIAXpress?

A.    The system automatically calculates how long the request has been outstanding and records it.

Q.    So we would -- when we looked earlier at Exhibit 2, there was a start date and an end date field.  Do you know if these figures in the third and fourth columns come from measuring the distance between -- the time between start date and end date?

Michelle Christ
February 07, 2025

A.    I believe so.  But just to clarify, you know, probably that is where it's coming from, but then the system also separately has the start date, and then when you close the matter of the waiver, it will also put that in, too.

Q.    Okay.  I didn't follow that.  Could you say that again?

A.    Sure.  So, yes, it comes from the start and end date. But the system also, because we're always, you know, mindful of timeliness, the system also tracks it from the time that you entered it, to the time that you close whatever item you're working on, fee waiver requests included.  So that also comes from that, too.  So it's not just what the analyst is choosing, the system itself -- there's no way to -- I guess what I'm trying to say, is the system itself does it objectively.

Q.    I see.  There was one part of that explanation that I didn't follow, which is when the -- you said something about the analyst closing a particular action, is there -- how would an analyst close the fee waiver request?

A.    When they send out through FOIAXpress the fee waiver notice to the requestor.

Q.    I see.  That makes sense.  Okay.  Could you look at Chart X, Roman X.  It's on the next page.  Fees collected for processing requests, that middle column 544,362, where does that number come from?

MS. SCHWARTZ:  I'm objecting to this.  If you know,

Michelle Christ
February 07, 2025

you --

BY MS. TARANTOLO:

Q.   Do you know the answer -- do you know where that number comes from?

A.   No.

Q.   Could you look at chart -- back to Chart Roman V(b)(1) titled Disposition of FOIA Requests All Processed Requests.

A.   I'm sorry, you said Roman V --

Q.   (B)(1).

A.   Thank you.

Q.   There are a number of columns to the right hand side with a subheading that says number of full denials based on reasons other than exemptions.  Do you see that?

A.   I'm sorry, where are you referring to?

Q.   So if you look at Chart V(b)(1), there are one, two, three --

A.   Oh, number of full denials based on exemptions?

Q.   Yes.  Sorry, yes.

A.   I thought I heard something different.  I don't know if --

Q.   I may have misspoken.  There's a number of columns -- yeah.  Okay.  Let's see.  Hold on.  There are nine columns on the right hand side that all have one title over the top of them, and that says number of full denials based on reasons other than exemptions.  Do you see that?

Michelle Christ
February 07, 2025

A.    Yes.

Q.    And then one of the columns underneath that is request withdrawn.  It says there were 26 of those requests?

A.    Yes.

Q.    What requests are those -- does that cover?

A.    Requests that the requester asked us to withdraw. They said they no longer wish to pursue their FOIAXpress.

Q.    And would that be -- we were discussing earlier that someone that -- sorry, strike that.  Would that correlate to withdrawn on Exhibit 2, or could it correlate to withdrawn in a different part of FOIAXpress?

A.    No, I do not believe it would correlate to Exhibit 2. These are, I believe, FOIA requests that have been withdrawn.

Q.    I see.  So this is --

A.    Not fee waiver requests that are withdrawn.

Q.    Understood.  Okay.  Look at the next column.  Fee related reason?

A.    Yeah.

Q.    What is a full denial based on a fee related reason?

A.    It can really vary.

Q.    What are all the things that it might mean?

A.    I mean, it -- I can't really give a list without going through all of the requests.

Q.    Okay.  I actually just don't understand what that means to be -- what does it mean to be denied for a fee related

Michelle Christ
February 07, 2025

reason?

A. So, for instance, somebody may make a request that is so -- that is specific enough to be a FOIA request -- this is just one example.

Q. Okay.

A. But somebody made a request that is specific enough that technically it is a valid FOIA request, but the result would be so extensive that it would be like $2 million to provide it. Or, example, somebody might request the word FOIA in four different people's thing. Like, let's say they chose myself as one of the agency employees, all of my emails contain the word FOIA. So it would take -- and we've had instances where let's say, we calculate that take us about 22 years to fulfill the request and be $6 million. And so we deny those as -- you know.

Q. I see. So it's a -- it's sort of a way of expressing that a response to the FOIA request would be so burdensome that the fee would be exorbitant, and thus the request is denied?

A. Essentially, but that's just one example. Like, there are many different types, you know.

Q. Could you give me any other examples you can think of, just to try and understand what the category is?

A. There's nothing coming to mind at the moment.

Q. Okay. Because you were -- you were saying before that if a person declines to provide payment information, that

Michelle Christ
February 07, 2025

request is no longer -- and says they don't wish to proceed, that request is not acted on.  But it's considered a withdrawal, not a denial, so is that right?

A.    It's considered a denial of the fee waiver request still.  It would be considered a withdrawal of the FOIA request.

Q.    Understood.  So that would fall into the request withdrawn -- in that situation, that particular request would be coded as request withdrawn within this chart.

A.    I'm not sure if we're also tracking them under some of the other categories, so I don't want to say -- I don't know.

Q.    Okay.  All right.  And I think this is the last one I want to look at.  If you could -- there's a page -- the page that has Roman VI Chart (b) -- actually, I'm sorry.  Roman VI Chart (c)(2).

A.    I'm sorry, could you repeat that again?

Q.    Yes, Roman VI(c)(2).  The chart is titled Reasons For Denial On Appeal, Reasons Other Than Exemptions.  Do you see that?

A.    Yes.

Q.    So is fee related reason that appears in this chart, does that have the same meaning as in the other chart we just looked at?

A.    Yes, I believe so.

Q.    So to be sure I understand, these are -- these 45 cases in this column, would be ones where initially the request

Michelle Christ
February 07, 2025

was denied because, for example, with that limitation, for example, the request was excessively large and burdensome, and then that denial was affirmed on appeal?

A.   I wouldn't necessarily characterize it as excessively burdensome, because that's a different sort of scenario sometimes under FOIA.  But because the fee was too large, it's possible.  I don't know all the instances that it would be, so I really can't say.

Q.   Okay.  But it's similar -- it would be whatever the other -- whatever got that request into that column in the other chart, this is the same set of universe of requests, but just the ones that have been affirmed on appeal?

A.   Yes.  I mean, they're separate requests, but yes.

MS. TARANTOLO:  Okay.  All right.  Can we just pause for a second.

(Off the record at 2:29 p.m.)

(On the record at 2:48 p.m.)

THE REPORTER:  Okay.  We're back on.

EXAMINATION

BY MS. RANUCCI:

Q.   MS. RANUCCI:  Hi, I know we met briefly earlier, but I'm Jessica Ranucci.  I work with Danielle here, I know it's unusual, but we're just splitting this because now we're turning to the second topic, which is affirmative disclosures or maybe proactive disclosures.  Is there one of those terms that you use

Michelle Christ
February 07, 2025

more than the others?

A.    I think proactive disclosures, is the one used in FOIA, so.

Q.    Great.  So I'm just going to start by asking you a few questions at a very high level about OPD's work with respect to proactive disclosures.  Could you talk about, again, at just a very high level, what functions OPD performs that have to do with proactive disclosures?

A.    Sure.  Well, at a very high level, you know, the FOIA requires, you know, certain proactive disclosures.  To that effect, for instance, if something is successfully requested three times under FOIA, an agency has to proactively put it on its public website, which we certainly adhere to.  Additionally, we have what is known as a FOIA reading room or a library where we put things that we think could be of interest to the general public, or, you know, different areas, or things that have been historically requested a lot.

If we received it in prior years, we might say, okay, well, this years new statistics should be put on there as well as resources.  We also -- sometimes a component will come to us about an item that they'd like to make public and available for everyone transparent and ask us to take a look at it from a FOIA principal to determine if any redactions or anything needs to be made, so we'll review it from a FOIA.

Q.    Got it.  So just to go through that, I understand you

Michelle Christ
February 07, 2025

might come up with other ideas later, but just for now, there's the frequently requested records, obligations, and that OPD handles the compliance with that, that OPD is the one who maintains the reading room; is that right?

A.    Yes.

Q.    And then OPD works with components that want to make something public in order to assess from a FOIA perspective whether it should go up; is that right?

A.    Yes.  And sometimes those components will also ask us if we can put it in our FOIA library or reading room.

Q.    Okay.

A.    Additionally, of course, the agency has many other areas where we proactively disclose items outside of OPD.

Q.    Understood.  And are -- but those are not in the FOIA reading room?

A.    No.

Q.    Everything -- I guess put another way, everything in the FOIA reading room goes through OPD at some point because OPD maintains the FOIA reading room?

A.    Yes.

Q.    Thanks.  Earlier you testified, I believe, that there were 10 staff people working in -- is it Division 3; is that right?

A.    Yes.  Division 3 FOIA and Transparency, we have a division director and nine government information specialists.

Michelle Christ
February 07, 2025

Q.    Are those the people within OPD who work on the proactive disclosure responsibilities you just described?

A.    Yes.

Q.    Does anyone else in OPD also work on those responsibilities?

A.    Myself.  Occasionally we may assign someone else from another division if we need to for workload issues, or people move around, or if we had someone out on extended leave.

Q.    But typically it's considered to be part of Division 3's workload?

A.    Yes.

Q.    And is there anything different about the reporting structure or, like, organizational chart, I guess you'd call it, at Division 3, than what you testified to earlier with respect to practice disclosures?

A.    I'm sorry, could you clarify that?

Q.    Sure.  Just as you testified earlier, there were nine analysts, but two of them were more senior at GS 14, but all of those nine people reported to the division director who then reported to you.  Is all of that basic structure the same with respect to proactive disclosure obligation?

A.    Yes.  I mean, they -- all of the folks in that division, all of the government information specialists report directly to our division director, Sara Reagan, and then she reports to me.  We don't have the same formal review structure

Michelle Christ
February 07, 2025

that we have.

Q.   Right.  But there's no, say, specific person within that who's more knowledgeable about productive disclosure who would review other people's work, or any other sort of like different structure than what you explained earlier?

A.   We don't have a formal -- a structure for productive disclosure.  A lot of times, you know, an analyst will say, hey, I think we should disclose this, you know, and we will usually say, that's a great idea and disclose it.  You know, we're much -- this is not a formal FOIA system where we're, you know, accounting for it in FOIAXpress.

We are much more, you know, what's the word I'm looking for.  We're much looser in terms of what we're willing to publish, you know, proactively discovery.  -- I mean, sorry, proactively disclose.  But I will say that we do have -- one of our senior reviewers is very well versed in proactive discovery, and also tracks our FOIA requests to see when we're getting towards three.

So I would consider her to be, you know, her expertise -- she, of course, always runs it past myself and the division director before she formally puts anything online, but, you know, she would, I would say, be more expert than most in that area.

Q.   Does your office work with ODEPPIN on proactive disclosures?

Michelle Christ
February 07, 2025

A.    So ODEPPIN does not have responsibility for -- let me let me back up.  Our office works with ODEPPIN on certain matters.  Some of them, you know, involve disclosures.

Q.    And what -- can you give some examples of what those are?

A.    For instance, since December 2023, as part of the process ODEPPIN, we'll -- we have a role in the process of -- of when to proactively disclose sensitive POMS, or redact them.

Q.    And EM's?

A.    And EM's, yes.

Q.    Other than -- so I understand that your office works with ODEPPIN, and we'll talk about that, the disclosure of certain sensitive POMS after December 2023.  Are there any other situations in which your office works with ODEPPIN related to proactive disclosure that you can think of?

A.    I mean, obviously, not without getting to far into, like, deliberative things or things of that nature.  But ODEPPIN -- we work closely with ODEPPIN in a lot of different areas, and they may reach out to us about, you know, something in particular they want to disclose.  Or a component may go to them and say they want to disclose something that they mentioned earlier and make it available, and then we might just reach out to the component and say, yes, we'll look at it from a FOIA perspective.

Q.    Thank you.  Now, I'm just going to ask some questions

Michelle Christ
February 07, 2025

about compilation or indexes of the POMS.  Is there a thing called the POMS comprehensive index?

A.    Yes.

Q.    What is it?

A.    It's a listing goal of the POMS and the titles.

Q.    And like, is it a paper or a website?  Like how would one access it?

A.    It's a website.

Q.    And who maintains that website?

A.    ODEPPIN.

Q.    And is it an SSA internal only website or a website it's available to the public?

A.    It's both, I believe, but I really would defer to ODEPPIN, this is an area of their ownership, not -- I know all POMS that are not sensitive, are automatically proactively -- whether or not there's a proactive disclosure requirement, the agency makes those public.  So the vast majority of POMS are available online.  You certainly could get an index of what POMS are available there.

Q.    Right.  I'm really just -- this term POMS, comprehensive index, I've seen it.  I'm happy to show you a POMS that uses that term.  I'm just not exactly sure how you use that term.  Like, it's literally just a question about what that term means.  But it sounds like to you the POMS comprehensive index means an index of all the POMS that, as your understanding,

Michelle Christ
February 07, 2025

exist both within SSA and to the public; is that right?

MS. SCHWARTZ:  Objection.  I just want to note that I think this is outside the scope of deposition Topic 1a, but to the extent you need to establish some sort of background and to the extent that Michelle knows what the POMS comprehensive index is, you can answer the question.

THE WITNESS:  I mean, I really can't.  I don't manage it, and I feel I don't want to say something that is incorrect.

BY MS. RANUCCI:

Q.   No problem.  It's your understanding that as currently, SSA makes available a list of all the titles of all the POMS to the public; is that right?

A.   I believe so.  There -- but I can't -- again, I'm not -- ODEPPIN is in charge of that, so I would defer to them. I don't have, you know, experience with that.  It's possible that there could be, you know, something for security reasons, but I believe the titles themselves are provided.

Q.   And I just want a yes or no answer to this question. I'm not asking for the content.  Do you know who decided to make that list public?

A.   No.

Q.   Okay.  Same thing, just a yes or no answer.  Do you know why that list was made public?

A.   No.

Q.   Is it your understanding that there's -- as of today,

Michelle Christ
February 07, 2025

a publicly available list of all the EM's, emergency messages?

A.   Can't really speak to that.  Again, it would be ODEPPIN.

Q.   And just the same questions, I gather from that, that you -- I'll just ask it a yes or no way.

Do you know who decided to make that list public?

MS. SCHWARTZ:  Objection.

BY MS. RANUCCI:

Q.   You can answer.

A.   No.

Q.   As I'm sure your attorneys have told you, we conducted a deposition with a SSA staff person from ODEPPIN.  So to move things along, I'm going to summarize some understanding of the POMS publication process from what I learned with ODEPPIN, just to provide some background of where I understand that the OPD's role is.

I understand that you may or may not know that, but I think that'll help both of us, to the extent you know.  If you don't know, that's fine.  So I understand from ODEPPIN that ODEPPIN typically runs the publication process for POMS and EM's that has a number of steps, including that an authoring component will draft the POMS, that that POMS will go through what's called IRD review, or inter departmental review, will update the draft.  There's a sign off sheet conducted, for which for sensitive POMS that ABC has to sign off, there's final

Michelle Christ
February 07, 2025

approval by the author, by approvers and AC's.  And at that point, for sensitive POMS, there's publication within ODEPPIN, and certain sensitive POMS are then sent to OPD for FOIA review.  I understand -- I'm just trying to on the scope of your testimony.  I understand today that OPD's role is in that last step with the certain sensitive POMS and EM's that are sent to OPD for FOIA review; is that right?

A.    That is correct, yes.

Q.    Are there any of the steps before that that I described -- let me strike that.  Let me just -- we'll start with there.  As of today, are all non sensitive POMS available to the public, if you know?

A.    Yes.

Q.    Has that been the case for as long as you've worked in OPD?

A.    Based on my knowledge and understanding, not being in ODEPPIN, it's been my knowledge, even when I've been OPD and even beforehand when I worked in the regional counsel's office.

Q.    Thank you.  Do you know where SSA's definition of a sensitive POMS is?

A.    Again, this would be more of ODEPPIN's role, but I'm aware that it's -- that there is a POMS section that describes when the sensitive designation would be appropriate.

Q.    And is that where you would look to find the definition of sensitive?

Michelle Christ
February 07, 2025

A.    I mean, I don't know -- you know, again, I would defer to ODEPPIN on that.  But, yeah, that is where you would look for, you know, the description of how the agency designates POMS as sensitive.

Q.    And my understanding from the ODEPPIN deposition is that the decision about whether or not a POMS is sensitive is initially made by the offering component, and then the final approval for the sensitivity designation is given by the ADC on the sign off sheet; is that correct, if you know?

A.    Yes.  After December 2023.

Q.    Right, today?

A.    Yes.

Q.    Thank you.  Does OPD play any role in that sensitive designation, setting aside POMS that are -- or EM's for which OPD is the primary author, if there are any.  Does OPD play a role in that sensitivity designation, either by the initial author or by the ADC?

A.    No.

Q.    And are there POMS or EM's for which OPD is the principal author and would play a role because it's the author?

A.    We are indeed the author of several POMS.  I do not believe any of ours are marked as sensitive.

Q.    Thank you.  Now, I'm going to ask about the term administrative staff manuals and instructions to staff that affect a member of the public.  Are you familiar with this term

Michelle Christ
February 07, 2025

from the FOIA?

A.    Yes.

Q.    Does SSA have a definition of this term somewhere that you're aware of?

A.    I'm sorry, can you clarify?

Q.    Sure.  Earlier you said that if we were going to look at the definition of sensitive, we would look in a specific POMS.  If I'm looking for the definition of this term, is there something in writing that you would look for that would have a definition of that term?

A.    Well, just to clarify, I didn't actually say the definition in that POMS.  I know the agency talks about it.  I again, would have to defer to ODEPPIN on the exact content of that particular POM.  As to, you know, the administrative thing, I believe, you know, we of course have regulations based on the FOIA, and they discuss proactive disclosure.  I also -- I do know that the ODEPPIN POM that talks about sensitivity has a proactive disclosure discussion in there with respect to the FOIA.  Again, we're not the authoring component on that, so it wouldn't be for me to interpret it, but it is definitely there to provide guidance to the agency components.

Q.    Is there anything else in writing that you're aware of that would interpret this term?

A.    Which term?

Q.    Sorry, administrative staff manuals and instructions

Michelle Christ
February 07, 2025

to staff that affect a member of the public?

A.   Not that I can think of at this moment.

Q.   I'm going to ask some specific examples of where those might be.  So, for example, in a PowerPoint?

A.   I'm not aware of that.

Q.   Or a desk guide?

A.   I'm not aware of any manuals that go out to the rest of the agency, or training.

Q.   Thank you.  I have similar questions here for another term, statements of policy and interpretations which have been adopted by the agency and are not published in the federal register.  Are you familiar with that term for the FOIA?

A.   Yes, I am.

Q.   Same question here.  Is there anywhere that you would look in writing that would explain what that term means?

A.   I believe, again, ODEPPIN -- you know, making clear that, you know, that's not my role, but ODEPPIN's the authoring component, but they have a POMS -- their POMS that describes the sensitive designation, includes that proactive disclosure language.

MS. RANUCCI:  I'm going to ask the court reporter to mark this as Exhibit 9.

(Exhibit No. 9 was marked for identification.)

MS. RANUCCI:  Just before you do that, I'm just going to note this is marked as protected information.

Michelle Christ
February 07, 2025

THE REPORTER:  Thank you for doing that for me.

BY MS. RANUCCI:

Q.    Do you recognize this document?

A.    I do, yes.

Q.    When you were talking abstractly just a minute ago about a POMS by ODEPPIN regarding sensitivity, is this the one that you were talking about, if you know?

A.    Yes, it is.

Q.    Okay.  Thanks.  And just for the record, it's POMS AO 40410.030.  I don't see anything in here specifically about proactive disclosures.  Is there something in here that you see?

A.    Yes.  If you look under Subsection A, the paragraph below the bullet, I think it would be the second paragraph technically.  The sensitive structure -- instructions are not available to the public on SSA's internet website.  The agency makes non sensitive POMS and non sensitive EM's available to the public based on the Freedom of Information Act, FOIA.

FOIA states that the rules of procedure and of general applicability, statements of policy, and interpretations of them not already published in the federal register, and instructions to staff that affects members of the public must be made available to the public.

Q.    Okay.  I see.  Thank you.  So these two phrases from the FOIA that we just talked about -- I'm sorry, I'll just read them again, they're long.  Administrative staff manuals and

Michelle Christ
February 07, 2025

instructions to staff that affect a member of the public, and statements of policy and interpretations which have been adopted by the agency and are not published in the federal register.  If you know, does SSA provide any training on what those terms mean?

A.    I do not know.

MS. RANUCCI:  I'm going to ask the court reporter to mark this document as Exhibit 10.

(Exhibit No. 10 was marked for identification.)

MS. SCHWARTZ:  Just noting for the record that this document, Exhibit 10, is also marked protected information.

BY MS. RANUCCI:

Q.    Do you recognize this document?

A.    Yes.

Q.    What is it?

A.    It's an emergency message or EM 23075, which includes a revised associate commissioner sign off sheet for POM.

Q.    And my understanding is the sign off sheet that is enclosed in this emergency message is still the currently applicable sign off sheet even though the POMS -- or I'm sorry, the emergency message itself has been archived; is that right?

A.    Again, just with the caveat that this is something managed by ODEPPIN, and they would best be able to speak to it. To my knowledge, yes, it is.

Q.    Thank you.  I'm going to direct your attention to the

Michelle Christ
February 07, 2025

first checkbox on the sign off sheet.  I'm going to read it, you can confirm I'm reading it correctly.  This sign off is for:  A sensitive instruction.  Instructions designated as sensitive are for internal SSA use only.  Sensitive designation should be used sparingly.  If designated an instruction as sensitive, identify the criteria it meets by checking the appropriate box below.  In addition, highlight the specific sensitive content in your attachment and complete the justification section below following this determination.  And then, there are three additional checkboxes.  First, descriptions of internal security controls, and override instructions, and claims processes.  Second, instructions which explain to employees what steps they must take to effectuate a redirect of payment, or to override an internal control feature.  Or third, instructions designed to detect fraudulent documents and actions.

          Did I read that right?

     A.    Yes.

     Q.    If you know, is there any training given to staff on how to check this box?

     A.    Again, I do not know.  I, you know, ODEPPIN manages it.  I do know that it's signed off on a very high level within the component.  So the person should be very knowledgeable.

     Q.    Thank you.  And this is a -- it's a little bit difficult because I understand the sensitivity designation largely goes through ODEPPIN, but there are other parts of the

Michelle Christ
February 07, 2025

send off sheet that are more related to OPD.  So I'm going to ask you a few questions about this, but if the answer is that it's not within the scope of your knowledge at OPD, that's fine. And I understand that that might be the case here, particularly for the sensitivity designation.  So if -- since if this box is checked as a sensitive instruction, is there any review of that decision after it's signed off on by the ADC?

A.   So we're not reviewing it per se for -- I can't speak to what sort of review might occur outside.  But once the ADC signs it, it is sent to OPD to review.  We're not reviewing the sensitive designation, we're reviewing whether there is anything that would require a proactive disclosure.

Q.   Understood.  And are there any circumstances under which someone at OPD -- I think I understood you to say no, but just to be very clear.  Are there circumstances under which someone at OPD, upon reviewing for proactive disclosure, would go back to the component, or to ODEPPIN, and ask why it was sensitive in the first place?  Or say it shouldn't have been sensitive in the first place?

A.   We're not reviewing the sensitive designation at all.

Q.   Thank you.  If you know, which you might not, is there anyone in SSA that does review the sensitivity designation after the ADC has signed off?

A.   I can't say.

Q.   Understood.  Now, I'm going to go to the next checked

Michelle Christ
February 07, 2025

box in the part in red in the middle of the page.  If you checked that this is a sensitive instruction, please review and check as appropriate, the below statement.  This instruction does not contain, one, statements of policy and interpretations which have been adopted by the agency, and are not published in the federal register.  Or two, administrative staff manuals and instructions to staff that affect a member of the public.

Just a yes or no for now, do you know who wrote this language?

A.    No.

Q.    What's your understanding of what this language means?

A.    My understanding is that this is asking the authoring component to indicate whether they believe that these two -- you know, what we've read aloud is accurate.  I think they're trying to determine whether the authoring component believes, you know, either of these two items are appropriate.  I mean, not appropriate, applicable.

Q.    And we spoke earlier about where in writing a staff might look to better understand these definitions, and I believe that you said they would look at the POMS, the sensitive instructions POMS that we looked at.  Is there anywhere else?

A.    I mean, I -- you know, as I said, I'm not the -- you know, the authoring component.  That's ODEPPIN, they would look at it.  I don't necessarily indicate that they would look to it to understand, just that that language was included in an

Michelle Christ
February 07, 2025

explanation.  I do not know what sort of instructions different staff components are given for training.

Q.   And are you aware of any instructions or training that any staff has been given about whether or not to check this box, or under what circumstances to check it?

A.   I would not be.

Q.   And are you aware of any written guidance regarding the same?

A.   No.  By no, I mean I'm not aware.  I do not know if there is any.

Q.   Understood.  If this box is checked, if you know, isn't there any review of that decision?

A.   Yes.

Q.   Who reviews that?

A.   Well, if this box is checked -- oh, no.  Excuse me. This is -- if this box is checked, I do not know whether or not there's any review.

Q.   Would OPD have any -- again, setting aside where OPD is itself the authoring component.  If OPD is not the authoring component, would OPD have any involvement in the publication process for POMS where this box is checked?

A.   I do not believe so.

Q.   Thanks.  And just to make sure I understand what this form is doing, which I think we're on the same page here.  But if the first box is checked and that the POMS is sensitive, and

Michelle Christ
February 07, 2025

the second box is also checked and that the instruction does not contain those things that are listed, then the POMS is not made public, is that your understanding?

A.    Again, I would defer to ODEPPIN on this.  You know, I would not know.

Q.    Okay.  Now, under the language that I read before, I'm going to read the -- there are two notes.  Note, if you do not check this box, insert a brief explanation as to why and identify the relevant subject matter expert.  ODEPPIN will forward the instruction and your explanation to OPD for a FOIA review.

And then, there's a second note.  The selections and justification above will be used to make a final determination on whether the policy may be released publicly.  So lets take these one at a time.  The first one asks an author that does not check this box to have a brief explanation about why.  Do you know where they're supposed to put that explanation?

A.    I mean, they're supposed to provide the explanation.

Q.    But like literally where on the form?  It's not meant to be a tricky question, just there's no -- there seems to be no space on the form.

A.    I believe that, you know, they can edit the form. It's a Word, you know, document where they can add in their explanation, but others have attached it.

Q.    Got it.  And am I correct to understand that that

Michelle Christ
February 07, 2025

justification would be written by the author -- from the authoring component?

A.   From the authoring component.  I don't know who they would assign writing it to.  Actually, if you could see, like above where it says justification right under there, like I think they can put it in there and they can always make more space.

Q.   Great.  When this sign off sheet was new in December 2023, are you aware of any training given to SSA staff on it?

A.   I'm not aware either way.

Q.   Are you aware of any written guidance given to SSA staff on it, other than obviously the emergency message that had closed it?

A.   I'm not aware, other than the emergency message.

Q.   Is everything that we've talked about so far, to the best of your knowledge, true of all POMS?

MS. SCHWARTZ:  Objection.

BY MS. RANUCCI:

Q.   State it a different way.  Are there any POMS for which they would not go through this sign off sheet process, as far as you know?

A.   As far as I know, no.

Q.   So as far as you know, all newly published POMS or newly updated POMS would go through this process?

A.   As far as I know.

Michelle Christ
February 07, 2025

Q.   Thank you.  And the same for EM's, as far as you know, all EM's would go through this process?

A.   Yes.

Q.   Are you aware of a memo written by The Office of General ROGL in December 2023 relating to proactive disclosures? Just a yes or no question.

A.   Yes.

Q.   I'm going to ask you some specific questions about this document.  But just to be very careful, I'm not asking you about the content, and I want to be very careful in the way I phrase my questions.  So do you -- just yes or no for now, do you know who wrote this document?

A.   No.

Q.   Do you know -- to the extent the document may have been written by multiple people, do you know any of them, even if you don't know all of them?

A.   Yes.

Q.   And what were the titles of those individuals that you do know?

A.   I don't know necessarily what their titles were.

Q.   Okay.  But do -- what were their names, then, if you --

MS. SCHWARTZ:  Objection, I'm going to instruct her not to answer.  You want to know the names of the lawyers in OGL that wrote the memo?

Michelle Christ
February 07, 2025

MS. RANUCCI:  Well, she doesn't know their titles.  So I'd rather just know -- if they're lawyers in OGL, that's fine.  But I don't -- I asked her the titles, and she didn't know the titles.  So I'm not sure how else to identify them.

MS. SCHWARTZ:  Is this question relevant to, like, further questions you're going to ask?  Because we can confer about this --

MS. RANUCCI:  We can confer, that's fine.

MS. SCHWARTZ:  Okay.

BY MS. RANUCCI:

Q.   Again, just yes or no.  Do you know when this memo was drafted?

A.   No.

Q.   Again, just yes or no.  Do you know who made the decision to issue the memo?

A.   No.

Q.   Were you involved in that decision?

A.   No.  I wasn't involved with the decision about the memo.

Q.   Just yes or no, do you know why it was drafted?

A.   No.

Q.   Now, I'm going to ask some questions again, being careful with yes or no about what's happened since the memo has been drafted.  I understand from your attorneys it was on December 12, 2023.  So I'm just asking after that date, just

Michelle Christ
February 07, 2025

because that's the date that I've been given by your attorneys. So do you know who was in charge of distributing that memo?

A.    No.

Q.    Do you know to whom it has been distributed?

A.    No.

Q.    Was it distributed to you?

A.    No.

Q.    Have you distributed it to others?

A.    No.  Just to clarify, I'm not in the Office of General Law, so, you know, I'm not part of that process.

Q.    Have you read it?

A.    No.

Q.    Okay.  Do you know, and I understand you may not, whether there are any trainings or instructions that have been given to anyone in connection with the memo?

A.    No.  I'm not aware.

Q.    And are you aware of what the purpose of the memo is?

A.    No.

        MS. SCHWARTZ:  Objection.

BY MS. RANUCCI:

Q.    Just a yes or no.  Thanks.  So just to be clear, if I asked -- I'm not asking you to do this, but if I were to ask you to describe the contents of the memo, would you be able to do so?

A.    No.

Michelle Christ
February 07, 2025

MS. SCHWARTZ:  Objection.

BY MS. RANUCCI:

Q.    I'm now going to ask a set of questions about what I understand you refer to as FOIA review with respect to the sensitive POMS after 2023.  Could you just explain at a high level what you mean when you say that -- I believe here it says, ODEPPIN will forward the instruction in your explanation to OPD for a FOIA review.

A.    Well, we would review it from a FOIA perspective to see whether -- because presumably, if it's forwarded to us from ODEPPIN, the authoring component would not have checked the box that says that it contained -- that does not contain statements of policy and interpretations which have been adopted by the agency not published in the federal register.  And it also would, you know, or administrative staff manuals and instructions to staff that affect a member of the public.  So since they did not check -- it's kind of -- since they did not check that it does not contain any of those things, it's possible that it does contain them, and we would have to review it because if it did contain those, it may be required to be a proactive disclosure.

Q.    Understood.  So --

A.    Under FOIA, proactive disclosure of FOIA.

Q.    Thank you.  So would it be fair to summarize that the first step is for OPD to determine whether this document will be

Michelle Christ
February 07, 2025

disclosed under FOIA?

A.    I mean, maybe not the first step.  It would be to review it and to review the subject matter experts, you know, comments.  Maybe to talk to the subject matter expert.

Q.    Right.  So let's break it down into, like maybe the most literal sense.  I think that might help.  Literally, who in OPD is notified by whom about this?

A.    Typically, we would receive an email, usually to our division director and myself.  She and I would look at it.  I look at every one of them that we've received.

Q.    So you and your division director would receive an email and then what -- and then it sounds like that's the first step, the second step is you and the division director each review it.  And then, what happens next?

A.    I mean, it depends on, you know, the situation.  It hasn't come up frequently.  We would review whether or not the check was accurate, and check with the subject matter expert.

Q.    So just to break it down.  So the -- it sounds like those are potentially two different things, but maybe not.  So the first step would be, you'd get it.  The second step is, you would do your own review.  And then the third step, would be to speak with the subject matter expert?

A.    We wouldn't necessarily speak to a subject matter expert in every instance.  Only if we had a question, or needed clarification, or a concern.

Michelle Christ
February 07, 2025

Q. And then what would happen next? Or the range of the possible things of what might happen next?

A. I mean, it would depend. If we found that, you know, corrective disclosure was required, that would be our recommendation to ODEPPIN. And if we found that it wasn't, then, you know, we would -- you know, that would be the end of our portion of it.

Q. And if you found that it was -- disclosure was recommended, would OPD -- is that the end of OPD's involvement, or would OPD be involved in, in fact, doing further work to effectuate it being made public?

A. All POMS publication is being handled by ODEPPIN as post December 2023.

Q. Got it. So --

A. As far as I'm aware.

Q. Thank you. I'm going to try and ask about each of these steps then in a little bit more detail. So I believe that you said that when you get this email from ODEPPIN that contains -- does it contain the POMS or EM itself, and the sign off sheet?

A. Yes.

Q. Anything else?

A. No.

Q. And you and your division director would then read the POMS or EM itself, and the sign off sheet?

Michelle Christ
February 07, 2025

A.    Yes.

Q.    Is there anything else that you would read in the first instance?

A.    No.

Q.    And so at that point, for some POMS or EM's, you would then go ahead and make a determination about whether you would recommend that it does or does not meet the proactive disclosure requirements?

A.    We would conduct a review.  We may see counsel, and we would make a, you know, recommendation to ODEPPIN.

Q.    And so --

A.    Or we may also -- we may -- what actually happens in most instances, is what we will do is we would redact portions that are sensitive, but leave out the parts that meet the instruction.

Q.    Okay.  I figured there would be redaction in there somewhere, so that makes sense.  I just want to break -- just break it down in order of who does what.  So -- I think what I'm hearing from you is that might be a little different in different circumstances.  So I -- maybe we'll try and identify the different routes that it could go down.

A.    No, it's actually been fairly consistent.  ODEPPIN sends us the POMS and the, you know, AC sign off, in these rare instances.  We have not received many.  And Sarah Reagan and myself review it, and then if we do determine that it does

Michelle Christ
February 07, 2025

indeed contain these things, we will then redact the portions of the POMS that -- you know, working with the component, we will redact the portions of the POMS that we do need to remain sensitive for, you know, security or fraud reasons, as identified above.  And then, release the parts that are subject to proactive disclosure, recommend that to ODEPPIN.

Q.    Understood.  So it sounds like there are two steps in the review that you and Ms. Reagan do.  The first is whether the document itself meets the requirements, and then the second is separately about redactions.  Let's -- can we separate those, if that's all right?

