**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW YORK LEGAL ASSISTANCE GROUP,<br>Plaintiff,<br>-v-<br>THE SOCIAL SECURITY ADMINISTRATION,<br>Defendant. | No. 23 Civ. 9363 (ALC) (OTW) |

# MEMORANDUM OF LAW IN SUPPORT OF THE SOCIAL SECURITY ADMINISTRATION'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF NEW YORK LEGAL ASSISTANCE GROUP'S MOTION FOR SUMMARY JUDGMENT

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2633
E-mail: tara.schwartz@usdoj.gov

TARA SCHWARTZ
Assistant United States Attorney
– Of Counsel –

# TABLE OF CONTENTS


PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 3

I. Factual Background .......... 3

A. SSA's FOIA Processing .......... 3

B. SSA's Fee Waiver Decisionmaking .......... 4

C. SSA's Responses to NYLAG's Fee Waivers .......... 8

II. Procedural History .......... 13

LEGAL STANDARD .......... 15

I. Summary Judgment Standard .......... 15

II. Review of APA Claims .......... 15

ARGUMENT .......... 16

I. This Court Lacks Jurisdiction to Review SSA's Denial of Fee Waivers Under FOIA (Counts One and Three) .......... 17

A. Notwithstanding FOIA, SSA Has Statutory Authority Under the Social Security Act to Charge Fees for FOIA Requests .......... 17

B. SSA's Fee and Fee-Waiver Regulations Implement § 1306(c) .......... 19

C. SSA Imposes Fees for Non-Program-Related Requests Under § 1306(c) .......... 19

D. FOIA's Judicial-Review Provision Extends Only to the Waiver of Fees "Under This Section" .......... 20

E. NYLAG Cannot Invoke FOIA to Litigate an Injury Stemming from an Independent Statutory and Regulatory Framework .......... 21

F. NYLAG's Arguments to the Contrary Do Not Establish Jurisdiction .......... 23

II. NYLAG Cannot Establish a Policy or Practice of Unlawful Fee Waiver Denials (Count One) .......... 25

A. SSA's Multi-Tier Review Process Reflects Individualized Consideration of Fee Waiver Requests .......... 26

B. The Statistical Record Does Not Support an Inference of Unlawful Conduct ..... 29

C. NYLAG Cannot Show a Continuing Injury ..... 33

III. NYLAG's Claims Challenging the Fee Waiver Determinations for Requests 1, 2, and 6 are Moot and Its Challenges to Requests 4 and 5 are Partially Moot (Count Three) ..... 35

IV. Even if Reviewable, SSA Properly Declined to Waive the Fees for the Paid Subparts of Requests 4 and 5 (Count Three) ..... 37

V. The APA Does Not Provide a Cause of Action for NYLAG's Policy and Practice Claim (Count Two) ..... 40

A. NYLAG's Asserted "Policy and Practice" Is Not a Discrete Agency Action Subject to Review Under the APA ..... 40

B. NYLAG's Aggregate Denial Rate Evidence Does Not Establish that SSA Has Departed from the Criteria in 20 C.F.R. § 402.85 ..... 44

C. Because NYLAG Has Identified No Discrete Agency Action, There Is No Administrative Record for the Court to Review ..... 46

CONCLUSION ..... 47

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) .......... 35

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 15, 16

*Animal & Plant Health Inspection Serv.*,
60 F.4th 16 (2d Cir. 2023) .......... 26

*Ariz. Christian Sch. Tuition Org. v. Winn*,
563 U.S. 125 (2011) .......... 25

*Bauxites de Guinee*,
456 U.S. 694 (1982) .......... 24

*Brown v. Eli Lilly & Co.*,
654 F.3d 347 (2d Cir. 2011) .......... 16

*California v. Texas*,
593 U.S. 659 (2021) .......... 22

*Camp v. Pitts*,
411 U.S. 138 (1973) .......... 46

*Carney v. DOJ,*
*19 F.3d 807 (*2d Cir. 1994) .......... 26, 37, 39

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 15

*Democracy Forward Found. v. Soc. Sec. Admin.*,
No. SAG-25-03384, 2026 WL 1251617 (D. Md. May 7, 2026) .......... 1, 21, 22, 24

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) .......... 46

*Grand Cent. P'ship v. Cuomo*,
166 F.3d 473 (2d Cir. 1999) .......... 26

*Hall v. CIA*,
437 F.3d 94 (D.C. Cir. 2006) .......... 35, 36

*Horror Inc. v. Miller*,
15 F.4th 232 (2d Cir. 2021) .......... 15

*Kakar v. USCIS,*
29 F.4th 129 (2d Cir. 2022) .......... 16

*Kee v. City of New York*,
12 F.4th 150 (2d Cir. 2021) .......... 15

*Kovalevichv. BIA*,
No.18 Civ. 0610 (KBJ), 2021 WL 2417348 (D.D.C. June 14, 2021) .......... 36

*Kroposkiv. FAA*,
No. 08 Civ. 1519 (AWT), 2010 WL 11565869, at *3 (D. Conn. June 1, 2010) .......... 36

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) .......... 22

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... *passim*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) .......... 16, 45

*Nat'l Audubon Soc'y v. Hoffman*,
132 F.3d 7 (2d Cir. 1997) .......... 46

*Nat'l Sec. Counselors v. CIA,*
898 F. Supp. 2d 233 (D.D.C. 2012) .......... 30

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... *passim*

*NRDC v. EPA,*
*658 F.3d 200 (2d Cir. 2011)* .......... 16

*Payne Enterprises, Inc. v. U.S.,*
837 F.2d 486 (D.C. Cir. 1988) .......... 26, 33

*Saeli v. Chautauqua County*,
36 F.4th 445 (2d Cir. 2022) .......... 15

*Schoenman v. FBI*,
573 F. Supp. 2d 119 (D.D.C. 2008) .......... 36, 37

*Shapiro v. SSA,*
160 F.4th 347 (2d Cir. 2025) .......... 1, 18, 19, 20

*Simon v. Eastern Ky. Welfare Rights Org.*,
6 U.S. 26 (1976) .......... 22

*United States v. Smith,*
945 F.3d 729 (2d Cir. 2019) .......... 23

*West v. Lynch*,
845 F.3d 1228 (D.C. Cir. 2017) .......... 23

**Statutes**

5 U.S.C. § 552 .......... 25

5 U.S.C. § 551(13) .......... 40, 41

5 U.S.C. § 552(a)(4)(B) .......... 24

5 U.S.C. § 706(2)(A) .......... 14, 16, 40

42 U.S.C. § 1306(c) .......... *passim*

**Rules**

Fed. R. Civ. P. 56(a) .......... 1, 15

**Regulations**

20 C.F.R. Part 402 .......... *passim*

Defendant the Social Security Administration ("SSA") by and through its attorney, James M. McDonald, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Counts One, Two, and Three of the Amended Complaint, ECF No. 22 ("Am. Compl.") and in opposition to plaintiff New York Legal Assistance Group's ("NYLAG") motion for summary judgment on the same counts, ECF No. 91.

## PRELIMINARY STATEMENT

In Counts One and Three of its Amended Complaint, NYLAG raises a policy and practice claim under FOIA, as well as claims of improper denial of specific fee waiver requests under FOIA. In doing so, NYLAG asks this Court to superintend the SSA's administration of a cost-reimbursement statute that Congress deliberately placed outside the framework of the Freedom of Information Act ("FOIA"). That request cannot be reconciled with the governing law. For Count Two, NYLAG asserts an alternative policy and practice claim only under the APA. This claim similarly fails because NYLAG identifies no discrete agency action to review under the APA.

Section 1106(c) of the Social Security Act, codified at 42 U.S.C. § 1306(c), authorizes SSA to charge the "full cost" of responding to requests for information that are "not directly related to the administration" of a Social Security program, and it does so "[n]otwithstanding" FOIA. The Second Circuit has now squarely held that this "notwithstanding" clause is unambiguous, that Section 1306(c) "take[s] precedence" over FOIA, and that Section 1306(c) creates "an express (and quite narrow) exemption to FOIA specifically for the SSA." *Shapiro v. SSA*, 160 F.4th 347, 355, 357 (2d Cir. 2025). Building on *Shapiro*, the District of Maryland has held that where SSA imposes fees under Section 1306(c), FOIA's judicial review provision does not confer jurisdiction to review the denial of a waiver of those fees, because such a challenge is not "an action by a requester regarding the waiver of fees under this section." *Democracy Forward Found. v. Soc.*

*Sec. Admin.*, No. SAG-25-03384, 2026 WL 1251617, *3 (D. Md. May 7, 2026) (quoting 5 U.S.C. § 552(a)(4)(A)(vii)).

Those authorities are dispositive here. Every fee at issue in this case was imposed—or would have been imposed—under Section 1306(c), because NYLAG's requests are not directly related to the administration of a Social Security program. NYLAG does not seriously dispute that its requests were non-program-related; indeed, its requests sought information for the express purpose of public education and advocacy, which is precisely the category of request that *Shapiro* held to be non-program-related. Because Section 1306(c) governs fee waivers for information that is not directly related to the administration of a Social Security program, FOIA does not supply a cause of action or jurisdiction to review the fee waiver denials, and NYLAG's FOIA claims (Counts One and Three) must be dismissed.

Further, even if the Court were to reach the merits of NYLAG's FOIA claims, NYLAG cannot establish either a systemic FOIA violation or that its individual requests were wrongly denied. NYLAG's statistical showing collapses on inspection: a substantial share of the denials it cites were responses to automated "bot" submissions that contained no fee-waiver justification whatsoever, and SSA's publicly reported figures capture limited information, omitting the many cases in which fees are never assessed or collected and records are produced at no charge—as happened with the majority of NYLAG's own requests. In fact, of 24 FOIA requests submitted to SSA by NYLAG in recent years, NYLAG paid fees for only about 10 percent of those requests. Also, far from reflecting a "blanket" policy, SSA's process subjects every fee waiver request to review by multiple agency employees responsible for FOIA processing, culminating in the personal review of each request by the agency's FOIA Officer.

Finally, NYLAG's alternative policy and practice theory under the Administrative Procedure Act ("APA") fares no better. NYLAG identifies no discrete agency action to review under the APA. It points to no SSA rule, directive, or decision adopting a policy of denying public-interest fee waivers—only a purported denial rate calculated from the outcomes of thousands of individual adjudications, each applying the criteria of 20 C.F.R. § 402.85. A statistic derived from discrete adjudications is not itself "agency action," and NYLAG's request that the Court enjoin SSA's future administration of its fee-waiver regulation would require precisely the ongoing programmatic supervision the APA forbids. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–91 (1990); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–64 (2004).

For these reasons, SSA respectfully requests that the Court grant its motion for summary judgment and deny NYLAG's motion.

## BACKGROUND

### I. Factual Background

#### A. SSA's Independent Fee Charging Authority

SSA determines fees for FOIA requests under SSA's independent fee charging statute, section 1106(c) of the Social Security Act, 42 U.S.C. § 1306(c). *See* Declaration of Jennifer Karangelen, dated August 27, 2026 ("Karangelen Decl.") ¶ 10. Section 1106(c) authorizes SSA to charge the "full cost" of responding to requests for information—including FOIA requests—that are not directly related to the administration of a Social Security program. *See id.* SSA's implementing regulations authorize recovery of the "full cost" of responding to such requests, including direct and indirect costs, under a separate fee schedule. *See id.* ¶ 11 (citing 20 C.F.R. §§ 402.70(a)(1), 402.80). Legislative history explains that Congress intended for this cost recovery authority to displace FOIA's fee requirements out of concern for conserving the Social Security trust funds. *See* H.R. Rep. 97-158, at 253 (1981); H.R. Conf. Rep. 97-208, at 976 (1981).