A.    We can, but, I mean, it's very much kind of part of it.

Q.    So just because an agency doesn't check this box and the POMS or EM gets to you, doesn't mean that it's automatically designated a statement of policy and interpretations which is adopted by the agency and are not published in the federal register or administrative staff manuals and instructions to staff that affect a member of the public.  You and Ms. Reagan would also be considering that, am I understanding you correctly or not?

A.    I mean, we would take a look.  But in a factuation, we would defer to the authoring component and see if they felt that this does indeed conclude new policies and interpretations, or administrative staff manuals that affect the public.  We are not

Michelle Christ
February 07, 2025

looking to second guess their, you know, determination there.  I mean, I'm just saying it is conceivable that we could read something and say, oh, we don't see it, can you provide further clarification?  But in most instances, we're going to take a look at it.

Q.   Understood.  So then it sounds that in most cases -- is there some review of whether or not the document meets the productive disclosure requirements under FOIA by you and Ms. Reagan, or has that decision already been made by the authoring component, or a little bit of both?

A.   I would say it's probably essentially been made by the authoring component.  We would err on the side of assuming proactive disclosure applies, especially if the authoring component thought as much.  And we have -- to my knowledge, we have not questioned that decision with any of the authoring components.  We have focused more on redacting the parts that are sensitive by allowing the parts that required proactive disclosure to be available.

Q.   So you can't recall in fact over turning that checkbox, for lack of a better word?

A.   No, and I don't know that it would necessarily be appropriate for us.

Q.   Thanks.  So then, the next step that you and Ms. Reagan take is review the document itself, either the POMS or EM itself?

Michelle Christ
February 07, 2025

A.    Yeah.

Q.    And literally what do you do?  Read the PDF start to finish, or could you just describe that process a little more?

A.    Yeah, I mean, we read it.

Q.    And then what happens next?

A.    I mean, again, usually Ms. Reagan is the one who does the initial redaction, and she'll send it to me to take a look.

Q.    And when you're doing those redactions, what standards are you applying for what should or should not be redacted?

A.    Again, we will often work with the authoring component to determine what they think, since they know the best and they are subject matter experts, and they would tell us what they, you know, feel is sensitive based on the standards that are in the sign off sheet at the top there is my assumption.  I obviously don't have, you know, insight into their internal thoughts.

Q.    So you and Ms. Reagan, but it sounds like primarily Ms. Reagan, are looking for portions of the POMS or EM that meet the sensitive definition, and thus should not be disclosed to the public, even if the larger document is disclosed to the public; is that right?

A.    Not exactly is I would phrase it.  We're not looking for the sensitive parts.  The authoring component has already designated it as sensitive.  They would tell us which parts are -- that are concerning these three -- you know,

Michelle Christ
February 07, 2025

descriptions, and they would provide either the justification or we would follow up. We would then recommend and perform the redaction of those parts, so that the parts that are, you know, subject to proactive disclosure could be published by ODEPPIN, you know, which we would send it to ODEPPIN for, you know, actual publication. So I would defer to them on their next steps.

Q. And what written materials would you look at to figure out what should and should not be sensitive?

A. We would just look at the AC signoff and the POMS, or EM, depending on what the policy document is.

Q. Thank you. And in every circumstance, would you contact someone from the authoring component and or a subject matter expert?

A. I can't recall if we have. I think we have often, but I can't recall. In most cases it was Ms. Reagan doing it.

Q. But would it be -- it would be typical to do so?

A. I mean, they're so few of these requests, I hesitate to characterize anything as typical.

Q. Understood. Do the FOIA analysts have anything to do with this process?

A. Not generally.

Q. Are there circumstances where they would?

A. I don't believe so. I mean, unless we got a FOIA request for a particular POMS repeatedly and we did disclose it

Michelle Christ
February 07, 2025

in a redacted version, they might let us know, because we may,
you know, coordinate with ODEPPIN to have that published.

Q.   I understand.  And I want to separate that, I think,
but I'm just going to repeat back to you what I understand,
which is that separate from this policy publication process,
individual FOIA requesters may individually request a section of
the POMS.  That FOIA request would be treated as other FOIA
requests, but that later down in the process there may be some
interaction again with productive disclosure, for example, if
that section of the POMS was itself a frequently requested
record, or something like that.

But those are written in response to individual FOIA
requests; is that right?

A.   So there are individual FOIA request sometimes for
POMS that were pre subject to the December 2023 process.  In
those cases, and even before December '23, we had a proactive
policy, you know, proactive disclosure policy based on a more ad
hoc basis.  In which case, you know, we would look at it from a
FOIA perspective, either because a component asked us to because
they wanted to make it public, or because an individual
requested it.

It didn't necessarily have to be a frequent request.
Sometimes it was, it would just be that we thought that it might
be of interest to the public.  In which case, you know, we may
propose, like, a redacted version.  Before December 2023, it

might have been posted in our FOIA library reading room.  After that, we have more consistently had ODEPPIN -- you know, sent it to ODEPPIN for consideration of publication.

Q.   Thank you.  That's helpful.  I understood you to say that you and Ms. Reagan redact information that would qualify as sensitive under the authoring component sensitivity designation; is that right?

A.   We would recommend those.

Q.   Do you literally do the redacting?

A.   I mean, in most cases, we mark it, but we don't do the literal redacting, that would be for ODEPPIN.

Q.   Okay.  But you would -- by mark it, you mean you mark the places that should be redacted, but don't apply the redactions?

A.   We -- yes, we recommend it and we mark the places where we're recommending.

Q.   How does the redacting sensitive portions relate to the FOIA exemptions?

A.   It doesn't -- I'm sorry, could you rephrase your question?  These are not FOIA requests.

Q.   So I just -- when you're marking the redactions, you're marking sensitive information, and that's separate than a FOIA exemption?

A.   Well, it's not -- we're not doing it in the FOIA context.  Well, we are, but we're doing it under the proactive

Michelle Christ
February 07, 2025

disclosure context.  So we're not invoking a, you know, exemption with a requester.  These are things that, you know, sensitive designations, -- agencies are allowed to withhold things that are deliberative process and internal.  And so we're not necessarily, you know, things, especially fraud and ways to get around our control system or, you know, direct payments elsewhere from their, you know, appropriate source and customer. So in those instances, you know, redactions may be appropriate because an agency wouldn't normally have to make something like that available publicly.

Q.   And those might overlap with FOIA exemption sometimes, but wouldn't always have to?

A.   I mean, I think in most cases it would -- we would meet a FOIA exemption.  Like, it wouldn't be something we would have to give out via FOIA.  So an exemption would be applicable.

Q.   Is that a -- but that's not a separate review that you do?

A.   I'm sorry, could you clarify your question.

Q.   When you're marking redactions, you're marking material that's sensitive, do you do a separate review for material that meets one of the FOIA exemptions?

A.   Well, one of these things may meet a FOIA exemption, but we're not reviewing it -- it's not been FOIA requested in most instances, so we're not doing a FOIA -- we're not doing a FOIA exemption review.

Michelle Christ
February 07, 2025

Q.   Okay.

A.   But most of these things would probably be exempt from FOIA, if not all.

Q.   When you and Ms. Reagan does this review, is it documented in FOIAXpress?

A.   No.

Q.   Is it documented anywhere?

A.   It's documented in our email system of records.

Q.   What does that mean?

A.   It means that she -- you know, we use email to do it. So it, you know, if someone were looking for the records, they would -- you know, it would be in our email system of records, which are backed up and maintained for seven years.

Q.   Understood.  So if we wanted to go back for an individual POMS and see who reviewed it, is there anywhere you would look besides your emails?

A.   Not that I can think of.

Q.   Thank.  And are the actual redacted documents themselves stored on the share drive you talked about earlier?

A.   Well, I mean, I can't speak to it because this is really ODEPPIN's process.  So ODEPPIN may be storing everything in a different location.  So I really actually want to backtrack a little bit and say, like, I can't answer these things because it's quite possible -- I don't know enough about where the systems of records is.  We have a part to play that we document

Michelle Christ
February 07, 2025

for ODEPPIN, I can't speak to how they're marking it.

Q.   Understood.  Just for the part that OPD does, besides your emails, are the records of your participation in the process anywhere else?

A.   No.

Q.   And are the documents that you work on in terms of marketing redactions, where are those stored?

A.   They're attached to the email.  And they're also probably -- if we save it to our personal drives on those -- you know, our personal government jobs drives, of course, that are searchable and, you know, retainable.

Q.   Thank you.  And then, just to close out the process, how are these transmitted back to ODEPPIN?

A.   Via email.

Q.   From whom?

A.   Sarah, usually.  I think I may have sent one or two when she's out.

Q.   And you'd characterize it as a recommendation.  What's the -- what does that email say?  Or what are the range of things that email might say?

A.   I really can't recall at this point.

Q.   Is OPD the final decision maker on whether these are published?

A.   I don't know that there's any, like statute that indicates as much.  I'm the FOIA officer for FOIA requests and

Michelle Christ
February 07, 2025

things like that.  ODEPPIN is in charge with publicizing POMS.
We have not really explored -- as far as I know.  I mean, it's
quite possible that ODEPPIN or OGL has provided guidance on
this, but I'm not aware.

Q.    But your understanding is OPD makes the recommendation
and then ODEPPIN acts on that recommendation?

A.    ODEPPIN is in charge of publicizing the POMS.

Q.    Okay.

A.    I'm sorry, excuse me.  Apologies.

Q.    That's fine.  Good to continue?

A.    Yes.

Q.    Okay.  I'm now going to ask a few questions about the
process from before 2023 for publication of POMS and EM's.  I
understand that there are at least two ways in which the process
changed in 2023.  Do you want to say them or do you want me to
say them?  Either way.

A.    If you could share your understanding.

Q.    Sure.  I think one is that this checkbox about this
instruction does not contain statements of policy, et cetera, et
cetera, was new as of December 2023.  And then, second,
relatedly, the FOIA review for sensitive -- certain sensitive
POMS was new as of December 2023.  Do you share that
understanding about both of those?

A.    I think that it was made more formalized in terms of
the signer sheet.  We always had a policy proactive disclosure.

Michelle Christ
February 07, 2025

It was always in our regulations as well as, I know, again, I'm deferring to ODEPPIN, as they are in charge of it, but I do believe that AO 0410.030 always contained language about proactive disclosure and, you know, and components were -- were certainly required to consider that.  And there were times where on an ad hoc basis, components would send it to us to conduct a FOIA review.

Q.   I think you just answered my next question, which was prior to 2023, it sounds like OPD's involvement in the process included that on an ad hoc basis, it would be sent POMS or EM's by components for FOIA review?

A.   Yes.

Q.   Were there other ways that OPD was involved in the publication process prior to December 2023?

A.   Not unless we were asked, like, one off questions or things of that nature to look at from a FOIA or otherwise perspective.  I know we're sticking to things in Division 3, but there may have been issues where we were asked, you know, disclosure items for POMS before that.

Q.   What's your understanding prior to December 2023 of how anyone at SSA determined whether a sensitive POMS or EM's was a statement of policy and interpretations which have been adopted by the agency and are not published in the federal register?

A.   I'm sorry, can you repeat that?

Michelle Christ
February 07, 2025

Q.   Sure.  What's your understanding of how prior to December 2023, anyone at SSA decided whether a sensitive POMS or EM was a statement of policy or interpretation which has been adopted by the agency and are not published in the federal register?

A.   Again, I would have to defer to ODEPPIN on that.  That would be part of their's and their POMS that the agency was following.

Q.   But you're not aware -- OPD, as far as you know, was not involved with any process of determining whether the POMS or EM's met that criteria?

A.   Met the sensitive criteria?

Q.   No, the criteria of statements of policy and interpretations which have been adopted by the agency and are not published in the federal register?

A.   No.  You know, I do not believe OPD was, unless asked by the component.

Q.   And is that the same for the other administrative staff manuals and instructions to staff that affect a member of the public?

A.   For the EM's, yes.

Q.   And AM's -- or sorry, sorry, POMS?

A.   POMS or EM's, yes.  AM's are generally instructional manuals that don't contain policy.

MS. SCHWARTZ:  Jessica, sorry, is there any way to

Michelle Christ
February 07, 2025

turn the heat down here?

MS. RANUCCI:  Does anyone want a break or are we okay to keep going?

MS. SCHWARTZ:  Can I just --

MS. RANUCCI:  Yeah, yeah, let's take a two minute break.

(Off the record at 3:49 p.m.)

(On the record at 3:54 p.m.)

THE REPORTER:  Okay.  Whenever you're ready.

BY MS. RANUCCI:

Q.   As far as you know, after the policy changed in December 2023, did the agency ever go back and assess old POMS under the criteria on the new signoff sheet?

A.   Well, the criteria of that sign off sheet was always what we considered in terms of -- well, you know, I would assume -- again, I can't speak, but other components always considered sensitive, and again, you know, I'm not, you know, ODEPPIN role, but they always considered, you know, these proactive disclosure criteria from FOIA when making terminations about what to be public.

So the prior ones would have had those considerations at the time of their designation by their -- you know, before they were signed off by the associate commissioner in charge. Again, the associate commissioner is in charge of each component.  So they are a very high level person who would be

Michelle Christ
February 07, 2025

familiar with the agency's rules and resources.

So, yes, I mean, generally I -- you know, also, additionally, sometimes we did, if we received a FOIA request or are other interest in a POMS, we would go back and look at that one, and consider it under the same criteria that we've always used on a more ad hoc matter to determine whether publication is appropriate.

Q.   Thanks.  There was a lot in there.  I understand the end of that, about what OPD's role was on an ad hoc basis.  But I -- if I understood you correctly at the beginning, you spoke about how authoring components and their leadership prior to the policy change would have considered whether a document was a statement of policy and interpretation, or an administrative staff manual, those proactive disclosure criteria.  What's the basis for your understanding of that?

A.   Okay.  I'm not, as I, you know, caveated, I'm not part of those, and I wouldn't be part -- you know, I wasn't privy to this.  However, you know, we always had in our regulations a pro proactive disclosure criteria as an agency, and that was always, you know, our criteria, as well as the fact that ODEPPIN, and, again, I would defer to ODEPPIN, has had this POMS that's binding on us, as the same employees.

Q.   But other than the POMS and the regulations, are you aware of any document through which anyone at SSA would have considered those questions prior to December 2023?

Michelle Christ
February 07, 2025

A.   I think that was always our policy.  I'm not -- you know, I wouldn't be familiar with documents.  And, again, this is always something that's been, even now, is the authoring components responsibility because they are the subject matter experts.  They know this best.  They know whether or not, you know, it meets these sensitive criteria or, you know, whether it's a new instruction.

Q.   Yeah, are there any specific practices you are aware of, of the authoring components compliance with these requirements?

A.   Again, that's outside the scope of OPD, so I would not necessarily know.

Q.   Understand.  Yeah, understood that there could be compliance that you don't know about, compliance practices you don't know about, but are there any that you do know about?

A.   I mean, other than the general compliance that all of our components always follow with our regulations and POMS.

Q.   Understood.  So just the general principle that the agency follows the regulations and POMS, but nothing specific about the practices?

A.   Well, I would assume our practices follow those POMS and regulations.

Q.   Thank you.  Do you know -- I can't remember exactly how I asked this question before, so I apologize if it's repetitive, but I just want to be clear about what I'm asking.

Michelle Christ
February 07, 2025

Do you know, just a yes or no for now, who made the decision to change the sign off sheet?

MS. SCHWARTZ: Objection.

BY MS. RANUCCI:

Q. Just a yes or no?

A. No.

Q. At the ODEPPIN deposition, the witness testified about a series of meetings held in 2023 that involved staff from ODEPPIN and staff from OPD regarding the decision to make changes to the sign off sheet. Are you familiar with those?

A. Yes.

Q. Were you involved in those meetings?

A. I'm not sure if I was personally involved with the meetings or Sarah briefed me afterwards. But I'm familiar with them, and I think I may have been in at least one or two. Actually, I take that back. I -- I was in one or two, at the -- at the least.

Q. And is it your understanding that these meetings were part of the process that led to the change in the sign off sheet?

A. My understanding was that ODEPPIN was already, you know, working and considering a sign in sheet. And given that OPD had a role in the new -- formal role in the new process as opposed to our more ad hoc approach, they asked us, you know, our thoughts on incorporation in our role.

Michelle Christ
February 07, 2025

Q.   Thank you.   And so it's your understanding that the final decision to change the sign off sheet was made by someone at ODEPPIN, even if you don't know who?   Or is that not right?

A.   I don't know.

Q.   Okay.   Thank you.   Are you aware of any specific training or guidance on the terms administrative staff manuals and instructions to staff that affect a member of the public, or statements of policy and interpretations which have been adopted by the agency and are not published in the federal register, that existed prior to December 2023?

A.   I'm not aware of how components conduct training.

Q.   Going back to the first page of the emergency message under C, the second sentence says, due to the time sensitivity, component authors will use this EM for guidance.   What was the time sensitivity?

A.   I don't know.   I didn't draft this EM.

Q.   Thanks.   Now, I'm going to ask some questions focused on -- we've talked at a high level going back to the current policy about the December -- post December 2023 policy and process.   Now, I want to ask some concrete questions about what has happened.   I understand from your testimony, your team has in fact begun performing the FOIA review under the December 2023 policy, right?

A.   Yeah.

Q.   How many POMS have been sent to you by ODEPPIN?

Michelle Christ
February 07, 2025

A.    I can't recall, but only a handful, I believe -- yeah.

Q.    So without the exact number, a handful means less than 20?

A.    Less than 10, I think.

Q.    And --

A.    Between 5 and 10.

Q.    And is that of POMS and EM's together, or specific only to POMS?

A.    Both.

Q.    So between five and 10 total?

A.    Total, yes.

Q.    And I think that we discussed before -- well, in theory, OPD could recommend not to publish them, that you can't recall that happening, if all of these POMS and EM's moved or at some point through a publication process with OPD?

MS. SCHWARTZ:  Objection.  Do you mean publication process with ODEPPIN?

MS. RANUCCI:  Yeah, let me rephrase that.  No, I can ask it better, it's fine.

BY MS. RANUCCI:

Q.    So for each of these 5 to 10 POMS that have been sent to your office by ODEPPIN, what are the -- what are the outcomes that have happened?

A.    I think in all those cases we provided back our redaction recommendations.

Michelle Christ
February 07, 2025

Q.   And they're all complete, or are any in progress?

A.   I believe they're all complete, although I have not checked my email today.

Q.   Understood.  So as far as you know, all of those may be available to the public with redactions now?

A.   I haven't confirmed.

Q.   Do you think someone would notify you if ODEPPIN decided not to publish them?

A.   I believe so, yes.

Q.   And where are there records of this?

A.   Records of what?

Q.   The recommendation to ODEPPIN.  Just in emails again?

A.   As far as I know, they're in our emails.  Whether ODEPPIN -- I would imagine ODEPPIN is, you know, maintaining them somewhere else, but I do not know.

Q.   So if I asked you how would you figure out exactly -- between 5 and 10, exactly how many have been sent to you, you would look in your emails?

A.   Yes.

Q.   And how many have been sent back, you'd also look in your emails.

A.   I'm sorry, could you clarify that?

Q.   Sure.  How many have completed the process with OPD and been sent back to ODEPPIN?

A.   Yes, those would be in our email.

Michelle Christ
February 07, 2025

Q.   And nowhere else you would think to look?

A.   Not -- I mean, not personally.  They also might be in my government personal drive.

Q.   And ODEPPIN might separately maintain records of all those things?

A.   Yes, because they're maintained -- I mean, this process is owned by ODEPPIN, and they would be the system record manager.

Q.   And if you know, which you may not, how would a member of the public know whether a POMS or EM has gone through this redaction process?

A.   I mean -- sorry, can you clarify that?

Q.   Yeah.  Does OPD have any role in deciding how the redacted POMS are put online?  In what format or how they're characterized, or is that all ODEPPIN?

A.   That would be ODEPPIN.

Q.   Thanks.  So as of today, do you know how many non sensitive POMS are available to the public?

A.   I do not.

Q.   But it would be -- your best understanding would be presumably the 5 to 10 that -- POMS or EM's that OPD has reviewed, but possibly others, or maybe not all of those?

A.   I'm sorry, could you --

Q.   Yeah, that's fine.

MS. SCHWARTZ:  I think just because you said non

Michelle Christ
February 07, 2025

sensitive, but --

MS. RANUCCI:  Oh, meant to --

MS. SCHWARTZ:  Yeah.

THE WITNESS:  Yeah, that's -- if you could clarify, because you said not sensitive, so I -- you know, I don't know how many -- the majority of our POMS are not sensitive and available to the public, so that's what I was answering.

BY MS. RANUCCI:

Q.   Oh, apologies.  Sorry.  Some of these are -- it's just we don't know what's your job and not your job, so it's hard to ask questions to know why you don't know the answer, if it's a bad question, or it's just not part of your job.

So if you know, could you walk me through which sensitive POMS are now available to the public as of today?

A.   I mean, I don't know -- you know, some of them would have been made without OPD.  You know, I can't tell you.

Q.   So you mean ODEPPIN might have, separate from OPD, made some sensitive POMS public?

A.   No.  I mean -- I'm sorry, could you clarify your question?

Q.   Yeah.  Today, are there some sensitive POMS that are available to the public?

A.   I mean, I think, again, you know, it would depend on the situation.  And ODEPPIN is responsible for making POMS available based on the authoring components.  You know,

Michelle Christ
February 07, 2025

historically, authoring components have always had the ability to ask for a sensitive POMS to subsequently become made public or redacted.  And, you know, sometimes OPD would be asked on an ad hoc basis to review it.  OPD does not track what specific POMS are made public.

Q.    Thank you.

MS. RANUCCI:  Going to ask the court reporter to mark this, but sorry, I've lost my exhibit number.  I think it's 11.

(Exhibit No. 11 was marked for identification.)

BY MS. RANUCCI:

Q.    Do you recognize this document?

A.    I mean, I don't personally have familiarity with it, but I recognize it as a POMS of the agency.

Q.    And it's marked as sensitive at the top?

A.    Yes.

Q.    I printed this out from the SSI website, so it is -- I can represent to you it's available to the public.  That's how I got it.  And if you turn it over on the back, I think you'll notice that there's one redaction at the bottom.

Do you recognize this POMS as one that has gone through the post December 2023 OPD file review process?

A.    I believe so, yes.

Q.    And if you wanted to confirm, again, you would just go check your emails; is that right?

A.    Yes.  Or I could confirm with ODEPPIN.

Michelle Christ
February 07, 2025

Q.    And do you personally remember reviewing this POMS?

A.    No.

Q.    But you might have, you just may not remember?

A.    Right.  Actually, I take that back.  I do remember looking at this POMS.

Q.    Thank you.  So then that means pursuant to the FOIA review process post December 2023?

A.    Yes.  I remember looking at this during the process because this was one where -- yes, I remember it.

Q.    Thank you.  And so what was your role with respect to this -- the publication of this POMS?

A.    So our role is this was sent to us by ODEPPIN because the box was not checked for -- it was not checked for that -- you know, it's a double negative, but it was not checked it did not contain things, so it was sent to OPD by ODEPPIN.

Q.    And either you, or Ms. Reagan, or both of you, reviewed it for redactions?

A.    Yes.

Q.    And it looks like to me there's only one redaction on the second page; is that right?

A.    That is correct.

Q.    Just because I read a lot of these, my understanding of what would be under this redaction would typically be a website address to an internal POMS link; is that right, do you believe?

Michelle Christ
February 07, 2025

MS. SCHWARTZ:  Objection.

BY MS. RANUCCI:

Q.    You can answer.

A.    Yes.

Q.    Thanks.

MS. SCHWARTZ:  I'm just pointing out --

MS. RANUCCI:  No, I know -- yeah, yeah -- look, it's a little --

BY MS. RANUCCI:

Q.    So I just want to make sure I understand this right, that this is a POMS that has been released as fully public, and the only thing that's been redacted is a link to the same document without the link redacted?

MS. SCHWARTZ:  Objection.

BY MS. RANUCCI:

Q.    I'm just -- is that your understanding, or is that not -- is that not right?

A.    The link is the only thing redacted.  May we take a short break?

Q.    Sure.

(Off the record at 4:12 p.m.)

(On the record at 4:18 p.m.)

BY MS. RANUCCI:

Q.    I'm ready to move on, but I just -- if there's anything that you wanted to clarify on this, we can -- you can

Michelle Christ
February 07, 2025

go ahead, otherwise we --

A.   No, I'm good.  Thank you.

Q.   I don't think we have too much longer.  I just earlier -- much, much earlier, I understood you to say that you were involved in the process of issuing the new FOIA regulation that was recently released; is that right?

A.   Yes.

Q.   I'm going to ask some questions about that again.  I'm going to try and be careful to ask some yes or no questions here.  To the best of your knowledge, who participated in the decision to make the changes in the proposed and final rule as opposed to the old regulation?

A.   I don't know who made the decision.  I will say, though, that our regulations had not been updated in 30 years and that we had subsequent law we wanted to clarify what was at the -- you know, proactively clarify what was at the regulatory level.

Q.   And who was involved in those decisions?  Again, by title, as far as you know?

A.   I don't know who originally started off.

Q.   But who from OPD was involved in the rule change?

A.   Myself, Sarah Reagan, and several of our analysts.

Q.   And were there people outside OPD who were also involved in the rule change?

A.   Yes.

Michelle Christ
February 07, 2025

Q.   Who?  Again, by title and component, who were those?

A.   People in the Office of General Law and people in the Office of Congressional Liaison -- or Congress and Legislative Affairs, OLGA.

Q.   Any other components that you can think of?

A.   I'm sure, but not that I can think of at this moment.

Q.   Thank you.

A.   Or that I was part of.

Q.   Do you recall when this process started?

A.   It started a very long time ago.  I don't know the exact date.

Q.   More than three years ago?

A.   I believe it started around like 2016, 2017.

Q.   Thank you.  And without disclosing the content of anything, could you describe what the process was with respect to that rule change?  For example, were there regular meetings, ad hoc meetings?

A.   Both.  Regular meetings depending on different processes, and obviously we published things in the federal register and followed the normal regulatory legislative steps.  And in anticipation of each stage, we met, you know, as a group.  I should also clarify that we did work closely with DOJ.

Q.   Thanks.  I'm going to ask a few questions regarding the rule itself in the federal register notice that is already in an exhibit as Exhibit 4.  I'm going to ask you to turn all

Michelle Christ
February 07, 2025

the way -- almost to the last page, the second to last page.

The number at the top ends in 720.  On the right hand column,

the second full paragraph starts with C, records that SSA makes

available.

        A.   I'm sorry.  Could you -- are you speaking about

402160?

        Q.   No.  Sorry.  402.155 which starts on the bottom of the

middle column and then goes up to the top of the third column?

        A.   Oh, yes.  Okay.

        Q.   So on 402.155, Subsection C, I'm just going to read

some of this.  Are you there now?

        A.   Yes.

        Q.   Okay.

        A.   Thank you.

        Q.   Records that SSA makes available for public inspection

in an electronic format may be accessed through www.ssa.gov free

of charge.  Such records include:, then it lists one, two, three

and four, and then for our purposes, number five, SSA's public

programs operations manual system.  Did I read that right?

        A.   Yeah.  SSA's public programs operations manual system,

yes.

        Q.   First, are you familiar with this regulation?

        A.   Yes.

        Q.   What does SSA's public programs operation manual

system mean?

Michelle Christ
February 07, 2025

A.    That's the POMS that you've been referring to.

Q.    And the whole POMS, or part of it?

A.    All the POMS that are not sensitive, so the vast majority are published on the website.

Q.    And so you understand this to mean the POMS portions that are already published on the website?

A.    I'm sorry.  I think -- what we mean is that we're going to be publishing, you know, POMS that we have -- I mean, it's not a static document.  Obviously, POMS are updated.  They are added, they are removed, depending on their -- you know, whether the agency is using them.

Q.    But if I were to want to figure out what SSA's public programs operations manual system means, where would I go to figure that out?

A.    You could go to SSA.gov, and there's an explanation of what the POMS is, as well as you know most, if not, you know, most of the POMS available.

Q.    Thanks.  Now, I'd like to turn to a really different place in this document.  Just give me a second.  Closer to the beginning.  The number at the top is 102709.  I'm going to read a couple of sentences that are in the middle of the middle column.  I'm going to read a sentence.  The end of this sentence has Footnote 11, if that orient you to where we are.  Our current policy publication process directs authoring components to flag sensitive POMS and EM's that should be proactively

Michelle Christ
February 07, 2025

disclosed under FOIA, in Footnote 11.  Do you see where I read that from?

A.   Yes.

Q.   Could you just explain what you understand this to mean?

A.   Sure.  So, you know, as our response says, POMS and EM's are not categorically always subject to proactive disclosure.  Even sensitive POMS are not always -- you know, doesn't always have the criteria for public disclosure.  While we make the majority of our POMS accessible that are not sensitive, regardless of whether they would need to under proactive disclosure policies, there are some that, you know, should be disclosed under proactive disclosure.  And to the extent that some of those sensitive POMS are that, we ask authoring components to flag it in AC sign off sheet.

Q.   Thanks.  So that essentially just describes the process that we've been talking about today post December 2023?

A.   I mean, at a high level, it describes the agency's position towards this.  Obviously, you know, we might change processes, or have additional processes.

Q.   Thank you.  And then there's a link in Footnote 11. Do you know what that link goes to?

A.   It goes to the SSA.gov website.

Q.   Do you know what page -- it's fine if you don't, but do you know which page?

Michelle Christ
February 07, 2025

A.   I'm not sure exactly.  It looks to me, though, like it's a reference link.

Q.   And what's a reference link?

A.   You know, to one of our, you know, either policy manuals, or regulations, or something to that effect.

Q.   Thank you.  The next sentence then says, any such flagged policies then undergo a FOIA review and are published with appropriate redactions if they contain nonexempt content. Could you explain what that means?

A.   Sure.  So as we were discussing, there may be instances where, you know, a sensitive POM should be proactively disclosed, or we may just decide to proactively disclose a POM, even if it doesn't need those criteria.

But there may still be sensitive information that would be exempt from FOIA, from disclosure in FOIA, or, you know, that would, you know, indicate -- you know, because it might indicate, say, fraud, for example, or something like that, or how to get around our system.  So we would redact that.

Q.   And so non exempt content means?

A.   Nonexempt content would generally be things that would not -- it would again, be a negative.  It's not exempt from disclosure under FOIA.

Q.   Thank you.  And then, just the next one.  AM's, which are informational or staff reminders and do not contain new instructions or policy, are also not categorically subject to

Michelle Christ
February 07, 2025

proactive disclosure requirements.  Our regulations and policy

publication practices reflect these distinctions.  Could you

explain what this means?

A.    I mean, basically what it says.  You know, AM's, you

know, are mainly informational, or they provide staff with

reminders of things.  They're not discussing the -- you know,

the prongs of a proactive -- the requirement of proactive

disclosure, as indicated in the FOIA statute or our regulations.

So since they're not subject to proactive disclosure and they're

just informational or reminders, you know, we would reflect --

our handling of those reflect that distinction.

Q.    Thank you.  We haven't spoken about AM's today.  Am I

right to understand that OPD really wouldn't have anything to do

with the AM publication process?

A.    Generally that would fall under ODEPPIN.

Q.    And OPD may have something to do with AM's, for

example, if they were the subject of an individual FOIA request,

but that would be separate?

A.    Yes.

Q.    Thank you.  I just want to ask briefly about exactly

that, which is what happens when an individual FOIA requester,

through a typical FOIA request, seeks a section of the POMS, or

an EM, or an AM.

Does the SSA handle that request any different than a

FOIA request seeking any other type of document?

Michelle Christ
February 07, 2025

A.    It goes through the same process.  Same review process.  However, you know, we do look at the POMS to see if it, you know, even if it wasn't subject to proactive disclosure, whether we could disclose it.

And if we can disclose it, we will often ask ODEPPIN to put it, you know, publish it, if it had been before the December 23 process or, you know, it seems like it could be disclosed at this point.  You know, after conferring with the authoring component, I should add, because obviously they know best.

And then, we might point the requestor to that if it's publicly available.  Similarly, we also -- I should back up a little bit and say, the first thing we look at with, especially POMS or EM's, is whether or not it's already publicly available, so we can refer the requester.

Q.    Understood.  And so under the current process, if an individual FOIA requester seeks a sensitive section of POMS, and that sensitive section of POMS is disclosed to the individual requester, is it also automatically posted?

A.    I mean, I think -- so -- and just to back up, you know, we treat things like any sort of policy that might be -- may already be available.  You know, we look at it to see if it already is available first.  If it's -- if someone is getting a sensitive POM, we determine there's no exemption that would be applicable after listening to the authoring component, in most

Michelle Christ
February 07, 2025

instances we would publish it and not send it to the requester because we wouldn't be charging them or making them do them. We would just -- then, we could just refer them to that.

Q. And what about circumstances where there is certain content that is redacted, but some of the substance is not redacted. Under the current process, would you provide it to the requester and post it, or only provide it to the requester?

A. I think it would depend on a case by case basis. I think in most cases we would try to publish it first, unless there was a reason not to.

Q. And has that always been true since you've been at OPD?

A. I don't know that we've had that many requests for me to characterize anything.

Q. Thank you. And is that the same for AM's? Or no, because AM's would not be considered for public disclosure?

A. We don't usually proactively disclose AM's because their nature does not require it. They're just instructional or reminders. We would instead just review them under FOIA.

Q. And could you describe briefly what the FOIA review of an individual FOIA request for a POMS, EM, or AM would entail?

A. Again, it would be a case by case basis. We look at everything one on one, so I can't really, you know, speculate in that way.

Q. Typically, would you, again, be looking for the

sensitive material within that sensitive POMS, or sensitive EM, or AM?

A. Sensitive is not a designation under FOIA, so that would not be part of the FOIA review.

Q. What would be part of the FOIA review then?

A. I mean, it would be a normal FOIA review on a case by case basis. We have to look at the nature of the request, the different POMS suggested, the authoring components comments.

MS. RANUCCI: I think this is the last one, could you mark it as No. 12? Thank you.

(Exhibit No. 12 was marked for identification.)

BY MS. RANUCCI:

Q. Do you recognize this document?

A. Yes.

Q. What is it?

A. It is a POMS.

MS. RANUCCI: Just for the record, it's GN 03360.040 public access to staff manuals.

BY MS. RANUCCI:

Q. Is OPD the author of this, if you know?

A. I believe so.

Q. Thank you. I direct your attention to No. 5, which is on Page 3 of 12. I'm going to read under No. 5 a couple of sentences. Withhold sensitive portions of certain publications under FOIA Exemption 2, which refers to matters that are, quote,

Michelle Christ
February 07, 2025

"related solely to the internal personnel rules and practices of the agency."  What does this mean?

A.    I mean, it means -- I mean, the face of it is what it means.  We would -- you know, to the extent that a FOIA exemption should apply, we wouldn't provide that information.