Waiver of those costs (or "fees") is governed by SSA's own regulation, not by FOIA's fee waiver provision. *See id.* ¶ 15. The regulation permits waiver or reduction where disclosure "[i]s in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government" and "is not primarily in the commercial interest of the requester." *Id.* ¶ 14 (quoting 20 C.F.R. § 402.85). The regulation directs SSA to consider three factors in analyzing public interest:

> (i) How the records pertain to the Federal Government's operations or activities;
>
> (ii) Whether disclosure would reveal any meaningful information about Government operations or activities not already known to the public; and
>
> (iii) Whether the contribution to public understanding of those operations or activities would be significant.

*Id.* ¶ 16 (quoting 20 C.F.R. § 402.85(b)(2)(i)–(iii). Requesters "must be reasonably specific" in the waiver request as to "the specific Government operation or activity and provide direct, clear (not remote or attenuated) connections to the meaningful information" sought. *Id.* (quoting 20 C.F.R. § 402.85(b)(2)(iv)).

Critically, SSA does not administer the FOIA fee waiver provision. *See id.* ¶ 15. Given SSA's statutory independent fee authority, SSA does not grant fee waivers for nonprogram requests based on the FOIA's statutory fee waiver provisions; but on its own regulations setting a similar standard for public interest fee waivers instead, SSA charges and may elect to waive charges solely under 42 U.S.C. § 1306(c) and SSA's regulation at 20 C.F.R. § 402.185, which explains when it will waive fees for public interest when it charges under § 1306(c). *Id.* SSA made this clear when it responded to public comments on its 2024 rulemaking, which updated, reorganized and clarified its FOIA processes for the public. *See id.* (citing 89 Fed. Reg. 102,704, 102,708–09 (Dec. 18, 2024)).

### B. SSA's FOIA Processing

***1. The agency and its records.*** SSA is among the largest agencies in the federal government, employing approximately 50,000 people. *See id*. ¶ 3. It has issued nearly 550 million Social Security numbers and maintains records relating to those numbers as well as records concerning its administrative, operating, and business practices. *Id*. SSA publicly posts a large volume of records on its SSA.gov website, including policy records, hearing manuals, hearings and appeals data, program statistics, and research studies. *Id.* at ¶ 7.

***2. Centralized FOIA Processing.*** SSA administers FOIA on a centralized basis. *Id*. at ¶ 2. Aside from a subset of simple requests, every FOIA response the agency issues from a single office: SSA's Privacy and Disclosure Policy ("PDP") Office, which was formerly known as the Office of Privacy and Disclosure ("OPD"). *Id*. ¶¶ 1-2. PDP is a component with SSA's Office of Law and Policy. *Id*. ¶ 4.

Within PDP, FOIA is handled largely by the FOIA and Transparency Division. *Id*. ¶ 5. This Division currently has 13 employees: a Division Director and 12 Government Information Specialists ("analysts"). *Id*. The analysts process FOIA requests and adjudicate fee waiver requests. *Id*. ¶ 6. Both the Division Director and the agency's FOIA Officer report to the Head of PDP. *Id*. ¶ 5.

***3. Volume.*** SSA receives a substantial volume of FOIA requests: generally, between 10,000 and 15,000 per year. *Id*. ¶ 7. PDP tracks FOIA requests in a system called FOIAXpress.[1] *Id*. ¶ 18. Only a small portion of the requests that PDP processes are accompanied by a request for a fee waiver: in recent years, SSA has processed approximately 600 to 800 per year. *Id*. ¶ 8.

---

[1] SSA began using FOIAXpress around July 2023; prior to that it used FOIAOnline as its case-management system. *See* Karangelen Decl. ¶ 29.

***4. Adjudication.*** PDP evaluates each fee waiver request, applying 20 C.F.R. § 402.85 to the requester's stated justification—that is, the FOIA's requester's articulated rationale for a fee waiver for each record or set of records requested. *See id*. ¶¶ 20-21. Each fee waiver request is evaluated on its own merits, consistent with 20 C.F.R. § 402.85. *See id*. ¶ 23. Fee waiver requests are evaluated, in the first instance, by the analyst assigned to the FOIA request. *Id*. ¶ 20. The analyst considers the nature of the records requested and the justification provided by the requester to determine whether the regulatory criteria for a fee waiver are met. *Id*. Analysts routinely consult colleagues, mentors, and the two senior analysts when reviewing a fee waiver request. *Id*. The analyst then prepares a recommendation in the form of a draft determination letter. *Id*.

The draft determination letter then proceeds through successive steps of staff review, first by the Division Director and then the FOIA Officer. *Id*. ¶ 21. During their review, the Division Director and FOIA Officer repeat the regulatory analysis, taking into consideration the request itself, the justification provided, and any prior correspondence or discussion about the FOIA request within SSA or between PDP and the requester. *Id*. PDP frequently seeks legal guidance from disclosure law attorneys at the agency and considers that advice. *Id*. The FOIA Officer may revise the draft or change the outcome where warranted before making a final decision. *Id*. Once the FOIA Officer gives final approval, the analyst issues the determination letter to the requester. *Id*. If the requester appeals the determination, the review process begins again and any additional justification provided by the requester is considered. *See id*. ¶ 22.

PDP does not impose quotas, nor does it have any policies, guidance, or directives that are inconsistent with the regulatory criteria. *Id*. ¶ 23. While analysts are extensively mentored, the only factors the analysts are directed to consult in making fee waiver recommendations are the regulations at 20 C.F.R. Part 402. *Id*.

***5. Administrative appeals.*** Requesters may appeal the fee waiver determination. *See id*. ¶ 22. On appeal, the review process begins again. *Id*. However, the appeal is assigned to a different analyst who drafts the determination letter for the appeal, which is then reviewed by a senior analyst. *Id*. Appeal recommendations are ordinarily reviewed by the Division Director, the FOIA Officer, and then finally, by the Head of PDP, who makes the agency's final determination. A fee waiver appeal therefore receives as many as five levels of review. *See id*.

***6. Fee waiver denials are not the agency's final decision on fees.*** Denial of a fee waiver request does not mean a requester will necessarily be charged. *Id*. ¶ 25. Even if a FOIA requester does not request a fee waiver or PDP denies the fee waiver request, consistent with SSA's fee authorities, PDP often ultimately charges no fee. *Id*. For example, SSA will not charge a requester if the cost to produce records is less than the cost of issuing a bill, may not charge if it makes the requested records publicly available due to program needs or proactive disclosure obligations,[2] or may not charge if SSA determines that all requested records are already publicly available. *Id*. (citing 20 C.F.R. §§ 402.45(b), 402.80(b)). The aggregate figures reflect this practice: PDP recovers only a small portion (less than 20%) of its total FOIA processing costs each year. *Id*. ¶ 27.

Where PDP intends to charge a FOIA requester a fee, it issues a fee notice with an estimated fee. *Id*. ¶ 26. If PDP does ultimately charge a FOIA requester for responding to a FOIA request, SSA processes the payment only after the FOIA request is closed. *Id*.

***7. How FOIAXpress records dispositions.*** To comply with its annual reporting obligations, PDP reports statistics to the Department of Justice (DOJ). *Id*. ¶ 28 (citing 5 U.S.C.

---

[2] In these instances, PDP may publish the records without charge in the FOIA reading room, making them available to the public at large. Karangelen Decl. ¶ 25.

§ 552(e)(1)). The data concerning fee waivers in these reports is extracted from FOIAXpress.[3] *Id.* ¶ 29. PDP records the disposition of a fee waiver request in FOIAXpress through a dropdown menu that offers six options: "TBD," "Granted," "Denied," "Withdrawn," "Not Billable," and "N/A." *Id.* ¶ 30. There are no options in this field of FOIAXpress to distinguish between determinations made at the initial stage versus the appeal stage, nor to record a partial grant. *Id.*

**C. SSA's Responses to NYLAG's Fee Waivers**

NYLAG challenges SSA's denial, or partial denial, of fee waiver requests it submitted to SSA in conjunction with five specific FOIA requests: FOIA Requests 1, 2, 4, 5, and 6. However, as noted above, fee waiver determinations are not the final agency decision on fees. Of these five multi-item FOIA requests, SSA did not charge NYLAG any fees for FOIA Requests 1, 2, or 6, and charged NYLAG for only two discrete items for FOIA Requests 4 and 5. *Id.* ¶¶ 33-57. These outcomes are not outliers. Of the 19 other FOIA requests that NYLAG submitted to SSA from 2020 through the present, SSA has charged fees in only two. *See id.* ¶¶ 58-68.

***1. FOIA Request 1: Fee Waiver Request Policies.*** On April 4, 2023, NYLAG requested (1) "[a]ll policies and procedures for processing, adjudicating, granting, or denying FOIA fee waiver requests," and (2) "[c]opies of all communications granting FOIA fee waivers on or after October 1, 2019." *Id.* ¶ 33 (citing Am. Compl. Ex. 1A ("Request 1"). NYLAG sought a fee waiver in connection with Request 1. *Id.*

PDP determined that this request was not made for a program purpose and therefore, under § 1306, SSA could charge the full cost for responding to the request. *Id.* ¶ 34. PDP then evaluated the justification for the fee waiver request and denied the fee waiver on May 1, 2023, explaining

[3] The data contained in reports prior to fiscal year 2023 were generated from FOIAOnline, a program that PDP used to track FOIA requests prior to the transition to FOIAXpress. Karangelen Decl. ¶ 29.

that "[t]he public currently has access to the regulation and policy governing SSA FOIA fee waivers," and that NYLAG had "not explained with reasonable specificity how disclosure of the requested information will enhance the information on FOIA fee waivers that the agency already posts publicly." *Id.* That rationale tracked two of the four regulatory criteria: 20 C.F.R. § 402.185(b)(2), which asks whether disclosure would reveal meaningful information "not already public knowledge," and § 402.185(b)(4), which asks whether the contribution to public understanding "be[] a significant one." *Id.* In sum, PDP determined that public availability of the regulation and policy governing SSA FOIA fee waivers undercut Plaintiff's fee waiver request. *Id.* NYLAG appealed the denial on May 9, 2023; however, SSA did not adjudicate the appeal before NYLAG filed this action. *Id.* ¶ 35.

In response to item 1 of Request 1, PDP identified SSA policies and procedures for processing, adjudicating, granting, or denying FOIA fee waiver requests that are available on SSA's public-facing website and 20 C.F.R. § 402.185. *Id.* ¶ 36. In response to item 2 of the request, PDP identified seven responsive records, which PDP produced to Plaintiff *at no cost* in January 2024. *Id.* ¶ 37. Accordingly, NYLAG paid nothing to SSA in connection with this FOIA request.