Q.    And I think one reading of this is that all sensitive portions of POMS are subject to Exemption 2, but I --

A.    I would not agree with that.  I would say that what this is, is there could be certain -- you know, it says withholds certain publications under FOIA Exemption 2.  And, again, OPD is the only -- you know, only portion of the agency charged with FOIA, so we would be looking at that.

Q.    Thanks.  And then the next sentence starts, refer to the POMS comprehensive index, which annotates all sensitive materials.  This is what I asked about before, do you know what that's referring to?

A.    Yeah.  So they're telling the employee to look at the internal POMS index to see if it's sensitive.  You know, otherwise, if it's a regular POMS that is not sensitive, that would be publicly available.  And if someone comes in, they should immediately give it to you.  But otherwise, the field office staff wouldn't necessarily know whether a sensitive POMS falls under FOIA exemption or not.

So this is meant for them to look at it and see that it could potentially fall under something and that they should

Michelle Christ
February 07, 2025

refer to a Freedom of Information Staff, OPD, so that we can review whether or not disclosure is appropriate. As I mentioned, like I think way back in the beginning of my deposition, sometimes field offices refer FOIA requests to us.

Q. Thank you. All right. I think just a few final questions. Does OPD have a standard rate for how long it takes to review or redact documents in response to FOIA requests?

A. No, because it depends on the nature of the documents.

Q. And who makes that decision?

A. It's not a decision per se. It's how long it takes us. I mean, obviously, our staff tries to work their hardest. We have a huge number of FOIA requests each year, and many of them are quite voluminous. So, you know, it will depend on the nature of the request and the nature of the redactions. Some redactions are relatively straightforward, other redactions may be more complex.

Q. And specifically talking about POMS, EM's, and AM's, is there any sort of standard rate that your office uses?

A. No, we get very few requests from them, so I think saying anything is standard.

Q. Okay. Thank you. If you had to estimate, how long would it take you to review one POMS?

A. I mean, again, it depends the POMS, it depends on the authoring component, it depends on whether we need to seek legal counsel.

Michelle Christ
February 07, 2025

Q.    Okay.  I think we're good.  Why don't you -- can we go off the record for a second?

(Off the record at 4:36 p.m.)

(On the record at 4:47 p.m.)

THE REPORTER:  All right.  We're all good.

EXAMINATION

BY MS. SCHWARTZ:

Q.    Okay.  Ms. Christ, I want to ask you a few follow up questions about proactive disclosure, and specifically about the process that OPD became involved in with respect to reviewing POMS and EM's post December 2023.  So I think you testified earlier that you've reviewed about 5 to 10 POMS or EM's since this process change went into effect on December 2023?

A.    Yes.

Q.    And when you've reviewed those, when you and your office have reviewed those POMS and EM's, are the -- and I believe you testified earlier that you've made redactions or suggested redactions to those POMS and EM's; is that correct?

A.    That is correct, yes.

Q.    When you're reviewing those POMS and EM's to see whether there's material that needs to be redacted, are you reviewing them to see whether they contain sensitive information, or are you reviewing them to see whether there's information contained in them that can -- or that must be redacted pursuant to FOIA exemptions?

Michelle Christ
February 07, 2025

A.    So we're reviewing them if whether or not there's redactions for FOIA exemptions.  So conducting a FOIA review, the sensitive designation made by the authoring component and applies to the POMS is not, you know, part of it.  We're actually reviewing the documents to see whether or not any of the exemptions apply, and then listing it as such.

Q.    Okay.  And when you actually propose redactions to a particular POMS for EM, do you designate the material that's being redacted as sensitive, or do you utilize a name for a FOIA exemption?

A.    No, we utilize the name for the FOIA exemption that we believe is applicable.

Q.    Okay.  And just turning your attention back to Exhibit 11.  If you look on the second page, do you see where there's a box that has been redacted?

A.    Yes.

Q.    And what does the text of the redaction box say?

A.    (B)(7)(E).

Q.    And what does that refer to?

A.    That refers to the FOIA exemption applied.

Q.    Okay.  And is this what redactions on other POMS and EM's would look like?

A.    Yes.

Q.    In other words, there would be redaction boxes, and then there would be a notation reflecting whatever FOIA

Michelle Christ
February 07, 2025

exemption had been applied?

A.   Yes, we would redact it with the box, and then indicate which FOIA exemption applied.

Q.   Okay.  Thank you.  Okay.  That covers my questions with respect to proactive disclosure.  I just have a few questions about fee waivers.

So -- and I want to direct your attention back to Exhibit A, which is the Social Security Administration Freedom of Information Act Annual Report for Fiscal Year 2024.  And I want you to take a look at the table that's labeled 8b, request for fee waiver that we looked at earlier.

Is there anything in this table that reflects determinations by the agency that a FOIA request is non billable?

A.   No.  If the entire FOIA request was non billable, it would not be reflected in this table.

Q.   Okay.  And are there instances where the agency receives a FOIA request with a request -- receives a FOIA request that contained a request for a fee waiver, but is ultimately determined to be not billable?

A.   Yes.

Q.   Okay.  And do you see in the third column of the table, it lists the number of denied fee waivers at 625?

A.   Correct.

Q.   Do you know of any categories of fee waiver requests

Michelle Christ
February 07, 2025

that comprise that 625 denials?

A.   Yes.   So, for instance, we got 412 during fiscal year 2024.   412 requests from automated bots.   Those were used to make FOIA requests across government agencies.   Some of them were not applicable to SAA, but they marked -- as part of FOIAXpress on the front page, they clicked the box requesting a fee waiver.

So they were noted as a fee waiver, but they did not include a justification at all.   There was no justification written, so we denied those requests for a fee waiver.   And they are represented here as -- also sometimes people will click fee waiver requests, and then put a justification that's clearly private, such as, you know, I'd like this genealogy to prove, like, that I can get a certain citizenship in the European Union or things like that.

Q.   Okay.   So just to be very specific and make sure I understand your testimony.   412 of the 625 denials reflected here, were fee requests submitted by bots or AI that were submitted.   -- they were FOIA requests submitted across all federal agencies?

A.   Most at least, yeah.

Q.   Okay.   That's your understanding.   Okay.   Those are all my questions.

MS. TARANTOLO:   Could I ask just a couple of quick follow up questions to that.

Michelle Christ
February 07, 2025

EXAMINATION

BY MS. TARANTOLO:

Q. How do you -- how did you know that there were 412 of those?

A. So they come in, in a batch, you know, several different times. And Aponix (phonetic)which is the vendor for FOIAXpress warned us that those were bot requests that were being made because they could tell from their -- you know, their technical safeguards.

Q. Understood. And can you run reports in FOIAXpress that are queries based on particular parameters of data in the system that are not ultimately published in this report?

A. Probably.

Q. Okay. And so it would depend on what the parameters are?

A. It would depend on the parameter. I mean, obviously we run the parameters for this report of the ones that are requested. Sometimes we also have to do some manual accounting in different cases. But, you know, we're obviously focusing on the report. I assume that FOIAXpress could potentially have the capability for things outside this report as well.

Q. Understood. And sorry, just back to the bots for one second. Did the vendor identify the 412 that were from the bots, or did you have to do some review after you got the notice from the vendor?

Michelle Christ
February 07, 2025

A.   No, the vendor identified them.  And then, also the requests themselves were very characteristic of a bot.  Also, the individual who used the bot gave public interviews where he indicated he was using the bots.

MS. TARANTOLO:  Understood.  Okay.  All right.  That's it.  Thank you.  Thank you, everyone.

MS. SCHWARTZ:  Thank you, guys.

(Proceedings concluded at 4:55 p.m.)

Michelle Christ
February 07, 2025

WITNESS SIGNATURE PAGE

_____

MICHELLE CHRIST

Sworn and subscribed to before me this \_\_\_\_ day of

_____, 20\_\_.

_____

NOTARY PUBLIC

Michelle Christ
February 07, 2025

CERTIFICATE OF REPORTER

STATE OF NEW YORK                    )
                                     )
COUNTY OF KINGS                      )


     I, QUINN O'CONNOR, AAERT No. 3613, Digital Reporter, State

of New York, do hereby certify that I was authorized to and did

electronically report the deposition of MICHELLE CHRIST; that

the MICHELLE CHRIST was duly sworn on the date indicated; that

the questions and that the electronic recording of the

proceedings was provided for transcription.

     I FURTHER CERTIFY that I am not a relative, employee, or

attorney, or counsel of any of the parties, nor am I a relative

or employee of any of the parties' attorneys or counsel

connected with the action, nor am I financially interested in

the action.

          DATED this 17th day of February, 2025.



_____
QUINN O'CONNOR,
AAERT No. 3613

Michelle Christ
February 07, 2025

CERTIFICATE OF TRANSCRIPTIONIST

I, MELISSA IADIMARCO, do hereby certify that I transcribed the electronic recording produced by QUINN O'CONNOR, AAERT No. 3613, Digital Reporter, State of New York of the proceeding on the record; of the Deposition on the record; and that the foregoing transcript is a true transcript of said electronic recording.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 17th day of February, 2025.

_____
MELISSA IADIMARCO

Michelle Christ
February 07, 2025

ERRATA SHEET

Witness: MICHELLE CHRIST
RE: NEW YORK LEGAL ASSISTANCE GROUP vs. THE SOCIAL SECURITY
ADMINISTRATION
Date of Proceeding: FEBRUARY 7, 2025
U.S. Legal Support Reference No.: 6773576-001

   *** PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE
                    REASON FOR SAME ***


     Page / Line /      Change      / Reason

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

Michelle Christ
February 07, 2025

---

**Exhibits**

---

**EX 0001 Miche lle Christ 02 0625**
  4:3 15:3,4
**EX 0002 Miche lle Christ 02 0625**
  4:4 52:22,25
  87:9 157:7,
  12 162:11
  168:9,18
  169:21
  172:10,12
**EX 0003 Miche lle Christ 02 0625**
  4:5 89:3,6
  100:22
**EX 0004 Miche lle Christ 02 0625**
  4:7 102:9,
  10,14,22
  148:4 228:25
**EX 0005 Miche lle Christ 02 0625**
  4:8 102:11,
  15 111:16
  150:17
  151:10
**EX 0006 Miche lle Christ 02 0625**
  4:10 132:13,
  16 159:14
**EX 0007 Miche lle Christ 02 0625**
  4:11 158:16,
  17,20
**EX 0008 Miche lle Christ 02 0625**
  4:13 161:17,

18 166:6
167:5,6
**EX 0009 Miche lle Christ 02 0625**
  4:14 187:22,
  23
**EX 0010 Miche lle Christ 02 0625**
  4:15 189:8,
  9,11
**EX 0011 Miche lle Christ 02 0625**
  4:16 224:9
  240:13,14
**EX 0012 Miche lle Christ 02 0625**
  4:17 236:11

---

**$**

---

**$2**
  173:8
**$3,000**
  167:2
**$33**
  137:23
**$4,000**
  167:3
**$59**
  137:24
**$6**
  173:14
**$771**
  137:22
  159:17,22
  160:1,9,12

---

**(**

---

 **(b)**
  174:13
 **(B)(1)**
  171:9

**(B)(7)(E)**
  240:18
**(c)(2)**
  174:14
**(d)(1)**
  148:16,22
  149:12
**(phonetic) which**
  243:6

---

**0**

---

**000377**
  52:23
**03311.005**
  102:17
**03360.040**
  236:17
**0402**
  103:3
**0410.030**
  213:3

---

**1**

---

**1**
  15:3,4 55:25
  56:1,2,3
  64:10,11
  101:1 148:17
**1,500**
  71:2
**10**
  17:17,18
  23:4,16,17
  84:8 160:3
  165:8,9
  177:22
  189:8,9,11
  220:4,6,10,
  21 221:17
  222:21
  239:12
**10,000**
  25:17 39:12
  47:13,16,24

83:9 105:21,
22,25 139:17
141:22
**100**
  87:10 106:7
**1000**
  25:18 83:5
**102709**
  230:20
**102717**
  103:16,18
**10:00**
  84:4
**10:06**
  45:19
**10:20**
  45:20
**11**
  88:22 224:8,
  9 230:23
  231:1,21
  240:14
**1106**
  36:23 37:1,5
  105:13
  123:11,13,19
  140:13,22
  141:6
  147:18,22
  148:10
**1106(c)**
  136:5 140:8
**11:35**
  100:19,20
**12**
  197:25
  236:10,11,23
**12:00**
  84:4
**12:04**
  118:23
**12:05**
  118:24
**12:35**
  139:6
**13**
  76:17,23

Michelle Christ
February 07, 2025

151:11

**13s**
 27:1

**14**
 76:22 178:18

**14s**
 25:4 76:17

**15**
 22:21

**15,000**
 25:17 39:12
 47:24 83:9
 105:25
 139:17

**17**
 76:2

**18**
 137:22

**19**
 89:6,7,23
 94:7

**1942**
 121:22

**1:32**
 139:7

**1a**
 15:14 182:3

---

**2**

**2**
 52:22,25
 64:1,10,12
 87:9 95:25
 97:4,22
 101:1 106:14
 136:2,5
 142:4 157:7,
 12 159:18,20
 160:7 162:11
 168:9,18
 169:21
 172:10,12
 236:25
 237:7,10

**20**
 27:9 60:6

103:2 220:3

**2000**
 71:12 72:6
 83:5

**2006**
 14:3,13

**2007**
 13:22,23
 14:14,15

**2016**
 228:13

**2017**
 228:13

**2018**
 11:22,23
 12:10

**2022**
 11:5,13,23
 33:8 43:3,4,
 8 101:25
 102:2,5

**2023**
 11:6 44:5
 89:7,24
 90:5,19,25
 94:7 167:24
 180:6,13
 185:10 195:9
 196:5 197:25
 199:5 201:13
 207:15,25
 212:13,15,
 20,22 213:9,
 14,20 214:2
 215:12
 216:25 218:8
 219:10,19,22
 224:21 225:7
 231:17
 239:11,13

**2024**
 29:3,4 45:11
 132:16,23
 133:6 159:15
 167:8,23
 241:9 242:3

**22**
 88:22 173:13

**23**
 207:16 234:7

**23075**
 189:16

**24**
 45:11

**25**
 21:23 67:18

**26**
 172:3

**2:29**
 175:16

**2:48**
 175:17

---

**3**

**3**
 18:21 19:21,
 22,23 20:15
 21:17,21
 24:9 26:20,
 21 28:10,21
 29:5,11
 32:11,16
 33:1,15,20
 40:24 89:1,
 2,3,6 100:22
 125:14 142:4
 161:5
 177:22,24
 178:14
 213:17
 236:23

**3's**
 178:10

**30**
 6:11 21:24
 84:15,19
 227:14

**30(b)(6)**
 10:17,18
 17:5 129:21
 135:20 155:5

**31**
 132:16
 159:15

**31st**
 133:6

**3613**
 5:2

**3:49**
 215:7

**3:54**
 215:8

---

**4**

---

**4**
 100:24
 102:9,10,14,
 19,22 132:19
 148:2,4
 151:11
 159:15
 228:25

**402**
 27:9 60:7

**402.155**
 229:7,10

**402.185**
 104:5,10

**402.280**
 149:2

**402.80**
 148:6

**402.85**
 103:15,22
 104:5,7,15
 106:2 128:16
 148:6

**402160**
 229:6

**40410.030**
 188:10

**412**
 242:2,3,17
 243:3,23

**45**
 174:24

**4:12**
 226:21

**4:18**
 226:22

Michelle Christ
February 07, 2025

**4:36**
  239:3
**4:47**
  239:4
**4:55**
  244:8

---

**5**

---

**5**
  15:17 48:2
  62:8 101:1
  102:11,15
  106:5 111:16
  124:2,6,18
  125:14
  141:25
  142:11,23,24
  148:2 150:17
  151:10
  220:6,21
  221:17
  222:21
  236:22,23
  239:12
**5-0**
  22:25 23:1
**50**
  17:24 21:23
  22:23,24
  23:2 67:18
**544,362**
  170:23

---

**6**

---

**6**
  15:21 101:1
  132:13,16
  159:14
**600**
  139:18
**6103**
  13:6
**625**
  168:11,20,21
  241:23

242:1,17
**650**
  139:18

---

**7**

---

**7**
  15:24 16:4,6
  158:16,17,20
**700**
  159:22
**716**
  148:7
**720**
  229:2
**75**
  67:22,25

---

**8**

---

**8**
  16:12,15,19
  129:24
  133:16
  161:17,18
  166:6 167:5,
  6
**8:00**
  84:6
**8b**
  241:10

---

**9**

---

**9**
  16:22
  187:22,23
**90**
  26:2
**95**
  47:19,25
  106:4 124:1,
  5 125:14
  141:23
  142:3,8,11

**97**
  142:4
**98**
  142:4
**9a**
  16:23 133:21
  147:6,9,10
**9b**
  16:25 17:3,6
**9c**
  17:6

---

**A**

---

**a.m.**
  45:19,20
  100:19,20
**AAERT**
  5:2
**ABC**
  183:25
**ability**
  8:3 10:12
  224:1
**able**
  28:22 37:4
  81:20 119:22
  126:1 189:23
  198:23
**above**
  30:8 97:7,8
  98:17 100:5
  109:11
  194:13 195:5
  203:5
**absolutely**
  63:25 80:9
  82:3 151:3
**abstract**
  44:17
**abstractly**
  188:5
**abundance**
  60:25
**AC**
  202:23
  206:10

231:15
**AC's**
  184:1
**accept**
  160:23
**access**
  29:12 40:20
  73:3 120:23
  181:7 236:18
**accessed**
  229:16
**accessible**
  231:10
**accidentally**
  85:15
**accordance**
  5:7 91:9
**account**
  25:6 40:6
  88:1
**accounting**
  179:11
  243:18
**accurate**
  192:14
  200:17
**accurately**
  64:15
**acknowledgeme**
**nt**
  41:25
**acknowledgmen**
**t**
  33:20 34:9
  41:24
**acronym**
  11:9
**across**
  83:1 94:19
  242:4,19
**act**
  18:1,5 24:10
  28:14 30:25
  31:5,6 39:25
  40:2,7,9,19
  45:10 105:9,
  18 136:5

Michelle Christ
February 07, 2025

140:9,13,18
148:10
149:10,18
152:18 167:7
188:17 241:9
**acted**
174:2
**acting**
11:5,7,12
22:8 104:13
**action**
170:17
**actions**
65:5,7 88:5
190:15
**active**
93:16
**activities**
106:22
108:4,6
109:6
**acts**
152:12 212:6
**actual**
16:6,8 23:21
48:15 51:19
61:16 128:18
206:6 210:18
**ad**
207:17
213:6,10
216:6,9
218:24 224:4
228:17
**adapt**
70:5
**ADC**
185:8,17
191:7,9,23
**add**
59:13 74:23
139:12
194:23 234:9
**added**
230:10
**addition**
25:21 70:5

117:5 190:7
**additional**
13:6 85:14
118:8 122:1,
3 150:1
164:16,17,
18,25 190:10
231:20
**additionally**
18:3 176:13
177:12 216:3
**address**
71:20 72:2,
8,9,20 73:8,
10 75:7
225:24
**addressed**
89:7
**addresses**
75:19
**adhere**
27:14 60:9
176:13
**adhering**
111:25
**adjudicate**
93:25 94:3,6
169:14
**adjudicates**
18:9
**administer**
5:5 140:18
**administers**
149:18
**administratio
n**
5:17 9:9,19
10:20 17:24
149:10 241:8
**administratio
ns**
103:2
**administrativ
e**
49:7,12 57:5
127:23
185:24

186:14,25
188:25 192:6
199:15
203:18,25
214:18
216:13 219:6
**administrativ
ely**
140:20
**adopted**
187:11 189:2
192:5 199:13
203:17
213:23
214:4,14
219:8
**advance**
89:20 90:1
101:14
**advice**
20:12 68:6,
10 70:10
80:25 110:21
111:12,13
**advise**
21:4 32:8
**advised**
13:2 76:6
**advising**
17:25
**Affairs**
228:4
**affect**
10:11 75:21
185:25 187:1
189:1 192:7
199:16
203:19,25
214:19 219:7
**affects**
188:21
**affirm**
5:25
**affirmative**
7:1 19:15
20:1,4
175:24

**affirmed**
162:9 175:3,
12
**affixed**
85:19
**afterwards**
218:14
**agencies**
117:16,18
122:24
156:14
167:15 209:3
242:4,20
**agency**
9:7,19 10:2,
4,16 11:10
12:17 13:4
16:15,20
17:5,10
18:1,4 21:4
39:6 44:13,
17 46:8
48:14 57:23
58:12,20
68:16,17
94:2 115:1
125:10
126:14
128:25
139:17
141:4,11,22,
24 152:24
153:2,4,9,14
154:4,12
155:2 156:5,
11,14 160:16
173:11
176:12
177:12
181:17 185:3
186:12,21
187:8,11
188:15 189:3
192:5 199:14
203:14,17
209:9 213:23
214:4,7,14
215:12

Michelle Christ
February 07, 2025

216:19
217:19 219:9
224:13
230:11
237:2,11
241:13,17

**agency's**
18:9 21:6
148:9 216:1
231:18

**agenda**
30:19

**agendas**
31:24

**agents**
12:18

**ago**
93:8 129:10
138:12 188:5
228:10,12

**agree**
5:5 6:10
81:21 126:4
144:25 237:8

**ahead**
105:4 139:13
143:21 144:7
155:7 165:5,
9,10 168:12
202:6 227:1

**AI**
242:18

**albeit**
93:8 104:1

**ALJ**
49:7

**allow**
48:11 93:20
160:24

**allowed**
161:1 209:3

**allowing**
204:17

**allows**
140:22

**aloud**
192:14

**alter**
20:22

**alternative**
76:13,14

**alternatives**
76:15

**AM's**
214:22,23
232:23
233:4,12,16
235:15,16,17
238:17

**amended**
104:4,9

**amount**
36:17 57:20
70:19 119:25
123:1 153:7,
11 154:14
157:20,23
159:11
160:16
166:10,12,
14,18,19

**analysis**
28:3 61:24
71:23 72:23
77:15 95:18
99:4,16
107:2,11,25
109:25
141:7,9,10
142:22 146:5
149:22

**analyst**
33:19,21
34:2,3,7
41:24 42:1
53:12,19
54:4,23
55:13,22
61:1,10,11,
24 62:12,14
64:18,21
65:10,21
66:8,16,17,
19 69:12,17
70:13,19

71:7,12,15,
16,17 72:15,
16 73:3,19,
23 74:21,22
75:2 76:20
78:1,17
79:9,11,14,
16 81:20,25
82:23 83:7
85:7 86:3,8
88:7 90:10
91:4 92:17,
21 96:10
97:12,17,19
98:22 99:10,
24 108:8,11,
24 109:22
110:5,13
111:5 120:3,
9,19 121:6
130:12,15,19
131:6,9,10,
12 132:2
138:7,8,13
142:12,15,19
143:4,17,25
144:9,14,15,
17,18,19,21
146:4 161:14
162:23
163:20,23
164:8 165:2,
14,25 167:19
170:12,17,18
179:7

**analyst's**
70:22

**analysts**
35:2 69:14
71:4 78:4
85:22 86:16
95:16 96:20
99:22 101:11
108:5 109:8
122:10,18
131:20 137:4
138:2 166:21
178:18

206:20
227:22

**annotate**
63:11,17,19

**annotated**
64:24 65:20
67:12

**annotates**
237:14

**annotation**
63:14,15

**annual**
30:6,7 46:16
113:14
116:11,16,23
167:7 241:9

**annuitant**
19:9

**answer**
7:25 8:2,4,
6,12 17:9
18:25 45:2
48:24,25
68:2 69:9
81:20 84:11
91:7,11,12,
13,16 92:4
94:5,8,16
107:19
113:25 118:9
130:2,4
134:20,21
135:21,24,25
136:17,20
137:8,10
138:5,23
139:11
143:23,24
145:7,11,21
155:6 159:7
171:3 182:6,
18,22 183:9
191:2 196:24
210:23
223:11 226:3

**answered**
8:11 213:8

Michelle Christ
February 07, 2025

**answering**
7:25 223:7
**answers**
7:21 77:3
137:15
148:13
150:14
**anticipation**
228:21
**anybody**
26:10 36:16
53:10 74:2
**anymore**
39:17 49:21
**anyone**
9:3,18,21
29:7 91:5
93:5 94:17
138:25 178:4
191:22
198:15
213:21 214:2
215:2 216:24
**AO**
188:9 213:3
**apart**
20:15 32:9
62:14 90:23
117:9 126:7
**apologies**
40:3 212:9
223:9
**apologize**
157:1 217:24
**Aponix**
243:6
**appeal**
33:24 41:3,
6,7,9,11,15
49:9,12
56:7,9,14
58:8 72:21
86:12,21
115:6 162:1,
9,14,17,19
163:5,10,14,
15,16,17,19,

21 164:9
165:2,15,18
166:2 174:17
175:3,12
**appealed**
56:11 114:19
162:5
165:21,24
**appealing**
41:4 166:10
**appeals**
41:2 161:23
**appearances**
5:10
**appears**
174:20
**applicability**
188:19
**applicable**
5:8 49:4
61:21 95:19
98:2,3
111:11
123:17 124:8
129:6 150:20
152:5 189:20
192:17
209:15
234:25
240:12 242:5
**application**
46:18 113:24
**applied**
107:14,23
240:20
241:1,3
**applies**
140:14
148:23
149:12
204:13 240:4
**apply**
83:3 85:23
100:13
107:25 108:9
123:16
128:17

208:13 237:5
240:6
**applying**
77:11 100:5
129:3,5
205:9
**appreciate**
33:4 36:3
60:17 134:24
**appreciating**
44:6
**approach**
128:21
218:24
**appropriate**
61:20 99:18
100:16 109:3
113:24
161:9,11
184:23 190:6
192:3,16,17
204:22
209:7,8
216:7 232:8
238:2
**approval**
85:3,8,9,10
184:1 185:8
**approve**
77:17 78:12
80:18 81:9
85:4
**approved**
82:1 85:2,5,
6,9,10,11,
12,25 86:6
89:21,23
91:22 93:2
101:19
132:22
**approvers**
184:1
**approves**
79:3
**approving**
90:23 94:14

**approximate**
21:22 71:7
**approximately**
9:15 11:23
13:10,21
14:2 21:16
23:4 25:14,
25 39:12
43:15 47:13,
15,24,25
48:2 62:6
67:14 70:22
80:14 81:7
82:5 88:10
106:4,5
119:13
124:1,3,11
141:22 162:4
166:19
**April**
11:6
**aptitude**
28:1 75:16
**archived**
189:21
**archives**
121:25
**area**
12:9,22
50:19 61:12
62:16 63:11
112:13
179:23
181:14
**areas**
12:8 13:3,19
81:17 84:13
91:8 109:11
143:3 146:16
176:16
177:13
180:18
**arise**
25:23 58:4
**around**
36:15 42:22
73:9 83:5
89:23 178:8

Michelle Christ
February 07, 2025

209:6 228:13 232:18

**asked**
8:11 124:9 136:17 148:13 172:6 197:3 198:22 207:19 213:15,18 214:16 217:24 218:24 221:16 224:3 237:15

**asking**
7:24 16:7,8 36:25 38:20 45:9 49:18 51:25 59:23 62:3,4 63:12 68:3,22 69:9 90:11 91:10, 25 93:11 105:19 110:18 111:7 117:15,16,17 126:2 135:23 138:20 140:16,17 165:20 166:22 176:4 182:19 192:12 196:9 197:25 198:22 217:25

**asks**
16:6 194:15

**aspect**
129:1

**aspects**
24:25 26:17 28:6,7

**assert**
146:20

**assess**
105:23 108:12 109:8

126:15 177:7 215:12

**assessed**
106:8 124:4 128:4 129:24 147:17,18, 21,22

**assessment**
51:21

**assign**
27:20 178:6 195:4

**assigned**
26:25 27:19, 21 33:19 34:6,8 35:9 41:23 52:6 53:10 60:2 73:24 120:12 123:2

**assigning**
25:6

**assignments**
71:5

**assigns**
73:24

**assist**
32:19

**Assistance**
5:12,14 6:22

**assistant**
12:13,16

**associate**
189:17 215:23,24

**assume**
22:18 52:12 68:17 110:12 215:16 217:21 243:20

**assuming**
35:16 37:4 97:13,14,17 144:2 156:20 165:4 166:4 204:12

**assumption**
52:14 205:14

**attach**
59:10

**attached**
59:11 194:24 211:8

**attaching**
134:15

**attachment**
15:7,13 133:11 190:8

**attended**
29:9

**attention**
106:12 148:15 189:25 236:22 240:13 241:7

**attenuated**
110:4

**attorney**
7:11,14 8:21 12:17 14:17 15:25 17:13 83:25 93:20 94:18 134:25

**Attorney's**
5:15

**attorneys**
6:22 9:7,8, 10,19 10:3,4 13:15 69:3 183:11 197:24 198:1

**audio**
5:7

**audited**
116:4

**August**
13:22 14:3

**author**
184:1 185:15,17, 20,21 194:15 195:1 236:20

**authored**
61:22 112:2

**authoring**
183:21 186:19 187:17 192:12,15,23 193:19 195:2,3 199:11 203:23 204:9,12,13, 15 205:10,23 206:13 208:6 216:11 217:3,9 223:25 224:1 230:24 231:15 234:9,25 236:8 238:24 240:3

**authority**
68:16 147:18,22 148:9

**authorize**
133:1

**authorized**
133:3 152:24 153:5,10 156:25

**authors**
219:14

**automated**
242:3

**automatic**
85:20

**automatically**
52:11,17 88:4 112:16 169:19 181:15 203:15 234:19

**availability**
27:1

Michelle Christ
February 07, 2025

available
  32:19 44:3
  57:8,22 70:6
  77:23 96:11
  98:25
  112:14,17,
  24,25 113:4,
  6,7,8
  116:17,20
  122:18
  131:10 137:4
  153:12
  154:14
  156:12
  157:2,5
  158:9 176:21
  180:22
  181:12,18,19
  182:11 183:1
  184:11
  188:15,16,22
  204:18
  209:10 221:5
  222:18
  223:7,14,22,
  25 224:17
  229:4,15
  230:17
  234:12,14,
  22,23 237:20
average
  70:23 88:16,
  22 169:14
aware
  85:14 114:17
  184:22
  186:4,22
  187:5,7
  193:3,7,9
  195:9,10,11,
  14 196:4
  198:16,17
  201:15 212:4
  214:9 216:24
  217:8 219:5,
  11
awareness
  29:20

————————————

            B

————————————

B(d)
  151:11
back
  11:22 27:5
  33:12 34:18,
  19 41:13,16
  43:15,17,22
  44:17 45:3,
  21,25 47:3
  49:3,9
  51:13,22
  52:2 56:9
  58:2 59:24
  63:24 67:12
  69:12,19
  78:16 87:25
  101:25
  103:12 111:3
  114:10,12
  115:13,15,21
  118:25
  122:16
  128:19 130:9
  131:12
  139:8,14,23,
  25 141:19
  143:6 145:9,
  10,12,15,20,
  24 147:24
  150:16
  155:9,11
  157:11
  159:14
  164:24
  166:25 171:6
  175:18 180:2
  191:17 207:4
  210:14
  211:13
  215:12 216:4
  218:16
  219:12,18
  220:24
  221:20,24
  224:18 225:4

  234:12,20
  238:3 240:13
  241:7 243:22
backed
  210:13
background
  10:24 182:4
  183:15
backtrack
  210:22
bad
  223:12
barred
  14:17
based
  38:4 40:21
  43:9,10 61:5
  74:18 77:4,
  21 95:17
  104:3 122:4
  127:5,14
  128:4,23
  131:4 135:8
  138:1,9
  144:10
  169:18
  171:12,17,24
  172:19
  184:16
  186:15
  188:17
  205:13
  207:17
  223:25
  243:11
bases
  148:15 169:9
basic
  6:24 133:10
  178:20
basically
  77:7 130:11
  233:4
basis
  27:3 40:8
  69:4 70:12
  82:9 94:18
  97:14 98:1,

  21 99:16
  107:2 108:9
  110:17
  111:14
  113:20
  126:20
  144:23 150:5
  156:14
  157:24
  207:18
  213:6,10
  216:9,15
  224:4 235:8,
  22 236:7
batch
  243:5
Bates
  52:22
began
  11:22
begin
  11:20 27:22
  33:21 34:25
  107:13
beginning
  54:4 55:13
  74:9 95:17
  96:1 107:22
  120:12 149:4
  216:10
  230:20 238:3
begins
  42:2 52:7
begun
  219:22
behalf
  5:12,14,16
  10:15 12:17
  68:15,17
believe
  11:22 29:8
  31:18,22,25
  32:5,12 43:6
  53:20 54:6
  59:1,7 64:1
  66:2 76:9
  82:14 88:21
  92:3 94:9

Michelle Christ
February 07, 2025

96:19 101:18
103:6 116:21
119:13
122:11,20
129:9 130:19
138:16
147:2,11
160:4 162:25
163:12 169:5
170:1
172:12,13
174:23
177:21
181:13
182:13,17
185:22
186:15
187:16
192:13,19
193:22
194:22 199:6
201:17
206:24 213:3
214:16 220:1
221:2,9
224:22
225:25
228:13
236:21
239:17
240:12
**believes**
152:24
192:15
**below**
137:21 163:6
188:13
190:6,8
192:3
**benefit**
13:8 38:16
46:18 140:17
149:17
**besides**
9:3,19
126:10
210:16 211:2

**best**
8:3 93:9
135:7 189:23
195:16
205:11 217:5
222:20
227:10
234:10
**better**
39:11 46:15,
20 74:11
192:19
204:20
220:19
**big**
126:6 141:21
**bigger**
49:17
**bill**
57:4,7 58:9,
12
**billable**
55:5 56:25
57:20 58:10,
13 124:20,
21,24 125:2,
6,18 126:10,
15 156:17,23
157:3,7
169:2
241:14,15,20
**billed**
163:8
**billing**
57:5
**binding**
216:22
**bit**
13:8 25:5
34:1 37:8
46:25 51:15
58:7 105:6
113:16
120:20
141:20
161:22
190:23
201:17

204:10
210:23
234:13
**blacked**
54:16
**blank**
54:4,6 58:21
72:13
**block**
84:3
**blowing**
103:20
**bones**
72:24 73:22
**bot**
243:7 244:2,
3
**bots**
242:3,18
243:22,24
244:4
**bottom**
106:13 149:3
158:23,24
224:19 229:7
**bound**
112:1
**box**
24:18 39:21
53:17,18
54:5,15
64:6,11
65:14,25
85:13 157:13
190:6,19
191:5 192:1
193:4,11,15,
16,21,25
194:1,8,16
199:11
203:14
225:13
240:15,17
241:2 242:6
**boxes**
64:13,14,17,
19,20,24