***2. FOIA Request 2: Equifax Payroll Matching Process.*** On April 4, 2023, NYLAG submitted a FOIA request to SSA for six categories of records, with additional subparts, concerning SSA's proposed information exchange with Equifax for payroll data—an exchange SSA had not yet implemented. *Id.* ¶ 38 (citing Am. Compl. Ex. 2A ("Request 2")). NYLAG's fee waiver justification was phrased similarly, and in places verbatim, to the justification submitted with Request 1, except that NYLAG explained with greater specificity that information "related to the accuracy of the Equifax data matching process," "associated safeguards," and "testing of accuracy" would help the public understand the proposed exchange. *Id.* ¶ 39.

PDP determined that this request was not made for a program purpose and therefore, under § 1306, SSA could charge the full cost for responding to the request. *Id*. ¶ 40. On July 26, 2023, PDP granted the fee waiver in part. *Id*. ¶ 40. The determination distinguished among the six items:

> Within your 'Request for Waiver of Fees' document, you sufficiently addressed how the information requested under item #4 [records relating to assessment of the accuracy of Equifax's data] meets our regulatory criteria [for fee waivers]; therefore, I will grant a fee waiver for item #4. Concerning items 1, 2, 3, 5, and 6, your fee waiver request fails to explain with reasonable specificity how the disclosure of the information you requested will meet the above factors, and I have not otherwise found that release of the records requested would meet the abovementioned factors.

*Id*. ¶ 41 (quoting Am. Compl. Ex. 2B, p. 1).

NYLAG appealed on July 28, 2023, and filed this action before OPD issued a determination on the appeal. *Id*. ¶ 42. PDP continued processing the request during this litigation. *Id*. ¶ 43. In response to the request, PDP produced several documents, including the responsive contract, and identified eighteen publicly available sources addressing the proposed exchange, including two Federal Register notices, fifteen POMS provisions, two Emergency Messages, and a public-facing SSA pamphlet. *Id*. Even though PDP granted the fee waiver only as to item 4 of the request, SSA produced all responsive records for Request 2 during the course of this litigation *at no cost* to NYLAG. *Id*. ¶ 44. Accordingly, NYLAG paid nothing to SSA in connection with this FOIA request.

***3. FOIA Request 4: Standard Hearings Operations Procedures and SSA Field Office Phone Numbers***. On December 5, 2023, NYLAG submitted a FOIA request seeking: (1) a section of the POMS addressing services for individuals with limited English proficiency; (2) the Standard Hearings Operations Procedure ("SHOP"), a guide used by staff of SSA's Office of Hearings Operations; and (3) a list of direct telephone numbers for SSA field offices. *Id*. ¶ 45 (citing Am.

Compl. Ex. 4A ("Request 4")). NYLAG requested a fee waiver in connection with this FOIA request. *Id*.

PDP determined that this request was not made for a program purpose and therefore, under § 1306, SSA could charge the full cost for responding to the request. *Id*. ¶ 46. By letter dated December 19, 2023, PDP granted the fee waiver request with respect to item 1, denied the fee waiver request with respect to item 2, and noted that the records requested in item 3 were already publicly available. *Id*. ¶ 47. SSA's determination letter stated that NYLAG sufficiently addressed how the information requested under item 1 "meets our regulatory criteria"; that, with respect to item 2, the fee waiver request "fail[ed] to explain with reasonable specificity how the disclosure the information you requested will meet the [regulatory] factors"; and as to item 3, PDP advised that the requested information was already publicly available online and supplied the URL. *Id*. On February 7, 2024, NYLAG appealed the fee waiver determination; however, SSA did not adjudicate the appeal before NYLAG added it to this action in the Amended Complaint. *Id*. ¶ 48.

On May 31, 2024, PDP issued a response to the FOIA enclosing the responsive record for item 1, restating the website for the field office directory for item 3, and including a fee notice for item 2. *Id*. ¶ 49. The notice states that "we are charging you fees for your request for Item No. 2 under Section 1106(c) of the Social Security Act," and estimated the cost at $771, comprising "18 hours of search and review time at $33 per hour and three hours of search and review time at $59 per hour." *Id*. Those inputs were derived by canvassing the components likely to hold responsive records and obtaining for each the estimated search time and the GS grade of the employee who would perform the search. NYLAG paid the fee and SSA produced all responsive records. *Id*. Accordingly, NYLAG paid a total of $771 to the SSA in connection with Request 4.

***4. FOIA Request 5: SSA Policy Documents and Handbooks.*** On December 6, 2023, NYLAG submitted a FOIA Request to SSA seeking three items: (1) manuals, handbooks, or guidance provided to consultative examiners, medical experts, and vocational experts "outside of what is currently available in" the publicly available Consultative Examination Guide (the "Greenbook"), the Medical Expert Handbook, and the Vocational Expert Handbook; (2) policy and guidance records concerning diagnoses, consultative examinations, medical source statements; and (3) a copy of the report on best practices created by the SSA regarding the consultative examination oversight meeting with state agencies held in spring of 2023. *Id.* ¶ 50 (citing Am. Compl. Ex. 5A ("Request 5")). NYLAG also sought a fee waiver. *Id.*

PDP determined that this request was not made for a program purpose and therefore, under § 1306, SSA could charge the full cost for responding to the request. *Id.* ¶ 51. On December 22, 2023, PDP issued a determination letter denying the fee waiver on the grounds that the request "fail[ed] to explain with reasonable specificity how the disclosure of the information . . . requested will meet the [public interest] factors." *Id.* ¶ 52. NYLAG appealed that determination on February 7, 2024. *Id.* On May 31, 2024, PDP issued a determination on the appeal; it reversed its determination in part by granting a waiver as to item 3, but PDP affirmed the denial as to items 1 and 2. *Id.* ¶ 53. The determination letter on the appeal explicitly invoked SSA's authority to charge fees under § 1306 and notified NYLAG that it estimated the fee would be $1,067 for producing records responsive to items 1 and 2 of the request, which includes 22.50 hours of search and review time at $33.00 per hour and 5.50 hours of search and review time at $59.00 per hour. *Id.* ¶¶ 53-54. NYLAG paid the fee during this litigation and SSA produced all responsive records. *Id.* ¶ 54. Accordingly, in connection with Request 5, NYLAG paid $1,067 to the SSA.

***5. FOIA Request 6: Data Regarding Redeterminations for Benefit Eligibility.*** On December 7, 2023, NYLAG submitted a FOIA request to the SSA seeking aggregate statistical data concerning SSA's redeterminations of benefit eligibility at age 18. *Id.* ¶ 55 (citing Am. Compl. Ex. 6A ("Request 6")). NYLAG also sought a fee waiver. *Id.*

PDP determined that this request was not made for a program purpose and therefore, under § 1306, SSA could charge the full cost for responding to the request. *Id.* ¶ 56. On December 21, 2023, PDP denied the fee waiver, explaining that the request failed to explain with reasonable specificity how the disclosure of information requested would meet the public interest factors. *Id.* ¶ 57. NYLAG appealed on February 7, 2024, but then added the FOIA request to this action in the Amended Complaint before SSA issued a decision on the appeal. *Id.* On May 31, 2024, PDP notified NYLAG that SSA had no records responsive to the request. *Id.* NYLAG paid nothing to SSA in connection with this FOIA request. *Id.*

## II. Procedural History

NYLAG filed the original complaint in this action on October 24, 2023. ECF No. 1. The original complaint contained four causes of action challenging an alleged: (1) policy and practice of denying fee waivers in violation of FOIA; (2) improper denial of fee waivers for Requests 1 and 2 in violation of FOIA; (3) withholding of records responsive to FOIA Requests 1 and 2 in violation of FOIA; and (4) failure to proactively make SSA's Program Operation Manual Systems, Emergency Messages, and Administrative Messages publicly available in violation of FOIA (the "Proactive Disclosure Claim"). *See id.* at 36-39. On March 19, 2024, NYLAG filed the Amended Complaint. ECF No. 22.

The Amended Complaint asserts five counts. Count One asserts the same claim as the original complaint: that SSA has engaged in a policy or practice of denying fee waiver requests to requesters who satisfy the applicable criteria, in violation of FOIA. Am. Compl. ¶¶ 210-14. Count

Two pleads the same theory in the alternative under the APA, 5 U.S.C. § 706(2)(A), "to the extent that the relief [NYLAG] seeks in Claim One is not available under FOIA." *Id.* ¶¶ 215-19 (the "APA Claim"). Count Three challenges SSA's fee waiver determinations as to Requests 1, 2, 4, 5, and 6 under FOIA. *Id.* ¶¶ 220-23. Count Four alleges that SSA withheld records responsive to FOIA Requests 1, 2, 4, 5, and 6, in violation of FOIA. *Id.* ¶¶ 224-27. Lastly, Count Five restates the Proactive Disclosure Claim. *Id.* ¶¶ 228-232. SSA answered the Amended Complaint on April 2, 2024. ECF No. 23.

On May 15, 2024, the parties appeared for an initial pretrial conference before Magistrate Judge Wang. *See* ECF No. 32. At the conference, the court granted NYLAG's motion to propound limited discovery requests on SSA regarding the Proactive Disclosure Claim and the Systemic Fee Waiver Claim. *Id.* NYLAG took two Rule 30(b)(6) depositions of SSA witnesses on noticed topics relating to SSA's fee waiver processing and its affirmative-disclosure practices under FOIA. *See* ECF No. 51. SSA also produced documents responsive to NYLAG's document requests and responded to interrogatories and requests for admission. *See* ECF Nos. 51, 58. Notably, discovery did not identify any SSA rule, directive, memorandum, guidance document, or other agency-level decision adopting a policy of denying public-interest fee waivers, nor did it reveal any instructions to adjudicators other than to apply the governing regulation.

On September 22, 2025, the parties settled the Proactive Disclosure Claim by stipulation and order. ECF No. 72. Further, during this litigation, SSA produced all records responsive to Requests 1, 2, 4, 5, and 6. Accordingly, the only claims that remain in dispute are Counts One and Two—challenging SSA's supposed policy-and-practice of denying fee waivers under FOIA and the APA—and Count Three—a FOIA challenge to SSA's adjudication of the fee waivers associated with Requests 1, 2, 4, 5, and 6.

## LEGAL STANDARD

### I. Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that it is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, courts "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (internal quotation marks omitted).

The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Saeli v. Chautauqua County*, 36 F.4th 445, 455 (2d Cir. 2022) (citation and internal quotation marks omitted). For a genuine dispute of material fact to exist, "the record must contain contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party." *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (internal quotation marks omitted). The nonmovant "may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). Moreover, the existence of a factual dispute does not preclude summary judgment where "the evidence is merely colorable, or is not significantly probative." *Anderson*, 477 U.S. at 249 (citations omitted).

### II. Review of APA Claims

Under the APA, instead of identifying disputed material facts that would preclude summary judgment, the district court conducts a narrow review to determine whether or not, as a matter of law, the evidence in the agency's certified administrative record permitted the agency to make the

decision it did; the court is not to substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). "[A] reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard requires the agency to "examine the relevant [evidence]" and "articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43 (internal quotation marks omitted).

Judicial review under the APA "is narrow and deferential, and limited to examining the administrative record to determine whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Kakar v. USCIS*, 29 F.4th 129, 132 (2d Cir. 2022) (citations and quotation marks omitted). Agency action may be set aside as arbitrary and capricious only where "'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *NRDC v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (quoting *State Farm*, 463 U.S. at 43).