65:8,20
71:23 158:2
240:24
**breach**
18:2
**break**
8:10 45:15,
25 95:22
113:25
118:15
139:22
200:5,18
202:17,18
215:2,6
226:19
**breaks**
8:9
**brief**
194:8,16
**briefed**
218:14
**briefly**
175:21
233:20
235:20
**bring**
30:10
**bringing**
32:1
**brought**
30:17 103:21
**build**
122:3
**bullet**
95:1 188:13
**bullets**
95:1,12 96:6
**burden**
141:18
**burdensome**
121:22
127:24,25
140:20
173:17
175:2,5
**busy**
76:17

Michelle Christ
February 07, 2025

| | | | |
|---|---|---|---|
| **button** | **calling** | 161:14 | **cell** |
| 85:8,9,10, | 89:16 | 166:22 | 38:20,25 |
| 15,16 | **calls** | 167:18,21 | **central** |
| | 78:21 | 184:14 191:4 | 73:3 |
| **C** | **capability** | 207:18,24 | **centrally** |
| | 87:15 243:21 | 235:8,22 | 18:9 |
| **C-H-R-I-S-T** | **capacity** | 236:6,7 | **certain** |
| 5:21 | 10:16 19:25 | **cases** | 7:2 26:7 |
| **calculate** | 20:4 | 12:19 27:2 | 44:24 73:14 |
| 31:21 119:25 | **card** | 28:2 35:25 | 74:13,18 |
| 122:12,24 | 36:9,11 | 49:4 61:9,10 | 77:19 88:14 |
| 130:13 | 120:6 160:19 | 67:2,3,21,22 | 100:8 |
| 173:13 | 165:23 | 71:10 73:4 | 115:11,20 |
| **calculated** | **cards** | 76:12,18 | 121:4 123:23 |
| 16:10 124:6 | 160:23 | 79:8 101:6 | 128:3 155:16 |
| 138:19 | **career** | 113:6 116:9, | 166:10,11 |
| 169:18 | 7:14 | 22 120:16 | 176:10 |
| **calculates** | **careful** | 124:16,25 | 180:2,13 |
| 169:19 | 114:20 | 126:13,22 | 184:3,6 |
| **calculating** | 196:9,10 | 127:5 139:4 | 212:21 235:4 |
| 119:16 121:1 | 197:23 227:9 | 153:4 174:25 | 236:24 |
| 123:10 | **carefully** | 204:6 206:16 | 237:9,10 |
| **calculation** | 80:25 | 207:16 | 242:14 |
| 121:10,11, | **cares** | 208:10 | **certainly** |
| 15,18 122:23 | 115:1 | 209:13 | 88:17 176:13 |
| 124:10 | **carry** | 220:24 235:9 | 181:18 213:5 |
| 130:16 | 66:3 | 243:19 | **certified** |
| 138:17 | **case** | **categorically** | 5:6 |
| **calendar** | 6:14,23 8:6 | 231:7 232:25 | **cetera** |
| 88:15 | 27:3 30:17 | **categories** | 7:23 54:13 |
| **call** | 33:18 38:21 | 46:2 47:4 | 136:5 |
| 10:16 24:9 | 40:8 44:1 | 48:5 142:10 | 212:19,20 |
| 66:15 67:7 | 46:21 49:9 | 174:10 | **CFR** |
| 69:24,25 | 50:13 54:19 | 241:25 | 27:9 60:6 |
| 70:2,4 89:18 | 56:10 57:16 | **category** | 103:3 |
| 178:13 | 70:12 73:25 | 19:14 22:2 | **chain** |
| **called** | 82:9 97:14 | 173:22 | 22:16 |
| 6:5 53:22 | 98:1,21 | **caution** | **chance** |
| 55:1 100:23 | 99:15,16 | 60:25 | 121:20 |
| 106:14 | 107:2 108:9 | **caveat** | **change** |
| 111:17 | 110:16,17 | 189:22 | 33:10 43:25 |
| 132:19 | 111:13,14 | **caveated** | 44:7,8,12 |
| 151:12 | 113:20 | 216:16 | 75:18,25 |
| 157:13 | 114:20,22 | **caveats** | 76:3 80:18 |
| 158:7,24 | 126:19,20 | 43:17 | 81:10 |
| 181:2 183:23 | 144:23 153:1 | **caves** | 104:11,12 |
| | 157:24 | 121:25 | 107:16 |
| | | | 116:23 |

Michelle Christ
February 07, 2025

162:17,24
216:12
218:2,19
219:2
227:21,24
228:16
231:19
239:13
**changed**
43:2,4,6
44:6 45:7,8,
12 58:6,10
81:15 162:20
163:11
212:15
215:11
**changes**
44:10 75:19
77:17 78:12
80:5,8 81:5
218:10
227:11
**Changing**
152:22
**characteristi
c**
244:2
**characterize**
38:14 175:4
206:19
211:18
235:14
**characterized**
38:11 222:15
**charge**
9:25 23:5,10
36:11,16
37:3,5 58:21
105:10 120:6
122:1 123:14
124:10,12
125:1,11
126:9,15
127:4,5,11,
13 140:19,
22,24 141:6,
10,12 148:9
156:25 161:4

182:14 198:2
212:1,7
213:2
215:23,24
229:17
**charged**
17:25 20:10
49:16 87:16
127:17
128:5,22
154:25 160:6
237:12
**charges**
159:2
**charging**
36:18
123:12,19
128:3 136:4
147:18,22
235:2
**chart**
22:3 168:1,7
169:4,7
170:22
171:6,15
174:8,13,14,
16,20,21
175:11
178:13
**check**
52:14 73:19
75:1 77:9
80:5 86:8,9,
11,19 107:4
112:22 113:1
140:23
160:20 161:1
168:5 190:19
192:3 193:4,
5 194:8,16
199:17,18
200:17
203:14
224:24
**checkbox**
190:1 204:20
212:18

**checkboxes**
190:10
**checked**
191:6,25
192:2
193:11,15,
16,21,25
194:1 199:11
221:3
225:13,14
**checking**
71:23 167:20
190:6
**checks**
161:9
**chief**
11:18 14:1
29:24
116:14,16
**chiefly**
154:13
**choose**
99:3 153:20
**chooses**
152:25
155:13
**choosing**
153:11
170:12
**chose**
173:10
**Chris**
17:9
**Christ**
5:21 6:4,20
16:18 89:8
102:22
139:11 239:8
**circle**
33:12 34:19
44:17
**circled**
51:13
**circumstance**
206:12
**circumstances**
74:19 78:2

107:6
127:19,21
153:9,14
155:16
156:4,6,7
191:13,15
193:5 202:20
206:23 235:4
**cite**
96:18,20
104:15
**cited**
103:25
**citizenship**
242:14
**City**
12:25
**civil**
10:17 23:21
**claim**
37:15 38:8
49:19
**claims**
190:11
**clarification**
23:2 31:14
34:16,17
105:6 112:5
141:3 142:10
143:7 150:18
167:5 200:25
204:4
**clarification
s**
116:8
**clarify**
8:8,14 9:23
10:23 16:5
23:21 31:1
42:8 45:25
46:10,25
64:25 71:11
72:25 92:15
104:13
110:23 114:9
117:2,8,17,
22 118:7,10
128:8 130:23

Michelle Christ
February 07, 2025

| | | | |
|---|---|---|---|
| 131:1 | clearing | 139:22 | 66:25 69:19 |
| 139:12,16 | 115:20 | **collect** | 73:15,16 |
| 143:15 | **clearly** | 57:18 99:8 | 81:14 83:1,6 |
| 145:16 146:5 | 62:3 72:14 | 152:24,25 | 87:25 103:12 |
| 147:4,19 | 99:13 242:12 | 153:5,10,15, | 105:20 |
| 153:3 156:9 | **clerk** | 20 154:6,13 | 122:13,14 |
| 159:18 166:7 | 13:24,25 | 156:5,11,15 | 132:25 |
| 168:13 170:1 | **click** | **collected** | 141:19 |
| 178:16 | 85:16 242:11 | 42:22,23,24 | 154:20 |
| 186:5,11 | **clicked** | 159:10,11 | 164:24 |
| 198:9 209:18 | 53:17 242:6 | 160:9,11 | 166:13,25 |
| 221:22 | **client** | 170:22 | 167:17,18 |
| 222:12 | 94:18 | **collection** | 168:4,14,17 |
| 223:4,19 | **close** | 36:7 51:21 | 169:15,23 |
| 226:25 | 71:12 122:8 | 57:18 129:24 | 170:24 |
| 227:15,16 | 170:3,10,18 | 160:22 | 176:20 177:1 |
| 228:22 | 211:12 | **colloquially** | 200:16 243:5 |
| **clarifying** | **closed** | 18:6 20:8 | **comes** |
| 30:1 51:12 | 116:22 | 23:23 | 26:24 39:21 |
| **clarity** | 195:13 | **column** | 51:1 52:5,10 |
| 51:25 75:8 | **closely** | 106:14 | 59:3,17 |
| 80:19 | 27:14 60:9 | 148:19 | 80:22 82:7 |
| **classified** | 108:19 109:2 | 168:16,17,20 | 130:16 |
| 51:23 | 180:18 | 170:23 | 170:7,11 |
| **classify** | 228:22 | 172:16 | 171:4 237:20 |
| 48:20 | **Closer** | 174:25 | **comfortable** |
| **clean** | 230:19 | 175:10 | 32:1 43:18 |
| 75:11 | **closing** | 229:2,8 | 47:19 |
| **cleaned** | 170:17 | 230:22 | **commenced** |
| 74:2 | **Cloud** | 241:22 | 135:3 |
| **cleanup** | 86:4 | **columns** | **comment** |
| 101:23 128:2 | **Code** | 122:11 | 80:4 |
| **clear** | 104:2 | 168:13 | **comments** |
| 8:6 9:8 | **coded** | 169:13,23 | 200:4 236:8 |
| 54:11 63:12 | 155:24 174:8 | 171:11,21,22 | **commercial** |
| 84:18 91:19 | **collaborating** | 172:2 | 128:5,12,14, |
| 104:7 107:16 | 32:1 | **combined** | 15,22 129:1, |
| 110:3,6,8 | **collaboration** | 99:19 | 7 |
| 111:3 127:7, | 30:23 | **come** | **commissioner** |
| 10 187:16 | **collating** | 27:5 38:19 | 189:17 |
| 191:15 | 119:24 | 39:2,7,15 | 215:23,24 |
| 198:21 | **colleague** | 41:13 45:2 | **common** |
| 217:25 | 6:21 7:3 | 46:3,4,5 | 39:21 92:17 |
| **clearer** | 63:18 64:22 | 47:1,3,4,23 | 137:2 166:12 |
| 81:11 | **colleagues** | 48:7,22 | **commonly** |
| **clearest** | 62:17,22 | 51:22 52:2,4 | 153:17 |
| 75:17 | 131:13 | 56:9 58:2,16 | **communication** |
| | | 59:24 64:5 | 68:5 |

Michelle Christ
February 07, 2025

communications
  63:13  66:9
  67:10  77:25
  92:5  93:24
  94:17,18
  126:18
compared
  109:16  137:1
compilation
  181:1
complete
  7:21  190:8
  221:1,2
completed
  42:16  221:23
complex
  70:18  88:18
  144:12
  238:16
complexity
  25:7
compliance
  177:3  217:9,
  14,16
complicated
  82:21
component
  19:7  61:22
  62:16  64:23
  78:3  120:22
  121:6,8,16,
  17  122:5,6
  138:13,14
  176:20
  180:20,23
  183:22  185:7
  186:19
  187:18
  190:22
  191:17
  192:13,15,23
  193:19,20
  195:2,3
  199:11
  203:2,23
  204:10,12,14
  205:10,23

  206:13
  207:19  208:6
  214:17
  215:25
  219:14  228:1
  234:9,25
  238:24  240:3
components
  29:9  31:12
  119:17
  166:23
  177:6,9
  186:21  193:2
  204:16
  213:4,6,11
  215:16
  216:11
  217:4,9,17
  219:11
  223:25  224:1
  228:5  230:24
  231:15  236:8
comprehensive
  60:16  181:2,
  21,24  182:5
  237:14
comprise
  47:13  242:1
computer
  29:16  52:13
  86:3  103:20
conceivable
  204:2
Conceivably
  146:12
concern
  30:11  66:12
  80:6,20
  200:25
concerns
  32:1
concise
  81:10
conclude
  203:24
concluded
  244:8

concrete
  52:21  68:9
  219:20
conduct
  202:9  213:6
  219:11
conducted
  28:14  117:19
  183:11,24
conducting
  240:2
confer
  197:6,8
conference
  67:7,11
conferring
  139:21  234:8
confidential
  84:13
confirm
  147:13  190:2
  224:23,25
confirmed
  168:4  221:6
confuse
  74:17
confused
  105:15
confusing
  10:22
confusion
  64:15
congratulate
  115:21
Congress
  228:3
congressional
  20:18  25:22
  57:25  228:3
Connecticut
  14:20
connection
  37:20  70:7
  105:22
  129:25  135:9
  198:15

connections
  110:4
consent
  40:21
consider
  35:3  39:24
  40:6  48:20
  51:4  68:14
  105:18,25
  106:2  108:19
  111:24
  141:14,16,18
  142:19
  148:17
  155:14,20
  179:19  213:5
  216:5
consideration
  37:20  42:2
  208:3
considerations
  215:21
considered
  39:6  47:24
  48:1,2,8
  104:25
  106:5,6
  125:21
  141:24,25
  147:11  154:5
  174:2,4,5
  178:9
  215:15,17,18
  216:12,25
  235:16
considering
  96:22  97:1
  105:12
  203:20
  218:22
considers
  129:1  141:12
  148:23
  149:13
consist
  17:24  77:6

consistency
  113:23
consistent
  30:6 74:16
  77:8 97:18
  202:22
consistently
  126:23 208:2
constantly
  99:15
constraints
  18:20
consult
  29:17,18
  32:11 60:4
  62:14 66:8
  106:25 107:6
  108:1,10,21,
  25 109:14
  110:2,11
  111:18,20,21
  112:4
  149:19,23
  150:2
consultation
  64:22,23
  66:10 78:4
consultations
  150:4
contact
  48:13 49:5
  67:17 87:22
  206:13
contained
  167:12
  199:12 213:3
  239:24
  241:19
contains
  72:9,23
  73:22 74:3
  201:19
content
  66:9 68:4
  182:19
  186:13 190:7
  196:10

228:14
232:8,19,20
235:5
contents
  93:21 94:13
  110:18
  198:23
context
  7:13 49:13
  105:13
  110:13 113:3
  114:15,16
  121:9,10
  123:17 127:9
  151:17
  161:24 162:8
  164:8,25
  208:25 209:1
contexts
  20:12
continue
  165:2 166:22
  212:10
continued
  159:1
contracted
  28:25
contracts
  12:19
contribution
  109:5,8
contributions
  150:22
control
  79:24 114:25
  115:2,7
  190:14 209:6
controls
  113:23
  190:11
convened
  31:15
conversation
  63:1,6,19
  78:17 92:23
  107:15
  123:16

conversations
  63:5 64:9
  65:16,21
  93:5
coordinate
  12:25 207:2
coordinator
  24:11 30:25
  31:6
coordinators
  31:11 32:7
  120:22
copy
  28:13 29:13
  49:16 57:3
  61:22 105:9
  120:24
  140:19
corporate
  10:18
correct
  11:24 14:12
  18:12 22:5
  23:12 33:9
  35:7 39:18
  40:25 42:13
  48:4,10
  54:14 64:10
  74:20 84:15
  86:7 87:6
  106:19 111:2
  123:8 139:25
  147:10,12
  151:9 153:13
  154:3 159:20
  168:15 184:8
  185:9 194:25
  225:21
  239:18,19
  241:24
correction
  5:9
corrective
  201:4
correctly
  26:5 72:15
  106:7 190:2
  203:20

216:10
correlate
  172:9,10,12
correspondenc
e
  15:25 17:1
  70:9 91:2,3,
  4,11,15,16,
  21,23,25
  92:7,10,12,
  21,24 93:4,
  6,10 100:13,
  16
cost
  119:14
  130:17
  137:21
  158:24
  159:11,17
  160:16
costly
  57:4
costs
  42:21,23
  51:21
  147:17,18,
  21,22
  152:24,25
  153:5,10,15,
  20 154:13
  156:5,11,15
  159:10
cough
  105:5
counsel
  11:14,15
  12:5,13,15,
  16 17:23
  22:8 63:18
  64:23 65:13
  66:8,11,13
  77:19 78:4
  82:23 102:4
  108:1,10,21,
  25 109:14
  110:2,10,12
  144:12
  146:18 202:9

Michelle Christ
February 07, 2025

238:25

**counsel's**
11:19 14:1
22:17,19
109:4 184:18

**count**
46:16

**couple**
96:4 133:10
230:21
236:23
242:24

**course**
8:9 18:5
60:13 70:10
101:21
107:12
145:13
177:12
179:20
186:15
211:10

**court**
7:19 11:8
13:8 15:2
89:5 102:13,
16 132:15
145:15,20
155:11
158:19
187:21 189:7
224:7

**cover**
28:5 35:2,14
148:15 169:9
172:5

**covered**
30:13 31:17
133:21 155:5

**covers**
28:7 140:7,9
241:4

**crafted**
77:13

**crafting**
109:21

**create**

74:24

**created**
5:7 72:17

**credit**
36:9,11
120:6
160:19,23
165:23

**credits**
152:9

**Crist**
5:20

**criteria**
95:20 97:1
98:19
104:17,21
125:25
127:14
128:16
130:13
148:23
149:12
153:18,22
164:23 190:6
214:11,12,13
215:13,14,19
216:5,14,19,
20 217:6
231:9 232:13

**current**
10:24 14:21
33:6,13 52:1
98:18 219:18
230:24
234:16 235:6

**customer**
209:7

**cut**
100:10

**cycle**
37:11 119:4

---

**D**

---

**daily**
27:25

**Daniel**
118:20

**Danielle**
5:11 6:20
175:22

**data**
12:25 18:2
20:6 44:12,
14,24 157:17
162:7 243:11

**date**
53:22,25
54:3 64:7
65:2 114:12
169:22,24,25
170:3,7
197:25 198:1
228:11

**dated**
89:6,7

**day**
8:10 33:19
54:2 83:12
84:4,6

**days**
6:11 88:15,
22 165:8,9
169:14,18

**de**
57:5 156:17

**deadline**
88:16

**deadlines**
50:1

**deal**
69:3 152:13

**dealing**
19:25 20:4

**deals**
18:13 19:15

**decedent**
19:8

**December**
89:6,7,23
90:5,19,25
94:7 180:6,
13 185:10

195:8 196:5
197:25
201:13
207:15,16,25
212:20,22
213:14,20
214:2 215:12
216:25
219:10,19,22
224:21 225:7
231:17 234:7
239:11,13

**decide**
51:5 57:6,21
77:18 141:6
143:4
144:15,17,19
146:4,8
153:14 156:5
232:12

**decided**
95:24 125:11
156:16
162:17 166:2
182:19 183:6
214:2 221:8

**decides**
58:12,20
154:6

**deciding**
70:24 118:2
141:12
148:22
149:11
222:13

**decision**
18:18 32:13
33:4 37:9,10
49:6 58:2
62:13 68:7,
12,15,18
80:22 94:2
97:17 99:1
114:23 134:4
142:13,25
144:1,6,19
145:2,25
146:14

Michelle Christ
February 07, 2025

153:2,24
154:2 156:14
162:2,9
163:5,10,14
165:1 185:6
191:7 193:12
197:15,17,18
204:9,15
211:22
218:1,9
219:2
227:11,13
238:9,10
**decisions**
114:13,14
163:7 227:18
**decline**
145:7 156:11
**declines**
155:20
173:25
**deem**
144:20
**deemed**
112:24 126:8
127:10,12
**deep**
61:15
**default**
55:12,14
143:15,25
**defendant**
5:17
**defending**
12:18
**defer**
112:3 181:13
182:14 185:1
186:13 194:4
203:23 206:6
214:6 216:21
**deferring**
213:2
**definitely**
37:7 106:1
127:4 150:20
186:20

**definition**
184:19,25
186:3,7,8,
10,12 205:19
**definitions**
192:19
**definitively**
55:15 125:14
134:21 159:7
**deliberations**
80:3 93:25
**deliberative**
94:6 146:17
180:17 209:4
**delivered**
94:19
**denial**
41:9 49:8
56:12 82:13
155:25
156:2,21
162:19
163:18,20
164:22
165:13,15,19
172:19
174:3,4,17
175:3
**denials**
162:5
171:12,17,24
242:1,17
**denied**
16:10 55:5
56:4,6,10,11
58:6,8,10
86:11 87:1,
3,7,11 157:8
162:8,10,14
163:2,3,4,6,
8,11 165:10
168:11,17,
21,22 172:25
173:18 175:1
241:23
242:10
**denies**
97:25 98:22

154:4
**deny**
57:15 68:12
153:24 154:2
173:14
**denying**
98:23 162:1
**departmental**
183:23
**depend**
39:4 50:17
53:14 70:16
77:18 78:20
98:3 125:19,
24 143:3
157:19 201:3
223:23 235:8
238:13
243:14,16
**dependent**
25:3
**depending**
27:1,25
98:20 117:15
206:11
228:18
230:10
**depends**
41:4 47:21
76:15 82:8
87:22 88:1
95:8 98:14
200:15
238:8,23,24
**deposition**
5:2 7:7,8,15
8:15,20 9:4,
22 10:17
15:10,13,15
16:1 19:12
89:20 90:1,6
101:14
133:15 147:3
155:6 182:3
183:12 185:5
218:7 238:4
**deputy**
9:25 11:1,2,

7,12 14:21
20:19
**describe**
29:25 33:5
63:9,22
64:21 65:21
140:5 198:23
205:3 228:15
235:20
**described**
21:18 23:16
26:1 31:3
34:23 36:2
39:23 40:5
43:19 44:9
45:6,13
51:8,17 61:5
62:15 63:7
65:8 79:21
87:4 90:14
93:22 110:13
119:7 146:22
164:5,14
178:2 184:10
**describes**
16:6 184:22
187:18
231:16,18
**describing**
33:6,11 66:8
96:1,7
101:22
134:14
**description**
54:15 64:5
70:3 87:8
96:6,9 152:2
185:3
**descriptions**
190:10 206:1
**designate**
240:8
**designated**
190:3,5
203:16
205:24
**designates**
185:3

Michelle Christ
February 07, 2025

designation
  184:23
  185:8,14,16
  187:19
  190:4,24
  191:5,11,20,
  22 208:6
  215:22 236:3
  240:3
designations
  209:3
designed
  190:14
desired
  152:3
desk
  32:13 83:1
  187:6
detail
  51:16 58:3
  90:15 201:17
detailed
  113:21
  131:23
details
  157:13
  158:24
detect
  190:15
determination
  36:3,22
  37:19 42:15
  55:1 56:12
  58:9 59:15
  60:1,4 61:7
  69:14,23
  70:1,5,14
  71:14 73:15
  74:21,22
  76:9 82:6,25
  83:12 87:19
  89:17 96:17
  100:22
  113:11 114:5
  118:1 130:22
  134:12
  144:22
  146:23

  162:1,18,19
  164:2,14
  190:9 194:13
  202:6 204:1
determination
s
  31:22 32:6
  84:19 104:19
  113:13,19
  114:7 115:3
  117:25 118:3
  241:13
determine
  35:1 36:11
  39:19 57:1,
  18,24 98:2,
  18 99:17
  100:13,15,17
  108:5 109:22
  110:5 117:17
  123:12 126:2
  141:4 144:9
  151:21,25
  176:23
  192:15
  199:25
  202:25
  205:11 216:6
  234:24
determined
  55:9,21
  56:5,6 58:6
  88:12 120:7
  124:2,3
  125:1,24
  126:14
  213:21
  241:20
determines
  143:9
determining
  59:22 61:20
  111:22 119:5
  214:10
develop
  143:6
Development
  151:13,14

deviate
  101:7 139:1
dialogue
  92:19 166:15
differ
  77:3
differed
  13:13 101:24
difference
  140:12
differences
  128:4
different
  9:12,14
  11:17 12:1,
  10,14 13:3,
  19,23 18:16,
  18 21:5
  25:2,5 33:7
  34:4 40:20
  44:16,19
  49:12 51:17
  52:1,5,10
  54:1 59:20
  64:13,14
  65:7,9,16,22
  70:4 76:23
  79:5,11,20
  80:17 81:16
  85:11 87:6
  88:17 99:18
  102:5 104:4
  107:20,23
  114:23 119:6
  123:24 124:6
  126:21
  140:9,11,14
  144:4 146:18
  153:24 156:7
  163:20,24
  164:7,15
  171:19
  172:11
  173:10,20
  175:5 176:16
  178:12 179:5
  180:18 193:1
  195:19

  200:19
  202:19,20,21
  210:22
  228:18
  230:18
  233:24 236:8
  243:6,19
differently
  51:10 126:9,
  16 128:6
difficult
  190:24
dig
  52:2
Digital
  5:2
direct
  106:12
  107:4,6,24
  110:3,6,9
  111:23
  142:21
  189:25 209:6
  236:22 241:7
directed
  32:17 61:11
  86:17 91:12
  96:20 108:5,
  11 111:20,21
  142:12,19
  149:19 150:1
directly
  21:9 24:5
  39:2 80:4
  149:9 178:24
director
  9:25 10:7
  11:1,2,8,13
  14:21 20:20,
  23 21:6,9
  23:10,11,24
  30:10 32:20,
  22 33:23
  35:18 42:20
  65:11 73:8
  92:20,22
  114:19
  163:25

Michelle Christ
February 07, 2025

164:3,10
177:25
178:19,24
179:21
200:9,11,13
201:24
**directors**
20:24
**directs**
145:11
230:24
**disability**
37:15 38:8
**disagree**
68:10,11
**disclose**
153:8 177:13
179:8,9,15
180:8,20,21
206:25
232:12
234:4,5
235:17
**disclosed**
108:12 200:1
205:19,20
231:1,13
232:12
234:8,18
**disclosing**
228:14
**disclosure**
11:3,9 12:9,
22 17:22
18:2 19:16
43:22 97:6
108:3,13
178:2,21
179:3,7
180:12,15
181:16
186:16,18
187:19
191:12,16
199:21,23
201:4,8
202:7 203:6
204:8,13,18

206:4 207:9,
17 209:1
212:25
213:4,19
215:19
216:14,19
231:8,9,12,
13 232:15,22
233:1,8,9
234:3 235:16
238:2 239:9
241:5
**disclosures**
7:1 20:1,5
40:21
175:24,25
176:2,6,8,10
178:15
179:25 180:3
188:11 196:5
**discovery**
179:14,16
**discuss**
28:2 30:18
31:23 33:13
62:23 67:5
81:12 107:22
110:9 186:16
**discussed**
30:21,22
32:3 37:12
64:8 95:15
101:4 110:22
114:3 126:18
129:18
130:11 138:7
146:21
220:12
**discussing**
31:20 65:2
105:23 172:8
232:10 233:6
**discussion**
31:3 65:3
186:18
**discussions**
6:13 31:4
43:10 93:21

94:6,13
102:3 103:13
**Disposition**
171:7
**distance**
169:24
**distinct**
40:7
**distinction**
140:4,5,7,15
233:11
**distinctions**
140:10,11
233:2
**distinguish**
18:19 87:14
**distributed**
198:4,6,8
**distributing**
198:2
**District**
5:16
**divide**
71:6
**Divided**
25:18
**division**
9:25 10:1,5,
7,8 18:8,11,
13,16,20,21,
24 19:1,5,
15,16,21,22,
23,24 20:2,
5,15,24
21:17,21
23:3,6,10,
11,17,23
24:4,9 25:1
26:20,21
28:10,21
29:5,11
30:7,9
32:11,16,20
33:1,15,20,
23 35:18
40:23,24
42:20 65:11

73:8 92:20,
22 161:5
163:25
177:22,24,25
178:7,9,14,
19,23,24
179:21
200:9,11,13
201:24
213:17
**divisions**
17:25 18:10,
14 19:19
20:23 21:14
22:21
**doctor**
74:18
**document**
15:1,2,6,11
52:21,23
53:4 59:13,
14,21 69:25
72:9,19
73:2,3 74:8
78:13 89:6,
9,20 110:19,
20,24 111:2
119:8 132:15
133:14,15,
19,20 135:22
136:10
139:23
151:12,23
158:19,23
188:3 189:8,
11,13 194:23
196:9,12,14
199:25 203:9
204:7,24
205:20
206:11
210:25
216:12,24
224:11
226:13
230:9,19
233:25
236:13

**documented**
  67:13 210:5,
  7,8
**documenting**
  64:15
**documents**
  6:13 73:20,
  21 110:19
  111:11
  121:24
  122:22
  135:2,6,8
  158:22
  190:15
  210:18 211:6
  217:2 238:7,
  8 240:5
**doing**
  49:17 64:25
  72:6 73:5
  77:4 99:15
  118:14
  119:24 121:8
  166:17 188:1
  193:24
  201:10 205:8
  206:16
  208:24,25
  209:24
**DOJ**
  30:6 44:22
  116:7 117:7,
  10,14,19,24
  118:4 167:14
  228:22
**dollar**
  157:20,23
**double**
  167:20 168:5
  225:14
**doubt**
  139:1
**dozen**
  50:23
**draft**
  69:16,23,25
  70:5 72:9,
  16,19,22

74:1,24
76:8,21
77:24 81:24,
25 82:1,2
90:23 99:19
120:13 132:2
183:22,24
219:16
**drafted**
  197:12,20,24
**drafting**
  70:14 71:14
  74:21 98:23
  103:7 120:15
  130:20,21
  131:10
**drafts**
  69:17 71:20
  131:6
**drag**
  59:8,9,16
**draw**
  109:25
  119:18
**drive**
  86:4 210:19
  222:3
**drives**
  211:9,10
**drop**
  59:9,16
**dropdown**
  55:4,19
  65:4,7,13
  125:3 157:8
  162:11,15,20
  168:8,17,22,
  25 169:3,7
**dropdowns**
  158:2
**due**
  219:13
**duly**
  6:5

_____

**E**
_____

**earlier**
  8:14 20:19
  22:20 44:9
  51:8,17
  83:20 84:14
  95:15 103:6,
  25 104:1
  106:3 119:3
  123:25 125:9
  129:4 138:1
  139:12
  141:23
  154:23 156:4
  157:6 159:16
  169:10,21
  172:8 175:21
  177:21
  178:14,17
  179:5 180:22
  186:6 192:18
  210:19 227:4
  239:12,17
  241:11
**early**
  143:5 161:25
**earnings**
  105:11
  151:21 152:9
**easier**
  8:1 44:25
  67:6 75:12
  131:3 155:10
**easily**
  48:11
**edit**
  78:12 194:22
**edits**
  77:17 80:1
**education**
  75:16
**effect**
  45:4 176:11
  232:5 239:13

**effectuate**
  190:13
  201:11
**efficiency**
  134:9
**efficient**
  71:21 74:16
  161:22
**efficiently**
  99:4,12
**effort**
  57:2 153:11
  154:14
  156:12
**ego**
  20:22
**eight**
  168:24
**either**
  26:12 30:11
  33:17 43:7
  47:9 57:15,
  19 76:22
  78:4 86:14,
  15 91:4
  116:4 120:22
  143:17
  160:19
  185:16
  192:16
  195:10
  204:24 206:1
  207:19
  212:16
  225:16 232:4
**elaborate**
  8:18
**electronic**
  18:3 33:18
  167:18
  229:16
**electronically**
  41:20
**elements**
  128:15

Michelle Christ
February 07, 2025

elicit
  104:6
eligibility
  151:21
  152:10
eligible
  82:14,17
  154:18
EM
  189:16
  201:19,25
  203:15
  204:24
  205:18
  206:11 214:3
  219:14,16
  222:10
  233:23
  235:21 236:1
  240:8
EM's
  180:9,10
  183:1,20
  184:6
  185:14,19
  188:16
  196:1,2
  202:5 212:13
  213:10,21
  214:11,21,23
  220:7,14
  222:21
  230:25 231:7
  234:14
  238:17
  239:11,12,
  16,18,20
  240:22
email
  24:18,20
  39:20 41:24
  73:9 76:1,6
  85:5,17
  87:21 88:2,
  3,4,6 200:8,
  12 201:18
  210:8,10,12
  211:8,14,19,

20 221:3,25
emails
  173:11
  210:16 211:3
  221:12,13,
  18,21 224:24
emergency
  183:1
  189:16,19,21
  195:12,14
  219:12
employee
  27:24 28:3
  29:15 237:17
employee's
  116:2
employees
  13:18 18:19
  28:22,25
  112:1 173:11
  190:12
  216:22
employer
  156:2
employers
  150:22
employment
  12:20
enclosed
  189:19
encumber
  22:6
end
  36:8 52:18
  54:3 89:14
  99:16
  169:22,25
  170:7 201:6,
  9 216:9
  230:22
ending
  148:7
ends
  229:2
enforcement
  12:23

English
  75:16
ensure
  79:24 113:23
entail
  85:3 235:21
entailed
  65:3,16
enter
  52:8 63:22
  64:7 85:16
entered
  34:5 66:6
  170:10
enterprise
  18:4
entire
  34:18 241:15
Entirely
  82:8
entities
  13:1 31:23
entitled
  74:6
entity
  28:24
equal
  80:21 81:9
err
  204:12
errata
  6:12
essentially
  173:19
  204:11
  231:16
establish
  182:4
established
  124:19
estimate
  84:17 118:20
  119:16
  120:5,15,19
  122:3,9
  124:18
  130:17

137:21 155:1
  159:17
  160:16
  238:21
estimated
  119:25
  154:25
estimates
  166:23
et
  7:23 54:13
  136:5 212:19
European
  242:14
event
  30:4
events
  134:19
  135:13
eventually
  35:22
everybody
  29:13 71:1
  73:9
everyone
  7:5 8:2 18:8
  61:1 176:22
  244:6
exact
  109:10
  186:13 220:2
  228:11
exactly
  90:24 98:15
  123:12,22
  181:22
  205:22
  217:23
  221:16,17
  232:1 233:20
EXAMINATION
  6:18 175:19
  239:6 243:1
examples
  107:14
  114:11
  151:19

Michelle Christ
February 07, 2025

153:19
157:21
173:21 180:4
187:3
**exception**
153:6
**excessively**
175:2,4
**Exchange**
20:6
**exchanges**
12:25 18:2,3
**exclusive**
140:14
**excuse**
13:12 17:19
22:24 35:11
45:11 61:24
92:25 98:5
121:11
124:20 150:2
164:17
165:18
168:12
193:15 212:9
**executing**
20:10
**executive**
11:1,2,8,12
14:21 20:20,
23 21:6,9
114:19
164:3,9
**exempt**
210:2
232:15,19,21
**exemption**
208:23
209:2,11,14,
15,22,25
234:24
236:25
237:5,7,10,
23 240:10,
11,20 241:1,
3
**exemptions**