**ARGUMENT**

This brief proceeds in five parts. Point I shows that the Court lacks jurisdiction over NYLAG's FOIA claims (Claims One and Three), because SSA imposed the fees at issue under 42 U.S.C. § 1306(c) rather than FOIA, and FOIA authorizes review only of "the waiver of fees under this section." 5 U.S.C. § 552(a)(4)(A)(vii). The remaining points address the claims in the alternative. Point II shows that NYLAG cannot establish the policy or practice alleged in Claim One, because SSA adjudicates each fee waiver request individually under 20 C.F.R. § 402.85 and because the aggregate denial rate NYLAG invokes proves nothing about the lawfulness of any

denial. Point III shows that, even if the Court reviewed Claim Three under FOIA, it is moot as to Requests 1, 2, and 6 and partially moot as to Requests 4 and 5. Point IV shows that SSA correctly denied a waiver as to the three subparts for which NYLAG actually paid. And Point V shows that the APA supplies no cause of action for Claim Two, because NYLAG has identified no discrete agency action to review and no departure from § 402.85.

## I. This Court Lacks Jurisdiction to Review SSA's Denial of Fee Waivers Under FOIA (Counts One and Three)

FOIA generally governs the fees agencies may charge to process records requests. But Congress enacted a separate and independent fee statute for the SSA—Section 1106(c) of the Social Security Act, 42 U.S.C. § 1306(c)—that authorizes SSA to charge the full cost of responding to information requests not directly related to program administration, and to do so "[n]otwithstanding" FOIA. Thus, SSA does not impose fees associated with non-program requests under FOIA, nor does it grant or deny fee waiver requests for such requests under FOIA. Because FOIA's judicial-review provision reaches only "the waiver of fees under this section"—that is, fees imposed under FOIA—the Court lacks jurisdiction to review NYLAG's challenges to the waiver of its § 1306(c) fees. Count One, alleging that SSA engages in a policy and practice of denying fee waivers in violation of FOIA, and Count Three, alleging that the SSA denied NYLAG fee waivers in connection with Requests 1, 2, 4, 5, and 6 in violation of FOIA, should therefore be dismissed.

### A. Notwithstanding FOIA, SSA Has Statutory Authority Under the Social Security Act to Charge Fees for FOIA Requests

Section 1106(c) of the Social Security Act provides:

> Notwithstanding sections 552 and 552a of Title 5 or any other provision of law, whenever the Commissioner of Social Security . . . determines that a request for information . . . is made for any . . . purpose not directly related to the administration of the program or programs under this chapter to which such information relates, such

> Commissioner . . . may require the requester to pay the full cost, as determined by such Commissioner, . . . of providing such information.

42 U.S.C. § 1306(c). By its terms, this provision authorizes SSA to charge the full cost of responding to non-program-related information requests, and it does so "[n]otwithstanding" FOIA and "any other provision of law."

The Second Circuit recently construed this statute and confirmed that it displaces FOIA. In *Shapiro v. SSA*, 160 F.4th 347 (2d Cir. 2025), the Second Circuit held that § 1306(c)'s text "is crystal clear: despite FOIA or any other law, the SSA can charge the requesting party for processing non-program-related information requests." *Id*. at 355. The Second Circuit explained that "Congress's use of the word 'notwithstanding' unambiguously demonstrates its intent to permit the SSA to recoup the 'full cost' of processing fees for FOIA requests that meet the requirements of § 1306(c) and overrides any other provision of law which would otherwise conflict." *Id*. Because the "notwithstanding" clause is "followed by the all-encompassing phrase 'any other provision of law,'" the Second Circuit held that Congress "expressly indicate[d]" its "intent that the Cost-Reimbursement Provision supersede not only FOIA but also *all other laws*." *Id*. The Second Circuit thus held that the clause "need not be harmonized with but, rather, takes precedence *over*" competing FOIA provisions, and characterized § 1306(c) as "an express (and quite narrow) exemption to FOIA specifically for the SSA," applicable whenever a request "is not directly connected to a program-related purpose." *Id*. at 356–57.

FOIA's plain text supports this interpretation. FOIA provides that "[n]othing in this subparagraph shall supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records." 5 U.S.C. § 552(a)(4)(A)(vi). Thus, when Congress enacted FOIA, it made clear that FOIA's fee provisions do not preempt all other statutory fee provisions. And, regardless of whether § 1306(c) is a fee setting statute as recognized by FOIA,

Congress clearly intended to permit SSA to exercise its authority to charge full costs under § 1306 "notwithstanding the FOIA." FOIA thus does not supersede § 1306(c); it defers to it. The two provisions operate exactly as Congress designed: for non-program-related requests to SSA, § 1306(c) supplies both the fee-charging authority and the governing fee standard, in place of FOIA.

### B. SSA's Fee and Fee-Waiver Regulations Implement § 1306(c)

SSA's regulations give effect to this statutory framework. They implement § 1306(c) without regard to FOIA; expressly establishing two distinct fee-charging tracks under these separate statutes. Section 402.70 sets out SSA's two "[c]harging authorities": (1) § 1306(c), which "allows the agency to charge for FOIA requests that are not directly related to SSA's administration of the Social Security Act," 20 C.F.R. § 402.70(a)(1); and (2) the FOIA fee categories, *id*. § 402.70(a)(2). For non-program-related requests charged under § 1306(c), the fee calculation is governed by § 402.80; for requests charged under FOIA's fee schedule, the calculation is governed by § 402.75.

The fee-waiver regulation, § 402.85, applies to both tracks. It provides that "[a] requester may request waiver or reduction of fees, whether charged under § 402.75 or § 402.80, if the release of the requested records is in the public interest." 20 C.F.R. § 402.85(a). Where SSA charges fees under § 1306(c), which expressly authorizes SSA to require payment of "the full cost, as determined by such Commissioner," SSA's decision to waive those fees is an exercise of the discretion Congress conferred to it by statute. 42 U.S.C. § 1306(c); *see also* 20 C.F.R. § 402.80(a). The waiver determination is thus a component of SSA's § 1306(c) authority, applied to a § 1306(c) fee. It is not a FOIA determination.

### C. SSA Imposes Fees for Non-Program-Related Requests Under § 1306(c)

The fees at issue in this case fall squarely within § 1306(c). SSA determined that each of NYLAG's requests at issue—Requests 1, 2, 4, 5, and 6—was not directly related to a program purpose and therefore the fee waiver requests for those FOIA requests were adjudicated pursuant to § 1306(c), *not* FOIA. *See* Karangelen Decl. ¶¶ 34, 40, 46, 51, 56. NYLAG does not contend that its requests were program-related; to the contrary, its own fee-waiver submissions describe the purpose of the requests as informing "the public," "advocates," and "policy makers."

SSA's determination was correct. As *Shapiro* makes clear, the "directly related" standard is demanding: requests aimed at public education or general transparency are not "directly related" to program administration even when the requester contends the information will assist future applicants. 160 F.4th at 357–58. The Second Circuit held that a request seeking to advance "scholarly research" or a general public understanding of agency operations falls outside the narrow category of program-related requests defined by SSA regulations, currently at 20 C.F.R. § 402.80(d) and prior to September 1, 2024, at 20 C.F.R. § 402.170(a)). *Id*. NYLAG's requests—for records about SSA's own FOIA fee-waiver policies (Request 1), a proposed vendor data exchange (Request 2), and aggregate statistical data (Request 6), among others—are paradigmatic non-program-related requests. None sought information "needed to pursue a benefit under the Act." 20 C.F.R. § 402.80(d).[4] Section 1306(c) therefore governs the fees charged to NYLAG.

### D. FOIA's Judicial-Review Provision Extends Only to the Waiver of Fees "Under This Section"

Because § 1306(c) governs the fees—and because SSA's waiver determinations were made under that authority—this Court lacks jurisdiction under FOIA to review those determinations. FOIA authorizes judicial review of fee-waiver disputes only in a narrowly worded provision: "In

[4] In considering whether a request is for a program purpose, it is not enough that the records sought are merely "about programs administered by SSA or are claimed to be of public interest." 20 C.F.R. § 402.80(d)(2).

any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo." 5 U.S.C. § 552(a)(4)(A)(vii). The phrase "under this section" refers to § 552 of Title 5—FOIA—and thus limits the Court's jurisdiction to challenges concerning the waiver of fees imposed under FOIA.

The District of Maryland applied this exact analysis in *Democracy Forward Foundation v. SSA*, No. SAG-25-03384, 2026 WL 1251617 (D. Md. May 7, 2026), a materially identical case. There, as here, SSA denied fee waivers and imposed fees under § 1306(c), and the plaintiff sued under FOIA. *Id*. at *1. The court held that it lacked jurisdiction to adjudicate the plaintiff's challenge to the fee waiver denial. It reasoned that "[t]he qualified language 'any action by a requester regarding the waiver of fees under this section' . . . indicates that district courts have jurisdiction to review only those actions concerning the waiver of fees under FOIA itself." *Id*. at *3. And it explained that "[n]either fees imposed pursuant to § 1306(c) nor waiver of those fees is governed by FOIA. Rather, Congress stated that those fees apply '[n]otwithstanding' FOIA, . . . and that FOIA's fee provisions do not 'supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records,' such as § 1306(c)." *Id*. It followed that "the waiver of fees imposed pursuant to § 1306(c) does not constitute the waiver of fees 'under this section,' or FOIA," and that "FOIA . . . does not grant this Court jurisdiction to review those denials." *Id*.

The same result follows here. NYLAG's claims challenge the denial of its requests to waive fees that SSA imposed under § 1306(c). Those challenges are not actions "regarding the waiver of fees under this section" within the meaning of FOIA. The Court accordingly lacks jurisdiction to adjudicate Counts One and Three.

### E. NYLAG Cannot Invoke FOIA to Litigate an Injury Stemming from an Independent Statutory and Regulatory Framework

The absence of jurisdiction is confirmed by settled Article III principles. To establish standing, a plaintiff's injury must be "fairly traceable" to the challenged conduct and "redress[able] by a favorable [judicial] decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks and citations omitted). NYLAG's alleged injury—the payment of or exposure to fees—flows entirely from SSA's exercise of its § 1306(c) authority, not from any action taken under FOIA. And that injury, if it exists (given NYLAG incurred costs for only 10 percent of its last two dozen SSA FOIA requests), cannot be redressed through NYLAG's FOIA claims, because FOIA does not govern the imposition or waiver of § 1306(c) fees.

The Supreme Court has declined to find liability where the challenged law is not the one that imposes or causes the complained of conduct. *See California v. Texas*, 593 U.S. 659, 678-79 (2021) (finding that state plaintiffs failed to show traceability when challenging one provision of the Patient Protection and Affordable Care Act, where the injuries alleged by the states were actually caused by other provisions of the same statute). In *Simon v. Eastern Ky. Welfare Rights Org.*, the Supreme Court declined to find redressability where the plaintiffs alleged injuries caused by an Internal Revenue Ruling in violation of the Internal Revenue Code, but the alleged injuries were found to result from independent hospital policies. 426 U.S. 26, 42-43 (1976). Courts have applied similar reasoning in declining to find traceability or redressability where plaintiffs allege injuries under a challenged law, but the cause of a plaintiff's injury is governed by another law. *See e.g., United States v. Smith,* 945 F.3d 729, 736-37 (2d Cir. 2019) (holding that an injury arising from separate provisions of a statutory and regulatory scheme was neither fairly traceable to, nor redressable by invalidation of, the provisions actually challenged); *West v. Lynch*, 845 F.3d 1228, 1236 (D.C. Cir. 2017) ("The direct causes of West's alleged injuries—e.g., recreational users who

smoke marijuana in public and state officials who restrict his access to medical marijuana—are not governed by the Cole Memorandum but by state laws he does not challenge.").