171:13,17,25
174:17
208:18
209:21
239:25
240:2,6
**exhaustively**
153:16
**exhibit**
15:3,4
52:22,25
53:2 63:24
64:1 87:9
89:1,3,6
100:22
102:9,10,11,
14,15,22
111:16
132:13,16
148:4 150:17
151:10
157:7,12
158:16,17,20
159:14
161:17,18
162:11 166:6
167:5,6
168:9,18
169:21
172:10,12
187:22,23
189:8,9,11
224:8,9
228:25
236:11
240:13 241:8
**exhibits**
102:13
147:25 148:2
**exist**
99:6 110:19
111:10 159:6
182:1
**existed**
81:25 219:10
**exists**
24:11 59:4
142:25

**exorbitant**
173:18
**expect**
28:21
**expected**
70:13
**expects**
138:14
**experience**
26:16 27:19
28:1,2 75:6,
14 86:25
102:4 182:15
**experienced**
26:15
**experiences**
102:3
**expert**
12:22 78:3
179:22 194:9
200:4,17,22,
24 206:14
**expertise**
26:13 61:16
75:6 109:25
149:22
179:20
**experts**
26:10 200:3
205:12 217:5
**explain**
66:5,9 96:25
97:5 98:9
99:1,13
129:17
135:10
140:12
187:15
190:12 199:5
231:4 232:9
233:3
**explained**
52:3 76:9
116:13 119:3
138:1 179:5
**explanation**
170:15 193:1

194:8,10,16,
17,18,24
199:7 230:15
**explicitly**
96:24
**explored**
212:2
**express**
78:25 99:3
109:18
**expressing**
173:16
**extend**
165:9
**extended**
71:8 120:17
178:8
**extensive**
127:23 173:8
**extent**
16:20 17:10,
16 94:3,5
102:2 128:25
130:2 156:22
182:4,5
183:18
196:14
231:14 237:4
**external**
28:20 30:3
**externally**
116:5
**extremely**
50:10 127:22
140:20

---

**F**

---

**face**
63:4 67:8,11
108:9 144:10
237:3
**facing**
158:5,21
159:6
**fact**
42:19 201:10

204:19
216:20
219:22

**factor**
98:4,7
106:23
107:9,19
108:2 149:20
150:10 151:7
154:7

**factors**
97:7,8
98:10,17
104:21
106:13
110:22
111:12 127:6
129:3,5
141:16
150:14
153:23
154:5,16,19

**factuation**
203:22

**fails**
97:5

**fair**
50:4 70:3
80:7,11
87:13
143:13,15
199:24

**fairly**
43:17 157:25
202:22

**fall**
38:5 129:21
174:6 233:15
237:25

**falls**
36:22,23
152:17
237:23

**familiar**
31:10 61:12
112:3 129:14
185:25
187:12 216:1

217:2
218:10,14
229:22

**familiarity**
224:12

**FAQ**
32:14

**far**
28:1 43:15,
17 47:1
117:19
125:13 132:3
139:25
180:16
195:15,21,
22,23,25
196:1 201:15
212:2 214:9
215:11
221:4,13
227:19

**feature**
190:14

**February**
56:1,2

**federal**
10:17 12:18
27:8 60:6
75:15
102:14,19,23
103:1 104:2,
3 106:21
113:24
122:20
187:11
188:20 189:3
192:6 199:14
203:17
213:23
214:4,15
219:9
228:19,24
242:20

**fee**
7:1 16:9,10
25:12 26:13,
17 28:5,7,11
30:13,18,21

31:5,17,21
32:2,6,8
33:3 34:13,
19,21 35:3
36:3,4,9,10,
18,24 37:3,
10,20 38:23
41:9 42:3,14
51:16,18,19,
20,23,24
53:17,18
54:8,9,13,
15,18 55:11,
18,20,24
56:5,19,21
57:13,16
58:4,5,16,
20,23 59:15,
22 60:1,17
61:3,8,21
62:5 64:5
67:14 68:6,
7,12 69:1,6,
13,14 70:14,
23 71:1 72:6
73:25 74:1
82:6,12,15,
25 83:9,12,
15 84:4,19
87:7 88:11
89:12,16,18,
19 93:25
94:3,6
95:10,23,24
96:15,17
97:5,25 98:8
100:6,17,22,
23,25 101:2,
23 103:24
104:14,19,
22,24
105:12,21,23
106:8 111:22
112:20
113:11,13,18
114:15,16
115:3 116:1
117:6,20,25
118:3,11

119:6,8,11,
12,25 120:4,
13,14,15
121:9,10,11,
18 122:2,15,
16 123:9,18
127:7 128:3
129:3,5,10
130:3,6,13,
21 131:6,10
133:22,23
134:12,13
135:18
137:4,11,17,
19 139:15,18
141:10,12
146:23
147:14,15
153:25
154:2,5,8,
16,18 156:1,
18 157:12,13
158:1 160:3
162:2,4,8,13
163:14,18,19
164:14
165:1,11,13,
15,18,19
166:23 168:1
170:11,18,19
172:15,16,
19,25 173:18
174:4,20
175:6 241:6,
11,19,23,25
242:7,8,10,
11,18

**feel**
31:25 43:17
87:15 182:8
205:13

**fees**
31:5,21 36:7
51:19,20
96:5 100:13
103:15
111:17
112:8,13,14

122:24
123:10
124:4,10
128:4 129:24
130:2 134:14
136:4 154:6,
24 157:21
158:6 170:22

**fell**
37:6

**felt**
95:19 112:4
127:7 203:23

**fewer**
71:10

**FICA**
150:22

**field**
37:3,16
38:1,3,6
39:2,7,10,
13,22 46:4,
5,6,15,20
48:7,19,23
49:2,3,20
50:3,8,12,
13,18 52:16
53:22 54:3
55:1 63:22
85:16 152:8
157:12
169:22
237:21 238:4

**fielding**
69:1

**fields**
53:13 63:16,
21 157:16
158:1,6
159:5

**fifth**
164:9

**figure**
123:1 160:12
206:8 221:16
230:12,14

**figured**
202:16

**figures**
169:13,23

**file**
52:15 56:14
58:4,19
59:10,11
70:8 224:21

**filed**
52:11 53:16
93:15

**filled**
54:21

**final**
36:14,15
54:11 68:6
82:2 85:24
94:2 117:24
164:2 183:25
185:7 194:13
211:22 219:2
227:11 238:5

**finalize**
57:19

**finalized**
87:18

**finally**
33:23 166:2

**find**
32:2 48:13
84:14 151:13
160:8
166:15,21
184:24

**finding**
54:13

**fine**
130:7 134:6
158:15
183:19 191:3
197:2,8
212:10
220:19
222:24
231:24

**finish**
7:24,25
13:11 205:3

**finished**
14:11,13

**first**
5:19 6:5 7:2
14:10 20:24
23:9 39:16
47:3 50:8
53:12 54:5
58:17 60:1
62:13 64:11
73:25 76:10,
21 77:3,12
80:7 81:25
94:25 95:23
106:13,21
110:13
119:15 131:6
134:13 136:3
140:5,19
156:16,25
162:9,14
163:17,20,21
168:6,13,16
190:1,10
191:18,19
193:25
194:15
199:25
200:2,12,20
202:3 203:8
219:12
229:22
234:13,23
235:9

**fiscal**
167:7 168:21
241:9 242:2

**five**
9:17 17:25
18:10,11
20:23 21:14
22:21 124:11
142:3,9
164:5 220:10
229:18

**flag**
230:25
231:15

**flagged**
232:7

**flags**
143:17,18

**flat**
123:13

**flip**
89:13 97:3
111:16
151:11
158:23
167:25

**fluent**
28:22

**focused**
83:15 204:16
219:17

**focusing**
243:19

**FOIA**
7:1 8:19
10:1,7 12:7
18:5,6,8,9,
11,13,23
19:1,4,13,
14,16,23
20:1,5,10,
11,13,14,15,
17 21:5,6,
17,20 22:1,4
23:3,5,7,17
24:4,10,13,
17,18,21,25
25:8,12,15,
18,21,25
26:17 27:9,
21 28:6,7
29:1,20,21,
24,25 30:11,
24 31:4,5,6,
11 32:7,11,
17 33:1,15,
17,19 34:18,
25 35:1
36:23 37:5
38:11 39:5,
6,20 40:7,
11,22,23

Michelle Christ
February 07, 2025

41:11 43:12,
13,14 44:1,
2,7,18 45:4,
10 46:2,7,
14,16,21
47:5,25
48:8,11,15
49:11 50:11,
19 51:4
52:15,19
56:22 57:6
59:13 68:8,
18 75:15
78:24 83:16
84:16,22
88:21 92:24
105:8,13
106:1 111:5,
6,25 113:14
116:11,14,16
119:4 120:21
123:10,17
124:1 128:3,
21 129:25
134:11
139:15,17
140:7,15,21,
22,25 141:4,
17 146:21
150:21
152:5,20
153:19
156:20
162:10
167:24 171:7
172:13
173:3,7,9,
12,17 174:5
175:6 176:3,
9,12,14,22,
24 177:7,10,
14,18,19,24
179:10,17
180:23
184:3,7
186:1,16,19
187:12
188:17,18,24
194:10

199:4,8,9,23
200:1 204:8
206:20,24
207:6,7,12,
14,19 208:1,
18,20,23,24
209:11,14,
15,21,22,23,
24,25 210:3
211:25
212:21
213:7,11,16
215:19 216:3
219:22 225:6
227:5 231:1
232:7,15,22
233:8,17,21,
22,25 234:17
235:19,20,21
236:3,4,5,6,
25 237:4,10,
12,23 238:4,
7,12 239:25
240:2,9,11,
20,25 241:3,
13,15,18
242:4,19

**FOIAXPRESS**
33:18 34:6
38:1 39:9,
15,20 40:10
41:19,20
44:2,8,18,25
49:21,23
51:2,11
52:4,6,9,11,
15,18 53:8
63:5 65:18,
22 66:7,21,
22 67:1,12
69:22 70:8,
20 72:1
78:24 80:24
85:5 86:1,2,
5 87:8,23,25
88:4,8 92:25
111:7
124:13,15
125:2,13

150:23
155:22
156:6,13
158:6,21
159:6,12
160:10,12
163:3 167:22
168:5,8
169:16,18
170:19
172:7,11
179:11 210:5
242:6 243:7,
10,20

**folks**
38:15 50:21
122:4 178:22

**follow**
8:2 51:7
68:20,21
70:11 122:10
126:21 139:3
170:5,16
206:2
217:17,21
239:8 242:25

**followed**
13:9 90:16
91:9 95:11
228:20

**following**
76:3 121:12
190:9 214:8

**follows**
6:6 97:22
128:25
217:19

**Footnote**
230:23
231:1,21

**Fordham**
14:16

**form**
72:24 95:16
97:12 104:1
158:22
160:21
193:24

194:19,21,22

**formal**
23:25 27:15
30:19 75:2
178:25
179:6,10
218:23

**formalistic**
128:21

**formalized**
212:24

**formally**
26:6 179:21

**format**
44:14 62:23
66:20 69:15
73:11 78:19
164:19
222:14
229:16

**formatting**
71:21

**formula**
122:10,17,
21,25 123:19

**formulaic**
128:23

**formulating**
69:13

**forth**
78:16 129:3
131:12
139:15

**forward**
57:17 194:10
199:7

**forwarded**
199:10

**forwards**
50:9

**found**
97:7 124:9,
12 153:17
201:3,5,8

**four**
46:1 95:11
96:5 156:10

Michelle Christ
February 07, 2025

164:6,12
173:10
229:18
**fourth**
157:1
169:13,23
**frame**
43:21 121:4
**fraud**
203:4 209:5
232:17
**fraudulent**
190:15
**free**
63:21 65:20,
25 100:22
229:16
**Freedom**
18:1,5 28:14
167:7 188:17
238:1 241:8
**frequent**
207:22
**frequently**
27:24 67:16
109:2 115:24
177:2 200:16
207:10
**front**
15:7 34:18
99:16 100:25
242:6
**frustration**
135:11
**fulfill**
173:14
**full**
7:21 33:3
60:3 97:25
98:24 119:3
163:10
171:12,17,24
172:19 229:3
**fully**
162:1 226:11
**function**
21:25

**functions**
176:7

—————————

G

—————————

**G-R-A-C-E**
22:12
**G6**
112:7
**gather**
183:4
**gathering**
57:14
**gave**
45:24 139:12
160:6 244:3
**genealogy**
242:13
**general**
12:5 17:23
22:8,17,18
25:17 29:19
30:15 61:24
66:14 92:12
100:7,10
101:7 106:25
110:24
111:2,11
114:10 128:3
131:23 135:7
138:12 139:3
149:24
176:15
188:18 196:5
198:9
217:16,18
228:2
**generalized**
29:1 111:11
135:5 150:8,
11
**generally**
19:17,18,20
26:25 30:18
31:19,21
32:18 33:16
35:12 37:13,

18 41:8
51:18 53:25
54:25 59:2,
19 60:20,21,
22 61:13
65:10 66:12
70:2 72:16
73:16 74:7
75:4 76:5,10
79:8 87:21
90:20 101:1
107:10 109:2
112:9 114:24
115:7,8
129:12,14
130:19
134:18
135:18
146:19 151:8
152:13
154:8,19
155:23 165:8
167:9 206:22
214:23 216:2
232:20
233:15
**generated**
16:4 59:16
71:15 129:15
130:3,6
135:12
**generating**
90:14 130:10
135:19
**generation**
119:7
**geographical**
121:23
**gesture**
7:23
**get all**
17:1 119:19
**getting**
63:10 68:1,4
84:12 101:10
109:1 179:17
180:16
234:23

**GIS**
61:10
**give**
6:1 7:20,21
15:15 16:8
23:19 27:7
33:4,14
38:18,23
43:16 67:19
72:18 73:2
82:10 83:18
85:13 91:15
92:1 107:9,
13,18 114:11
117:9 120:24
129:23 131:5
157:21
164:20
172:22
173:21 180:4
209:15
230:19
237:21
**given**
7:5,7 9:21
53:15 68:23
70:10 81:1
85:22 87:22
94:20 108:24
113:3 115:5
166:19 185:8
190:18
193:2,4
195:9,11
198:1,15
218:22
**glad**
51:12
**glass**
103:22
**GN**
102:17
236:17
**goal**
181:5
**goes**
35:6 42:20
43:16,22

Michelle Christ
February 07, 2025

49:20,23
58:8 77:10
79:6 80:10
81:17 96:5
115:5 130:25
132:7
163:20,24
177:18
190:25 229:8
231:22,23
234:1

**going**
6:24 13:7
18:6 24:8,9
32:24,25
34:19 37:24
41:16 42:12
46:2 47:2
51:22 52:21
56:14 57:4,
23 59:24
62:21 72:7,8
73:12 77:2,
21 84:25
88:20 93:23
94:15
100:16,17
101:25
103:12 105:4
106:12
115:16
118:19
125:10
126:1,5
130:1 133:12
134:9 139:24
140:1 142:8
144:2 145:9,
10 148:11
150:12 153:8
161:20
167:1,2
168:5 169:9
172:22 176:4
180:25
183:13
185:23 186:6
187:3,21,24
189:7,25

190:1 191:1,
25 194:7
196:8,23
197:6,22
199:3 201:16
204:4 207:4
212:12 215:3
219:12,17,18
224:7 227:8,
9 228:23,25
229:10
230:8,20,22
236:23

**good**
45:18 69:24
118:8 166:9
167:2 212:10
227:2 239:1,
5

**govern**
104:19,22
153:22

**government**
5:23 20:25
23:8,20,22
24:2,3,22
25:14,24
26:4,15
34:3,6,12
35:14,19
48:12 57:24
60:2 73:7
75:15 108:4
120:4 121:25
122:22
177:25
178:23
211:10 222:3
242:4

**government's**
106:21

**grab**
53:5,6

**Grace**
22:10,12

**grade**
25:2,3,6
31:21 119:23

121:2,7,14,
16 122:8
123:2,5
138:10
166:24

**Graduate**
28:15

**grant**
55:18 57:15
68:12 153:24
154:2
162:17,19,20
163:10,11

**granted**
16:10 55:5,
16,24 56:1
86:8,9 87:1,
2,10,16
112:9
124:17,21
147:15,16,17
154:8
156:18,19,
20,21 157:8
163:2,7
168:16,24

**granular**
120:20

**great**
45:22 139:9
176:4 179:9
195:8

**grounds**
155:4

**group**
5:12,14 6:22
228:21

**GS**
25:2,4 27:1
76:17,22,23
121:7 123:2,
5 138:9
178:18

**guess**
8:5 170:13
177:17
178:13 204:1

**guessed**
72:14

**guidance**
13:17 27:18
66:23 91:2
96:23 186:21
193:7 195:11
212:3 219:6,
14

**guide**
29:10 32:13
187:6

**guides**
32:11

**guys**
244:7

---

**H**

**half**
84:21

**hand**
5:24 50:12
52:21 148:18
171:11,23
229:2

**handed**
89:5 102:13
132:15
158:20

**handful**
220:1,2

**handing**
15:1,2

**handle**
24:25 25:8,
12 28:23
40:10 71:2,
10 84:7
161:14
233:24

**handled**
12:21,23
19:7 25:16
37:2 40:12,
24 46:15,20
50:3 90:21

Michelle Christ
February 07, 2025

handles
21:2 177:3
handling
156:23
233:11
happen
29:2 37:18
44:4 49:13
62:2,24 63:7
67:10 69:21
78:19 82:21
85:20 86:14,
15 134:19
138:21 143:8
146:11
201:1,2
happened
44:5 77:19
78:24,25
93:7 135:13
146:3 197:23
219:21
220:23
happening
114:4 220:14
happy
181:21
hard
43:20 66:4
127:23
223:10
hardest
238:11
health
12:23
heard
171:19
hearing
38:6 49:6,7,
8,10 202:19
heat
215:1
heavily
160:22

heightened
26:8
held
11:7 14:22
218:8
Hello
6:20
help
39:11 149:5
183:18 200:6
helped
12:25
helpful
13:9 32:25
45:2 48:6
73:1 74:7
139:21 142:9
158:10 208:4
hesitate
206:18
hey
50:19 57:22
73:9 81:9,11
179:7
high
29:1,19
32:25 33:14
119:15
129:16 134:8
135:20
176:5,7,9
190:21 199:5
215:25
219:18
231:18
higher
47:20 166:14
highlight
190:7
highly
61:19 62:15
historically
176:17 224:1
history
65:15
hit
85:15

hoc
207:18
213:6,10
216:6,9
218:24 224:4
228:17
hold
56:7 62:19
67:19 83:18
91:8 129:22
165:24 166:2
171:22
holds
30:8
holiday
54:1
honed
100:3
honestly
22:15 55:14
123:22
124:17,19
157:23
hour
137:23,24
hourly
123:1
hours
83:25
121:14,16
122:7
137:22,23
138:2,10,14
166:23
house
9:9,10
housekeeping
6:24
huge
238:12

I

i.e.
95:25
ID
5:23

idea
67:19 179:9
ideas
177:1
identificatio
n
15:4 52:25
89:3 102:10,
11 132:13
158:17
161:18
187:23 189:9
224:9 236:11
identified
61:7 203:5
244:1
identify
99:7 125:14
142:24 190:5
194:9 197:4
202:20
243:23
identity
128:24
ii
106:17
108:2,14
148:23
149:5,8,12
iii
106:18 109:5
iiii
106:18
109:15
images
123:15
imagine
160:24
221:14
immediately
237:21
implementatio
n
18:4
important
23:1 52:12

Michelle Christ
February 07, 2025

impression
  43:9,16
improve
  75:13
inappropriate
  87:15
inclement
  7:5
include
  18:2 28:11
  42:2 100:17
  117:3,24
  154:13
  229:17 242:9
included
  39:14 95:21
  154:19
  170:11
  192:25
  213:10
includes
  137:22
  187:19
  189:16
including
  18:4 28:7
  31:3,4 86:25
  152:1 183:21
incorporation
  218:25
incorrect
  86:23 182:8
indeed
  46:21 87:16
  185:21
  203:1,24
independent
  42:10
index
  181:2,18,21,
  24,25 182:5
  237:14,18
indexes
  181:1
indicate
  85:6 129:18
  147:8 151:23

156:23
165:8,10
192:13,24
232:16,17
241:3
indicated
  56:18 124:12
  125:2 133:16
  164:22
  165:4,7,21
  166:4 233:8
  244:4
indicates
  138:9 142:17
  160:25
  165:14
  211:25
indicating
  65:1
indicator
  56:1 58:5,6,
  9 163:6,11
individual
  38:4 40:5
  46:17 48:13
  68:25 82:12,
  13 99:22
  111:4 113:11
  114:3,4,22
  115:6,12
  121:2,3
  122:9 140:15
  152:1 207:6,
  12,14,20
  210:15
  233:17,21
  234:17,18
  235:21 244:3
individual's
  39:24 105:18
individually
  207:6
individuals
  31:12 69:6
  92:15 93:22
  122:5,6
  151:18 152:6
  196:18

info
  72:2
inform
  113:7,9
informal
  27:5,18
  30:23 63:1,6
informally
  26:7
information
  6:14 13:5
  17:2 18:1,5
  20:25 23:9,
  20,22 24:2,
  3,23 25:14,
  24 26:4,15
  28:14 34:3,
  6,12 35:14,
  19 36:9
  38:8,15
  41:23 44:19,
  20 46:17
  48:10 49:18
  52:8,10,11,
  16,17 53:2,
  15 54:17,19
  59:17,19
  60:2 61:25
  65:18 68:4
  73:7 74:2
  78:2,14
  80:25 87:22
  95:1 97:6,21
  108:3,6,12,
  14 110:5
  113:7 116:1,
  7,25 117:1
  120:1,4,6
  121:5 130:3
  135:12
  137:22
  144:10,11,
  18,20 148:24
  149:9,13
  150:24
  151:25
  152:2,17
  153:12

155:2,20
159:17
160:17,19
164:16,17,
18,21,24,25
165:24
167:7,12,14
173:25
177:25
178:23
187:25
188:17
189:11
208:5,22
232:14 237:5
238:1
239:23,24
241:9
information's
  113:4
informational
  232:24
  233:5,10
informed
  125:21
informs
  154:24
infrequently
  59:7
initial
  70:9 142:20
  143:17
  144:15
  162:12,18
  163:2,15
  164:14
  185:16 205:7
initially
  126:1 163:15
  174:25 185:7
initials
  85:13
input
  21:4 41:18
  52:5 121:14
inputs
  121:17
  130:15

U.S. Legal Support | www.uslegalsupport.com          28

Michelle Christ
February 07, 2025

inputted
  33:17
inquiries
  20:18 25:22
  46:15 47:1,
  4,23 48:6,
  18,22 50:2,7
inquiry
  110:25
insert
  194:8
insight
  205:15
inspection
  113:4 229:15
instance
  38:18,20,23
  39:16 50:8
  57:6 58:17
  121:24
  123:14 131:7
  150:21
  162:9,14
  164:3 165:25
  166:18 173:2
  176:11 180:6
  200:24 202:3
  242:2
instances
  63:8 76:20
  85:7 86:20
  88:9,13
  115:6 124:23
  127:17 141:1
  150:21
  155:12
  173:12 175:7
  202:13,24
  204:4 209:8,
  24 232:11
  235:1 241:17
instruct
  93:23 94:8,
  15 106:22,25
  150:2 196:23
instructed
  29:17,18
  96:24 109:8,

  11,22 110:5
  111:18
instruction
  108:23,25
  162:23
  190:3,5
  191:6 192:2,
  3 194:1,10
  199:7 202:15
  212:19 217:7
instructional
  214:23
  235:18
instructions
  9:21 75:2
  107:8,17
  150:9,11
  185:24
  186:25
  188:14,20
  189:1 190:3,
  11,12,14
  192:7,21
  193:1,3
  198:14
  199:16
  203:18
  214:19 219:7
  232:25
intake
  142:16,20
intense
  115:4
inter
  183:23
interaction
  41:14 72:1
  207:9
interactions
  43:11
interacts
  51:20 52:13
interest
  37:6 42:14
  61:15 96:16
  98:4 103:15
  106:14
  141:16

  153:19,23
  154:7,16
  156:13,19
  176:15
  207:24 216:4
interested
  18:22 19:11
  33:2 166:16
interface
  31:3,4 52:12
  65:22 158:11
interim
  117:3,23
interject
  93:20
intermediate
  42:12 77:2
  79:21,25
  80:1
internal
  146:17
  181:11
  190:4,10,14
  205:15 209:4
  225:24
  237:1,18
internally
  30:3 31:7
  92:10,14
  116:5 119:9
International
  20:7
internet
  188:15
interpret
  106:23
  107:9,18
  186:20,23
interpretatio
n
  110:21
  111:12,19
  150:9 214:3
  216:13
interpretatio
ns
  187:10

  188:19 189:2
  192:4 199:13
  203:16,24
  213:22
  214:14 219:8
interpreting
  149:19
interrupt
  33:25
interviews
  244:3
invited
  29:8
invoke
  152:3
invoked
  137:14
invoking
  209:1
involve
  18:25 19:20
  180:3
involved
  13:16 21:19,
  20 30:18
  40:22 43:14
  50:4 75:25
  103:7,10
  129:10 132:5
  160:22
  197:17,18
  201:10
  213:13
  214:10
  218:8,12,13
  227:5,18,21,
  24 239:10
involvement
  193:20 201:9
  213:9
involves
  21:16
IRD
  183:23
Islands
  13:2

Michelle Christ
February 07, 2025

**issuance**
114:5
**issue**
35:25 36:13
62:4 66:11
77:14 133:4
139:19
197:15
**issued**
5:23 42:21
93:15 94:7
96:17 97:24
104:15 135:8
**issues**
12:7 134:5
178:7 213:18
**issuing**
97:2 227:5
**item**
95:25 97:4,
22 136:4
170:10
176:21
**items**
79:22 123:13
177:13
192:16
213:19

---

**J**

---

**January**
55:25 56:2,3
64:10,11,12
76:2
**Jersey**
13:2
**Jessica**
5:13 6:21
89:8 132:16
175:22
214:25
**job**
21:16 22:2,6
23:22 24:11
25:25 72:12
83:21

223:10,12
**jobs**
211:10
**judge**
49:8
**July**
11:5,13 44:5
**June**
14:3
**jurisdictions**
14:19
**justification**
61:14 82:14
108:19
109:13 110:1
142:18 190:8
194:13
195:1,5
206:1 242:9,
12
**justified**
61:4

---

**K**

---

**K-I-M**
22:12
**keep**
118:19
135:23
142:3,8,9
215:3
**kept**
29:14
**Kim**
22:10,12,13
**kind**
46:17 59:11
72:1,10
75:19 82:16
110:20
113:1,18
114:23 132:4
144:9 152:10
157:17
164:18
167:12

199:17
203:12
**kindly**
119:3
**kinds**
40:12 64:23
**know**
6:23 7:19
8:4,5,17
12:6,19,21
13:2,5,17
18:22 19:19,
20 20:11,22,
23 21:1,2
22:15 23:7,8
24:20 26:14,
16,22 27:3,
25 28:2,3,
15,19,20,23,
24,25 29:21
30:2,5,6,8,
9,11,24
31:6,15,20
33:2,6,22
34:25 36:25
37:14,15
38:5,9,15,
16,22,24
40:9,11,15,
22 41:9,10
43:13,14,15,
22,23 44:21,
22 45:3
47:19 48:10
49:2,5,9,10,
12,17 50:16,
17,22 52:2,
13 53:6
54:1,18
55:12,14
57:1,3,5,12,
15 58:14
59:2,13
60:16,24,25
61:24 62:9,
10,18 63:3,
17 64:7,8
65:12,13

68:24 69:5,9
70:11 71:19,
20,23 72:6,
7,8,9,10,18,
20,21 73:4,
10,24 74:1,
3,5,17
75:10,11,14,
15,16,20,24,
25 76:3
77:9,10,12,
13,16,18
78:21 79:22,
24 80:4,15,
16,17,18,19,
20 81:1,3,
18,19 82:11,
15,16,17,20,
24 83:3,16,
19,23 84:3,
5,13,25
85:11,13,21
86:4,22,25
87:14 88:2,
14,16 90:9,
10,11,21,24,
25 91:11,15,
20 92:6,11,
17,18,23
94:4 95:18
97:13,14
98:6,14,15,
16,18,20
99:3,11,14,
16 100:3,8,
10 101:2,5,
6,8,9 102:3,
23 103:21
105:8,10
106:1
107:10,12,
15,22 108:1,
9 110:9
111:23
112:18,19
113:6,8,21
114:20
115:1,6,7,
10,11,14,19

Michelle Christ
February 07, 2025

116:19,22,24
117:15,19
118:6,7,9,
10,11
119:12,13,
20,25 120:1,
5,17 121:2,
20,23
122:11,21,
22,23,24
123:7,12,15,
23 124:8,18
125:13,19,
23,24 126:2,
21,22 128:7,
16,17
130:12,21
131:11,15,21
132:3,6,10
133:5
134:10,21,24
135:18,19,
21,24,25
136:20,22,23
137:1,5,10,
12 138:10,25
140:17
141:16 142:7
143:5,9
144:1
146:10,12,
17,20 147:2,
14 150:23,24
151:19,20
152:7 153:3,
5,6,17,18,20
155:6,13,14
156:24
157:16,22,
23,25 158:2,
7,8 159:5,8,
22,25 160:1,
2,3,5,6,7,
23,24,25
161:8,11,12
164:21,25
165:23
166:15,22,23
167:1,15,19

169:10,22
170:1,8,25
171:3,19
173:15,20
174:10
175:7,21,22
176:9,10,16
179:7,8,9,
10,12,14,19,
22 180:3,19
181:14
182:15,16,
19,23 183:6,
17,18,19
184:12,19
185:1,3,9
186:12,14,
15,17
187:16,17
188:7 189:4,
6 190:18,20,
21 191:21
192:8,14,15,
22,23 193:1,
9,11,16
194:4,5,17,
22,23 195:3,
21,22,23,25
196:1,12,14,
15,16,19,20,
24 197:1,2,
3,11,14,20
198:2,4,10,
13 199:15
200:3,15
201:3,6
202:10,23
203:2,4
204:1,21
205:11,13,
15,25 206:3,
5 207:1,2,
17,18,24
208:2 209:1,
2,5,6,7,8
210:10,11,
12,24
211:10,11,24
212:2 213:1,

4,17,18
214:9,16
215:11,15,
17,18,22
216:2,16,17,
18,20 217:2,
5,6,12,14,
15,23 218:1,
22,24 219:3,
4,16 221:4,
13,14,15
222:9,10,17
223:5,10,11,
13,15,16,23,
25 224:3
225:14 226:7
227:13,16,
19,20
228:10,21
230:8,10,16
231:6,8,12,
19,22,24,25
232:4,11,16
233:4,5,6,10
234:2,3,6,7,
8,9,21,22
235:13,23
236:20
237:4,9,11,
15,18,22
238:13 240:4
241:25
242:13
243:3,5,8,19

**knowledge**
24:12 27:17
102:6 118:5
131:19 133:3
138:19
154:11
184:16,17
189:24 191:3
195:16
204:14
227:10

**knowledgeable**
179:3 190:22

**known**
20:8 33:18
108:4,7
176:14

---

L

---

**label**
156:17
**labeled**
241:10
**lack**
204:20
**LAG**
8:19
**language**
71:22 72:7,
22 73:14,16,
22 74:3,13,
23,24 75:8,
13,23 95:14,
15 96:10
97:11,15,18,
19,21,23
98:2,12,15,
25 99:8,11,
18,20,24
100:3,6,7,14
104:12
107:3,5
108:17
109:24
131:10
136:8,13,23
137:2,3,17
138:8 187:20
192:9,11,25
194:6 213:3
**languages**
100:1
**large**
47:1,23
175:2,6
**largely**
190:25
**larger**
112:12

Michelle Christ
February 07, 2025

205:20
**largest**
  47:2
**law**
  5:8 12:20,23
  13:24,25
  14:11,13,15,
  16 49:7
  66:14 75:18
  92:12 106:25
  149:24
  198:10
  227:15 228:2
**lawsuit**
  93:15
**lawyer**
  8:3 14:8,23
  17:1 68:22
  145:11
  146:19
**lawyer's**
  68:21
**lawyers**
  6:24 68:11
  196:24 197:2
**lay**
  74:4
**layer**
  77:2 164:9
**layers**
  77:9 114:4,
  18 115:5
**lead**
  12:22
**leadership**
  216:11
**leading**
  75:25 114:5
**learn**
  27:4 75:5
  116:1 121:6
  138:13
  141:20
**learned**
  75:4 183:14
**leave**
  35:12,17

71:8 76:17
79:5 107:11
120:17 178:8
202:14
**led**
  138:16
  218:19
**left**
  77:22 132:18
**legal**
  5:11,13 6:22
  74:4 238:24
**legislative**
  228:3,20
**lets**
  194:14
**letter**
  59:15 69:24
  70:1,5,15
  71:14,15
  74:12,22
  76:9 77:24
  78:17 79:2
  80:2,10
  81:4,5,14
  82:7 85:4,
  20,24 86:6
  87:18,20
  89:6,7,17
  90:3,14,16,
  18,23 91:5,
  22,24 93:2
  94:7,14 95:4
  96:11,21
  97:19,24
  98:8,23
  100:23
  103:25
  104:14 120:5
  130:22 131:6
  132:16,20,22
  134:13,15
  135:16
  137:20 138:9
  159:15
  160:25
  164:22

**letters**
  71:17 73:11,
  15,17 74:11,
  12 76:4
  83:1,13
  95:16 96:17
  97:12 98:13
  100:25
  101:3,12
  129:11 131:9
  136:13,15,24
  137:1,4
  146:23
**level**
  25:3,6 29:1,
  19 32:25
  33:14 37:3
  71:5 75:15
  76:10 79:21,
  25 80:1
  92:15 104:13
  110:14
  119:15
  123:2,5
  129:16 134:8
  135:20
  176:5,7,9
  190:21 199:6
  215:25
  219:18
  227:17
  231:18
**levels**
  25:2,3 92:11
**liaison**
  24:13,18
  25:22 39:20
  228:3
**liaisons**
  18:3
**library**
  57:7 176:14
  177:10 208:1
**licensed**
  5:4
**life**
  37:11 119:4