NYLAG therefore cannot assert FOIA claims to challenge the denial of its fee waiver requests because SSA has not acted pursuant to any provision of FOIA. Because NYLAG's fee waiver challenges are improper as a matter as law (because they are based on the fee waiver provisions of FOIA and not those under § 1306(c) and its related regulations at 20 C.F.R. §§ 402.80 and 402.85 on which the agency expressly relied), the Court lacks jurisdiction over Counts One and Three, and, alternatively, SSA is entitled to judgment as a matter of law on those claims.

**F. NYLAG's Arguments to the Contrary Do Not Establish Jurisdiction**

NYLAG's motion resists this conclusion on three principal grounds. None withstands scrutiny.

First, NYLAG's central premise is that 20 C.F.R. § 402.85 is a FOIA implementing regulation, such that a challenge to a waiver denial necessarily arises under FOIA. *See* ECF No. 92 ("NYLAG Br.") at 27-34. That premise is incorrect for the reasons set out in Part I.B, above. Section 402.85 implements § 1306(c) and governs the waiver of fees charged under either of SSA's two charging tracks. That the regulation borrows FOIA's public-interest phrasing does not convert a § 1306(c) fee determination into a FOIA determination, nor does it enlarge the jurisdictional grant Congress enacted in § 552(a)(4)(A)(vii). The relevant question is not which standard SSA applied as a matter of administrative practice, but whether Congress conferred jurisdiction on the federal courts to review SSA's waiver of § 1306(c) fees in the first place. Congress did not do so.

Second, NYLAG points to 20 C.F.R. §§ 402.85(b)(1) and 402.105(e), which describe SSA's administrative-appeal process and note that requesters "may . . . ask a U.S. District Court to review [SSA's] final decision," citing 5 U.S.C. § 552(a)(4)(B). NYLAG Br. at 31. But the scope

of this Court's subject matter jurisdiction is fixed by Congress, not by agency regulation. *See Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701-02 (1982). The district court in *Democracy Forward* considered and rejected this precise argument, holding that although SSA's regulations "purport to provide judicial review of waiver decisions regarding its fees imposed pursuant to § 1306(c)," "[a] regulation . . . cannot grant a federal court jurisdiction when Congress has not done so." 2026 WL 1251617, at *3. Because "Congress has not, through FOIA, granted district courts jurisdiction to review waiver decisions for fees imposed pursuant to § 1306(c)," the regulatory cross-references on which NYLAG relies cannot supply jurisdiction that the statute withholds. *Id*. At most, § 402.105 notes the general availability of judicial review where it independently exists; it does not enlarge this Court's Article III jurisdiction.

Moreover, such a reading of SSA regulations is clearly inconsistent with SSA's demonstrated intent. SSA consistently explains to FOIA requesters, including NYLAG, that the FOIA does not apply to agency fee determinations under § 1306(c). In 2024, when SSA responded to comments to the agency's regulations governing FOIA requests, two commenters requested that SSA "ensure the application of the fee waiver provision is consistent with the FOIA statute." 89 Fed. Reg. 102,704, 102,708–09 (Dec. 18, 2024). SSA's response in the Federal Register explained that SSA:

> consistently follow[s] the statutory and our regulatory requirements to disclose records at no fee or a reduced fee. Because SSA charges fees when the request is not directly related to the administration of the Social Security Act based on our authority in section 1106(c) of the Social Security Act, which applies notwithstanding the FOIA provisions in 5 U.S.C. 552 and 552a, the *FOIA statutory fee provisions would not apply*. When a public interest fee waiver is sought, we will approve waiver when the criteria in our regulation at 20 CFR 402.85 (formerly 20 CFR 402.185) have been met; this aspect of our fee charging and waiver procedures has not changed in this final rule from our current regulations.

*Id*. (emphasis added). SSA's regulations are designed to "conform with the requirements" of the law (*id.* at 102704) and § 402.105(e); including a citation to the FOIA's statutory right of appeal is just that—a recognition of the law. The regulation does not express that all judicial review would be proper under FOIA, it merely acknowledges that requesters may seek judicial review. SSA's regulations and consistent explanations in fee notices provide no support for NYLAG's arguments that jurisdiction exists under FOIA to challenge decisions under § 1306(c) of the Social Security Act.

Third, NYLAG observes that the Second Circuit reached the merits of a FOIA challenge in *Shapiro* where § 1306(c) supplied the charging basis. *See* NYLAG Br. at 33. But jurisdiction was neither contested nor decided in *Shapiro*; the Court addressed the particular FOIA argument the plaintiff raised without considering whether FOIA conferred jurisdiction over a § 1306(c) fee dispute. "[W]hen a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011). *Democracy Forward* is the only decision to have squarely confronted the jurisdictional question, and it resolved that question in SSA's favor.

## II. NYLAG Cannot Establish a Policy or Practice of Unlawful Fee Waiver Denials (Count One)

Even if the Court had jurisdiction to reach the merits of NYLAG's policy-and-practice claim under FOIA (Count One)—even though it does not—NYLAG cannot prevail. As a threshold matter, the Second Circuit has never held that policy-or-practice claims are cognizable under FOIA; it has only "assum[ed] without deciding" the point. *ASPCA v. Animal & Plant Health Inspection Serv.*, 60 F.4th 16, 21 (2d Cir. 2023). Under D.C. Circuit law, a policy-or-practice claim requires proof that the agency has adopted, endorsed, or implemented a policy or practice that constitutes an ongoing "failure to abide by the terms of the FOIA," and that the plaintiff "will

suffer continuing injury due to this practice." *Payne Enterprises, Inc. v. U.S.*, 837 F.2d 486, 491 (D.C. Cir. 1988). NYLAG cannot make either showing.

### A. SSA's Multi-Tier Review Process Reflects Individualized Consideration of Fee Waiver Requests

Far from reflecting a "blanket" policy, SSA's fee-waiver process subjects each request to a multi-level, individualized review. *See* Karangelen Decl. ¶¶ 20-24. Every request is evaluated first by the assigned specialist, then then by the Division Director, and finally by the FOIA Officer, who personally reviews and approves each fee waiver determination. *Id.* ¶¶ 20-21. In evaluating the fee waiver request, at each level of review, agency personnel consider the requester's justification for a fee waiver against the criteria in 20 C.F.R. § 402.85. *Id.*

Courts assessing FOIA claims accord agency declarations "a presumption of good faith." *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994); s*ee also Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999). That presumption "cannot be rebutted by purely speculative claims." *Grand Cent. P'ship*, 166 F.3d at 489 (citation omitted). The Declaration of Jennifer Karangelen, the agency's FOIA Officer, describing SSA's multi-tier, case-by-case review process is therefore entitled to a presumption of good faith, and NYLAG has offered no evidence—beyond speculation drawn from the raw denial rate—to overcome it. Simply put, the multiple levels of review of each fee waiver determination, including by a senior agency official and frequent consultation with agency counsel, is strong evidence of the agency's individualized consideration process and rebuts NYLAG's claim that SSA has a "blanket denial policy." NYLAG Br. at 44. Any similarities in SSA's denial letters also do not establish the existence of a "blanket denial policy." The recurring language tracks the regulatory factors and, if a requester failed to make a sufficient showing, states that the fee waiver request was denied for that reason.

Even the evidence submitted by NYLAG with its motion affirmatively demonstrates that SSA engages in substantive, individualized analysis where the request warrants it. In the Amended Complaint, NYLAG cites five of its fee waiver requests to SSA (Requests 1, 2, 4, 5 and 6). SSA's adjudication of those five fee waiver requests includes two instances in which SSA granted the fee waiver request for a portion of the FOIA request; one instance in which SSA originally denied the request but then reversed its decision on appeal; and another instance where SSA denied the fee waiver request on grounds specific to that request. *See* Karangelen Decl. ¶¶ 34, 41, 47, 53. This evidence refutes NYLAG's assertion that SSA issues "blanket denials" of fee waiver requests as a matter of policy.

In connection with FOIA Requests 2 and 4, SSA *granted* in part and denied in part the fee waiver request. *See id*. ¶¶ 41, 47. NYLAG FOIA Request 2 contained six subparts. *Id*. ¶ 38. In responding to the fee waiver request, SSA distinguished between the six subparts of that FOIA request, and granted the request with respect to subpart 4. *Id*. ¶ 41. That SSA differentiated subpart 4 from the remaining five subparts reflects an item-by-item review, rather than a categorical denial. NYLAG FOIA Request 4 demonstrates another partial fee-waiver grant with request-specific considerations. *Id*. ¶ 47. SSA granted the fee waiver with respect to subpart 1, denied the request with respect to subpart 2, and found subpart 3 moot because the requested information was publicly available (the determination letter explained that the requested information was publicly available and provided the relevant URL). *Id*. These examples plainly refute NYLAG's contention that SSA has a "blanket" policy of denying fee waiver requests without applying the specific criteria governing fee waivers to each request.

Further, in connection with NYLAG FOIA Request 5, on appeal, SSA reversed its initial decision to fully deny a fee waiver, and it granted a fee waiver with respect to subpart 3 of the

request. *Id*. ¶ 53. And finally, SSA's response to the fee waiver in connection with FOIA Request 1 squarely engages with the substance of the request and SSA's fee waiver policies. The letter explained that "[t]he public currently has access to the regulation and policy governing SSA FOIA fee waivers" and that NYLAG had "not explained with reasonable specificity how disclosure of the requested information will enhance the information on FOIA fee waivers that the agency already posts publicly." *Id*. ¶ 34. That the request sought publicly-available records constitutes a request-specific rationale for the denial of the fee waiver.

SSA's fee waiver determinations issued to third parties, as reflected in NYLAG's submissions in support of its motion, belie NYLAG's assertion that SSA does not conduct an individualized analysis of each fee waiver. In numerous fee waivers that NYLAG attached to its motion, the fee waiver determination responds directly to the subject of the request for information. For example, NYLAG includes a fee waiver determination letter sent to Urban Justice Center in connection with its request for information on the use of consultative examinations in SSA-decision making. ECF No. 100, Declaration of Kate Fetrow, Ex. OO (ECF No. 100-41 at 7-8). The determination letter explained that the fee waiver was being denied because the information requested, "the guidelines and additional information concerning [consultative examinations], was already publicly available" at enumerated URLs. *Id*. In another example, NYLAG cites a fee waiver request submitted by the Legal Council for Health Justice in connection with a request for records concerning the SSI prerelease program in Illinois. *Id*. at Ex. SS (ECF No. 100-45). Again, SSA's determination letter engaged directly with the requester's specific arguments and identified four publicly available alternative sources addressing the requester's stated concern. *See id*. at 4-5. As a further example of SSA engaging in individualized analysis, SSA reversed its initial denial of a fee waiver request submitted by the National Student Legal Defense Network concerning the

Department of Education's Gainful Employment Rule and the expiration of a data-sharing agreement between SSA and the Department. *See* Declaration of Tara Schwartz, dated August 27, 2026, Ex. 20. After reviewing the requester's arguments, SSA granted the fee waiver as to three of the four categories of records requested, while affirming the denial of the fourth as overly broad. *Id*.