**likewise**
  168:24
**limestone**
  121:25
**limit**
  166:19
**limitation**
  175:1
**line**
  12:17 20:24,
  25 23:8,9
  133:18
**link**
  225:24
  226:12,13,18
  231:21,22
  232:2,3
**list**
  95:1 156:19,
  21 172:22
  182:11,20,23
  183:1,6
**listed**
  100:5 147:3,
  5 156:2,4,10
  163:8 194:2
**listening**
  234:25
**listing**
  95:20 181:5
  240:6
**lists**
  229:17
  241:23
**literal**
  127:1 200:6
  208:11
**literally**
  63:16 85:3
  130:24
  181:23
  194:19 200:6
  205:2 208:9
**litigation**
  12:7,18,20
  43:13 52:24
  68:17 93:16

Michelle Christ
February 07, 2025

94:21 100:24
101:13
132:19 135:3
146:22 147:7
**little**
  13:7 25:5
  34:1 37:8
  46:25 51:15
  56:13 58:7
  105:6,15
  106:11 108:2
  113:16
  118:17,18
  120:19,20
  141:20
  148:21
  161:22
  190:23
  201:17
  202:19
  204:10 205:3
  210:23 226:8
  234:13
**load**
  79:5
**loathe**
  62:9
**local**
  38:6
**locate**
  119:20
**location**
  121:24
  210:22
**lodged**
  39:7 41:3
  58:16
**logged**
  63:5,6,9
**logistics**
  74:5
**long**
  11:4,20
  57:21 70:13
  73:5 82:5
  88:10 118:21
  119:20,22
  121:1,6

166:11
169:19
184:14
188:25
228:10
238:6,10,21
**longer**
  43:23 44:2
  88:18
  118:17,18
  155:21 172:7
  174:1 227:3
**look**
  15:14,21,24
  16:12,22
  17:17 27:23
  32:24 34:21
  36:24 37:5
  38:20 46:8
  53:21 59:8
  60:5,11,17,
  19 66:11
  70:9 72:15
  73:12,25
  77:11,12,15
  78:8 80:24
  81:1,2 82:17
  84:4 88:20
  89:13 90:2
  91:10 94:25
  95:3,7,9
  97:13 98:1,
  17,24 100:4
  101:12
  102:22
  103:14
  105:13
  106:13
  107:2,5
  108:2,8,17,
  20 109:5,12,
  13,15,24
  110:1,7,8
  111:15 112:7
  114:12,13
  115:13,15,21
  119:20
  121:20

122:13
128:10,11,
13,16,17,18
129:7 133:11
135:2,6,17
136:2,3
137:14,21
139:23,25
140:21
142:16
147:24
148:4,6,16
149:21
150:16
157:11
159:14,16
160:10
161:21 162:7
166:5 167:1,
5 170:21
171:6,15
172:16
174:12
176:22
180:23
184:24 185:2
186:6,7,9
187:15
188:12
192:19,20,
23,24 200:9,
10 203:22
204:5 205:7
206:8,10
207:18
210:16
213:16 216:4
221:18,20
222:1 226:7
234:2,13,22
235:22 236:7
237:17,24
240:14,22
241:10
**looked**
  88:17 91:1
  116:19
  126:1,20
  133:6 136:25

137:1 157:6
158:22
159:16 168:8
169:21
174:22
192:21
241:11
**looking**
  35:2 38:25
  46:17 49:1
  57:12 61:13
  63:25 83:12,
  17 84:6
  103:24 104:7
  114:17
  120:25 129:2
  139:23 141:3
  143:25
  144:2,8
  147:8,9
  148:5 149:17
  151:10,18,20
  152:6,9
  168:16
  179:13 186:8
  204:1
  205:18,22
  210:11
  225:5,8
  235:25
  237:12
**looks**
  61:17 143:9,
  10 144:9
  225:19 232:1
**loop**
  19:21 122:8
**looser**
  179:13
**lost**
  224:8
**lot**
  37:7 48:12
  83:15,20
  100:10
  115:20
  121:24 135:2
  140:14

Michelle Christ
February 07, 2025

176:17 179:7 180:18 216:8 225:22

**loud**
7:22 149:8 150:13

**lunch**
139:22

---

**M**

**M-I-C-H-E-L-L-E**
5:21

**made**
19:4 31:22 32:6 35:4 36:22 40:7 41:19 42:3 56:12 61:7 78:5 87:24 94:1 96:15 105:22 111:4 114:8,13,23 134:13 137:3 142:25 145:2,25 146:2,9,14, 21 162:2 173:6 176:24 182:23 185:7 188:21 194:2 197:14 201:11 204:9,11 212:24 218:1 219:2 223:16,18 224:2,5 227:13 239:17 240:3 243:8

**magnifying**
103:22

**mail**
161:1

**mailed**
161:8

**main**
96:23

**maintain**
29:15 222:4

**maintained**
29:14 44:13, 14,22 61:22 73:2 210:13 222:6

**maintaining**
221:14

**maintains**
177:4,19 181:9

**major**
6:25 148:23 149:12

**majority**
47:11,23 83:8 113:5 181:17 223:6 230:4 231:10

**make**
7:22 8:1,6 21:8 41:15 45:25 47:4 48:11 64:15 66:20 68:9 73:7,13 75:17 76:3 77:12,17 80:1,8,14 81:3 82:18, 19 85:14 86:22 88:5 90:8 111:24 119:19 121:12 122:17 126:6 127:8,10 134:3 139:20 142:12 143:5 144:18,22 146:5 153:2 161:9 162:23 164:2 165:19 173:2 176:21 177:6 180:22

182:19 183:6 193:23 194:13 195:6 202:6,10 207:20 209:9 218:9 226:10 227:11 231:10 242:4,16

**maker**
68:7 211:22

**makes**
25:16 58:9 70:25 72:24 78:5 80:11 97:17 118:13 140:15 170:21 181:17 182:11 188:16 202:17 212:5 229:3,15 238:9

**making**
49:11 57:8, 22 60:4 62:13 68:15 74:21 94:2 140:7 144:1 187:16 215:19 223:24 235:2

**manage**
24:18 182:7

**managed**
189:23

**management**
167:21

**manager**
80:6 222:8

**managerial**
26:11 115:10

**manages**
21:3 190:20

**managing**
69:2

**mandate**
28:23

**manual**
29:18 102:16 112:10 216:14 229:19,20,24 230:13 243:18

**manually**
125:17

**manuals**
185:24 186:25 187:7 188:25 192:6 199:15 203:18,25 214:19,24 219:6 232:5 236:18

**mark**
89:1 102:8 187:22 189:8 208:10,12,15 224:7 236:10

**marked**
6:13 15:2,4 52:22,25 53:2 64:1 89:3,6 102:10,11 126:15 132:13,15 157:7 158:17,20 161:18 185:22 187:23,25 189:9,11 224:9,14 236:11 242:5

**marketing**
211:7

**marking**
208:21,22 209:19 211:1

**material**
28:13 29:11

Michelle Christ
February 07, 2025

32:10 43:2
209:20,21
236:1 239:21
240:8

**materially**
77:4 101:24
102:5

**materials**
27:7 60:3
77:23 150:1
154:14,15
206:8 237:15

**matter**
6:1 12:22
26:9,12
39:19 40:23
53:10 57:12
60:24 61:12,
15 62:4 78:3
165:24 170:4
194:9 200:3,
4,17,22,23
205:12
206:14 216:6
217:4

**matters**
12:21 13:6
19:20 21:5
25:23 43:13
180:3 236:25

**Matthew**
21:12 164:4

**mean**
18:23 19:18,
19 22:4
26:14 28:16
30:16,17
32:5 37:24
38:4,13
39:4,8 40:14
43:20 48:15
49:16 50:10,
16,17 53:14
55:8 56:25
59:12 60:22,
23 61:13
62:9,17,25
63:10,14,15,

16 67:21
68:1 69:3
70:2,8,16
71:8 72:6,18
73:17 74:17
75:10 77:12
78:20 80:4,
16 81:8,17
82:11 83:2,
3,23 84:6,12
86:15 88:1,
13 90:20,24,
25 97:13
98:2,4,14,17
99:10 100:7,
15 101:5
107:21
109:1,10
110:23 111:2
112:11 113:2
115:4
117:14,16
118:5
121:11,19
122:14 123:4
124:16
125:17
126:19
127:1,16
129:12 131:1
133:2
136:14,25
138:6,24
139:2,14
142:6,15
143:3,10,24
144:8 145:5
146:3,10
150:18 153:3
154:11 160:2
163:21
164:20
168:5,12
172:21,22,25
175:13
178:22
179:14
180:16 182:7
185:1 189:5

192:16,22
193:9 194:18
199:6 200:2,
15 201:3
203:12,15,22
204:2 205:4,
6 206:18,24
208:10,12
209:13
210:9,20
212:2 216:2
217:16
220:16
222:2,6,12
223:15,17,
19,23 224:12
229:25
230:5,7,8
231:5,18
233:4 234:20
236:6 237:2,
3 238:11,23
243:16

**meaning**
106:23
174:21

**meaningful**
43:4 44:12
108:3,12,14
110:4

**means**
67:4 91:1
168:21
172:25
181:24,25
187:15
192:11
210:10 220:2
225:6 230:13
232:9,19
233:3 237:3,
4

**meant**
46:11 99:12
153:18
194:19 223:2
237:24

**measuring**
169:24

**median**
88:22 169:13

**medication**
10:13

**meet**
8:21,24 9:3,
18 27:24
88:15 97:6,8
98:4,6,10
99:15 154:15
202:7,14
205:18
209:14,22

**meeting**
9:1 29:22
30:9,21,25
31:19 67:8

**meetings**
9:12,13
10:1,2 29:25
30:8,13,23
31:15,17,24
32:3 84:5
218:8,12,14,
18 228:16,
17,18

**meets**
98:19 190:6
203:9 204:7
209:21 217:6

**member**
26:24 29:4
185:25 187:1
189:1 192:7
199:16
203:19
214:19 219:7
222:9

**members**
17:24 22:21,
22,23 23:2,
16 26:21
28:21 188:21

**memo**
196:4,25
197:11,15,

Michelle Christ
February 07, 2025

19,23 198:2,
15,17,23
**memorialized**
69:15 111:11
**memorializing**
110:21
**mention**
43:2 111:18
154:20
**mentioned**
8:19 16:4
18:10 26:3
28:9 31:2
40:19 66:7
78:11 97:8
110:11
114:25 125:9
152:23,25
153:21
180:21 238:3
**mentor**
26:11 27:2,
19,20 62:18,
23 73:24
74:9 75:4,5
**mentored**
107:13
**mentoring**
13:17
**mentors**
100:2
**mentorship**
27:6 28:5
**menu**
65:7 125:3
162:11,15,20
168:8,17,22
169:3,7
**message**
66:23
189:16,19,21
195:12,14
219:12
**messages**
183:1
**met**
97:15 98:15

125:25
153:19
164:23
175:21
214:11,12
228:21
**method**
63:14
**methods**
123:10
**metrics**
113:15
**Michelle**
5:20 6:4
182:5
**microfiche**
121:22
**Microsoft**
71:16
**middle**
11:23 120:9
159:20
170:23 192:1
229:8 230:21
**million**
173:8,14
**mind**
59:3 154:21
173:23
**mindful**
170:8
**mine**
68:18
**minimal**
36:17 57:2
141:18
153:7,11
154:14
156:12
**minimis**
156:17
**minimus**
57:6
**minute**
27:6 73:12
122:17
127:15

133:10 162:7
188:5 215:5
**minutes**
45:17 125:10
138:12
**mirrors**
116:23
**miscellaneous**
25:23
**Missouri**
122:1
**misspoken**
8:13 171:21
**mistake**
23:2
**moment**
15:17 93:20
94:25 129:10
141:21 144:8
155:17
173:23 187:2
228:6
**moments**
144:5
**money**
160:20 161:3
**month**
50:18 70:24
**monthly**
29:21,25
30:9
**morning**
119:3
**move**
10:24 49:25
58:13 65:9
88:13 119:6
137:20
146:20 178:8
183:12
226:24
**moved**
104:4 220:14
**multiple**
77:9 99:2,6
113:22
114:18 115:5

129:23
196:15

_____

**N**

_____

**N/a**
55:5 58:24
**NA**
169:9,10
**nail**
90:7
**name**
5:19 10:9
21:11 72:10
77:10 90:11
240:9,11
**names**
92:1 196:21,
24
**national**
13:4
**natural**
126:24
**nature**
32:14 44:8
45:7,12
53:14 61:3,
18 70:17
76:16 80:17
82:8 129:2
157:19
180:17
213:16
235:18 236:7
238:8,14
**necessarily**
48:15 49:1,3
64:25 105:7
107:1 112:14
115:12 153:4
175:4 192:24
196:20
200:23
204:21
207:22 209:5
217:12
237:22

Michelle Christ
February 07, 2025

necessary
  130:15
need
  8:2 38:8
  52:3 61:15
  64:19 68:23
  74:18 77:18
  82:22 90:7
  99:19 109:18
  112:4,18
  131:22 132:5
  144:10,11
  145:9 146:24
  148:15
  149:23
  151:22 158:5
  161:1 178:7
  182:4 203:3
  231:11
  232:13
  238:24
needed
  107:25
  108:10,22,23
  109:14
  110:10
  149:17
  200:24
needs
  64:18 99:18
  144:18
  176:23
  239:21
negative
  225:14
  232:21
Negotiations
  20:7
never
  30:15 49:23
  83:14 111:23
  124:10
newly
  195:23,24
nice
  72:4
nine
  23:19,20

24:3 25:8,
11,18 71:4,6
160:4 171:22
177:25
178:17,19
non-program
  37:1,4,10
  51:6 105:2,
  14 125:8,16,
  22 127:13
  140:4,6,9,16
  141:15,24
  142:14
  143:13,16
  144:17 147:1
  148:16
noncommercial
  128:6 129:1
nonetheless
  76:1 129:14
  154:6 155:3
nonexempt
  232:8,20
noon
  118:15
normal
  51:7 91:9
  92:23 133:7
  228:20 236:6
notary
  5:4
notation
  240:25
notations
  65:15
note
  17:4 33:12
  37:13 45:3
  53:1 65:12
  84:15 93:14
  115:19 182:2
  187:25
  194:7,12
noted
  16:16,22
  17:7 65:13
  82:16 142:8,

10 163:3,4
242:8
notes
  63:23 64:18
  66:1 77:25
  93:6 167:20
  194:7
notice
  5:3 8:20
  15:10 16:1
  36:4,9,10
  42:4 51:20
  119:8,11,12
  120:5,15
  129:10,21
  130:10,12,
  17,18,20,25
  131:6,10
  133:16,22
  134:13 137:4
  154:24 161:8
  170:20
  224:19
  228:24
  243:24
notices
  122:15,16
  123:18
  130:3,6
  133:4 135:18
  137:11,19
notification
  160:15
notified
  87:19 200:7
notify
  221:7
noting
  189:10
notionally
  142:25
number
  16:9 19:6
  39:14 47:2
  49:13 71:6
  88:14 103:13
  104:12
  114:12

115:21
124:25
126:5,6,13
132:18
138:10,14
168:11,14,
16,17,20
169:13,14
170:24
171:4,11,12,
17,21,24
183:21 220:2
224:8 229:2,
18 230:20
238:12
241:23
numbered
  103:15
numbers
  16:3,6,8
  25:15 47:3
  75:21 82:4
  117:21 138:2
  139:20
  143:14 148:1
  168:1,4,7
  169:15
NYLAG
  6:22 52:17
  53:16 89:8
  100:24
  101:1,13
  132:17,19
  135:1,9,14
  146:21 147:8
  158:21
  159:15,22
  160:1,3,9,11
NYLAG's
  86:25 146:25
  147:21

─────────

O

─────────

O'CONNOR
  5:2
O-D-E-P-P-I-N
  20:2

Michelle Christ
February 07, 2025

**oath**
5:6 7:20
**object**
16:14 17:13
68:22 130:1
**objected**
17:5,10
**objecting**
16:15,20
133:16 155:4
170:25
**objection**
17:16 67:23
69:7 84:9,23
91:6 93:23
94:15 110:23
129:20
131:17
133:13
134:16,20
136:9 137:6
138:3,18
143:21 145:4
159:23 182:2
183:7 195:17
196:23
198:19 199:1
218:3 220:16
226:1,14
**objectively**
170:14
**obligation**
178:21
**obligations**
177:2
**obtain**
150:24 152:1
**obtaining**
42:4,5
**obvious**
143:4
**obviously**
21:1 31:18
60:25 68:14
69:3 74:18
75:24 113:8,
21 119:18

127:1 129:24
158:10
180:16
195:12
205:15
228:19 230:9
231:19 234:9
238:11
243:16,19
**occasionally**
19:19 20:17
35:12 47:12
154:10 178:6
**occur**
75:19 191:9
**occurred**
13:3 94:2
155:16
**occurrence**
84:7
**occurs**
82:4
**October**
45:11
**odd**
141:1
**ODEPPIN**
20:2,6,12
179:24
180:1,2,7,
12,14,17,18
181:10,14
182:14
183:3,12,14,
19,20 184:2,
17 185:2,5
186:13,17
187:16 188:6
189:23
190:20,25
191:17
192:23
194:4,9
199:7,11
201:5,12,18
202:10,22
203:6 206:4,
5 207:2

208:2,3,11
210:21
211:1,13
212:1,3,6,7
213:2 214:6
215:18
216:20,21
218:7,9,21
219:3,25
220:17,22
221:7,12,14,
24 222:4,7,
15,16
223:17,24
224:25
225:12,15
233:15 234:5
**ODEPPIN's**
184:21
187:17
210:21
**offering**
185:7
**office**
5:16 11:3,8,
19,25 12:5,
6,9 13:18,25
14:1 17:22,
23 20:6,9
21:2 22:17,
19 26:16
28:10,19
37:3,16
38:1,6,7
39:2,7,10,
13,16,22
40:6 43:12,
21 46:15
48:1,19,23
49:2,3,20
50:4,8,9,12,
13,18 65:12
66:13,14
69:4 73:7,21
75:24 76:11
78:21 92:12
96:17 97:24
101:8 102:4

103:6
105:17,23
106:25 109:2
112:2 113:1,
13,17 114:6,
12 116:4
118:8 119:9
122:4 123:18
124:2 149:24
152:8 161:4,
8,10,11
179:24
180:2,11,14
184:18 196:4
198:9 220:22
228:2,3
237:22
238:18
239:16
**office's**
104:19
**officer**
21:6,20
22:1,4 23:7
29:24 49:10
68:8,18
211:25
**officer's**
116:14,17
**offices**
38:3 46:5,6,
7,20,24 48:7
50:3 92:8
119:4 238:4
**officials**
21:4
**OGIS**
72:21 73:9
167:14
**OGL**
66:15,23
67:15 68:6,
9,10,25
93:11 94:14,
17 107:6
110:14
150:5,9
196:24 197:2

212:3

**OGL's**
  68:12,14
  69:2 110:21
  111:6,12

**okay**
  5:18 6:17
  7:17 11:12
  14:4 16:22
  17:20 18:6,
  22 20:14
  21:25 22:13
  23:1,11
  24:22 25:20
  26:3 34:8
  37:7,17
  41:13 42:10,
  24 43:1,24
  45:15,17
  46:8,12,23,
  25 47:22
  48:17 49:14
  51:9 52:20
  53:16 58:2,
  24 59:3,21
  62:12 63:12
  66:3 68:3
  70:4 71:13
  72:5 76:8,20
  77:2 79:19
  82:10 84:8,
  18,21 87:6
  88:25 90:5,7
  92:9 93:13
  95:22 99:21
  100:18
  102:2,7,8,22
  103:12
  105:15
  106:3,11,20
  107:4,16
  108:2 109:20
  111:15
  113:10
  114:21
  115:25
  118:13,16,19
  120:1,9

  121:5,12
  123:24
  124:25 126:4
  127:3 128:2
  129:9 130:1,
  7,9 131:16
  132:12 133:9
  134:6
  137:14,20
  139:21
  140:12
  141:2,8,19
  142:3,8
  144:4,14
  145:22
  146:7,13,19,
  20 147:13,24
  148:4,11
  149:15
  150:12,16
  151:10
  152:15,22
  153:9 157:2,
  6 158:12
  161:13,16
  162:7,13,18
  163:10,13
  165:1 166:5
  167:4,5,9
  168:11,15
  169:12
  170:5,21
  171:22
  172:16,24
  173:5,24
  174:11
  175:9,14,18
  176:18
  177:11
  182:22
  188:9,23
  194:6 196:21
  197:9 198:13
  202:16
  208:12 210:1
  212:8,12
  215:2,9
  216:16 219:5
  229:9,13

  238:21
  239:1,8
  240:7,13,21
  241:4,17,22
  242:16,22
  243:14 244:5

**OLGA**
  228:4

**once**
  42:9,18
  50:18 51:1
  59:15 85:2,
  22,24 86:6
  87:18 120:1,
  3 122:7
  166:18 191:9

**one**
  8:11 13:14
  18:11 23:15,
  17 26:25
  27:1 35:4,9
  37:25 38:18
  42:3 45:25
  51:10 56:23
  58:3 63:2
  64:9,10,21
  65:19 66:17
  69:19 71:6
  73:12 76:10,
  22 81:14
  82:17,21,23
  89:1 95:2
  98:1,20,24
  99:17 100:18
  101:3 106:21
  108:19
  112:13
  120:14
  122:13,14,23
  123:5,10,11
  126:6 128:2
  129:6 133:5
  134:12
  139:19
  141:13,14
  146:24 147:2
  151:7 153:18
  156:8,16

  158:6 160:4
  161:20
  164:12 168:6
  170:15
  171:15,23
  172:2 173:4,
  11,19 174:11
  175:25 176:2
  177:3 179:15
  181:7 188:6
  192:4 194:15
  200:10 205:6
  209:21,22
  211:16
  212:18
  213:15 216:5
  218:15,16
  224:19,20
  225:9,19
  229:17
  232:4,23
  235:23 236:9
  237:6 238:22
  243:22

**ones**
  48:18 74:18
  104:18
  121:19
  125:18
  126:4,7
  147:3,5,9
  148:12 164:6
  174:25
  175:12
  215:21
  243:17

**online**
  44:1,2,7,18
  122:21
  167:24
  179:21
  181:18
  222:14

**onset**
  107:12

**OPD**
  11:8,9,13,17
  12:1,4,7

Michelle Christ
February 07, 2025

13:4 14:22
17:21 18:23
19:16 20:10,
20 21:9,14
22:20 23:2
24:10,18
28:21 29:5,
7,13 31:22
32:6 33:8
38:3 40:21
43:11 46:3,
4,5,13 47:1,
4,5,23 48:7,
22 50:9 52:2
58:8 61:17
68:5 88:5
92:10,14
93:22 94:17
112:22
149:19
152:3,12
167:11 176:7
177:2,3,6,
13,18 178:1,
4 184:3,7,
15,17
185:13,15,19
191:1,3,10,
14,16
193:18,19,20
194:10
199:7,25
200:7 201:9,
10 211:2,22
212:5 213:13
214:9,16
217:11
218:9,23
220:13,15
221:23
222:13,21
223:16,17
224:3,4,21
225:15
227:21,23
233:13,16
235:12
236:20
237:11

238:1,6
239:10
**OPD's**
152:5 176:5
183:15 184:5
201:9 213:9
216:9
**operation**
229:24
**operations**
102:15
106:22 108:4
109:6 112:10
229:19,20
230:13
**operative**
103:4
**opinion**
62:5 109:4,
19
**opinions**
63:20
**opportunity**
128:10
**opposed**
21:18 54:11
56:21 218:24
227:12
**option**
55:10,12,19
57:10 58:24
59:4,6 87:9
168:22 169:2
**options**
55:4 157:8
**order**
6:14,16 33:3
41:16 44:8
88:5 96:25
116:1 134:18
141:6 144:18
151:23
160:20 161:3
177:7 202:18
**orders**
13:6

**organizational**
22:3 178:13
**orient**
51:16 230:23
**original**
77:25 114:20
165:13
**originally**
87:24 101:16
227:20
**outcome**
77:15 78:3
80:20 81:12,
13,14,15,16
117:6 155:21
**outcomes**
117:20,21
220:22
**outreach**
62:23 66:20
67:15
**outside**
16:21 17:16
22:18 28:24
29:7 31:23
40:10,11,15,
22,23 94:9
131:14 132:4
133:2 138:6
177:13 182:3
191:9 217:11
227:23
243:21
**outstanding**
169:20
**overlap**
100:1 209:11
**overlapping**
101:10
129:17,19
**override**
190:11,13
**oversee**
20:23
**overseeing**
21:14,17

**oversees**
21:3
**oversight**
21:1 113:18
114:1
**overview**
33:5 41:1
45:24
**owned**
222:7
**ownership**
181:14

---

P

---

**p.m.**
118:23,24
139:6,7
175:16,17
215:7,8
226:21,22
239:3,4
244:8
**package**
42:6,8
**page**
15:7 72:13
89:14 97:3
103:16 136:2
148:7
151:11,12
158:23
159:2,18,20
167:25
170:22
174:12 192:1
193:24
219:12
225:20 229:1
231:24,25
236:23
240:14 242:6
**paid**
159:22
160:4,6
**paper**
181:6

Michelle Christ
February 07, 2025

**paragraph**
95:9,11
113:3 136:2
148:22
149:12
152:11
188:12,13
229:3
**paragraphs**
137:21
**parameter**
243:16
**parameters**
29:20
243:11,14,17
**part**
12:5 18:14
19:6 27:9
30:19 34:22,
23 36:3,5,24
37:10,18,19
44:25 49:18
52:9 55:6
60:6 65:22
87:16 95:17,
20 96:1,10
97:9,25
98:24 103:3
104:3,4
107:15,23
112:9,12
117:10
123:15
127:16
129:20 136:3
141:7,8
142:15,21
147:11
148:18,24
152:7 156:21
158:5 159:6
161:6 163:2,
7,8 168:9
170:15
172:11 178:9
180:6 192:1
198:10
203:12

210:25 211:2
214:7
216:16,17
218:19
223:12 228:8
230:2 236:4,
5 240:4
242:5
**partial**
160:6
**partially**
87:1,2,3,9
162:1
**participant**
29:10
**participated**
227:10
**participation**
211:3
**particular**
19:12 33:11
81:24 83:21
95:18 108:10
111:5,7,14,
24 115:18
118:11
130:13
138:25 143:1
151:7 160:2,
5,16 168:6
170:17 174:7
180:20
186:14
206:25 240:8
243:11
**parties**
5:5,9 6:7,9
**parts**
190:25
202:14 203:5
204:16,17
205:23,24
206:3
**party**
58:4
**pass**
60:1 62:13

**past**
32:3 72:17
73:21 99:14
101:25
107:14
167:23
179:20
**paste**
100:10
**patience**
94:23
**pause**
38:2 66:3,5
100:18
175:14
**pay**
160:1
**paying**
148:15
**payment**
155:2,14,20
158:7 159:2
160:17,21,25
173:25
190:13
**payments**
161:4,7
209:6
**PD**
43:5
**PDF**
205:2
**people**
7:14 23:16
24:5 31:15,
25 38:1,6
48:11 50:1
62:14 68:10,
25 71:19
77:4 78:1
83:2 88:2
92:2,7 99:13
105:8 123:14
144:13
151:20 164:7
177:22
178:1,7,19
196:15

227:23 228:2
242:11
**people's**
173:10 179:4
**percent**
21:24 26:2
47:19,25
48:2 62:8
67:18,22,25
84:8,16,19
87:10 106:4,
6,7,8 124:1,
3,5,6,11,18
125:14,15
141:23,25
142:11,23,24
**percentage**
21:22 142:7
**Perfect**
5:22
**perform**
71:9 107:1,
11 146:5
206:2
**performance**
80:6 115:17
116:2
**performed**
12:17
**performing**
13:15 28:4
219:22
**performs**
176:7
**period**
25:16 71:9
73:6
**permanent**
11:5
**permission**
85:22
**person**
24:15,17
27:2 29:1
34:10 36:25
41:19 52:6,
7,8 53:13

54:17 58:1
60:4 61:11
62:20 66:7
72:12 74:6,8
76:13 78:21
88:1 107:24
115:18,20
119:24
120:6,12,14
121:8,17
123:5 126:2
138:10
142:17
155:19 157:4
165:4 173:25
179:2 183:12
190:22
215:25

**person's**
10:6 21:11
56:13 116:1

**personal**
10:16 74:2
131:18 133:3
138:19
211:9,10
222:3

**personally**
50:12 103:10
133:19
218:13 222:2
224:12 225:1

**personnel**
12:20 30:12
237:1

**perspective**
12:18 26:11
30:12 115:11
177:7 180:24
199:9 207:19
213:17

**pertain**
28:11 106:21
133:15

**phase**
36:4,5,21
37:19

**phone**
63:2,4 67:7,
10

**phrase**
52:9 144:4
196:11
205:22

**phrases**
188:23

**physical**
12:20

**physically**
78:20 85:21

**pick**
34:11

**picture**
141:21

**piece**
42:18 83:21
117:12 129:7

**pieces**
42:10

**piling**
115:14

**pitch**
18:17

**place**
37:10 59:20
66:6 73:3
98:24 156:25
191:18,19
230:19

**places**
208:13,15

**plain**
75:13 107:3,
5 108:17
109:24 138:8

**plaintiff**
5:12,14 6:23
52:22

**play**
58:16,22,23
61:2 185:13,
15,20 210:25

**please**
5:10,18,23

6:17 7:24
8:7 10:23
15:14,17,24
16:5,22
17:9,17 18:7
19:2 41:17
44:15 52:2
63:25 68:24
73:10 76:3
91:12 117:8
119:19
120:22,25
143:23
145:16 147:4
150:16 167:5
192:2

**point**
7:2 10:22
17:13 18:25
19:21 33:21
36:1,19
37:11 41:2
42:12 45:18
51:4 73:5,
13,20 79:2
86:8 90:6
119:13
125:20,24
127:1,2
142:12,25
143:18
144:2,13,15
146:6 148:11
157:22
165:22
177:18 184:2
202:5 211:21
220:15
234:8,11

**pointing**
106:20 226:6

**points**
145:1,2,25
146:1,8

**policies**
203:24
231:12 232:7

**policy**
18:1 20:7
112:1 187:10
188:19 189:2
192:4 194:14
199:13
203:16
206:11
207:5,17
212:19,25
213:22
214:3,13,24
215:11
216:12,13
217:1 219:8,
19,23 230:24
232:4,25
233:1 234:21

**POM**
186:14,17
189:17
232:11,12
234:24

**POMS**
27:12,13
45:10 95:3,
6,7 102:16
111:16,19,
20,22,23
112:1,2,3,
10,15,23,24
113:1,5
122:19
147:25
150:17
180:8,13
181:1,2,5,
15,17,18,20,
21,24,25
182:5,12
183:14,20,
22,25 184:2,
3,6,11,20,22
185:3,6,14,
19,21 186:8,
12 187:18
188:6,9,16
189:20

Michelle Christ
February 07, 2025

192:20,21
193:21,25
194:2
195:16,19,
23,24 199:5
201:12,19,25
202:5,23
203:2,3,15
204:24
205:18
206:10,25
207:7,10,15
210:15
212:1,7,13,
22 213:10,
19,21 214:2,
7,10,22,23
215:12
216:4,21,23
217:17,19,21
219:25
220:7,8,14,
21 222:10,
14,18,21
223:6,14,18,
21,24 224:2,
5,13,20
225:1,5,11,
24 226:11
230:1,2,3,5,
8,9,16,17,25
231:6,8,10,
14 233:22
234:2,14,17,
18 235:21
236:1,8,16
237:7,14,18,
19,22
238:17,22,23
239:11,12,
16,18,20
240:4,8,21

**populated**
54:7 72:3

**port**
8:17

**Portal**
158:21

**portion**
21:16 25:25
39:12 65:15
67:14 83:11
95:2,12,19,
24 102:23
160:23 162:4
201:7 237:11

**portions**
6:15 147:14,
15,16,21
202:13
203:1,3
205:18
208:17 230:5
236:24 237:7

**position**
10:25 11:4,
7,13,21,22
12:10,12,14
13:10,13,21,
23 14:2,10,
22 96:25
153:10
231:19

**positions**
14:5,7

**positively**
115:19

**possible**
38:16 39:5
49:25 86:25
88:14 98:25
115:10
156:10 175:7
182:15
199:19 201:2
210:24 212:3

**possibly**
78:2,3
222:22

**post**
201:13
219:19
224:21 225:7
231:17 235:7
239:11

**posted**
208:1 234:19

**potential**
123:9,10

**potentially**
47:20 48:24
61:23 62:11
94:19 119:18
200:19
237:25
243:20

**Powerpoint**
187:4

**practice**
33:10 86:18,
20 128:25
131:24
138:13
178:15

**practices**
102:5 217:8,
14,20,21
233:2 237:1

**pre**
72:16 207:15

**precedence**
83:17

**predecessor**
104:18

**predecisional**
94:1

**prefer**
88:2

**prep**
9:4 131:18

**preparation**
42:3 113:14
154:23

**prepare**
8:15 9:4
130:16
158:14

**prepared**
8:17 15:15,
18,22 16:2,
7,9,13,18,23
17:2,12,14,

15,18 132:2
134:25 135:3

**prepares**
120:19
130:18
167:10

**preparing**
120:14
130:25

**prepped**
133:17
135:20
136:11

**preselected**
53:19

**present**
5:23 101:25

**press**
87:11

**presumably**
60:11 75:22
199:10
222:21

**pretty**
46:21 82:13
114:20 143:3

**previous**
72:16 102:2
148:13

**previously**
70:10 86:7
104:10
111:17
114:13 148:5
149:25 150:4

**primarily**
33:2 205:17

**primary**
121:19
185:15

**principal**
176:23
185:20

**principals**
20:13

**principle**
217:18

Michelle Christ
February 07, 2025

print
  29:16
printed
  224:16
printout
  102:14,15
  158:20
prior
  28:1 43:7,8
  80:25 94:2,7
  102:5 109:17
  176:18
  213:9,14,20
  214:1 215:21
  216:11,25
  219:10
privacy
  11:3,9 12:7,
  9,22 13:3
  17:22,25
  18:3 21:5
  24:10 28:14
  30:24 31:5,
  6,11 32:7
  39:25 40:2,
  7,9,19 43:21
  45:10 105:9,
  18 120:21
  152:18
private
  242:13
privilege
  68:2 94:20
  101:10 109:1
  145:6 146:16
privileged
  81:17 91:8
  92:3 94:18,
  19 106:24
  143:2
privy
  216:17
pro
  216:18
proactive
  175:25
  176:2,6,8,10
  178:2,21