Thus, NYLAG's assertion that "[n]o fee waiver contains any additional basis for its denial" (ECF No. 93, NYLAG 56.1 Statement ¶ 164(b)) is squarely refuted by SSA's determination letters, which in several instances, reflect the agency's item-by-item analysis of the requested records, reflect its revised analysis on appeal, and in other instances show that the agency fully explained its denial by pointing the requester to specific public sources that already contain the requested records.

### B. The Statistical Record Does Not Support an Inference of Unlawful Conduct

NYLAG's theory of "systemic" denials rests almost entirely on the statistics reported by SSA in connection with its mandatory FOIA reporting to the Department of Justice. *See* NYLAG Br. at 39, 42. But these statistics do not establish an unlawful policy. They establish only that SSA denied most of the fee waiver requests it received at the initial level and they do not reflect ultimate fee-charging determinations. These raw statistics do not show whether those denials reflect an unlawful "policy" of refusing meritorious requests, as NYLAG claims, or the lawful application of governing standards to a population of requests that overwhelmingly do not qualify for a waiver under those standards. The denial rate is fully consistent with lawful agency conduct, and NYLAG has offered nothing to bridge the analytical gap between the statistics and the allegedly unlawful policy it must prove.

#### i. A Policy-or-Practice Claim Requires Proof of an Unlawful Policy, Not Merely a High Denial Rate

To prevail on a policy-or-practice claim, a plaintiff must show that the agency "has adopted, endorsed, or implemented a policy or practice that constitutes an ongoing failure to abide by the terms of the FOIA." *Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233, 253 (D.D.C. 2012). The operative requirement is unlawfulness: the challenged policy must itself violate the statute. But NYLAG does not identify any SSA rule, directive, memorandum, instruction, or other agency-level decision establishing a policy or practice of denying public-interest fee waivers. Nor has discovery revealed the existence of one. *See* NYLAG Br. at 39-44. To the contrary, the undisputed evidence concerning SSA's actual adjudicatory process demonstrates that there is no centralized policy governing fee waiver requests apart from the criteria set forth in 20 C.F.R. § 402.85. See Karangelen Decl. ¶¶ 20-24.

NYLAG's reliance on the agency's statistics concerning its fee waiver denial rate do not establish such an unlawful policy. A statistic showing that an agency frequently reaches a particular outcome does not, standing alone, establish that the outcome is unlawful. If the agency's denials are correct—that is, if the requests did not qualify for a waiver under the governing standard—then a high denial rate reflects lawful administration, not an unlawful policy, no matter how consistent the outcome.

That distinction is dispositive here. NYLAG does not attempt to show that the denials reflected in SSA's reports were substantively erroneous. It has not identified the universe of denied requests, analyzed their content, or demonstrated that any meaningful subset of requests were improperly denied despite satisfying the public-interest standard. Instead, NYLAG asks the Court to infer illegality from the denial rate itself—to reason that a 98.8% denial rate could not plausibly result from genuine, case-by-case review. *See* NYLAG Br. at 42-43. But that inference holds only if one assumes that a properly functioning fee waiver process would grant a substantial share of

the requests SSA actually receives. As explained below, that assumption is unfounded. The population of requests SSA receives is dominated by submissions that do not qualify for a waiver, and a high denial rate is the expected—and lawful—result.

**ii. The Reported Denial Rate is of Limited Value as far as Assessing SSA's Fee Waiver Practices**

The denial rate on which NYLAG relies is not a measure of meritorious fee requests wrongly denied. It is a raw count that sweeps together categories of dispositions and does not prove the existence of an unlawful policy.

First, the data has certain limitations. Due to the way these statistics are generated, based on the disposition of fee waiver requests in FOIAXpress, they reflect limited outcomes. Karangelen Decl. ¶ 30. FOIAXpress offers only the following options: TBD, granted, denied, withdrawn, not billable, and N/A. *See id*. The statistics do not distinguish partial grants, or capture grants approved on appeal. Thus, the aggregate number of fee waiver grants and denials as reported does not reflect the agency's final determination on whether to charge fees, nor does it reflect in any discernable way, what the agency actually charges in connection with processing FOIA requests. *See id*.

Second, this data is of limited value because it includes a large volume of facially deficient fee waiver requests. *See id*. ¶ 31. For example, in fiscal year 2024, the agency received over 400 fee waiver requests from automated bots. *Id*. The bot submissions checked the fee-waiver box in SSA's online portal but supplied no justification for a waiver. *Id*. Measured against the population of *bona fide* FOIA fee-waiver denials reflected in SSA's raw data for fiscal year 2024, these bot submissions account for the majority of the denials in that year. A denial of a request that contains no justification is not evidence of an unlawful policy; it is the correct disposition of a request that fails, on its face, to make the showing the governing standard requires.

**iii. The Interagency Comparison Refutes Any Inference of Unlawful Denials**

NYLAG seeks to bolster its statistical inference by comparing SSA's grant rate to a handful of agencies with high grant rates—the Equal Employment Opportunity Commission (100%), the Department of Agriculture (88–93%), the Department of the Interior (82–89%), and a few others. *See* NYLAG Br. at 13. From that comparison, NYLAG asks the Court to infer that SSA's low grant rate must reflect an unlawful policy. The comparison does not hold water. Considered against the full range of federal grant rates, it is clear that grant rates vary enormously across the government, that many agencies grant fee waivers at rates comparable to or below SSA's, and that a low grant rate is therefore fully consistent with lawful FOIA administration.

Numerous federal agencies grant public-interest fee waivers at single-digit rates:

- The Securities and Exchange Commission granted 6% of fee-waiver requests in FY2022, 2% in FY2023, 1% in FY2024, and 0.4% in FY2025. *See* Schwartz Decl. Ex. 1 at 12 (Sec. VIII.B), Ex. 2 at 12 (Sec. VIII.B), Ex. 3 at 13 (Sec. VIII.B), Ex. 4 at 12 (Sec. VIII.B).
- The Federal Labor Relations Authority granted 0% in FY2022 and 5% in FY2023. *See id*. Ex. 5 at 25 (Sec. VIII.B), Ex. 6 at 24 (Sec. VIII.B).
- The General Services Administration granted 1% in FY2022 and 5% in FY2023. *See id*. Ex. 7 at 12 (Sec. VIII.B), Ex. 8 at 13 (Sec. VIII.B).
- The National Labor Relations Board granted 8% in FY2024 and 3% in FY2025. *See id*. Ex. 9 at 12 (Sec. VIII.B), Ex. 10 at 12 (Sec. VIII.B).
- The National Aeronautics and Space Administration granted 8% in FY2022, 6% in FY2024, and 3% in FY2025. *See id*. Ex. 11 at 28 (Sec. VIII.B), Ex. 12 at 28-29 (Sec. VIII.B), Ex. 13 at 28-29 (Sec. VIII.B),
- The Surface Transportation Board granted 7% in FY2023 and 5% in FY2025. *See id*. Ex. 14 at 16 (Sec. VIII.B), Ex. 15 at 17 (Sec. VIII.B).
- The Federal Trade Commission granted 8% in FY2024. *See id*. Ex. 16 at 12 (Sec. VIII.B).
- The Pension Benefit Guaranty Corporation granted 8% in FY2021. *See id*. Ex. 17 at 29 (Sec. VIII.B).

- The Department of Justice granted 8% in FY2021. *See id*. Ex. 18 at 53 (Sec. VIII.B).
- The Department of the Treasury granted 9% in FY2025. *See id*. Ex. 19 at 21 (Sec. VIII.B).

These figures span agencies of various sizes and functions, and they establish that low grant rates are unremarkable across the federal government. The disparity NYLAG emphasizes is not a disparity between SSA and "other federal agencies" generally; it is a disparity between SSA and agencies selected by NYLAG with higher grant rates. Set against the full field of federal agencies, SSA is not an outlier.

That federal grant rates range so widely disproves NYLAG's inference. If a lawful fee waiver process were expected to produce grant rates clustered around some identifiable norm, and SSA alone diverged from it, the comparison might have some force. But there is no such norm. Grant rates vary significantly across agencies and they reflect a variety of different things: the composition of each agency's request population, the nature of the records it holds, the mix of commercial and non-commercial requesters it attracts, the substantive standard it applies, and the ways in which each agency defines and codes its data. Thus, these rudimentary statistics cannot show that any particular agency's denials are unlawful.

### C. NYLAG Cannot Show a Continuing Injury

A policy-or-practice claim requires not only an unlawful policy but also proof that the plaintiff "will suffer continuing injury due to this practice." *Payne*, 837 F.2d at 491 (relief available only where an agency policy "will impair the party's lawful access to information in the future"). NYLAG cannot make that showing, because its experience refutes the premise that SSA's fee-waiver practices have deprived it of access to records.

NYLAG's fee waiver requests to SSA demonstrate that a fee-waiver "denial" rarely results in the denial of access to requested records. SSA was able to identify ten FOIA requests submitted

to SSA by NYLAG in the years before this action was filed. Karangelen Decl. ¶ 58. NYLAG submitted a fee waiver request with nine of those requests. *Id*. ¶ 59. In response to five of the nine fee waiver requests, SSA stated that no fee would be assessed in connection with the FOIA request and produced the responsive records. *Id*. For an additional two of the FOIA requests, SSA responded to the FOIA request (either by producing the responsive records or notifying NYLAG that no such records existed) and did not charge NYLAG any fee. *Id*. ¶ 60. For the one request for which NYLAG did not request a fee waiver, SSA similarly responded to the FOIA request without charging NYLAG anything. *Id*. ¶ 61. For the remaining two FOIA requests, SSA notified NYLAG that it would charge a fee via a fee notice. *Id*. ¶ 62. In one of those two cases, NYLAG did not respond to the fee notice or follow up correspondence, so PDP administratively closed the request. *Id*. In the other case, NYLAG paid $132 and PDP produced the requested records. *Id*. Accordingly, before filing this action, NYLAG obtained responses to *nine* separate FOIA requests yet paid for only *one* request. *See id*.

Similarly, in connection with Requests 1, 2, 4, 5, and 6, NYLAG was only charged and actually paid for subpart 2 of Request 4 and subparts 1 and 2 of Request 5. *See id*. ¶¶ 49, 54. SSA responded to NYLAG (in many cases actually producing records) in connection with the other collective 14 subparts of Requests 1, 2, 4, 5, and 6 at *no cost*. *Id*. ¶¶ 36-37, 44, 49, 53-54, 57.