179:16,24
180:15
181:16
186:16,18
187:19
188:11
191:12,16
196:5
199:21,23
202:7 203:6
204:13,17
206:4
207:16,17
208:25
212:25 213:4
215:19
216:14,19
231:7,12,13
233:1,7,9
234:3 239:9
241:5
proactively
  176:12
  177:13
  179:14,15
  180:8 181:15
  227:16
  230:25
  232:11,12
  235:17
probably
  18:19 21:24
  25:18 26:18
  49:23 50:1,
  18,24 56:3,
  18 62:25
  86:3,9,10
  100:8 142:2
  156:17 170:1
  204:11 210:2
  211:9 243:13
problem
  135:4 182:10
procedural
  127:2
procedurally
  110:12 127:3

procedure
  10:18 188:18
procedures
  51:7 128:3
  139:3 167:15
proceed
  6:17 36:10
  155:15
  165:14,15,
  18,22
  166:11,13
  167:3 174:1
proceeding
  5:7 7:13
proceedings
  244:8
process
  16:3 32:8
  33:1,3,6,7,
  13 34:10,18
  35:13 36:19,
  24 37:11
  41:2 42:4
  43:12,18
  45:6,7,8,13
  46:22 52:1
  55:20 57:11
  59:22,25
  60:24 66:3,
  10 80:23
  85:3 87:3,5
  90:14,15,22
  93:5 101:3,
  6,22,24
  105:16
  111:22
  115:2,3,5
  116:11,12,22
  119:5,7
  120:20 121:7
  124:1 126:22
  129:15
  130:9,10,20,
  21,24 131:5
  135:5,8,19
  138:15,16
  143:8 144:6
  161:7

163:13,15,23
164:13 180:7
183:14,20
193:21
195:20,24
196:2 198:10
205:3 206:21
207:5,8,15
209:4 210:21
211:4,12
212:13,14
213:9,14
214:10
218:19,23
219:20
220:15,17
221:23
222:7,11
224:21
225:7,8
227:5 228:9,
15 230:24
231:17
233:14
234:1,2,7,16
235:6
239:10,13
processed
  34:2 126:17
  171:7
processes
  16:9 42:1
  46:14 101:8
  146:17
  190:11
  228:19
  231:20
processing
  28:6 33:18,
  22 34:24
  36:2,4,5,21
  37:18,19
  42:2,12,16
  44:1 50:9
  52:7 119:4
  131:24
  144:21 145:2
  161:4,10

165:2 167:18
170:23
**produce**
57:2 119:22
**produced**
52:23 56:1
**produces**
155:3
**producing**
153:7
**product**
27:23 94:20
**production**
134:15
**productive**
179:3,6
204:8 207:9
**proffering**
17:5
**prog**
151:22
**program**
36:25 37:1,
9,14,25
38:5,19
39:19 46:18
47:9,10,11,
12,16,17,18,
20 48:1,3,23
51:5 102:15
105:1,7,10,
14 106:5,6
112:10
124:2,3,9,12
125:1,15,22
126:3,8,14
127:11,17,22
140:4,5,8,
16,17,18,23,
25 141:1,5,
15,25 142:13
143:1,11,18
144:3,16,20
146:15
147:12
148:17
149:10,18
151:18,23,25

152:7,17
153:18,21
154:15
156:12,22
**programs**
151:22
229:19,20,24
230:13
**progress**
221:1
**projects**
13:4
**prompt**
7:6
**prongs**
233:7
**propose**
207:25 240:7
**proposed**
227:11
**protected**
6:13,15 53:2
187:25
189:11
**protective**
6:14,16
**protocols**
51:7 101:7
126:22
**prove**
242:13
**provide**
21:1,3 24:20
28:20,24,25
30:10 36:9,
10,12 44:22
57:2 61:23
107:10
111:13
112:5,19
113:22 116:6
117:5,23
118:7,9
137:22
155:2,13,20
159:17
164:24

165:23
173:9,25
183:15
186:21 189:4
194:18 204:3
206:1 233:5
235:6,7
237:5
**provided**
5:8 28:13,20
73:21 74:12
95:16 97:11
108:20 117:7
122:9 137:3
155:1
164:17,19
182:17 212:3
220:24
**provides**
61:14
**providing**
16:15 112:20
133:17
**provision**
54:12 152:3
**provisions**
148:11
**public**
5:4 24:13,
17,18,20
25:21 37:6
39:20 48:13
61:14 96:15,
16 98:4
103:15
106:14
108:5,7
109:6 113:4
141:16
153:19,23
154:7,16
156:12,19
157:5
176:13,16,21
177:7
181:12,17
182:1,12,20,
23 183:6

184:12
185:25 187:1
188:15,17,
21,22 189:1
192:7 194:3
199:16
201:11
203:19,25
205:20,21
207:20,24
214:20
215:20 219:7
221:5
222:10,18
223:7,14,18,
22 224:2,5,
17 226:11
229:15,18,
20,24 230:12
231:9 235:16
236:18 244:3
**publication**
20:7 183:14,
20 184:2
193:20
201:12 206:6
207:5 208:3
212:13
213:14 216:6
220:15,16
225:11
230:24
233:2,14
**publications**
20:9 30:3
236:24
237:10
**publicizing**
212:1,7
**publicly**
57:8,22
112:15,17,
24,25 113:6,
8 116:17
153:8,12
154:14
156:12
157:2,3

Michelle Christ
February 07, 2025

183:1 194:14
209:10
234:12,14
237:20
**publish**
179:14
220:13 221:8
234:6 235:1,
9
**published**
63:10 112:16
122:11,21
187:11
188:20 189:3
192:5 195:23
199:14
203:17 206:4
207:2 211:23
213:23
214:4,15
219:9 228:19
230:4,6
232:7 243:12
**publishing**
103:1 230:8
**Puerto**
13:1
**purpose**
37:1,2,4,14,
25 38:5,10,
19 46:18
47:9,10,11,
12,17,18,20
48:1,3,23
51:6 64:20
105:1,2,10
106:5,6
124:2,4,9,12
125:1,9,15,
16,22 126:3,
8,14 127:11,
13,17,22
140:4 141:5,
24,25
142:13,14
143:1,19
144:3,16,17,
20 146:15

147:1 148:16
149:9
151:18,23
152:1,2
153:18,21
154:15
156:12,22
198:17
**purposes**
18:15 30:5
47:6 101:23
105:7,14
128:13
147:12
152:7,18
229:18
**pursuant**
5:3 6:14,15
225:6 239:25
**pursue**
38:16,21
49:11,19
140:17
149:17 172:7
**pursuing**
37:15 38:7,
17 155:21
**put**
6:8 33:17
48:12 54:17,
21 55:22
56:17 57:6
59:20,21
61:14 64:2,7
71:2 72:9
82:12,14
86:22 87:7
97:19 100:24
105:19
108:18
109:13
113:10
120:3,4
124:21
133:13
152:22 157:3
170:4
176:12,15,19

177:10,17
194:17 195:6
222:14 234:6
242:12
**puts**
179:21
**putting**
57:22 114:6
131:17

---

Q

**qualify**
208:5
**qualitative**
117:1
**quality**
113:23
114:25
115:2,7
**quarterly**
30:24 31:15
44:23 116:6,
12,20 117:10
**queries**
243:11
**question**
7:24 8:1,2,
4,7,11,12
13:20 17:13
18:25 20:3
32:16 38:24
40:3 44:15
48:21,24
61:18 62:21
91:12,14,19
93:19 94:5,
16 107:17
109:7 114:2,
11 118:6
127:8 129:13
134:21
136:21
138:23
142:19
145:10,12,
15,17,20

147:19
155:8,11
159:25
181:23
182:6,18
187:14
194:20 196:6
197:5 200:24
208:20
209:18 213:8
217:24
223:12,20
**questioned**
204:15
**questioning**
133:18
**questions**
10:12,23
24:21 26:19
66:5 69:1
73:13 81:11,
13,20,21
90:13 92:18
113:12 116:8
131:4
133:11,12,14
134:1,2,4
135:21,23
137:16
148:12
161:24 176:5
180:25 183:4
187:9 191:2
196:8,11
197:6,22
199:3 212:12
213:15
216:25
219:17,20
223:11
227:8,9
228:23 238:6
239:9 241:4,
6 242:23,25
**quick**
81:2 242:24
**quicker**
37:16

Michelle Christ
February 07, 2025

quickly
  49:25 88:13
  111:15
  130:10
  139:15
  163:13
QUINN
  5:2
quite
  65:6 98:3
  115:24
  210:24 212:3
  238:13
quotas
  70:16
quote
  10:19 236:25

___

**R**
___

R-E-A-G-A-N
  32:23
raise
  5:24
Ramsey
  21:12,13
  22:7 164:4,
  10 166:3
range
  41:5,6 71:3
  82:10 83:18
  201:1 211:19
Ranucci
  5:13 6:21
  7:3 89:8
  132:16
  175:20,21,22
  182:9 183:8
  187:21,24
  188:2 189:7,
  12 195:18
  197:1,8,10
  198:20 199:2
  215:2,5,10
  218:4
  220:18,20
  223:2,8

224:7,10
226:2,7,9,
15,23 236:9,
12,17,19
rare
  37:2,24
  46:21 47:18
  50:7,10 78:2
  115:16
  121:21
  124:18
  202:23
rarely
  146:3
rarer
  127:18
rate
  123:13
  238:6,18
rationale
  99:1
reach
  31:12 48:14
  50:18 61:21
  62:16,22
  110:14
  130:12
  138:13
  180:19,22
reaches
  66:15 68:5
read
  6:10 15:18
  95:10 107:24
  133:10
  145:9,10,12,
  15,17,20,24
  149:8
  150:12,13
  151:13
  155:9,11
  188:24
  190:1,16
  192:14
  194:6,7
  198:11
  201:24 202:2
  204:2 205:2,

4 225:22
229:10,19
230:20,22
231:1 236:23
reading
  57:7 138:8
  176:14
  177:4,10,15,
  18,19 190:2
  208:1 237:6
ready
  79:23 85:12
  215:9 226:24
Reagan
  10:10 23:10,
  13,17 24:5
  32:22,23
  35:19 73:9
  76:18,23
  79:4,9,12,
  14,23 82:2
  91:5 164:8
  178:24
  202:24
  203:8,19
  204:9,24
  205:6,17,18
  206:16 208:5
  210:4 225:16
  227:22
real
  114:5,18
realize
  38:14
reask
  13:20
reason
  82:12 98:6
  138:16,20,
  24,25 139:2
  151:8
  172:17,19
  173:1 174:20
  235:10
reasonable
  97:5 98:5,9
reasons
  35:18 61:3

125:9 153:1,
2 171:13,24
174:16,17
182:16 203:4
recall
  8:25 9:2,16
  91:21 93:8
  95:5 118:12
  123:22 133:7
  154:22
  155:12,17
  158:3 204:19
  206:15,16
  211:21
  220:1,14
  228:9
receipt
  33:21
receive
  6:10 33:16
  39:13 41:8,
  9,10 46:14,
  20 69:6 74:8
  87:20
  139:16,18
  140:21
  163:19
  200:8,11
received
  29:13 41:18
  48:19 50:8
  53:25 88:11
  106:1 141:3
  151:20
  160:15
  176:18
  200:10
  202:24 216:3
receives
  54:5 69:23
  141:22
  165:13
  241:18
receiving
  71:5
recent
  88:21

Michelle Christ
February 07, 2025

recently
  45:5 90:6
  227:6
recognize
  15:6 89:8
  136:8 188:3
  189:13
  224:11,13,20
  236:13
recollection
  81:3 93:10
recommend
  146:7 202:7
  203:6 206:2
  208:8,15
  220:13
recommendatio
n
  68:21 69:14
  76:21 77:24
  120:13 143:5
  146:9 201:5
  202:10
  211:18
  212:5,6
  221:12
recommendatio
ns
  146:5 220:25
recommended
  201:9
recommending
  208:16
record
  5:7,10,19,22
  6:8 7:18
  16:14 17:2,4
  30:22 45:19,
  20 49:6
  53:1,19
  54:13 57:2,
  25 64:18
  81:23 93:14
  94:13,23
  100:19,20
  105:9,11
  112:9,19,21
  118:22,23,24

120:24
131:17
133:14
139:5,6,7,8
151:21 152:9
155:3
175:16,17
188:9 189:10
207:11
215:7,8
222:7
226:21,22
236:17
239:2,3,4
recorded
  7:19 65:14
  78:23,24
  92:24 111:6
  124:15
  156:1,6
recording
  65:4
records
  19:9 31:13,
  20 35:2
  36:12,17,18
  38:9 39:24
  40:5 42:5,16
  46:19 49:17
  54:12 55:25
  57:14,17,19,
  21 60:19
  61:2,6,23
  87:17 91:3,
  11 97:8
  105:19
  106:21
  119:18,20,
  21,23 120:7,
  24,25 123:17
  134:15
  151:18
  152:7,16,20
  153:7 169:20
  177:2 210:8,
  11,12,25
  211:3
  221:10,11

222:4 229:3,
15,17
red
  192:1
redact
  180:8 202:13
  203:1,3
  208:5 232:18
  238:7 241:2
redacted
  205:9 207:1,
  25 208:13
  210:18
  222:14 224:3
  226:12,13,18
  235:5,6
  239:21,25
  240:9,15
redacting
  204:16
  208:9,11,17
redaction
  202:16 205:7
  206:3 220:25
  222:11
  224:19
  225:19,23
  240:17,24
redactions
  176:23
  203:10 205:8
  208:14,21
  209:8,19
  211:7 221:5
  225:17 232:8
  238:14,15
  239:17,18
  240:2,7,21
redirect
  190:13
reduce
  95:24 96:5
reduction
  111:17
  112:8,13
refer
  18:6 23:23
  27:8,13

37:15 39:2,
10,22 49:9
56:20 57:8,
23 58:1
63:24 112:17
199:4 234:15
235:3 237:13
238:1,4
240:19
reference
  29:11 32:10
  232:2,3
referred
  39:13,16
  53:12 157:7
referring
  147:3,5
  152:6 159:19
  171:14 230:1
  237:16
refers
  29:22 236:25
  240:20
reflect
  162:10
  233:2,10,11
reflected
  155:22
  156:13
  159:11
  241:16
  242:17
reflecting
  240:25
reflects
  241:12
refresh
  81:3
reg
  81:2
Regan's
  23:21 79:19
  80:10
regarding
  150:9 188:6
  193:7 218:9
  228:23

Michelle Christ
February 07, 2025

region
  13:1
regional
  11:14,15,18
  12:6,13,15,
  16 13:18
  14:1 43:11
  102:4 184:18
register
  102:14,20,23
  103:1 122:20
  187:12
  188:20 189:3
  192:6 199:14
  203:18
  213:24
  214:5,15
  219:9
  228:20,24
regular
  41:14 60:24
  69:3 72:22
  84:7 101:8
  142:16
  228:16,18
  237:19
regularly
  169:12
regulate
  60:6
regulation
  21:7 22:1,6
  45:4,7 75:21
  76:2 95:20,
  21 96:6,9,
  13,14,18,21,
  22 98:18
  103:4,7,14,
  25 104:1,9,
  12,18 105:24
  106:9 107:3,
  5,19,25
  108:8,21
  109:12,16,
  17,21,25
  110:7 111:19
  112:6 129:4
  147:25

  148:5,8,12,
  13 149:22
  154:16
  227:5,12
  229:22
regulations
  27:8,14
  28:10,11
  60:6 70:11
  76:4 78:5
  81:2 103:2,
  13 104:2
  109:3 111:25
  113:24
  141:17
  149:21
  186:15 213:1
  216:18,23
  217:17,19,22
  227:14 232:5
  233:1,8
regulatory
  22:1 60:9
  104:13
  149:20
  150:14 154:5
  227:16
  228:20
relate
  158:6 208:17
related
  46:17 104:25
  105:1 119:6
  139:20
  148:18
  149:10 154:7
  172:17,19,25
  174:20
  180:14 191:1
  237:1
relatedly
  212:21
relates
  33:10 158:21
relating
  159:15 196:5
relationship
  12:4 118:8

release
  85:12 97:7
  203:5
released
  55:23 194:14
  226:11 227:6
relevant
  51:18 52:1
  54:18 194:9
  197:5
relooked
  8:19
remain
  47:5 56:15
  58:21 203:3
remainder
  105:20 126:9
  127:12
remember
  8:13 76:2
  90:18,20,22,
  24 217:23
  225:1,3,4,8,
  9
reminders
  232:24
  233:6,10
  235:19
remote
  110:4
removed
  230:10
repeat
  20:3 40:1,3
  44:15 103:17
  126:11 155:8
  174:15 207:4
  213:25
repeated
  73:15
repeatedly
  82:16 206:25
repetitive
  217:25
rephrase
  208:19
  220:18

reply
  54:8,9 77:16
  116:9
replying
  74:4
report
  21:8 22:7,13
  23:13 24:5
  29:25 30:6,7
  31:3 49:3
  88:20,21
  113:14
  116:6,15,16,
  17,23 117:14
  161:25
  167:8,13,16
  178:23 241:9
  243:12,17,
  20,21
reported
  178:19,20
reporter
  5:3,4,18,22
  6:7,17 7:19
  11:8 13:8
  15:2 45:21
  89:2,5
  102:13,16,18
  118:25
  132:15 139:8
  145:13,15,
  18,20,21
  155:11
  158:19
  175:18
  187:21 188:1
  189:7 215:9
  224:7 239:5
reporting
  31:11 49:22
  116:20
  117:10,13
  178:12
reports
  22:18 44:23
  47:6 116:12
  118:6 178:25
  243:10

Michelle Christ
February 07, 2025

**repository**
  99:4,7
**represent**
  132:17
  224:17
**representative**
  10:19 38:22
**represented**
  242:11
**request**
  33:15,16,21
  34:10,13,19,
  22 35:1,4
  36:22 39:1,
  5,6,24 40:4
  41:18,20
  42:1,2,3
  44:13,19
  48:11,16
  49:11 50:11,
  19 51:5,19
  52:4,7,15,19
  53:12,14,16,
  25 54:5,12
  55:11,18,20,
  23,25 56:6,
  19,21,22
  58:4,5,16,19
  59:12,13,20
  60:1,12,18
  61:3,8,12,16
  65:23 68:6,
  7,13 69:13,
  15 70:7,9,
  14,17 74:1,
  19 76:16
  77:16,25
  78:2 80:25
  81:24 82:8,
  12,16,19
  87:1,2,24
  88:10,11,12
  89:25 91:2,
  22,23 92:24
  94:3,7,25
  95:8,18,25
  96:16 97:5,

  15,25 98:9,
  23 100:14,
  23,24 105:8,
  22,24 106:1
  108:6,10,19
  109:12,14,22
  110:6,8,15
  111:4,5,7,
  14,22 112:23
  114:4 118:3
  119:4,6,14
  120:21,24
  124:5 125:21
  126:1 127:25
  128:11,12,
  13,15,18
  129:1,2,6
  131:25
  132:19
  133:23,24
  134:11,12
  135:1,9,14,
  16 136:4
  137:18
  139:15
  140:6,17,24,
  25 141:1,4,
  15 142:13,
  17,20 143:1,
  11,13,16
  144:1,9,16,
  17,21 145:3
  146:14
  147:15,16,
  20,21 148:17
  150:5 151:24
  152:17
  154:13,25
  155:15,21
  156:2,20
  157:19
  158:21
  159:15
  160:2,5,7
  161:7 162:8,
  10,12,13
  163:1,2,17,
  19,21 165:3,
  11,13,21

  166:1,13
  167:1 169:3,
  20 170:18
  172:2 173:2,
  3,6,7,9,14,
  17,18 174:1,
  2,4,5,6,7,8,
  25 175:2,10
  206:25
  207:6,7,14,
  22 216:3
  233:17,22,
  24,25 235:21
  236:7 238:14
  241:10,13,
  15,18,19
**requested**
  35:2 53:18
  83:9 95:2,25
  97:6,8 112:9
  124:6 127:21
  155:23
  157:12 158:2
  160:3 167:14
  176:11,17
  177:2
  207:10,21
  209:23
  243:18
**requester**
  52:12 54:21
  57:16 58:19
  59:18 61:14
  64:6 87:13,
  19 112:17
  113:7 119:12
  122:9 125:20
  128:5,11,12,
  14 130:17,25
  154:24 155:2
  158:5,20
  159:10
  160:15,17
  162:1 164:20
  165:7,12,17
  166:4,9
  172:6 209:2
  233:21

  234:15,17,19
  235:1,7
**requesters**
  74:17 75:13
  108:20 110:1
  128:5,6,22,
  23 143:6
  207:6
**requesting**
  30:7 44:24
  54:18 123:14
  164:21 242:6
**requestor**
  38:11 39:4
  41:3,25 42:1
  61:4 113:9
  128:18,24
  129:7 155:1
  165:21
  166:15,19,25
  170:20
  234:11
**requests**
  12:8,23,24
  13:5 16:10
  18:9 19:4,7,
  12,13,14
  20:11,18
  21:5 24:25
  25:9,12,15,
  18,22,25
  26:11,13,17
  27:21 28:6
  33:2,17
  35:22 38:3,
  12 39:9,23,
  25 40:10,12,
  19,21 43:12
  45:10 46:2,
  3,4,5,6,8,
  14,16,21
  47:5,8,25
  48:8 51:16,
  18,23,24
  56:18 59:23
  67:14 70:23,
  24 71:1
  83:15 84:5,

Michelle Christ
February 07, 2025

16,22 88:17
94:1 95:6
101:1,13
104:22,24,25
105:1,8,12,
17,18,20
106:8
113:12,18
117:6,20
124:1,17
126:7,17,25
127:10,12
128:21
129:25
132:18
139:16,17,18
140:4,8,9,
16,21 141:3,
22 146:21,
23,25 147:6,
8,14 152:14
160:3,16
168:1,21,24
170:11,23
171:7 172:3,
5,6,13,15,23
175:11,13
179:17
206:18
207:8,13
208:20
211:25
235:13
238:4,7,12,
19 241:25
242:3,4,10,
12,18,19
243:7 244:2

**require**
18:15 127:23
191:12
235:18

**required**
14:22 199:20
201:4 204:17
213:5

**requirement**
181:16 233:7

**requirements**
28:23 44:22
98:16 111:25
202:8 203:9
204:8 217:10
233:1

**requires**
176:10

**researching**
42:5

**resolution**
54:12

**resources**
176:20 216:1

**respect**
27:18 45:5
126:10
130:14
135:14,15
156:16 176:5
178:14,21
186:18 199:4
225:10
228:15
239:10 241:5

**respectfully**
145:7

**respond**
20:18 88:15
121:3 133:18
153:12

**responding**
25:21 33:1,
14 34:18
154:13

**response**
21:5 35:25
36:13 37:16
41:8,10,11
42:21 48:8
55:23 66:25
67:4 69:16,
17 73:22
87:25 89:12
97:2 98:20
100:23,25
101:3,12
103:24

104:14
110:24 111:6
133:23
173:17
207:12 231:6
238:7

**responses**
72:7 89:18,
19 116:10

**responsibilit
ies**
24:24 26:1,8
83:13,20
178:2,5

**responsibilit
y**
20:20 21:13
25:3 83:22
149:11 180:1
217:4

**responsible**
69:1,2
223:24

**responsive**
31:13,20
36:12 42:4,
5,16 57:19,
21 60:19
61:2,6,23
94:4 119:18

**rest**
25:5 83:13
97:23 126:16
187:7

**restate**
47:22 127:9
140:1

**result**
173:7

**retainable**
211:11

**retrospective
ly**
114:14

**return**
13:5 37:8
44:11 109:20

**Returning**
69:12 86:5

**reveal**
93:24 108:3,
14

**reversed**
162:14,16

**review**
5:9 6:11
13:16 20:13
21:1 26:11
34:13 35:6,8
42:7,11,15,
20,21 43:10
52:9 62:20
69:16 70:7
76:8,10,17
77:3,5,6,8
79:19,20,25
80:10,23
81:4 82:6,22
87:5 89:20,
22,25 90:22
91:22,24
92:11,14
93:5 95:10,
23 113:13,22
114:4,7,21,
23 115:4,17,
25 117:20
118:3
122:15,16
123:21
126:22
133:19
135:17
136:10,15,22
137:11,18,
23,24 138:15
142:20
143:8,17
144:15
163:17
164:5,6,9
176:24
178:25 179:4
183:23
184:3,7

Michelle Christ
February 07, 2025

191:6,9,10,
22 192:2
193:12,17
194:11
199:4,8,9,19
200:3,14,16,
21 202:9,25
203:8 204:7,
24 209:16,
20,25 210:4
212:21
213:7,11
219:22
224:4,21
225:7 232:7
234:1
235:19,20
236:4,5,6
238:2,7,22
240:2 243:24

**reviewed**
33:22 42:18,
19 81:15
89:21 91:5,
24 93:2
94:14 95:3
99:14 101:19
132:22 138:6
210:15
222:22
225:17
239:12,15,16

**reviewer**
27:23,24
33:23 35:14
42:6,11,15,
19,20 65:11
66:19 69:23
70:6 76:23
77:11,23
78:5 79:3,9,
11,16,21
80:1,8 82:1
91:4 92:18,
19,22 107:13
110:14 111:5
122:13
131:13

132:3,7
143:18
144:22
163:24 164:8

**reviewers**
25:4 26:5,
12,25 32:19
35:9 62:18
66:18 69:22
71:10 76:11,
22 82:24
86:20 99:14
100:3 107:18
149:23
167:19
179:16

**reviewing**
20:11 34:25
52:7 53:11
55:11 62:20
69:13 70:14
71:11 86:19
90:18 93:6
163:15
191:8,10,11,
16,20 209:23
225:1
239:10,20,
22,23 240:1,
5

**reviews**
114:19
163:23
164:12,13
193:14

**revise**
81:5

**revised**
75:9 103:7
189:17

**revisions**
76:5,6
80:11,15,20
81:9

**Rico**
13:2

**right**
5:24 7:11

10:23 22:1
33:2,5 34:17
41:21 45:21
50:24 51:15,
22 52:14
54:20 59:8
64:3 67:7
69:12 78:14
85:7 86:9,11
88:23,24,25
89:5 102:17
103:8 110:15
111:8 116:17
118:25
123:6,11,20
125:5 128:7,
20 129:11
131:7 134:11
140:2 142:1,
24 147:10,13
148:4,18
149:3 150:6
152:22
160:17,20
162:2
171:11,23
174:3,11
175:14
177:4,8,23
179:2 181:20
182:1,12
184:7 185:11
189:21
190:16 195:5
200:5 203:11
205:21
207:13 208:7
219:3,23
224:24
225:4,20,24
226:10,17
227:6 229:2,
19 233:13
238:5 239:5
244:5

**rights**
49:12

**risk**

68:17
**ROGL**
196:5
**role**
12:16 14:21
20:19,21,22
21:20 22:5
24:16 32:8
61:2 83:25
92:2 180:7
183:16
184:5,21
185:13,16,20
187:17
215:18 216:9
218:23,25
222:13
225:10,12
**roles**
26:4 92:2,7,
16
**Roman**
108:2 168:1
170:22
171:6,8
174:13,16
**Romanette**
106:17,18
108:14
109:5,15
148:23
149:5,8,12
**Romanettes**
108:18
**room**
57:7 176:14
177:4,10,15,
18,19 208:1
**roughly**
24:23 44:20
47:16 50:14
70:13 71:5
80:14 82:25
83:11,21
88:23
**round**
48:5 91:20

Michelle Christ
February 07, 2025

**route**
  150:23
**routes**
  202:21
**routine**
  133:8
**rule**
  10:17
  227:11,21,24
  228:16,24
**rules**
  7:17 188:18
  216:1 237:1
**run**
  243:10,17
**runs**
  179:20
  183:20

---

**S**

---

**SAA**
  242:5
**safe**
  84:8
**safeguards**
  243:9
**safety**
  12:23
**sample**
  73:17,22
  74:1,11,12
  85:21 95:16
  96:11 97:12
  99:8,11,17
  117:6 131:9
**samples**
  99:2,6,12,19
**Sara**
  163:25
  178:24
**Sarah**
  10:10 23:10
  73:8 76:18
  79:7 202:24
  211:16
  218:14

227:22
**sat**
  31:18
**satisfied**
  55:25 116:10
**save**
  29:16 71:21,
  25 211:9
**saved**
  85:24
**saves**
  99:14
**saying**
  13:9 37:9
  43:18 47:19
  51:25 72:5
  83:8 105:16
  114:21 142:3
  146:1 173:24
  204:2 238:20
**says**
  53:21 54:3,
  15 58:5
  95:23 98:4
  103:22 110:3
  112:8,14
  113:6 136:4
  148:16,22
  151:24 159:2
  160:15
  165:17
  168:11,20
  171:12,24
  172:3 174:1
  195:5 199:6,
  12 219:13
  231:6 232:6
  233:4 237:9
**scenario**
  62:15 157:1
  175:5
**schedule**
  122:18,19
  123:19
**schedules**
  123:9,16
**school**

14:11,13,15,
16 28:15
**Schwartz**
  5:15 6:9
  9:3,13 10:4
  16:14 17:4
  53:1 67:23
  69:7 84:9,23
  91:6,14 92:4
  93:14,23
  94:15 105:4
  110:23
  118:16,20
  129:20
  130:1,7
  131:17
  133:13,22
  134:2,6,16,
  20 135:15
  136:9,14
  137:6,9
  138:3,18
  143:21 145:4
  148:1 149:4
  152:16 155:4
  159:23
  170:25 182:2
  183:7 189:10
  195:17
  196:23
  197:5,9
  198:19 199:1
  214:25 215:4
  218:3 220:16
  222:25 223:3
  226:1,6,14
  239:7 244:7
**scope**
  16:21 17:16
  40:15 68:1
  94:10 123:15
  131:14 132:4
  133:2 138:6
  182:3 184:4
  191:3 217:11
**scratch**
  72:13

**screen**
  53:5,6,9
  103:20
**screenshot**
  86:5 157:6,
  14
**screenshots**
  66:4
**search**
  119:22 121:6
  128:22
  137:23
  138:15,25
**searchable**
  211:11
**searches**
  44:24
**searching**
  121:8
  138:10,11
**seated**
  63:2
**second**
  7:4 20:24
  23:8 47:3
  56:9 69:20
  89:14 95:10,
  20 97:3
  100:18
  110:14
  114:13 126:6
  129:23 136:3
  158:23
  168:17
  175:15,24
  188:13
  190:12
  194:1,12
  200:13,20
  203:9 204:1
  212:20
  219:13
  225:20
  229:1,3
  230:19 239:2
  240:14
  243:23

**section**
  58:21 95:2,3
  102:16,17,19
  103:15
  104:2,15
  105:13
  109:16
  111:21
  123:11,13
  136:5 140:8,
  13,22 148:10
  151:11,12,
  14,16
  157:16,17,18
  158:24
  184:22 190:8
  207:6,10
  233:22
  234:17,18
**sections**
  15:7 75:21
**security**
  5:17 9:9,11,
  18 10:19
  12:19 17:23
  38:7 40:6
  103:2 136:5
  140:8,13,18
  148:10
  151:21
  152:10
  182:16
  190:10 203:4
  241:8
**see**
  24:19 36:24
  37:6 39:15
  40:24 42:10
  52:17,19
  53:9,13,18,
  22 55:2,6
  56:13,15
  59:13 61:23
  63:21 65:6,
  15,17 66:22
  73:14 74:15
  76:5,20 79:8
  80:5 81:24

  83:4,7,8
  85:24 86:12
  87:8,24 90:2
  92:21 95:12
  97:9,17 99:6
  103:22
  105:16
  106:15,20
  109:20 110:8
  112:12,22
  113:1,2
  115:13,15
  116:25
  123:24
  124:11,22
  125:20
  126:24
  128:19,20
  129:6,9
  133:5,9
  136:6,25
  137:1,24
  140:23
  141:2,11
  148:18,24
  149:13
  151:14
  152:11,19
  156:4 157:14
  158:1,9,24
  159:3 161:1
  162:18
  165:6,12
  166:17 168:2
  170:15,21
  171:13,22,25
  172:14
  173:16
  174:17
  179:17
  188:10,11,23
  195:4 199:10
  202:9 203:23
  204:3 210:15
  231:1 234:2,
  22 237:18,24
  239:20,22,23
  240:5,14
  241:22

**seeing**
  70:5 156:22
**seek**
  20:12 58:20
  66:23 77:19
  78:13 82:23
  144:10,12,18
  152:3 238:24
**seeked**
  146:18
**seeking**
  31:13 40:5
  53:17 142:17
  143:7 233:25
**seeks**
  108:6 233:22
  234:17
**sees**
  53:19 85:7
**select**
  55:13 59:1,7
  65:23 74:22
**selected**
  55:10,17,20
  56:2,11
  57:10 58:25
  125:6 168:22
  169:2,3,6
**selecting**
  53:17 125:2
**selections**
  194:12
**send**
  27:23 33:20
  46:22 48:19
  50:13 66:23
  73:9 85:17
  88:4 100:12,
  16 120:21
  122:13
  130:17
  170:19 191:1
  205:7 206:5
  213:6 235:1
**sends**
  48:7 202:23

**senior**
  21:4 25:1,4
  26:3,25
  32:18 33:22
  35:9 42:6,
  11,15,19
  62:18,19
  76:11,22,23
  79:9,16
  167:19
  178:18
  179:16
**sense**
  25:16 70:25
  71:6,7 72:24
  73:13 83:19
  118:13
  162:5,6
  165:19
  170:21 200:6
  202:17
**sensitive**
  112:16,25
  180:8,13
  181:15
  183:25
  184:2,3,6,
  11,20,23,25
  185:4,6,13,
  22 186:7
  187:19
  188:14,16
  190:3,4,5,7
  191:6,11,18,
  19,20 192:2,
  20 193:25
  199:5 202:14
  203:4 204:17
  205:13,19,
  23,24 206:9
  208:6,17,22
  209:3,20
  212:21
  213:21
  214:2,12
  215:17 217:6
  222:18
  223:1,5,6,

Michelle Christ
February 07, 2025

14,18,21
224:2,14
230:3,25
231:8,11,14
232:11,14
234:17,18,24
236:1,3,24
237:6,14,18,
19,22 239:22
240:3,9
**sensitivity**
185:8,16
186:17 188:6
190:24
191:5,22
208:6
219:13,15
**sentence**
75:12 81:10
95:23 97:4
100:4,12
112:8 136:3
137:14,16
159:16
219:13
230:22 232:6
237:13
**sentences**
96:4 230:21
236:24
**separate**
40:2,20 64:4
65:7 93:5
114:1 175:13
203:10
207:3,5
208:22
209:16,20
223:17
233:18
**separately**
40:10,13
41:12 42:11
54:23 65:22
85:6 157:11
170:3 203:10
222:4

**September**
29:3,4
**sequencing**
87:4
**series**
135:13
146:21 218:8
**seriously**
85:15
**served**
16:1
**service**
23:22
**sessions**
27:16
**set**
65:20 75:2
99:24 104:17
129:3 150:24
175:11 199:3
**setting**
185:14
193:18
**seven**
210:13
**several**
8:25 9:16
43:23 55:4
185:21
227:22 243:5
**shape**
79:24
**share**
150:25
210:19
212:17,22
**shared**
86:4
**she'll**
205:7
**sheet**
183:24 185:9
189:17,18,20
190:1 191:1
195:8,20
201:20,25
205:14