Further, since the filing of this action, NYLAG has continued to submit FOIA requests to SSA. *Id*. ¶ 63. Of the nine FOIA requests that NYLAG has submitted to SSA since the case initiated, it has requested fee waivers in six and did not request fee waivers in three. *Id*. ¶ 64. For the three requests for which NYLAG did not submit a fee waiver request, SSA responded in full to the FOIA requests, either by providing records or information, without charging NYLAG fees. *Id*. ¶ 65. For five of the six requests for which NYLAG did request a fee waiver, SSA similarly

provided a substantive response to the FOIA request without charging NYLAG fees. *Id.* ¶ 66. The final request in this set is the only one for which NYLAG may have a financial consequence, as SSA denied the fee waiver (which NYLAG has appealed) and has not otherwise declined to charge NYLAG a fee. *Id.* ¶ 67.

NYLAG's experience with fee waiver requests to SSA cannot be reconciled with a policy that has purportedly impaired NYLAG's access to records. To the contrary, it confirms that a "denial" in SSA's statistics frequently carries no practical consequence, and that NYLAG has continued to obtain the records it seeks. Nor has NYLAG's access been chilled: it has continued to submit FOIA requests to SSA throughout this litigation, and SSA has continued to respond to them. On this record, NYLAG faces no continuing injury of the kind a policy-or-practice claim requires.

## III. NYLAG's Claims Challenging the Fee Waiver Determinations for Requests 1, 2, and 6 are Moot and Its Challenges to Requests 4 and 5 are Partially Moot (Count Three)

Even if the Court were to find that it can reach the merits of Count Three under FOIA, the majority of Count Three is moot. NYLAG's challenges to the fee-waiver determinations for its own requests are moot because SSA has already produced the responsive records or otherwise fully responded to the FOIA request without charge. A case becomes moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted). Because a federal court's jurisdiction is limited to live cases and controversies, "[i]f an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Id.* (citation omitted). That is what has occurred here.

Where an agency produces the records a requester sought without charging for them, the requester's challenge to the denial of a fee waiver is moot, because the requester has already "obtained everything that [it] could recover" by a judgment in its favor *Hall v. CIA*, 437 F.3d 94, 99 (D.C. Cir. 2006). In *Hall*, the CIA's decision to deliver the requested documents "without seeking payment" mooted the plaintiff's fee-waiver claim: once the records were produced for free, there was no longer any fee for the court to waive and no relief left to award. *Id*. Courts have applied the same rule to fee disputes generally. In *Kovalevich v. BIA*, the agency initially expressed an intent to assess search fees, but produced the responsive documents "free of charge" during the litigation; the court held that it therefore had "no basis to even consider whether the Bureau's initial determination regarding search fees was unlawful." No. 18 Civ. 0610 (KBJ), 2021 WL 2417348, at *6 (D.D.C. June 14, 2021). And in *Schoenman v. FBI*, the court explained that a plaintiff's request for a declaration that an agency's initial refusal to waive fees was incorrect—after the records had been produced without charge—would call for "an advisory opinion which federal courts may not provide." 573 F. Supp. 2d 119, 136 (D.D.C. 2008) (citation omitted).

A district court in this Circuit has applied the same principle. In *Kroposki v. FAA*, the FAA initially informed the plaintiff that it would charge a $90 search fee, then waived the fee during the litigation; the court granted the agency summary judgment, because the waiver eliminated any live dispute over the charge. No. 08 Civ. 1519 (AWT), 2010 WL 11565869, at *3 (D. Conn. June 1, 2010). Together, these authorities establish a straightforward rule: once an agency has produced the responsive records without charging the requester, there is no fee to waive, no injury to redress, and nothing left for the court to decide.

That rule disposes of NYLAG's challenges to several of its requests. As to Requests 1, 2, and 6, SSA has produced all responsive records to NYLAG without charging any fee. See

Karangelen Decl. ¶¶ 36-37, 43-44, 57. NYLAG has thus already obtained everything a favorable judgment on those fee-waiver challenges could provide. *See Hall*, 437 F.3d at 99. No live controversy remains, and any declaration that SSA's initial fee-waiver determinations for those requests were incorrect would be precisely the "advisory opinion" federal courts may not issue. *Schoenman*, 573 F. Supp. 2d at 136. The portion of Count Two consisting of NYLAG's challenges to the fee-waiver determinations for Requests 1, 2, and 6 should accordingly be dismissed as moot.

The same reasoning moots NYLAG's challenges to Requests 4 and 5 in substantial part. SSA granted a fee waiver in part for each of those requests and produced the corresponding records without charge—Request 4's subpart 1 and subpart 3, and Request 5's subpart 3. Karangelen Decl. ¶¶ 47, 53. Because NYLAG obtained those records for free, no live dispute remains as to the fee-waiver determinations for those subparts, and NYLAG's challenges to them are moot for the same reasons that its challenges to Requests 1, 2, and 6 are moot. What remains a live issue is NYLAG's challenge to the single subpart of each request for which SSA assessed and NYLAG paid a fee—subpart 2 of Request 4 (a request for the Standard Hearings Operations Procedure, for which NYLAG paid $771) and subparts 1 and 2 of Request 5 (a request for non-public expert guidance and consultative-examination policy, for which NYLAG paid $1,067). *Id.* ¶¶ 49, 54. NYLAG's fee-waiver challenges to Requests 4 and 5 should therefore be dismissed as moot except as to those subparts for which it paid a fee.

## IV. Even if Reviewable, SSA Properly Declined to Waive the Fees for the Paid Subparts of Requests 4 and 5 (Count Three)

If the Court concludes that it has jurisdiction over NYLAG's fee-waiver challenges under FOIA (*contra* Point I), only two determinations remain: SSA's denial of a fee waiver for subpart 2 of Request 4 and subparts 1 and 2 of Request 5. Both determinations were correct.

A requester seeking a public-interest fee waiver must make a "*prima facie* showing" that disclosure is in the public interest and not primarily in its commercial interest; the burden rests on the requester, not the agency. *Carney*, 19 F.3d at 814. Under SSA's regulation, a waiver is warranted only where disclosure "is likely to contribute significantly to public understanding of the operations or activities of the government," and the requester must identify, with reasonable specificity, how the particular records sought would reveal "meaningful information about government operations or activities not already known to the public" and how the contribution to public understanding "would be significant." 20 C.F.R. § 402.185(b).[5]

For each of the paid subparts, NYLAG's fee-waiver justification rested on the same broad proposition: that any internal instruction bearing on benefits determinations is a matter of public interest because the staff who receive it make consequential decisions in beneficiaries' cases. NYLAG's generalized assertion that essentially any internal agency guidance is a matter of public concern does not satisfy § 402.185(b). *See* Am. Compl. Exs. 4A at 2-5, 5A at 2-5. Each paid subpart fails that standard, for reasons specific to the request.

NYLAG's justification for the Standard Hearings Operations Procedure ("SHOP") (Request 4, Subpart 2) asserted only that the guide "provides instructions to OHO staff, who make crucial determinations in SSA beneficiaries' cases," and that there is "limited public information on the specific training and guidance" those staff receive. *Id.* at Ex. 4A at 3. That submission

---

[5] The fee-waiver determinations at issue were made in 2023 and 2024 under 20 C.F.R. § 402.185, the regulation then in effect. Effective January 17, 2025, SSA reorganized its FOIA regulations and renumbered the fee-waiver provision to 20 C.F.R. § 402.85. *See* 89 Fed. Reg. 102,704 (Dec. 18, 2024). The renumbering did not substantively change the fee-waiver standard. Because the determinations challenged here predate that change, this brief cites § 402.185 when addressing the specific determinations of NYLAG's requests and § 402.85 when describing SSA's current framework; the analysis is the same under either regulation.

identifies, at most, a generalized interest in how SSA conducts hearings; it does not explain what meaningful information about government operations the SHOP would reveal, or why disclosure would significantly enhance public understanding, as § 402.185(b) requires. NYLAG's generalized assertion that hearing-office guidance is important does not fulfill the regulation's mandate that the requester establish a request-specific showing tied to the particular records sought. SSA reasonably concluded that NYLAG had not carried its burden as to this subpart. *See Carney*, 19 F.3d at 814 (requester bears the burden of making a *prima facie* showing of entitlement to a waiver).

NYLAG's showing for Request 5 subparts 1 and 2, which sought non-public expert guidance consultative examination policy, was deficient for the additional, independent reason that SSA already publishes substantial guidance in the very areas NYLAG identified—and NYLAG's request sought only the non-public increment beyond that published guidance. Request 5 expressly sought manuals for consultative examiners, medical experts, and vocational experts "*outside of what is currently available in*" the publicly available Consultative Examination Guide (the "Greenbook"), the Medical Expert Handbook, and the Vocational Expert Handbook. *See* Am. Compl. Ex. 5A (emphasis added). NYLAG's request thus acknowledged that SSA already makes the core guidance for these experts available to the public. Yet NYLAG did not explain how the residual, non-public materials would add anything significant to the substantial guidance SSA already publishes—precisely the showing § 402.185(b) requires, which asks whether disclosure would reveal "meaningful information . . . not already known to the public" and would "significant[ly]" enhance public understanding. Where an agency already makes the relevant guidance public, a requester must do more than assert a generalized interest in the non-public

remainder; NYLAG did not. SSA reasonably declined to waive fees for these subparts on that record.

SSA's partial grants confirm that these denials reflect the individualized application of the regulatory standard and were not a "blanket" refusal. Far from denying NYLAG's requests wholesale, SSA granted fee waivers for the subparts as to which NYLAG made an adequate showing—subpart 1 of Request 4 (the limited-English-proficiency POMS section) and subpart 3 of Request 5 (the consultative-examination oversight report)—while declining to waive fees for the subparts where NYLAG's showing was insufficient. That sub-request-by-sub-request differentiation is the hallmark of individualized review. It confirms that SSA applied the § 402.185 criteria to each discrete category of records and reached different results based on the strength of NYLAG's particular showing—precisely what the regulation requires.

## V. The APA Does Not Provide a Cause of Action for NYLAG's Policy and Practice Claim (Count Two)

NYLAG pleads its systemic challenge in the alternative under the APA, alleging that SSA has adopted and implemented a policy of denying fee waivers to requesters who satisfy the governing criteria, in violation of 5 U.S.C. § 706(2)(A) (Count Two). NYLAG frames this claim as available only "to the extent that the relief [it] seeks in Claim One is not available under FOIA." Am. Compl. ¶ 215. But NYLAG's APA claim is entirely improper. NYLAG has identified no discrete agency action subject to APA review and requests relief that the Supreme Court has deemed improper under the APA.

### A. NYLAG's Asserted "Policy and Practice" Is Not a Discrete Agency Action Subject to Review Under the APA

NYLAG's challenge to an alleged agency-wide "policy and practice" of denying fee-waiver requests fails at the threshold because NYLAG has identified no discrete agency action embodying such a policy. The APA does not authorize judicial review of an agency's operations

in the aggregate. Rather, a plaintiff proceeding under § 706(2) must identify a particular, circumscribed "agency action" within the meaning of 5 U.S.C. § 551(13). *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882, 890–91 (1990); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–64 (2004) ("*SUWA*"). NYLAG cannot satisfy that requirement by aggregating the outcomes of numerous individual fee-waiver determinations, calculating a denial rate, and labeling the resulting statistic an agency "policy."

The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). As the Supreme Court has explained, each of those categories denotes conduct that is "circumscribed" and "discrete." *SUWA*, 542 U.S. at 62. The requirement serves an important limiting function: it prevents plaintiffs from using the APA to obtain judicial supervision of an agency's administration of an entire program rather than judicial review of discrete agency decisions. *See id*. at 64; *Lujan*, 497 U.S. at 891.