212:25
215:13,14
218:2,10,20,
22 219:2
231:15
**shifted**
75:22
**Shifting**
76:8
**shock**
72:12
**shockingly**
7:6
**short**
57:3 118:9
226:19
**shorter**
88:19
**shortly**
141:20
**show**
5:22 53:4,5
122:22
146:23
158:4,5
181:21
**showing**
27:3 157:4
**shown**
6:12 29:10
**shows**
28:10
**shrug**
7:22
**sickle**
38:20,25
**side**
158:10
171:11,23
204:12
**sign**
6:10 72:11
85:21 133:19
183:24,25
185:9
189:17,18,20
190:1,2

195:8,20
201:19,25
202:23
205:14
215:14
218:2,10,19,
22 219:2
231:15
**signature**
5:9 85:19,25
89:14
132:20,25
133:4
**signed**
101:16
152:1,4
190:21
191:7,23
215:23
**signer**
212:25
**significant**
109:7,9
**signoff**
206:10
215:13
**signs**
191:10
**similar**
64:4 69:3
71:9 87:3,5
97:24 100:2,
9 101:3
109:7,10
130:21 131:2
137:18 140:7
148:12
149:21,25
150:4 158:1
159:5 163:23
164:13,16
175:9 187:9
**similarly**
28:9 30:24
45:9 56:4
94:12 100:6,
14 108:11,16
163:1 169:6

Michelle Christ
February 07, 2025

234:12

**simple**
19:7 82:13

**simplicity**
24:10

**single**
99:4,7

**sit**
60:25

**sitting**
7:19

**situate**
131:24

**situation**
58:3 68:5
87:2 120:17
127:20 135:6
151:6 154:4
174:7 200:15
223:24

**situations**
37:17 125:5
140:14
156:11
180:14

**skip**
35:13

**slightly**
21:20 51:17
71:10 104:4
126:21

**slow**
13:7 33:25
34:1

**small**
19:6 57:20
69:4 101:8
124:25
126:5,13
142:7

**so's**
63:20

**social**
5:17 9:9,10,
18 10:19
12:19 17:23
38:7 40:6

103:2 136:5
140:8,13,18
148:10
151:21 152:9
241:8

**solely**
20:10 237:1

**solemnly**
5:25

**something's**
37:14

**sort**
40:14 72:11,
19,21 78:13
80:3 109:20
113:23
124:18
131:14
135:13
137:17 153:3
159:1 173:16
175:5 179:4
182:4 191:9
193:1 234:21
238:18

**sought**
116:8

**sound**
128:7

**sounds**
181:24
200:12,18
203:7 204:6
205:17 213:9

**source**
168:7 209:7

**sources**
24:7

**Southern**
5:16

**space**
75:17 194:21
195:7

**sparingly**
190:5

**speak**
7:2,3 32:20

51:15 62:17
63:21 144:12
183:2 189:23
191:8
200:22,23
210:20 211:1
215:16

**speaking**
34:14,16,17
73:16 74:8
120:18
122:25 229:5

**special**
35:17
127:19,21

**specialist**
23:9,23 24:2
34:4,7,13
35:14,19
41:24 60:2
73:8

**specialists**
20:25 23:21
24:4,23
25:15,24
26:4,7,15
120:4 177:25
178:23

**specialized**
24:24

**specific**
22:2,5
24:15,17
43:21 66:5
68:25 108:24
109:23
110:15,24
111:5,14,21
115:9,21,25
116:2 120:23
135:22
146:13
164:24 168:8
173:3,6
179:2 186:7
187:3 190:7
196:8 217:8,
19 219:5

220:7 224:4
242:16

**specifically**
16:22 25:11
26:13 29:17
30:14 37:20
38:12 54:9
56:20 67:15
71:13,14
83:1 84:16,
22 86:17,24
90:2,18
96:20 103:14
111:18 112:7
114:16 115:3
117:20,25
119:5 120:18
123:1 140:3
159:14
161:5,23
163:14
188:10
238:17 239:9

**specificity**
90:20 97:5
98:5,10,16

**specify**
19:2

**speculate**
8:6 40:9
67:16 131:19
137:9 139:2
144:24
235:23

**speculating**
83:24 142:7

**speculative**
146:4,11
157:25

**spell**
5:19 22:11

**spend**
70:13 82:6

**spending**
84:1

**spends**
70:19

Michelle Christ
February 07, 2025

| | | | |
|---|---|---|---|
| **spent** | 24 27:7,15 | 9,25 77:19 | **stated** |
| 83:12 101:22 | 28:10 29:11, | 163:9 164:6 | 154:16 |
| 121:16 122:5 | 17,21,25 | **stamp** | **statement** |
| 138:14 | 30:10,23 | 52:23 | 152:1,4 |
| **splitting** | 32:11,16 | **standard** | 192:3 203:16 |
| 175:23 | 34:9,12 | 37:6 74:3, | 213:22 214:3 |
| **spoke** | 41:23 43:10 | 13,23 75:8, | 216:13 |
| 64:8,11,12 | 52:6,8 61:11 | 23 76:4 | **statements** |
| 192:18 | 74:8 76:1,5 | 95:14 96:10 | 187:10 |
| 216:10 | 106:22 | 97:11,15,18 | 188:19 189:2 |
| **spoken** | 107:1,5,9,18 | 98:25 100:6, | 192:4 199:12 |
| 233:12 | 111:18,20,21 | 9,14 131:9 | 212:19 |
| **SSA** | 112:2 | 137:3 153:19 | 214:13 219:8 |
| 10:25 12:10 | 115:18,20 | 238:6,18,20 | **states** |
| 13:23 14:5 | 120:23 133:3 | **standards** | 188:18 |
| 16:10 19:4 | 149:19,21 | 59:23 60:10 | **static** |
| 22:3 27:9 | 150:1 151:8 | 61:21 74:4 | 230:9 |
| 38:25 46:24 | 152:11,12 | 77:11 100:5 | **statistic** |
| 52:23 66:13 | 167:11 | 205:8,13 | 86:23 118:7 |
| 112:1 117:16 | 177:22 | **staple** | 168:6 |
| 121:24 | 183:12 | 103:18 | **statistical** |
| 148:23 | 185:24 | **start** | 113:15 |
| 149:11,12,18 | 186:25 187:1 | 13:10,21 | 116:25 |
| 159:6 161:6 | 188:21,25 | 14:2 32:18 | **statistics** |
| 181:11 | 189:1 190:18 | 36:20 44:18 | 116:7,23,24 |
| 182:1,11 | 192:6,7,18 | 48:21 53:21, | 117:3,9,11, |
| 183:12 186:3 | 193:2,4 | 22 131:13 | 21,23,24,25 |
| 189:4 190:4 | 195:9,12 | 145:24 149:4 | 167:16 |
| 191:22 | 199:15,16 | 166:17 | 176:19 |
| 195:9,11 | 203:18,19,25 | 169:22,24 | **status** |
| 213:21 214:2 | 214:19 | 170:3,7 | 158:7 159:2 |
| 216:24 | 216:14 | 176:4 184:10 | **statute** |
| 229:3,15 | 218:8,9 | 205:2 | 40:20 68:8 |
| 233:24 | 219:6,7 | **started** | 104:3 107:3 |
| **SSA's** | 232:24 233:5 | 43:5 72:13 | 141:17 |
| 116:17 | 236:18 | 227:20 | 211:24 233:8 |
| 129:24 | 237:22 | 228:9,10,13 | **statutory** |
| 184:19 | 238:1,11 | **starts** | 40:2 |
| 188:15 | **staffer** | 71:17 95:9 | **stay** |
| 229:18,20,24 | 27:20,21 | 96:5 97:4 | 46:4,6 |
| 230:12 | **stage** | 100:4 136:2 | 107:11 |
| **SSA.GOV** | 34:23 35:3 | 229:3,7 | **stays** |
| 230:15 | 61:7 62:12 | 237:13 | 163:6 |
| 231:23 | 65:23 160:14 | **state** | **step** |
| **SSI** | 228:21 | 5:3,5,10 | 35:13 36:2, |
| 224:16 | **stages** | 13:1 92:7 | 13,14,15 |
| **staff** | 33:14 41:6 | 195:19 | 120:9,18 |
| 25:5 26:20, | 51:17 65:5, | | |

Michelle Christ
February 07, 2025

184:6 199:25 200:2,13,20, 21 204:23
**steps**
8:15 41:16 43:4 44:8 63:17 64:21, 23 65:1,4 74:6 87:4 113:22 119:16 120:20 183:21 184:9 190:12 201:17 203:7 206:7 228:20
**stick**
141:21
**sticking**
213:17
**stipulate**
6:9
**stipulations**
6:8
**stop**
46:9
**stopping**
45:18
**store**
121:24
**stored**
210:19 211:7
**storing**
210:21
**straight**
76:14 79:6
**straightforward**
56:10 70:17 238:15
**strike**
36:20 68:24 97:23 114:2 163:16 172:9 184:10
**strongly**
68:14

**structure**
72:24 178:13,20,25 179:5,6 188:14
**struggling**
115:12
**sub**
104:13
**subheading**
171:12
**subject**
12:22 26:9, 12 61:12,15 62:4 78:1,3 96:13 101:13 146:22 147:6 194:9 200:3, 4,17,22,23 203:5 205:12 206:4,13 207:15 217:4 231:7 232:25 233:9,17 234:3 237:7
**submission**
69:20
**submit**
6:11 69:16, 20,22 160:25
**submitted**
37:25 79:3, 23 160:3 242:18,19
**subparagraph**
151:19
**subs**
26:23
**subsection**
84:18 106:14 110:3 111:16 112:7 140:21 148:16,17 149:17 151:11 152:16 188:12 229:10

**subsequent**
227:15
**subsequently**
134:13,14 224:2
**substance**
92:5 93:24 94:16 157:13 235:5
**substantive**
13:16 21:3 44:10 73:14 117:1,6 139:1
**substantively**
104:11
**substitute**
146:7
**successfully**
176:11
**sufficient**
151:25
**suggest**
77:17 78:12 80:1 81:5 133:25 143:14
**suggested**
236:8 239:18
**summarize**
77:21 154:12 183:13 199:24
**supervise**
26:6,10
**supervised**
12:8 13:15
**supervising**
13:18
**supervisor**
13:14 20:24, 25 23:8,9 32:20
**supervisory**
11:14,15 12:15 13:14 23:22 24:2

35:18
**suppose**
54:1 144:23
**supposed**
194:17,18
**sure**
5:20 16:6 21:8 23:20 24:2 26:22 27:20 29:9, 23 41:15 45:3,16,25 47:4 64:15 65:6 75:17 76:3 77:12 81:3 82:18 85:14 90:8 92:17 98:14 109:10 111:24 117:3 119:19 121:12 122:17 123:20 126:7 127:8,10 130:5 139:20 140:13 149:6 150:19 154:23 161:9 166:8 170:7 174:9,24 176:9 178:17 181:22 183:11 186:6 193:23 197:4 212:18 214:1 218:13 221:23 226:10,20 228:6 231:6 232:1,10 242:16
**swear**
5:25
**switch**
142:4
**switched**
44:18

Michelle Christ
February 07, 2025

switching
  139:14
sworn
  6:5
system
  33:18 34:6
  40:11 44:1,
  6,7,20 59:6
  65:4 87:14
  102:16
  112:10
  167:18,21
  169:19
  170:2,8,9,
  13,14 179:10
  209:6 210:8,
  12 222:7
  229:19,20,25
  230:13
  232:18
  243:12
systematic
  113:18,23
  114:7
systemic
  113:13
systems
  18:5 150:24
  210:25

T

table
  241:10,12,
  16,23
tailor
  98:19
take
  8:9,11,15
  15:14,17
  25:6 37:10
  45:15,17
  57:20 62:19
  66:11 74:5,6
  81:2 83:2,17
  85:15 88:10,
  18 95:10

  97:22 109:4
  119:21,22
  120:8 121:1,
  2,7 130:10
  133:10
  142:16
  153:10 161:9
  166:5 167:5
  173:12,13
  176:22
  190:13
  194:14
  203:22
  204:4,24
  205:7 215:5
  218:16 225:4
  226:18
  238:22
  241:10
taken
  5:2 7:15
  41:7
takes
  238:6,10
taking
  63:17 64:21
talk
  16:2,3,9,23
  17:2,18,20
  18:23 34:19
  41:2 45:5
  47:2 51:15,
  23 59:24
  82:23 86:24
  113:16
  125:10 126:5
  127:15 130:5
  176:6 180:12
  200:4
talked
  8:23 32:10
  46:1 63:18
  117:12 129:4
  153:22
  154:5,23
  161:23
  164:6,7
  188:24

  195:15
  210:19
  219:18
talking
  6:25 19:13
  40:15,17
  43:2 59:25
  65:19 96:2
  105:21
  113:5,11,17
  118:2 119:5
  120:10
  123:3,4,25
  128:20
  130:24
  136:15
  150:21
  151:17,22
  153:23 157:9
  167:22
  188:5,7
  231:17
  238:17
talks
  112:12
  186:12,17
Tara
  5:15
Tarantolo
  5:11 6:19,21
  15:1,5
  16:16,17
  17:7,8
  45:17,22,23
  52:20 53:3
  67:24 69:8
  84:10 85:1
  88:25 89:4
  91:18 92:13
  93:17,18
  94:11,22,24
  100:18,21
  102:8,12,19,
  21 111:2,9
  118:14,17,
  19,22 119:1,
  2 129:22
  130:5,8

  131:22
  132:1,12,14
  133:21,25
  134:3,7,17,
  23 135:23
  136:1,12,17,
  19 137:7,13
  138:4,20,22
  139:5,9,10
  143:22
  145:8,12,14,
  17,19,22,23
  148:2,3
  149:6,7
  152:19,21
  155:9,18
  158:16,18
  159:24
  161:17,19
  171:2 175:14
  242:24 243:2
  244:5
tax
  13:5
TBD
  55:5,8 56:15
  58:5
team
  219:21
Teams
  63:3,5 78:21
technical
  61:19 62:15
  243:9
technically
  173:7 188:14
tedious
  106:11
tell
  7:20 8:5
  24:8 41:17
  93:11 120:24
  134:9,10
  135:24
  136:18
  137:19 138:7
  140:2 142:5
  153:1 166:9

Michelle Christ
February 07, 2025

**telling**
8:23 128:24
237:17
**tells**
8:3
**template**
71:17,22
**templates**
71:19
**term**
29:24 30:2,5
31:2,6,10
34:7 74:11
114:25 119:9
141:5
181:20,22,23
185:23,25
186:3,8,10,
23,24
187:10,12,15
**terminations**
215:19
**terms**
25:15 30:7
31:10 77:22
87:4 105:7
126:17
166:22
175:25
179:13 189:4
211:6 212:24
215:15 219:6
**test**
16:18
**tested**
99:13 158:13
**testified**
6:6 7:8,9
50:6 84:14
103:6 106:3
111:4 133:18
135:17
136:14
138:12
141:23 163:1
169:10

205:12,24
223:16 243:8

177:21
178:14,17
218:7
239:11,17
**testify**
10:12,18
15:18,22
16:13,18
17:12,14,15
135:1
**testifying**
16:21 17:11
**testimony**
5:25 16:15
17:5 83:20
133:17 184:5
219:21
242:17
**testing**
38:21,25
**text**
54:21 63:21
64:6,11
65:20,21,25
85:13,16
240:17
**thank**
6:7,17,20
7:4,6 10:2,
11 13:7
16:12 17:20
19:11 20:14
22:13 23:1
24:1,22 30:1
32:24 43:1
45:2,15,24
46:10 48:6
51:12,14
68:23 79:19
92:9 94:23
103:23 104:6
106:11
111:15
118:13 119:1
121:13 127:3
128:10 129:9
139:9,14,19
146:7 147:24

148:2 149:16
150:3,12,16
151:15
152:15
158:25
159:21 167:4
168:15
171:10
180:25
184:19
185:13,23
187:9 188:1,
23 189:25
190:23
191:21 196:1
199:24
201:16
206:12 208:4
210:18
211:12
217:23
219:1,5
224:6 225:6,
10 227:2
228:7,14
229:14
231:21
232:6,23
233:12,20
235:15
236:10,22
238:5,21
241:4 244:6,
7
**Thanks**
45:22
145:14,19
177:21 188:9
193:23
198:21
204:23 216:8
219:17
222:17 226:5
228:23
230:18
231:16
237:13
**that'll**

183:18
**their's**
214:7
**theory**
81:23 86:15
111:6
162:21,22
220:13
**thing**
33:11 45:25
50:21 64:4
65:4 66:6
68:9 69:24
70:4 72:10,
21 95:17
97:1 108:17
115:1 128:23
152:10
161:20
173:10 181:1
182:22
186:14
226:12,18
234:13
**things**
6:25 21:3
31:20 32:9
38:5 50:1
60:5 65:21
71:21 72:25
77:14,22
84:2,25
85:11,15
92:23 99:13
104:11
115:15
128:17
131:20
141:11,13,14
143:5 145:6
146:18
160:24
172:21
176:15,16
180:17
183:13 194:2
199:18
200:19 201:2

Michelle Christ
February 07, 2025

203:1 209:2, 4,5,22 210:2,23 211:20 212:1 213:16,17 222:5 225:15 228:19 232:20 233:6 234:21 242:15 243:21

**think**
8:13 26:2 31:19 33:8 37:8 40:8,14 41:16 43:20, 22 44:21 46:1 47:1,18 50:6,25 51:18 52:20 55:14,22 56:23 59:5, 19 60:23 61:1,9,16 62:1,6,7,10, 25 63:8 67:21 68:22 70:2,3 71:12 72:18 73:19 75:7 77:3,7, 8,22 78:10 80:3 81:10 82:22 83:3 84:14 86:6, 15,20 87:13 90:9 91:8 96:9,23,24 98:14 100:9, 15 106:24 113:25 114:21 115:4,9 121:19 123:23 124:16,20 125:17,23,25 126:19 127:9 128:19 130:11

131:14 132:24 135:3,10 138:21,24 139:3,22,25 142:9 143:2, 24 144:11 145:6 146:10,13, 16,19,24 151:8 153:3, 16 155:5,9, 23 156:1 161:22 162:16 164:23 168:5 173:21 174:11 176:2,15 179:8 180:15 182:3 183:18 187:2 188:13 191:14 192:14 193:24 195:6 200:6 202:18 205:11 206:15 207:3 209:13 210:17 211:16 212:18,24 213:8 217:1 218:15 220:4,12,24 221:7 222:1, 25 223:23 224:8,18 227:3 228:5, 6 230:7 234:20 235:8,9 236:9 237:6 238:3,5,19 239:1,11

**thinking**
71:13 140:3

**third**

169:13,23 190:14 200:21 229:8 241:22

**thirds**
148:21

**thought**
39:10 100:11 156:18 171:19 204:14 207:23

**thoughts**
63:20 64:16 99:3 205:16 218:25

**thousand**
71:2

**three**
51:17 95:1 128:17 137:23 164:12 171:16 176:12 179:18 190:9 205:25 228:12 229:17

**time**
7:6 9:1 19:21 25:16 28:19 31:21 33:7 36:1,15 42:22 43:12, 21 56:2 58:5,8,12 59:3 62:1,8 70:19 71:9, 21,25 72:13 73:5,6 75:9, 10,22 79:6 82:10 85:12 91:5 95:21 99:14 100:3 101:19 114:5,6,18, 22 117:21

119:13,23 120:8 121:4 122:2,4 125:24,25 128:22 129:13 130:16 137:23,24 142:12 144:13 148:6 154:22,25 155:13 158:3 165:22 169:24 170:9,10 194:15 215:22 219:13,15 228:10

**timeline**
118:2 131:24

**timeliness**
170:9

**times**
8:24 9:15 41:5 50:15 90:7,9 101:25 146:13 152:23 154:12 176:12 179:7 213:5 243:6

**timing**
166:24

**title**
10:6 22:2,6 23:22,25 171:23 227:19 228:1

**titled**
15:13 168:20 171:7 174:16

**titles**
23:19 24:7 181:5 182:11,17 196:18,20

Michelle Christ
February 07, 2025

197:1,3,4
**today**
6:25 7:5
8:12,16
10:12,15
15:15,19,22
16:8,13,19
17:3 18:23
47:2 76:2
104:15
182:25
184:5,11
185:11 221:3
222:17
223:14,21
231:17
233:12
**today's**
19:12
**told**
115:11
183:11
**ton**
26:22
**top**
53:19 103:16
132:18 148:7
159:2 171:23
205:14
224:14
229:2,8
230:20
**topic**
7:2,4 15:14,
15,17,18,21,
24,25 16:4,
6,12,13,15,
19,22,23
17:17,18
30:15 82:15
129:24
133:15,16,21
147:6 175:24
182:3
**topics**
6:25 8:20
15:14 16:25
17:2,6,14

18:1 129:23
152:22 155:6
**total**
121:18
220:10,11
**totally**
49:12
**touched**
113:14
**track**
41:14,15
44:20 81:19
83:24 84:25
88:14 142:6,
9 224:4
**tracked**
47:5 48:9
49:21 65:18
70:20 81:19,
22 82:3
83:14,24
113:16
**tracking**
39:17 44:18
83:25 132:17
174:9
**tracks**
170:9 179:17
**train**
27:7
**trained**
26:20,21
**training**
27:15,18
28:13,14,20
29:1 68:24
69:6 187:8
189:4 190:18
193:2,3
195:9 219:6,
11
**trainings**
117:12,13
198:14
**transcript**
5:6 6:11,15
8:1

**transfer**
5:8
**transition**
44:2
**transmitted**
211:13
**Transparency**
10:7 18:8,
11,24 19:1,
5,14,24
20:1,5,15
21:17 23:3,
6,17 24:4
177:24
**transparent**
48:11 135:4
176:22
**treat**
51:10 146:14
234:21
**treated**
51:24 126:9,
16,25 127:3
143:16
144:16
146:25 207:7
**tree**
32:13
**trial**
7:9
**tricky**
194:20
**trigger**
88:7,8
**trip**
91:20
**true**
46:14 47:8,
24 48:8,15
51:4 56:4
61:6 104:24
151:1,3
195:16
235:11
**truth**
6:1,2 7:20

**truthfully**
10:12
**try**
44:16 49:25
74:16 75:16
88:13,15
105:15
107:10 114:2
126:12 140:1
141:2 144:14
145:10
163:16
173:22
201:16
202:20 227:9
235:9
**trying**
38:15,21
40:16 49:19
72:14,23,25
75:13 104:6
131:23
135:5,7,11
144:5,6
155:25
170:14 184:4
192:14
**turn**
7:3 15:13,17
215:1 224:18
228:25
230:18
**turned**
36:16
**turning**
71:13 106:20
130:9 140:3
175:23
204:19
240:13
**turnover**
26:22
**tweaked**
99:18
**tweaks**
44:24
**two**
6:25 15:6

Michelle Christ
February 07, 2025

25:1,4 26:3
33:19 35:9
47:13 51:22
54:2 64:9,
13,14 65:17,
19 76:11,22
102:13
109:11 123:9
137:21
148:21
164:12
168:13
171:15
178:18
188:23
192:6,13,16
194:7 200:19
203:7 211:16
212:14 215:5
218:15,16
229:17

**type**
16:3 40:4,20
44:12 52:15
54:24 68:4
79:17 92:23
95:15 120:25
233:25

**types**
24:7 65:17
77:4 140:10,
11 152:14
173:20

**typical**
83:12 134:11
206:17,19
233:22

**typically**
55:22 69:16
82:6 95:6,7
178:9 183:20
200:8 225:23
235:25

**typos**
77:14

—————————

**U**

—————————

**U.S.**
5:15

**ultimate**
68:18

**ultimately**
58:20 68:11
127:14
159:10
160:11 164:2
241:20
243:12

**unable**
32:19

**unavailable**
79:5

**undergo**
232:7

**underlying**
56:21,22
91:1 109:13
165:3,20
166:1

**underneath**
157:12 172:2

**understand**
8:7 10:12,
15,20 17:12
20:14 26:5
33:3 37:8
40:16,17
41:14,19
47:4 50:1
58:3,15
62:1,12 65:6
67:18 68:19
74:7 75:14
82:5 83:19
93:9 105:16
111:3 113:15
114:3 117:23
121:15
122:17
123:25
126:5,7,12,

13 129:9
130:15
131:1,4,22,
23 133:14
135:15
139:11 140:6
141:2 142:23
144:25
151:1,5
153:22
160:14
163:13 165:1
167:4,25
172:24
173:22
174:24
176:25
180:11
183:15,17,19
184:4,5
190:24 191:4
192:19,25
193:23
194:25
197:24
198:13 199:4
207:3,4
212:14 216:8
217:13
219:21
226:10 230:5
231:4 233:13
242:17

**understanding**
68:23 73:19
75:1 86:7
107:4 109:6
123:8 128:2
134:8,10
135:7 139:24
140:1 161:24
181:25
182:10,25
183:13
184:16 185:5
189:18
192:11,12
194:3 203:20
212:5,17,23

213:20 214:1
216:15
218:18,21
219:1 222:20
225:22
226:16
242:22

**understood**
10:5 13:20
17:17 18:16
19:8,25 21:8
22:20 23:25
24:22 25:8
26:19 29:10,
21 32:9
41:15 44:4
46:1,13
48:17 49:20
50:2 51:12
55:16 59:21
69:5 71:4
74:20 93:17
94:12,22
104:14 106:7
113:10
115:23,25
116:16
127:9,24
132:11
139:19,20
141:19
151:10
158:12 160:8
161:16,25
163:22
165:25 166:5
168:15
169:12
172:16 174:6
177:14
191:13,14,25
193:11
199:22 203:7
204:6 206:20
208:4 210:14
211:2 216:10
217:13,18
221:4 227:4
234:16

Michelle Christ
February 07, 2025

243:10,22
244:5
**unfamiliar**
7:18
**unhappy**
41:10
**Union**
242:14
**unique**
113:21 135:6
**unit**
11:5
**universe**
46:7 60:3
106:4 135:1
175:11
**unlimited**
64:17
**unquote**
10:19
**unusual**
135:13
175:23
**unusually**
127:25
**update**
45:12 73:6,
8,10 75:23
183:24
**updated**
45:11 73:10
75:17,18
76:2 103:1
195:24
227:14 230:9
**updates**
30:10
**USA**
28:15
**utilize**
240:9,11

---

**V**

---

**V(b)(1)**
171:6,15

**valid**
5:23 35:1
173:7
**variation**
126:24
**varied**
117:16
**varies**
83:14 134:22
**various**
20:12 24:7
166:23
**vary**
54:19 117:15
172:20
**vast**
181:17 230:3
**vendor**
243:6,23,25
244:1
**verbal**
118:9
**verbally**
67:5
**verify**
151:20
**versed**
28:22 179:16
**version**
6:10 103:2
104:9
109:16,17
207:1,25
**versus**
25:25 37:9
38:3 47:17
83:13
125:14,15,22
**VI**
174:13
**VI(C)(2)**
174:16
**video**
67:7,11
**view**
127:2

**VIII(B)**
168:1,7
**Virgin**
13:2
**voluminous**
238:13

---

**W**

---

**wait**
7:24,25
56:13 86:12,
16,17,21
93:19 102:16
**waive**
95:24 96:5
100:6
112:14,20
**waived**
160:3
**waiver**
16:10 25:12
26:13,17
30:18 31:22
32:6,8
34:13,21
35:3 36:3,24
37:11,21
41:9 42:3,14
51:16,18,19,
23,24 53:18
54:9,15,18
55:11,18,20,
24 56:5,6,
19,21 57:13,
16 58:4,16,
20,23 59:15,
23 60:1,11,
18 61:3,8,21
62:5 64:5
67:14 68:6,
7,13 69:13,
15 70:14,23,
24 71:1 72:6
73:25 74:1
82:6,12,15,
25 83:9,12,
15 84:5

87:2,7 88:11
89:12,16,18,
19 93:25
94:6 95:10,
23 97:5,25
98:9 100:22,
23,25 101:2
103:15,24
104:14,19,
22,24
105:12,21,23
106:8 107:24
111:17,22
112:8,13
113:12,13,18
114:15,16
115:3 117:6,
20,25 118:3
119:6 120:13
121:9,10
124:17 127:7
129:3,5
130:21
133:23
134:12
137:17
139:15,18
147:14,15,17
153:25
154:2,5,8,18
156:1,18
157:12 158:2
160:6 162:2,
4,8,13
163:14,18,19
164:15
165:1,11,13,
15,19 168:2
170:4,11,18,
19 172:15
174:4
241:11,19,25
242:7,8,10,
12
**waivers**
7:1 28:5,8,
11 30:14,21
31:5,17 32:2
33:3 34:20

Michelle Christ
February 07, 2025

54:8 69:1,6
84:19 101:23
116:1 118:11
154:17
241:6,23
**walk**
50:11 107:22
223:13
**walked**
50:19
**want**
16:14 17:4
31:25 36:16
37:7 45:25
47:3 48:14
49:6,8,11
51:15,23
53:1 55:15
57:16 58:2
59:22 62:18
82:23 86:21,
22 90:13
93:14 105:11
107:1 112:19
113:12
118:14,17,18
119:6 121:12
123:22 130:5
131:15,19
133:12,13
137:9 139:20
141:19 142:4
144:24 145:5
149:4 158:4
161:23
165:8,10,17,
18,22 166:11
167:3
174:10,12
177:6
180:20,21
182:2,8,18
196:10,24
202:17 207:3
210:22
212:15 215:2
217:25
219:20

226:10
230:12
233:20 239:8
241:7,10
**wanted**
32:2 33:4
77:24 99:7,
21 139:16
160:8 162:8
165:4,7
207:20
210:14
224:23
226:25
227:15
**wanting**
155:15
**warned**
243:7
**waver**
94:3
**way**
39:21 43:4
44:12,16
52:5,10
66:22 78:14
123:24
124:5,15
125:13
126:16,24
128:4 133:5
143:9,10
144:4 146:24
166:2 170:13
173:16
177:17 183:5
195:10,19
196:10
212:16
214:25 229:1
235:24 238:3
**ways**
79:20 99:13
107:23 124:7
145:1 209:5
212:14
213:13

**weather**
7:5
**website**
57:23,25
116:17,20
176:13
181:6,8,9,11
188:15
224:16
225:24
230:4,6
231:23
**websites**
48:12
**week**
70:24 83:1,
12,14
**weekly**
27:25 30:8
**went**
45:4 75:21
90:15 239:13
**who've**
26:15
**wide**
18:4
**wider**
119:18
**withdraw**
172:6
**withdrawal**
155:24
174:2,5
**withdrawing**
56:19
**withdrawn**
55:5 56:17,
20 155:23
156:3 169:6
172:3,10,13,
15 174:7,8
**withhold**
209:3 236:24
**withholds**
237:10
**witness**
5:6,9,18,20,

23 6:3,5,10,
12 84:24
91:17 92:9
93:24 94:9,
16 105:6
118:18
133:17
134:22
135:20
137:11
145:5,16
152:20
155:8,12
182:7 218:7
223:4
**word**
59:13,14
71:16 72:1
80:18 122:20
123:20
173:9,12
179:12
194:23
204:20
**words**
240:24
**work**
12:17,20
13:15 18:15,
20 20:2,6,11
21:1,18 23:3
27:22,23
49:2 63:1
72:16 73:20
79:5 83:16
84:13,22
92:23 94:20
99:17 109:2
114:10
116:1,21
152:5
166:17,18,22
175:22 176:5
178:1,4
179:4,24
180:18
201:10
205:10 211:6

Michelle Christ
February 07, 2025

228:22
238:11

**worked**
13:4,19
90:10 92:8
184:14,18

**working**
27:22 73:18
84:1 100:2
165:2 166:1
170:11
177:22 203:2
218:22

**workload**
18:15 25:4,
15 28:23
35:17 69:2
70:22 71:7
83:11 84:7,
16 115:14
120:16
178:7,10

**workloads**
21:3 27:1
71:9

**works**
12:6 89:19
177:6 180:2,
11,14

**write**
85:5,12

**writing**
85:9 186:9,
22 187:15
192:18 195:4

**written**
9:21 16:2
27:6,10
31:24 32:10
110:20
130:25
150:1,8
193:7 195:1,
11 196:4,15
206:8 207:12
242:10

**wrong**
41:17 84:15

86:7 122:20
123:9 134:11

**wrote**
72:13 192:8
196:12,25

**www.ssa.gov**
229:16

---

**Y**

**yeah**
23:18 31:2
34:17 40:16
44:16 60:15
72:18 73:23
75:5,20,24
82:3 91:14
103:18 115:4
117:14 128:9
129:12 139:2
143:12 149:6
156:9,10
158:14,15
159:9 171:22
172:18 185:2
205:1,4
215:5 217:8,
13 219:24
220:1,18
222:13,24
223:3,4,21
226:7 229:20
237:17
242:21

**year**
13:10 14:2
25:17,19
47:14,21,24
50:14,15,23
70:24 71:2
72:7 83:6
93:8 139:17,
18 141:22
168:22
238:12 241:9
242:2

**yearly**
44:23 116:7

**years**
26:16,24
43:23 167:23
173:13
176:18,19
210:13
227:14
228:12

**York**
5:3,5,11,13,
16 6:22 8:19
11:18 12:6,
9,25 13:1,18
14:1,17
102:4

---

**Z**

**zone**
59:9,17

Michelle Christ
February 07, 2025

## WITNESS SIGNATURE PAGE

MICHELLE CHRIST

Sworn and subscribed to before me this _____ day of

_____, 20__.


_____

NOTARY PUBLIC

Michelle Christ
February 07, 2025

ERRATA SHEET

Witness: MICHELLE CHRIST
RE: NEW YORK LEGAL ASSISTANCE GROUP vs. THE SOCIAL SECURITY
ADMINISTRATION
Date of Proceeding: FEBRUARY 7, 2025
U.S. Legal Support Reference No.: 6773576-001

*** PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE
REASON FOR SAME ***

Page / Line /     Change     / Reason

2 6 /23/"subs" to "GISs"/accuracy

6 0 /6/"regulate the federal" to "consult the federal"/ accuracy

6 3 /10/"published" should be "privileged"/ accuracy

7 9   /24/"ensure" should be "ensure consistency"/ accuracy

1 0 9 / 1 8 /"we need it more express" to "we made it more express" / accuracy

1 7 3 /10/" people's thing." To "people's email."/accuracy

1 7 9 /16/"proactive discovery" to "proactive disclosure"/ accuracy

2 2 7 /16/"regulatory" should be "sub-regulatory"/ accuracy

2 4 3 /6/"Aponix" should be "Opexus"/accuracy

_____/_____/_____/_____