*Lujan* is instructive. There, the plaintiffs challenged what they termed the Bureau of Land Management's "land withdrawal review program," which in reality consisted of numerous individual decisions made in the course of the agency's administration of federal lands. 497 U.S. at 890. The Supreme Court held that the asserted "program" was not itself an agency action. *Id*. The plaintiffs could challenge particular final agency actions affecting them, but they could not "seek wholesale improvement of this program by court decree." *Id*. at 891. Instead, the APA required them to "direct [their] attack against some particular 'agency action' that causes [them] harm." *Id*. *SUWA* subsequently reaffirmed that the APA's discreteness requirement "precludes the kind of broad programmatic attack" rejected in *Lujan*. 542 U.S. at 64.

NYLAG's claim is the paradigmatic programmatic attack *Lujan* forecloses under the APA. Even after discovery, including a Rule 30(b)(6) deposition of SSA's FOIA Officer, requests for admission, and the production of SSA's internal guidance, NYLAG identifies no SSA rule, directive, memorandum, or other agency-level decision adopting a "blanket" policy of denying public interest fee waivers.[6] NYLAG does not contend that SSA adjudicators receive instructions telling them to deny fee waivers regardless of whether the regulatory criteria are met. It has identified no decision by the Commissioner, the FOIA Officer, the Division Director, or any other SSA official adopting such a policy. It has identified no internal guidance adding criteria to § 402.85, eliminating criteria in the regulation, creating a presumption against waiver, or directing adjudicators to reach a particular result. And it has identified no common decisional document from which an unlawful substantive standard could be inferred. The undisputed evidence shows only a request-by-request adjudicatory process: SSA's analysts review each fee waiver request against the criteria prescribed by § 402.85, prepare an initial determination applying those criteria to the particular request, and submit it for successive review to the Division Director, and the FOIA Officer. *See* Karangelen Decl. ¶¶ 20-21. The record thus identifies numerous individual adjudications under the same regulation—not a separate agency action directing the outcome of those adjudications. The only across-the-board rule SSA applies is § 402.85 itself, the very regulation NYLAG does not challenge.

---

[6] NYLAG's Rule 56.1 Statement forecloses its own theory. By NYLAG's account: (1) SSA "does not have any generalized instructions from the Office of General Counsel regarding FOIA," ECF No. 93 ¶ 197; (2) SSA "does not maintain any template fee waiver response letters," *id.* ¶ 210; (3) SSA "consults its General Counsel's office with respect to individual FOIA requests on a case-by-case basis, but does not obtain or maintain any generalized legal advice applicable to multiple requests," *id.* ¶ 217; (4) SSA "does not have any other written guidance or materials that government information specialists are directed to consult about FOIA," and "does not have any desk guides, flow charts, or 'FAQs,'" *id.* ¶¶ 195–196; (5) "Other than the FOIA request itself, the only document the government information specialist consults when making fee waiver determinations is SSA's regulations," *id.* ¶ 198; and (6) each specialist "is directed to consider the plain language of the FOIA fee waiver regulation with respect to the justification offered by the requestor," *id.* ¶ 203.

Unable to point to any such directive, NYLAG derives its asserted "policy and practice" from SSA's publicly reported statistics, calculating a high aggregate denial rate and treating that result as an agency action. *See* NYLAG Br. at 45-47. But a denial rate aggregated from a series of individual fee determinations is not a "rule," "order," "sanction," or "relief" within § 551(13), and is not transformed into a freestanding policy. That many adjudications reached the same outcome does not establish a second, unwritten substantive rule. Agencies routinely decide large numbers of requests under a uniform standard, and skewed outcomes are common; were a high denial rate alone sufficient to establish a final agency action, virtually any set of agency decisions could be recast as a systemic final agency action subject to APA review simply by tabulating outcomes and labeling the outcome a "policy." That is precisely the transformation of discrete adjudications into a programmatic attack that *Lujan* and *SUWA* forbid. *See Lujan*, 497 U.S. at 899 (APA does not authorize "general judicial review of the [agency's] day-to-day operations").

NYLAG's requested relief confirms the defect. NYLAG asks the Court to enjoin SSA from "continuing to engage in an impermissible practice or policy of denying fee waivers to requesters that have satisfied all statutory and regulatory criteria," to order SSA to "cease engaging in" that practice, and to declare that SSA "is engaged in" it. Am. Compl., Prayer for Relief ¶¶ 1(a), 2(a), 3(a). Because there is no discrete agency action embodying the alleged policy, there is nothing for the Court to "hold unlawful and set aside" under § 706(2). What NYLAG seeks instead is an injunction governing SSA's future administration of its regulation—and enforcing it would require exactly the "pervasive oversight" the APA forbids. *SUWA*, 542 U.S. at 64–67. Whether a requester has "satisfied all statutory and regulatory criteria" is not a mechanical question; § 402.85 requires application of its criteria to the facts of each request. To determine compliance with the injunction, the Court would have to assess future individual determinations—deciding whether particular

requesters satisfied § 402.85 and, if so, whether SSA nonetheless denied them—so that every disagreement about the application of the regulation could become a dispute about compliance with the Court's decree. SSA is already obligated to apply § 402.85; the requested injunction thus amounts, in substance, to a command to administer the regulation lawfully in all future cases—the sort of "obey the law" decree, untethered to any discrete agency action, that the APA does not authorize. *See Lujan*, 497 U.S. at 891; *SUWA*, 542 U.S. at 64–67. NYLAG's requested declaratory relief fails for the same reason: absent an identifiable agency-wide policy, the Court would not be adjudicating the legality of a discrete action but would be making a judicial pronouncement of SSA's administration of its program as a whole.

None of this forecloses review of a discrete, final determination. An individual denial is an identifiable agency act directed to a particular requester, and NYLAG may challenge any properly exhausted final decision on one of its own requests; likewise, an actual agency directive requiring adjudicators to apply a standard inconsistent with § 402.85 could be set aside. But neither circumstance is present. NYLAG has chosen not to assert challenges under the APA to the SSA's adjudication of fee waivers for Requests 1, 2, 4, 5, and 6. NYLAG identifies only a statistic derived from individual § 402.85 determinations—not a freestanding agency action the Court may review or enjoin under the APA.

### B. NYLAG's Aggregate Denial Rate Evidence Does Not Establish that SSA Has Departed from the Criteria in 20 C.F.R. § 402.85

Even if NYLAG could identify a reviewable agency-wide policy or practice, its statistical evidence would not establish that SSA is applying a substantive standard inconsistent with 20 C.F.R. § 402.85. As explained *infra* Point II(B), a high denial rate is an observation about outcomes; it does not establish the decision rule that produced those outcomes, and it is fully consistent with the lawful application of a demanding public interest standard to a universe of fee

waiver requests that largely do not meet that standard. Two points bear emphasis in the APA framework specifically.

First, 20 C.F.R. § 402.85 establishes a request-specific inquiry that turns on the particular showing each requester makes—the information sought, the requester's proposed use and dissemination of the information, the extent to which disclosure would contribute to public understanding of government operations or activities, the significance of that contribution, and whether a commercial interest predominates. Those considerations necessarily require individualized judgments based on the showing made by each requester. The regulation does not establish any expected grant rate, create a presumption that a specified percentage of requests should qualify, or suggest that the validity of SSA's administration can be measured by comparing the number of grants and denials in the aggregate. Using an aggregate denial rate as proof of illegality would effectively impose a requirement found nowhere in § 402.85 or the governing statute: that SSA grant some judicially acceptable minimum percentage of applications. The relevant question is whether qualifying requests are adjudicated under the prescribed criteria, not whether the resulting grant rate appears intuitively high or low. And because NYLAG's reliance on an aggregate statistic treats every request as interchangeable, it does not show how many requesters actually satisfied those criteria—how many filed timely waiver requests, adequately explained their dissemination plans, sought information likely to contribute significantly to public understanding of government operations or activities, or instead sought information for private or commercial purposes.

Second, the denial rate cannot establish that any challenged determination was arbitrary and capricious. Judicial review under § 706(2)(A) asks whether the agency applied the governing standard and articulated a rational basis for the action before it, based on the reasons given and the

administrative record. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A statistical summary of outcomes in unrelated matters does not show that SSA failed to consider a relevant factor, relied on an impermissible one, or acted irrationally in any particular determination. To prove the systemic violation it alleges, NYLAG would need evidence that SSA employed a common rule inconsistent with § 402.85—for example, a criterion the regulation does not contain, or an instruction to disregard factors the regulation makes relevant. NYLAG has none. Discovery revealed no centralized policy directing denials and no substantive instruction other than to apply § 402.85. *See* NYLAG Rule 56.1 Statement ¶¶ 198, 203 (explaining that analysts consider the regulation and the FOIA request when making fee waiver determinations). Thus, no reasonable factfinder could conclude that SSA has adopted or implemented a policy inconsistent with its regulation.

### C. Because NYLAG Has Identified No Discrete Agency Action, There Is No Administrative Record for the Court to Review

The absence of a reviewable agency action is confirmed by a practical consequence of NYLAG's theory: there is no administrative record for the Court to review, and none can be compiled. Judicial review under the APA is review of a record. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The reviewing court's task is to "apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985); *see also Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (review is confined to the record compiled by the agency in reaching the challenged decision).

That framework presupposes what NYLAG cannot supply: a discrete decision, made at an identifiable time, by identifiable decisionmakers, on an identifiable body of material. Where an

agency adopts a rule or issues an order, the materials the agency considered and the explanation it gave exist and can be lodged with the court. Where, by contrast, the alleged "policy" exists only as an inference a litigant draws from the aggregate outcomes of unrelated adjudications, there is no decisional record to produce—no deliberative materials, no analysis, no statement of reasons—because there was no decision. The record requirement and the discreteness requirement are two expressions of the same limitation: the APA authorizes courts to review what an agency has actually decided, not to appraise how an agency has administered a program over time. *See Lujan* 497 U.S. at 890–91; *SUWA*, 542 U.S. at 64. It is the plaintiff's burden to identify the agency action it challenges, *Lujan*, 497 U.S. at 882, and NYLAG's inability to point the Court to any record of the decision it attacks is itself telling. SSA has no administrative record to lodge for the "policy and practice" alleged in Count Two because SSA never made the decision NYLAG posits.[7]

The absence of an administrative record is therefore not a gap that SSA can be ordered to cure. It is a direct consequence of the fact that the "policy and practice" NYLAG challenges is not agency action at all. Where a plaintiff identifies no discrete action, there is no record to review, no explanation to test for rationality, and nothing for the Court to "hold unlawful and set aside" under § 706(2). SSA is entitled to summary judgment on the APA Claim.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for the SSA on Counts One, Two, and Three of the Amended Complaint and deny NYLAG's motion for summary judgment on the same claims.

---

[7] If the Court somehow identifies an agency action subject to APA review in this case, SSA respectfully requests the opportunity to compile and file an administrative record concerning such action.

Date: New York, New York
August 27, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney
Southern District of New York

By: *_/s/ Tara Schwartz___________*
TARA SCHWARTZ
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2633
Email: tara.schwartz@usdoj.gov